1  JENNIFER C. PIZER (SBN 152327)    CAMILLA B. TAYLOR*
2  *jpizer@lambdalegal.org*    *ctaylor@lambdalegal.org*
   LAMBDA LEGAL DEFENSE AND    KENNETH D. UPTON, JR*
3  EDUCATION FUND, INC.    *kupton@lambdalegal.org*
   800 South Figueroa Street, Suite 1260    LAMBDA LEGAL DEFENSE AND
4  Los Angeles, California 90017-2521    EDUCATION FUND, INC.
   Telephone: (213) 382-7600    3656 North Halsted Street
5                                            Chicago, Illinois 60613-5974
   JOSE ABRIGO*    Telephone: (312) 663-4413
6  *jabrigo@lambdalegal.org*
   OMAR GONZALEZ-PAGAN*    KAREN L. LOEWY*
7  *ogonzalez-pagan@lambdalegal.org*    *kloewy@lambdalegal.org*
   LAMBDA LEGAL DEFENSE AND    LAMBDA LEGAL DEFENSE AND
8  EDUCATION FUND, INC.    EDUCATION FUND, INC.
   120 Wall Street, 19th Floor    815 16th Street NW, Suite 4140
9  New York, New York 10005-3919    Washington, DC 20006-4101
   Telephone: (212) 809-8585    Telephone: (202) 804-6245
10
11
12  *Attorneys for Plaintiffs*    *Additional counsel on signature page*
13  **UNITED STATES DISTRICT COURT**
14  **NORTHERN DISTRICT OF CALIFORNIA**
    **SAN FRANCISCO DIVISION**
15  ------------------------------------------------------------------ x
16  SAN FRANCISCO AIDS FOUNDATION;    :    Case No. 3:25-cv-1824
                                            :
17  GAY LESBIAN BISEXUAL TRANSGENDER    :
      HISTORICAL SOCIETY;    :
18  ASIAN AND PACIFIC ISLANDER WELLNESS    :    **COMPLAINT FOR**
      CENTER, INC. d/b/a SAN FRANCISCO    :    **DECLARATORY AND**
19    COMMUNITY HEALTH CENTER;    :    **INJUNCTIVE RELIEF**
                                            :
20  LOS ANGELES LGBT CENTER;    :
                                            :
21  PRISMA COMMUNITY CARE;    :
                                            :
22  LESBIAN AND GAY COMMUNITY SERVICES    :
      CENTER, INC. d/b/a THE LGBT COMMUNITY    :
23    CENTER;    :
                                            :
24  BRADBURY-SULLIVAN LGBT COMMUNITY    :
      CENTER;    :
25                                            :
    BALTIMORE SAFE HAVEN CORP.; and    :
26                                            :
    FORGE, INC.,    :
27                                            :
              *Plaintiffs*,    :
28        v.    :

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DONALD J. TRUMP, in his official capacity as
    President of the United States;

U.S. DEPARTMENT OF JUSTICE;

PAMELA BONDI, in her official capacity as Attorney
    General of the United States;

U.S. DEPARTMENT OF LABOR;

VINCE MICONE, in his official capacity as Acting
    Secretary of Labor;

OFFICE OF FEDERAL CONTRACTS
    COMPLIANCE PROGRAMS;

MICHAEL SCHLOSS, in his official capacity as
    Acting Director of Office of Federal Contracts
    Compliance Programs;

OFFICE OF MANAGEMENT AND BUDGET;

RUSSELL VOUGHT, in his official capacity as
    Director of the Office of Management and Budget;

U.S. DEPARTMENT OF HEALTH AND HUMAN
    SERVICES;

ROBERT F. KENNEDY, JR., in his official capacity
    as Secretary of Health and Human Services;

U.S. DEPARTMENT OF HOUSING AND URBAN
    DEVELOPMENT;

SCOTT TURNER, in his official capacity as Secretary
    of Housing and Urban Development;

NATIONAL ARCHIVES AND RECORDS
    ADMINISTRATION;

WILLIAM J. BOSANKO, in his official capacity as
    Deputy Archivist of the United States;

NATIONAL ENDOWMENT FOR THE
    HUMANITIES; and

SHELLY C. LOWE, in her official capacity as Chair
    of the National Endowment for the Humanities,

                            *Defendants*.

------------------------------------------------------------X

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    Plaintiffs are mission-driven nonprofits that specialize in the delivery of high-quality healthcare, social, and other critical services to members of the lesbian, gay, bisexual, transgender, and queer ("**LGBTQ**") community; an organization dedicated to ending the human immunodeficiency virus ("**HIV**") and acquired immune deficiency syndrome ("**AIDS**") epidemic; and a historical society whose mission is to record and celebrate the history of the LGBTQ community. All Plaintiffs receive federal funding to support their work.

2.    Plaintiffs bring this suit for declaratory and injunctive relief with respect to Executive Order No. 14168, 90 Fed. Reg. 8650 (Jan. 20, 2025), "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("**Gender Order**"), issued January 20, 2025; Executive Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025), "Ending Radical and Wasteful Government DEI Programs and Preferencing" ("**DEI-1 Order**"), issued January 20, 2025; Executive Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025), "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" ("**DEI-2 Order**"), issued January 21, 2025 (collectively, the "**Executive Orders**"); and related agency directives that seek to enforce illegal, *ultra vires* Presidential action.

## INTRODUCTION

3.    In the days following his inauguration, President Donald J. Trump issued a flurry of executive orders plunging the federal government into chaos. Included in those orders were three that seek to punish and defund Plaintiffs for acknowledging the existence of transgender people, advocating for their rights, and adopting an equitable approach to the provision of their services that recognizes the rich diversity of the United States.

4.    The Gender Order in particular expresses and imposes on others a disparaging, demeaning, idiosyncratic, and unscientific viewpoint about transgender people and gender identity; repudiates the existence of transgender people; deems their identities to be "false;" and orders their exclusion from government recognition and protection in numerous aspects of their lives.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

5.    The DEI-1 Order expresses a viewpoint that "diversity, equity, inclusion, and accessibility," "DEIA," or related programs are "illegal and immoral discrimination programs," and, among other things, directs agencies to terminate all equity-related grants or contracts.

6.    The DEI-2 Order lays out specific mechanisms to punish contractors and grantees that embrace principles of diversity, equity, inclusion, and/or accessibility, including mechanisms for the termination of already-appropriated funds to those contractors and grantees and for excluding the same from future contracts and/or grants.

7.    The Executive Orders together target Plaintiffs and the people they serve for opprobrium and exclusion from services that receive federal financial assistance because of who they are. Seeking to leverage the federal government's vast reach throughout the economy to control private thought and speech, President Trump has instructed federal agencies to condition federal contracts and grants on private parties' commitments to silencing themselves regarding "diversity, equity, inclusion, and accessibility," or the very existence of transgender people.

8.    The work that all Plaintiffs do is critical to thousands of LGBTQ and non-LGBTQ people across our country. This work documents the Nation's rich and diverse history; provides life-saving health care, housing, and other social services to people from all walks of life in a manner that respects everyone for who they are; builds community; and promotes wellness. To do this, Plaintiffs must be able to serve the people who need them by recognizing their humanity and personhood, and by tailoring services in a manner that acknowledges and addresses the many structural and societal barriers that their patients, clients, and patrons face.

9.    The Executive Orders pose an existential threat to transgender people and the organizations that respect their existence, shield them from harm, provide them with life-saving services and community, and engage in core protected speech advocating for their liberation.

10.    The Executive Orders should be declared unconstitutional, and their implementation should be enjoined.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

**JURISDICTION AND VENUE**

2    11.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises

3    under the laws of the United States and the United States Constitution.

4    12.    An actual controversy exists between the parties within the meaning of 28 U.S.C.

5    § 2201(a), and this Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C.

6    §§ 2201-2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

7    13.    Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)

8    and (e)(1) because each defendant is an agency of the United States or an officer of the United

9    States sued in their official capacity; Plaintiffs San Francisco AIDS Foundation, GLBT Historical

10    Society, and San Francisco Community Health Center reside in this district; and a substantial part

11    of the events or omissions giving rise to this action occurred and continue to occur in this district

12    where San Francisco AIDS Foundation, GLBT Historical Society, and San Francisco Community

13    Health Center reside.

14

**DIVISIONAL ASSIGNMENT**

15    14.    Pursuant to Civil L.R. 3-2(c) and (d), this action should be assigned to the San

16    Francisco Division because a substantial part of the events and the resulting injuries occurred in

17    San Francisco County, California.

18

**PARTIES**

19    **A.    Plaintiffs**

20    15.    Plaintiff **San Francisco AIDS Foundation** (**"SFAF"**) is a nonprofit 501(c)(3)

21    organization based in San Francisco, California. SFAF promotes health, wellness, and social

22    justice for communities most affected by HIV, through sexual health and substance use services,

23    advocacy, and community partnerships.

24    16.    Plaintiff **Gay Lesbian Bisexual Transgender Historical Society** (**"GLBT**

25    **Historical Society"**) is a 501(c)(3) mission-driven nonprofit based in San Francisco, California,

26    that collects, preserves, exhibits, and makes accessible to the public materials and knowledge to

27    support and promote understanding of LGBTQ history, culture, and arts in all their diversity.

28

3

17.     Plaintiff **Asian and Pacific Islander Wellness Center, Inc. d/b/a San Francisco Community Health Center** ("**SF Health Center**") is a nonprofit 501(c)(3) organization based in San Francisco, California. Founded in 1987, the SF Health Center seeks to celebrate and attend to the health and wellness of the communities that define San Francisco—immigrant and communities of color, queer, transgender, unhoused people, and all who are most affected by oppression—through comprehensive medical, dental, and mental health services. It offers a wide array of medical, mental health, education, and community services designed to empower people in safe, respectful, and supportive spaces.

18.     Plaintiff **Los Angeles LGBT Center** ("**LA LGBT Center**") is a nonprofit 501(c)(3) organization based in Los Angeles, California, that was founded in 1969. Its mission is to build a world in which LGBTQ people thrive as healthy, equal, and complete members of society. The LA LGBT Center offers programs, services, and advocacy spanning four broad categories: (i) health, (ii) social services and housing, (iii) culture and education, and (iv) leadership and advocacy.

19.     Plaintiff **Prisma Community Care** is a nonprofit 501(c)(3) organization based in Phoenix, Arizona. Founded in 1990, its mission is to provide affirming and inclusive services to promote well-being and advance health equity for diverse communities particularly people of color, 2SLGBTQIA+ and queer individuals, and those affected by HIV. Prisma Community Care offers a wide variety of healthcare services, including services related to HIV, sexual health, gender-affirming care, and mental and social wellness.

20.     Plaintiff **Lesbian and Gay Community Services Center, Inc., d/b/a/ The LGBT Community Center** ("**NY LGBT Center**") is a 501(c)(3) mission-driven nonprofit based in New York, New York, that was established in 1983 at the height of the AIDS crisis to provide a safe and affirming place for LGBTQ New Yorkers to respond to the urgent threats facing the community. Over the past 40 years, the NY LGBT Center has grown to meet the changing needs of New York's LGBTQ community. Operating in-person and virtually, the NY LGBT Center provides recovery and wellness programs, economic advancement initiatives, family and youth

4

support, advocacy, arts and cultural programming, and space for community organizing, connection, and celebration.

21.     Plaintiff **Bradbury-Sullivan LGBT Community Center** ("**Bradbury-Sullivan**") is a nonprofit 501(c)(3) organization based in Allentown, Pennsylvania. Bradbury-Sullivan provides a vibrant, inclusive space in Pennsylvania's Lehigh Valley for all the region's LGBTQ residents, offering affirming programming and health programs. Its mission is to provide safe and celebratory spaces for the LGBTQ community.

22.     Plaintiff **Baltimore Safe Haven Corp. ("Baltimore Safe Haven")** is a nonprofit 501(c)(3) organization based in Baltimore, Maryland. Baltimore Safe Haven is a leading provider of comprehensive support services for marginalized TLGBQIA+ people, especially focusing on Black transgender women navigating survival mode living.

23.     Plaintiff **FORGE, Inc. ("FORGE")** is nonprofit 501(c)(3) organization based in Milwaukee, Wisconsin. FORGE offers programs and services to reduce the impact of trauma on transgender and nonbinary survivors of violence by empowering service providers, advocating for systems reform, and connecting survivors to healing possibilities.

24.     Plaintiffs SF Health Center, LA LGBT Center, and Prisma Community Care are collectively referred to herein as the "**Plaintiff Health Centers**." Plaintiffs SF Health Center, LA LGBT Center, NY LGBT Center, Bradbury-Sullivan Center, and Baltimore Safe Haven are collectively referred to herein as the "**Plaintiff LGBTQ Community Centers**."

25.     All Plaintiffs assert claims on their own behalf and on behalf of the people they serve, including their patients, clients, and the LGBTQ community members who visit the GLBT Historical Society to learn about their community's past. These patients, clients, and patrons face barriers to asserting their own claims and protecting their own interests.

**B.     Defendants**

26.     Defendant **Donald J. Trump** ("**President Trump**") is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Executive Orders challenged in this suit. Only declaratory relief is sought as to President Trump.

27.     Defendant **U.S. Department of Justice** ("**DOJ**") is a cabinet department of the federal government. DOJ is an "agency" within the meaning of the Administrative Procedure Act (the "**APA**"), 5 U.S.C. § 551(1). DOJ is directed in the Executive Orders to effect their implementation in various ways, which DOJ has proceeded to do. DOJ also offers funding opportunities to assist victims of crime; provide training and technical assistance; conduct research; and implement programs that improve the criminal, civil, and juvenile justice systems. Upon information and belief, DOJ administers federal funds provided directly and indirectly to at least one of the Plaintiffs through contracts or grants.

28.     Defendant **Pamela Bondi** is the Attorney General of the United States. In that capacity, she is DOJ's highest-ranking official. She is sued in her official capacity. In the Executive Orders, the Attorney General and DOJ are directed to effect their implementation in various ways, which the Attorney General has proceeded to do.

29.     Defendant **U.S. Department of Labor** ("**DOL**") is a cabinet department of the federal government. DOL is an "agency" within the meaning of the APA. DOL is charged with oversight of the OFCCP (as defined below).

30.     Defendant **Vince Micone** is the Acting United States Secretary of Labor. In that capacity, he is charged with the supervision and management of all decisions and actions of DOL and is DOL's highest-ranking official. He is sued in his official capacity.

31.     Defendant **Office of Federal Contract Compliance Programs** ("**OFCCP**") is part of DOL and is responsible for ensuring that employers that do business with the federal government comply with laws and regulations requiring nondiscrimination. OFCCP is an "agency" within the meaning of the APA. OFCCP is directed in the Executive Orders to effect their implementation, which OFCCP has proceeded to do.

32.     Defendant **Michael Schloss** is the Acting Director of OFCCP. In that capacity, he is charged with the supervision and management of all decisions and actions of OFCCP and is OFCCP's highest-ranking official. He is sued in his official capacity.

33.     Defendant **Office of Management and Budget** ("**OMB**") is the largest office in

the Executive Office of the President of the United States. OMB produces the President's budget, and ensures that agency programs, policies, and procedures comply with the President's policies, including policies in the President's executive orders. OMB is an "agency" within the meaning of the APA. In the Executive Orders, OMB is directed to effect their implementation, which OMB has proceeded to do.

34.     Defendant **Russell Vought** is the Director of OMB. In that capacity, he is charged with the supervision and management of all decisions and actions of OMB and is OMB's highest-ranking official. He is sued in his official capacity.

35.     Defendant **U.S. Department of Health and Human Services** ("**HHS**") is a cabinet department of the federal government. HHS is an "agency" within the meaning of the APA. Multiple subagencies, offices, and entities of HHS provide grants and funding to healthcare and social service providers across the United States. These HHS components include, but are not limited to, the Health Resources & Services Administration ("**HRSA**"), National Institutes of Health ("**NIH**"), Centers for Disease Control and Prevention ("**CDC**"), Centers for Medicare and Medicaid Services ("**CMS**"), the Agency for Healthcare Research and Quality ("**AHRQ**"), the Substance Abuse and Mental Health Services Administration ("**SAMHSA**"), and the Administration for Children and Families ("**ACF**"). HHS also allots Preventive Health and Health Services Block Grants under the Public Health Service Act ("**PHSA**"). Upon information and belief, HHS, including through its components such as HRSA, NIH, CDC, CMS, and SAMHSA, administers federal funds provided directly and indirectly to at least one of the Plaintiffs through contracts and/or grants.

36.     Defendant **Robert F. Kennedy, Jr.** is the Secretary of Health and Human Services. In that capacity, he is responsible for all aspects of the operation and management of HHS and is HHS's highest-ranking official. He is sued in his official capacity.

37.     Defendant **U.S. Department of Housing and Urban Development** ("**HUD**") is a cabinet department of the federal government. HUD is an "agency" within the meaning of the APA. HUD is the agency charged with overseeing the development and execution of policies about

housing and metropolises. HUD contracts and subcontracts with, and provides grants to, private entities. Upon information and belief, HUD administers federal funds provided directly and indirectly to at least one of the Plaintiffs through contracts and/or grants.

38.    Defendant **Scott Turner** is Secretary of Housing and Urban Development. In that capacity, he is charged with the supervision and management of all decisions and actions of HUD and is HUD's highest-ranking official. He is sued in his official capacity.

39.    Defendant **National Archives and Records Administration** ("**NARA**") is the nation's record keeper. Through its affiliation with the National Historical Publications and Records Commission ("**NHPRC**"), NARA administers federal grant programs to promote the preservation and use of America's documentary heritage by collecting, describing, preserving, compiling, digitizing, and publishing records collections significant to the history of the United States. Upon information and belief, NARA, in conjunction with NHPRC, administers federal funds provided directly and indirectly to at least one of the Plaintiffs through contracts and/or grants.

40.    Defendant **William J. Bosanko** is the Deputy Archivist of the United States and is the highest-ranking official of NARA. He is sued in his official capacity.

41.    Defendant **National Endowment for the Humanities** ("**NEH**") is an independent federal agency and the largest federal funder of the humanities. The NEH awards grants to nonprofit organizations to support museums and historic sites nationwide and includes programs that advance education, and public engagement in the humanities by helping museums and historical organizations steward important collections of books and manuscripts, photographs, sound recordings and moving images, archaeological and ethnographic artifacts, art and material culture, and digital objects. The NEH administers federal funds provided directly and indirectly to Plaintiff GLBT Historical Society through a grant.

42.    Defendant **Shelly C. Lowe** is the Chair of the National Endowment for the Humanities and is the highest-ranking official of NEH. She is sued in her official capacity.

43.    Defendants DOJ, Attorney General Bondi, DOL, Acting Labor Secretary Micone, OFCCP, Acting OFCCP Director Schloss, OMB, OMB Director Vought, HHS, HHS Secretary Kennedy, Jr., HUD, HUD Secretary Turner, NARA, Deputy Archivist Bosanko, NEH, and NEH Chair Lowe are referred to collectively as the "**Agency Defendants**."

## FACTS COMMON TO ALL COUNTS

**A. All Plaintiffs Are Committed to Engaging in Speech, Advocacy, and Services Advancing the Civil Rights and Welfare of Transgender People, and to Addressing Systemic Racism, Sexism, and Anti-LGBTQ Bias.**

### i.    Plaintiff SFAF

44.    Plaintiff SFAF provides HIV prevention and treatment to clients living with HIV/AIDS or who are at risk of contracting HIV. SFAF receives federal grants and/or contracts and is dedicated to ending the HIV epidemic.

45.    As an essential part of its work, SFAF confronts and combats HIV-related health disparities among gay and bisexual men, transgender women, cisgender women, Black people, Latinx people, and, in particular, people residing at the intersections of these identities. The federal grants that SFAF receives and the statutory schemes that authorize such grants command such an approach.

### ii.    GLBT Historical Society

46.    Plaintiff GLBT Historical Society is devoted to recording and disseminating the stories of LGBTQ people and their struggle for legal recognition and respect across generations.

47.    The GLBT Historical Society exists to tell these stories. The history of LGBTQ people is one of self-expression, pride, and a celebration of the very existence of all LGBTQ people. The GLBT Historical Society's Archives and Special Collections are among the largest and most extensive holdings in the world of materials about LGBTQ+ people, occupying more than 4,000 linear feet of storage and spanning more than a century's worth of LGBTQ+ history.

48.    To advance its mission, the GLBT Historical Society receives and has received federal grant funding from Defendant NARA and Defendant NEH.

### iii. Plaintiff Health Centers

49.     Plaintiff Health Centers, which include SF Health Center, LA LGBT Center, and Prisma Community Care, are mission-driven community health centers that provide healthcare services, social services, community, and support for the LGBTQ community.

50.     Plaintiff Health Centers serve disproportionately low-income LGBTQ patients from a variety of backgrounds who frequently experience discrimination from other healthcare and social services providers on the basis of race, sex, and LGBTQ status.

51.     Plaintiff Health Centers receive federal funding in the form of grants and/or contracts and specialize in offering quality healthcare and social services free of discrimination, including to youth, seniors, domestic violence survivors, and patients with life-threatening conditions. A core aspect of their missions is to advance the civil rights of LGBTQ people.

### iv. The LGBTQ Community Centers

52.     Plaintiff LGBTQ Community Centers, which include SF Health Center, LA LGBT Center, NY LGBT Center, Bradbury-Sullivan Center, and Baltimore Safe Haven, offer myriad social services to members of the LGBTQ community addressing their housing, employment, sexual health, substance use, and mental health needs, among others, as well as youth and senior populations. Their missions include advocacy for equality for all LGBTQ people. Plaintiff LGBTQ Centers receive federal funding to support certain services they provide.

### v. FORGE

53.     Plaintiff FORGE's work focuses on training service providers who work with victims of sexual assault, intimate partner violence, stalking, and hate crimes to increase their knowledge of how to better serve transgender and nonbinary victims of crime. FORGE also provides direct support, resources, and healing services to transgender community members. FORGE receives federal funding to support certain services it provides.

### vi. Plaintiffs' Shared Purpose

54.     The work that the GLBT Historical Society does to record the history of LGBTQ people celebrates their existence and calls for a more just future.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

55.     The work that SFAF, Plaintiff Health Centers, the LGBTQ Community Centers, and FORGE do saves lives. To continue to do their work, Plaintiffs must be able to continue to acknowledge not only the existence of, but the equal dignity and humanity of the people they serve, including people who are transgender.

56.     In addition, Plaintiffs must continue to be able to direct their services and advocacy to communities most affected by the HIV/AIDS epidemic and to those most impacted by systemic barriers to health care, housing, and basic social services as a result of past and current discrimination—including Black, Latinx, and Asian and Pacific Islander communities, and transgender people. Plaintiffs advocate for an end to racism, sexism, and anti-LGBTQ bias and work to document and ameliorate structural inequities, including health disparities and housing discrimination, affecting these communities.

57.     To perform their work effectively, Plaintiffs must be able to continue to advocate for equality for those they serve; embrace their identities; be cognizant of the structural and societal barriers they experience; and train their staff in diversity, equity, inclusion, and accessibility practices.

**B. The Trump Administration Seeks to Erase Transgender People from Public Life, Promotes Discriminatory Viewpoints, and Punishes Federal Contractors and Grantees with Contrary Viewpoints.**

58.     The Trump Administration has wasted no time inflicting chaos and upheaval—with particularly cruel focus on the transgender community.

59.     Reminiscent of book burnings from bygone eras, in just four weeks, the Trump Administration has sought to erase any mention or recognition of transgender people from and by any part of the federal government and has demanded the same from every federal contractor and grantee.

60.     In addition to the Executive Orders at issue here, the Trump Administration has taken a series of actions seeking to eliminate or restrict existing protections for transgender people and has enacted myriad affirmative policies to discriminate against transgender people in all aspects of public life, including education, employment, health care, and housing, to name a few.

61.    On his first day in office, President Trump issued Executive Order 14148 ("the Rescissions Order"), which rescinded several Biden Administration Executive Orders that provided protections for transgender people.[1]

62.    President Trump then issued Executive Order 14183 ("the Military Service Ban Order"), banning transgender people from serving in the military, and revoked Executive Order 14004, which had allowed all qualified persons to serve in the military.[2]  As justification, President Trump declared that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service" and "is not consistent with the humility and selflessness required of a service member." The language in Executive Order 14183, on its face, expressly and unequivocally evidences discriminatory animus toward transgender people.

63.    President Trump also issued Executive Order 14187 ("**Denial of Care Order**"), declaring that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another," and directing the immediate defunding of medical institutions that provide gender-affirming medical care to transgender people under the age of nineteen.

64.    President Trump has acted to discriminate against transgender people in other contexts as well. For example, Executive Order 14170 forbids government employers from considering or even recognizing gender identity in the hiring process,[3] and Executive Order 14190 eliminates federal funding for K-12 schools that "directly or indirectly support" the "instruction, advancement, or promotion" of "gender ideology" in their curricula for students or in training

---

[1] Exec. Order No. 14148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025).

[2] Exec. Order No. 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025).

[3] Exec. Order No. 14170, *Reforming the Federal Hiring Process and Restoring Merit to Government Service*, 90 Fed. Reg. 8621 (Jan. 20, 2025).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

materials for instructors.[4] Executive Order 14190 also goes beyond the Denial of Care and Gender Identity Orders to prohibit the use of federal funds "to directly or indirectly support or subsidize the social transition of a minor student." "Social transition" is defined as "the process of adopting a 'gender identity' or 'gender marker' that differs from a person's sex."

65.    What is more, President Trump has directed all federal agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications[,] or other messages." Gender Order § 3(e).

66.    Pursuant to this purge directive, the National Park Service under the Trump Administration has removed any mentions of transgender people or gender identity, as well as any storytelling that incorporates discussion of gender identity or a person's experience. As a result, the National Park Service has sought to erase American history by erasing any mention of transgender people in relation to the Stonewall National Monument.[5] In response, the Stonewall Inn and the Stonewall Inn Gives Back Initiative said in a statement: "This blatant act of erasure not only distorts the truth of our history, but it also dishonors the immense contributions of transgender individuals - especially transgender women of color - who were at the forefront of the Stonewall Riots and the broader fight for LGBTQ+ rights."[6]

67.    As part of the Trump Administration's government-wide purge of transgender people, our Nation's researchers and scientists have also been ordered to remove any mention of transgender people or recognition of gender identity from any federally funded research.[7] The

---

[4] Exec. Order No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025)

[5] Juliana Kim, "Park Service erases 'transgender' on Stonewall website, uses the term 'LGB' movement," NPR (Feb. 14, 2025), https://www.npr.org/2025/02/14/g-s1-48923/stonewall-monument-transgender-park-service.

[6] Minyvonne Burke, "References to transgender and queer removed from Stonewall National Monument's web page," NBC News (Feb. 14, 2025), https://www.nbcnews.com/nbc-out/out-news/references-transgender-queer-removed-stonewall-monuments-webpage-rcna192204.

[7] Carla K. Johnson, "Health info wiped from federal websites following Trump order targeting transgender rights," PBS News (Jan. 31, 2025), https://www.pbs.org/newshour/health/health-info-

---

13

CDC has instructed its scientists to remove references to or mentions of a list of "forbidden" terms that include: "Gender, transgender, pregnant person, pregnant people, LGBT, transsexual, non-binary, nonbinary, assigned male at birth, assigned female at birth, biologically male, biologically female."[8] Researchers have had their federally funded studies pulled or suspended for mentioning transgender people. For example, NIH demanded a halt to a large-scale study that was examining ways to prevent HIV infections in transgender youth of color before it could enroll participants, and a federal scientific journal blocked publication of a paper that details the value of teaching transgender health.[9] All this in turn has inhibited innovative and life-saving research from occurring and prohibited a single vulnerable minority—transgender people—from benefitting from it.

wiped-from-federal-websites-following-trump-order-targeting-transgender-rights; Jeremy Faust, "BREAKING NEWS: CDC orders mass retraction and revision of submitted research across all science and medicine journals. Banned terms must be scrubbed.," Inside Medicine (Feb. 1, 2025), https://insidemedicine.substack.com/p/breaking-news-cdc-orders-mass-retraction; Apoorva Mandavilli and Roni Caryn Rabin, "C.D.C. Site Restores Some Purged Files After 'Gender Ideology' Ban Outcry," New York Times (Feb. 3, 2025), https://www.nytimes.com/2025/02/03/health/trump-gender-ideology-research.html; Will Stone and Pien Huang, "Some federal health websites restored, others still down, after data purge," NPR (Feb. 6, 2025), https://www.npr.org/sections/shots-health-news/2025/02/06/nx-s1-5288113/cdc-website-health-data-trump.

[8] Faust, *supra*, n.7.

[9] Fenit Nirappil, "Trans health, research programs ordered to stop by Trump administration," The Washington Post (Feb. 4, 2025), https://www.washingtonpost.com/health/2025/02/04/trump-order-transgender-health-research-programs/.

68.     When ordered by a federal court to restore websites containing invaluable data and resources for educational, medical, and scientific institutions across the country, the Trump Administration appended to the websites, such as the one pertaining to the CDC's Youth Risk Behavior Surveillance System, a notice stating: "Any information on this page promoting gender ideology is extremely inaccurate and disconnected from the immutable biological reality that there are two sexes, male and female. The Trump Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation, and to women, by depriving them of their dignity, safety, well-being, and opportunities. This page does not reflect biological reality and therefore the Administration and this Department rejects it."



69.     Notwithstanding binding guidance issued by the whole commission, the new acting chair of the U.S. Equal Employment Opportunity Commission ("**EEOC**"), appointed by President Trump, has taken the following unilateral actions pursuant to the Gender Order, among others:

- Announced that one of her priorities—for compliance, investigations, and litigation—is to defend the biological and binary reality of sex;

- Removed the EEOC's "pronoun app," which allowed an employee to opt to identify pronouns alongside the employee's display name throughout platforms used to communicate with internal and external parties;

- Ended the use of the "X" gender marker during the intake process for filing a charge of discrimination;

- Directed the modification of the charge of discrimination and related forms to remove "Mx." from the list of prefix options;

- Commenced review of the content of the EEOC's "Know Your Rights" poster, which all covered employers are required by law to post in their workplaces; and

- Removed materials promoting "gender ideology" on the EEOC's internal and external websites and documents, including webpages, statements, social media platforms, forms, trainings, and others outlets or programs.[10]

70.    The U.S. Department of State has similarly enacted the Trump Administration's erasure policies. For example, the Gender Order directs the Secretaries of State and Homeland Security to implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, reflect solely the holder's sex assigned at birth—thus preventing transgender people from carrying federal identity documentation that accords with their gender identities. Gender Order § 3(d). The Department of State has thus prohibited transgender Americans, including those who are nonbinary, from obtaining passports and other federal identity documents that accurately reflect their gender.[11]

71.    The Department of State has also removed transgender people from its webpage providing warnings to LGBTQ people about international travel.[12]

---

[10] Press Release, U.S. Equal Employment Opportunity Commission, "Removing Gender Ideology and Restoring the EEOC's Role of Protecting Women in the Workplace" (Jan. 28, 2025), https://www.eeoc.gov/newsroom/removing-gender-ideology-and-restoring-eeocs-role-protecting-women-workplace.

[11] Shawn Musgrave, "Rubio Orders State Department to Stop Issuing Accurate Passports to Trans People," The Intercept (Jan. 23, 2025), https://theintercept.com/2025/01/23/marco-rubio-state-department-passports-gender-trans-nonbinary/.

[12] Alex Kasprak, "Yes, State Department eliminated references to trans people on its websites," Snopes (Feb. 4, 2025), https://www.snopes.com/fact-check/travel-state-gov-lgb/.

72.    Through the Gender Order, President Trump has also ordered the rescission of rules that ensure transgender people have equal access to homeless shelters and the denial of necessary medical care to transgender persons in federal custody. Gender Order §§ 4(b)-(c).

73.    This battery of animus-laden acts has been so alarming that in a recent hearing in a case challenging the Military Service Ban Order, the court described President Trump's attempt to ban transgender servicemembers from the military as "part and parcel to an overall administrative push to discriminate [against] or demean transgender people" and proceeded to provide a rolling list of actions exemplifying the Administration's intent to erase transgender people and preclude their ability to participate in society. [13]

74.    Among the parade of horrors, Judge Ana C. Reyes of the United States District Court for the District of Columbia included the very Gender Order now before this Court: "[The administration] announced it is cutting all federal funding to any federal grant recipients or contractors who recognize the existence of transgender people or provide services to them."[14]

75.    In a different case involving a challenge to the Denial of Care Order, the court in that case stated, in relation to the Denial of Care Order and the Gender Order, that: "The Court cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist."[15]

   i.    **President Trump Issues the Gender Order that Forbids Contractors and Grantees from Acknowledging the Existence of Transgender People and Their Right to Equality and Respect.**

76.    President Trump issued the Gender Order on January 20, 2025. The Gender Order expresses a disparaging, demeaning, idiosyncratic, and unscientific viewpoint about transgender people and gender identity, denying that transgender people exist, deeming them "false," ordering

---

[13] Transcript of Status Conference at 34-35, *Talbott v. Trump*, Civil Action No. 25-00240 (D.D.C. Feb. 4, 2025) (ECF No. 34).

[14] *Id.*

[15] Memorandum Opinion at 41, *PFLAG, Inc. v. Trump*, Civil Action No. 25-00337 (D. Md., Feb. 14. 2025) (ECF No. 62).

their exclusion from government recognition and protection in numerous aspects of their lives, and demanding that others do the same.

77.     Section 2(a) of the Gender Order states that a person's "sex" is an "immutable biological classification as either male or female" and that it "does not include the concept of 'gender identity.'"

78.     The definitions contained in the Gender Order deny the existence of gender identities that differ from a person's sex assigned at birth and repudiate the existence of people who are transgender altogether. Specifically, Section 2 of the Gender Order establishes that it is the "policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." Section 2 further states that "the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy."

79.     Section 2 of the Gender Order defines "Female" to mean "a person belonging, at conception, to the sex that produces the large reproductive cell," and "Male" to mean "a person belonging, at conception, to the sex that produces the small reproductive cell."

80.     Section 2 of the Gender Order defines what it terms "gender ideology" as "replac[ing] the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." Federal agencies have subsequently described "[t]he term 'gender ideology' [as] refer[ring] to self-assessed gender identity."

81.     In addition, Section 2 of the Gender Order defines what it terms "gender identity" as "reflect[ing] a fully internal and subjective sense of self, disconnected from biological reality

and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

82.     Section 3(b) of the Gender Order directs each agency to "give the terms 'sex', 'male,' 'female,' 'men,' 'women,' 'boys' and 'girls'" (punctuation corrected) the meanings defined in the Gender Order "when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications."

83.     Section 3(e) of the Gender Order demands that agencies "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology."

84.     Section 3(g) of the Gender Order prohibits the use of federal funds "to promote gender ideology" and directs each agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."

85.     Section 7 of the Gender Order requires each agency to submit an update on the Gender Order's implementation within 120 days, including "agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of" the executive order.

86.     Defendants, therefore, penalize federal contractors and grantees, including Plaintiffs, whose speech, trainings, research, and/or mission-driven services express or reflect viewpoints that acknowledge the existence of transgender people and advocate for their equality.

## ii.     President Trump Also Issues Two Sweeping Executive Orders to Defund Activities and Penalize Entities that Have "Illegal DEI and DEIA Policies."

87.     On January 20, 2025, President Trump issued the DEI-1 Order, which expresses a viewpoint that "diversity, equity, inclusion, and accessibility," "DEIA," or related programs are "illegal and immoral discrimination programs."

88.     To execute President Trump's policy, for example, Section 2(b)(i) of the DEI-1 Order directs "[e]ach agency, department, or commission head . . . [to] terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions; all 'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees."

89.     On January 21, 2025, President Trump also issued the DEI-2 Order. The DEI-2 Order states that "diversity, equity, and inclusion," "DEI," "diversity, equity, inclusion, and accessibility," or "DEIA" policies are "illegal, dangerous, and immoral" and, in the Administration's view, violate federal civil rights laws. As expressed in its title, the DEI-2 Order also characterizes "diversity, equity, inclusion, and accessibility" efforts as oppositional to merit-based opportunity.

90.     The DEI-2 Order restricts "Diversity, Equity, Inclusion, and Accessibility" by federal contractors and grantees. As expressed in Section 1, the DEI-2 Order characterizes "diversity, equity, and inclusion" and "DEI," and "diversity, equity, inclusion, and accessibility" and "DEIA," as "dangerous, demeaning, and immoral race- and sex-based preferences"; "illegal" in violation of "the text and spirit of . . . Federal civil-rights laws"; "undermin[ing] our national unity"; "deny[ing], discredit[ing], and undermin[ing] the traditional American values of hard work, excellence, and achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system"; "threaten[ing] the safety of American men, women, and children across the Nation by diminishing the importance of individual merit, aptitude, hard work, and determination when selecting people for jobs and services in key sectors of American society"; "illegal, pernicious discrimination that has prioritized how people were born instead of what they were capable of doing"; and "illegal preferences and discrimination."

91.     Section 2 of the DEI-2 Order directs "all executive departments and agencies . . . to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements" to "protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work" and "to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities."

92.     Section 3(b) of the DEI-2 Order instructs OFCCP to "immediately cease . . . [p]romoting 'diversity'"; "[h]olding Federal contractors and subcontractors responsible for taking 'affirmative action'"; and "[a]llowing or encouraging Federal contractors and subcontractors to

engage in workforce balancing based on race, color, sex, sexual preference, religion, or national origin."

93.     Section 3(b) further requires each agency head to "include in every contract or grant award: (A) a term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and (B) a term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."

94.     Section 3(c) of the DEI-2 Order directs the Director of the OMB to "(i) Review and revise, as appropriate, all Government-wide processes, directives, and guidance; (ii) Excise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures to streamline those procedures, improve speed and efficiency, lower costs, and comply with civil-rights laws; and (iii) Terminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate."

95.     Section 4(a) of the DEI-2 Order directs the heads of all agencies to "take all appropriate actions with respect to the operations of their agencies to advance in the private sector the policy of individual initiative, excellence, and hard work," which the DEI-2 Order asserts is inconsistent with "diversity, equity, and inclusion."

96.     Section 4(b) of the DEI-2 Order directs the Attorney General to submit a report "containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI." In addition, the Attorney General's report must "contain a proposed strategic enforcement plan identifying: (i) Key sectors of concern within each agency's jurisdiction; (ii) The most egregious and discriminatory DEI practitioners in each sector of concern; (iii) A plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated 'DEI' or

otherwise) that constitute illegal discrimination or preferences. As a part of this plan, each agency shall identify up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500 million dollars or more, State and local bar and medical associations, and institutions of higher education with endowments over 1 billion dollars; (iv) Other strategies to encourage the private sector to end illegal DEI discrimination and preferences and comply with all Federal civil-rights laws; (v) Litigation that would be potentially appropriate for Federal lawsuits, intervention, or statements of interest; and (vi) Potential regulatory action and sub-regulatory guidance."

97.    The chilling effect of the Executive Orders is magnified by their provisions directing officials to create various lists of private individuals and organizations suspected of opposing the Administration's views. Section 2(b)(ii) of the DEI-1 Order directs agency, department, and commission heads to provide the Director of OMB with a "list" of contractors "who have provided DEI training or DEI training materials to agency or department employees" and grantees "who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities" in the last four years.

98.    The threat of these lists has a deterrent effect on speech. If Plaintiffs are placed on these lists, they will be further deterred—either directly by subsequent adverse government action or indirectly through negative consequences such as reputational harms. Moreover, the Executive Orders do not make clear whether such lists will be made public. If so, the lists would invite targeted harassment, hostility, and threats by members of the public.

99.    The penalties that the Orders threaten also go beyond loss of funding. The DEI-2 Order invokes the False Claims Act, 31 U.S.C. §§ 3729–33, and its harsh treatment of "material" false statements to the government, 31 U.S.C. § 3729(1)(a)(B). Section 3(b)(iv)(A) of the DEI-2 Order requires that, "for purposes of section 3729(b)(4) of title 31, United States Code," contractors and grantees agree that compliance with the Administration's undefined and unarticulated understanding of applicable Federal anti-discrimination laws is "material" to the government's payment decisions. By invoking the FCA, the DEI-2 Order exposes Plaintiffs to

private lawsuits, government prosecution, and potential penalties of up to three times the amount of the government's damages.

100.    Taken together, the DEI-1 and DEI-2 Executive Orders express the viewpoint that most "diversity, equity, inclusion, and accessibility" policies, programs, and activities do not comply with federal civil rights laws, do not advance federal civil rights laws, and must cease. Defendants thus penalize federal grant recipients and contractors, including Plaintiffs, whose speech, trainings, research, and/or mission-driven services express or reflect viewpoints that support "diversity, equity, inclusion, and accessibility" efforts, and who seek to assist Black people, women, LGBTQ people, and people living with HIV, among others, in overcoming systemic barriers to equality resulting from past and current discrimination.

###    iii.    Executive Directives Related to the Executive Orders Evidence the Trump Administration's Viewpoint Discrimination that Reinforces Both an Anti-Trans Bias that Will Erase Transgender Identities and Opposition to DEIA Initiatives.

101.    In the days following the release of the Executive Orders, the Trump Administration engaged in a broad-based attack against speech and viewpoints related to "diversity, equity, inclusion, and accessibility." These actions further confirm that the purpose of the Executive Orders is to suppress and chill viewpoints with which the Trump Administration disagrees and to inflict harms against transgender people and marginalized populations.

102.    For example, on January 21, 2025, the acting director of the Office of Personnel Management ("**OPM**") released a memo titled "Initial Guidance Regarding DEIA Executive Orders" (the "**January 21 OPM Memo**") that purported to implement the DEI-1 Order.[16] The January 21 OPM Memo directed agencies to take "prompt actions" against "DEIA initiatives and programs," including requiring agencies to "terminate any DEIA-related contractors," among

---

[16] https://www.opm.gov/media/e1zj1p0m/opm-memo-re-initial-guidance-regarding-deia-executive-orders-1-21-2025-final.pdf.

other actions, within 24 hours. The January 21 OPM Memo further demanded a report within 48 hours of "all DEIA-related agency contracts."[17]

103.    On January 22, 2025, the White House released "Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI."[18] This "Fact Sheet" explains that the DEI-2 Order terminates "radical DEI preferencing in federal contracting" and directs "federal agencies to relentlessly combat private sector discrimination." It claims that "DEI has dangerously tainted many of our critical businesses and influential institutions," "DEI's foundational rhetoric and ideas foster intergroup hostility and authoritarianism," and "Billions of dollars are spent annually on DEI, but rather than reducing bias and promoting inclusion, DEI creates and then amplifies prejudicial hostility and exacerbates interpersonal conflict."

104.    On January 23, 2025, President Trump announced at the World Economic Forum that his Administration "has taken action to abolish all discriminatory diversity, equity, and inclusion nonsense — and these are policies that were absolute nonsense — throughout the government and the private sector."[19]

105.    On January 27, 2025, the Acting Director of OMB issued a memo titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" ("**OMB Memo M-25-13**").[20] OMB Memo M-25-13 purported to implement a series of executive orders signed by President Trump, including the DEI-1 Order and the Gender Order, and directed

---

[17] *Id.* at 1–2. The January 21 OPM Memo also sought to root out what OPM characterized as efforts to evade the Trump Administration's policy. The memo included an email template for agency heads to send to their employees, notifying them that the Trump Administration is "aware of efforts by some in the government to disguise these [DEIA] programs by using coded or imprecise language." The email directed employees who know about such efforts to report them to an email address "DEIAtruth@opm.gov" and threatens unspecified "adverse consequences" for not doing so. The January 21 OPM Memo also demanded a "list" of "contract descriptions or personnel position descriptions" that had been recently "changed" to "obscure their connection to DEIA programs. *Id.*

[18] https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-protects-civil-rights-and-merit-based-opportunity-by-ending-illegal-dei/.

[19] https://www.whitehouse.gov/remarks/2025/01/remarks-by-president-trump-at-the-world-economic-forum/.

[20] https://blog.researchadmin.asu.edu/wp-content/uploads/2025/01/omb-memo-1-27.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

agencies to freeze "all activities related to obligation or disbursement of all Federal financial assistance, and other relevant activities that may be implicated by the executive orders, including but not limited to . . . DEI, [and] woke gender ideology[.]" OMB Memo M-25-13 contained a footnote explaining that "Medicare or Social Security benefits" were the only federal assistance programs that it did not cover.[21]

106.    The Administration's initiatives around DEI were mutually reinforcing of the Administration's clear intent to target transgender people.

107.    On January 29, 2025, the acting director of OPM issued a memo titled "Initial Guidance Regarding President Trump's Executive Order Defending Women" (the "**January 29 OPM Memo**") that purports to implement the Gender Order.[22] The January 29 OPM Memo is similar to the January 21 OPM Memo implementing the DEI-1 Order, insofar as it gives agencies 48 hours to "terminate" all programs, contracts, and grants and "[c]ancel any trainings that inculcate or promote gender ideology or have done so in the past," among other things.

108.    To implement the President's Executive Orders, the Agency Defendants have begun issuing stop-work orders or contract termination notices, forcing organizations to "cease and desist" performance of contracts, programs, and activities relating to diversity, equity, and inclusion. Plaintiffs are among those who have received such stop-work orders or termination notices.

---

[21] The breathtaking scope of OMB Memo M-25-13 spurred widespread chaos and confusion. The next day, multiple groups successfully sued to temporarily enjoin its enforcement for violating the Constitution and the APA. *See* Order at 5, *National Coalition of Nonprofits, et al. v. OMB, et al.*, No. 1:25-cv-00239 (D.D.C. Jan. 28, 2025) (ECF No. 13); Temporary Restraining Order, *New York, et al. v. Trump, et al.*, No. 1:24-cv-00039 (D.R.I. Jan. 28, 2025) (ECF No. 50). On January 29, 2025, OMB rescinded OMB Memo M-25-13. https://www.cogr.edu/sites/default/files/OMB%20M-25-14.pdf. In a public statement, however, the White House Press Secretary said that OMB only rescinded OMB Memo M-25-13 to "end any confusion caused by the court's injunction," the recission of the Memorandum was "NOT a rescission of the federal funding freeze," and the "President's EO's [sic] on federal funding remain in full force and effect, and will be rigorously implemented." https://x.com/PressSec/status/1884672871944901034.

[22] https://chcoc.gov/content/initial-guidance-regarding-president-trump%E2%80%99s-executive-order-defending-women.

109.    Following the issuance of the Executive Orders and related guidance, grantees, including some of Plaintiff Health Centers, who had received awards funded by Defendant HHS or a subagency thereof received notices pursuant to the Executive Orders "immediately, completely, and permanently" terminating the awards for which the notices were sent.

110.    On January 29, 2025, SF Health Center and Prisma Community Care both received notices from the CDC which specifically cited the DEI-1 Order and the Rescissions Order and stated as follows:

> *To implement Executive Orders* entitled Ending Radical and Wasteful Government DEI Programs and Preferencing and Initial Rescissions of Harmful Executive Orders and Action, *you must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting "diversity, equity, and inclusion" (DEI) at every level and activity,* regardless of your location or the citizenship of employees or contractors, that are supported with funds from this award. *Any vestige, remnant, or re-named piece of any DEI programs funded by the U.S. government under this award are immediately, completely, and permanently terminated.*
>
> No additional costs must be incurred that would be used to support any DEI programs, personnel, or activities.

(Emphasis added.)

111.    On or about January 31, 2025, Plaintiffs SF Health Center and Prisma Community Care both received notices from the CDC that specifically cited the Gender Order and stated as follows:

> *To implement the Executive Order* entitled Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government (Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government – The White House), and in accordance with Office of Personnel Management's Initial Guidance (Memorandum to Heads and

Acting Heads of Departments and Agencies: Initial Guidance Regarding President Trump's Executive Order Defending Women), *you must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity*, regardless of your location or the citizenship of employees or contractors, that are supported with funds from this award. *Any vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated.*

No additional costs must be incurred that would be used to support any gender ideology programs, personnel, or activities.

(Emphasis added.)

112.    Similarly, HRSA, another subagency of Defendant HHS, has sent notices to grant recipients stating that HRSA grant funds may not be used for activities that "do not align with" the Executive Orders and any "vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part."

113.    For example, on January 31, 2025, the NY LGBT Center received a notice from HRSA that specifically cited the DEI-1 Order, the DEI-2 Order, the Gender Order, and the Rescissions Order and stated as follows:

Your Health Resources and Services Administration (HRSA) award is funded in whole or in part with U.S. government funds.

*Effective immediately, HRSA grant funds may not be used for activities that do not align with Executive Orders* (E.O.) entitled Ending Radical and Wasteful Government DEI Programs and Preferencing, Initial Rescissions of Harmful Executive Orders and Action, Protecting Children from Chemical and Surgical Mutilation, and Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government (Defending Women). *Any*

*vestige, remnant, or re-named piece of any programs in conflict with these E.O.s*
*are terminated in whole or in part.*

You may not incur any additional costs that support any programs, personnel, or
activities in conflict with these E.O.s.

(Emphasis added.)

114.    On February 5, 2025, the OPM Acting Director issued a memorandum titled
"Further Guidance Regarding Ending DEIA Offices, Programs and Initiatives" instructing federal
agencies to terminate all DEIA offices, policies, and programs that allegedly "unlawfully
discriminate" in employment actions based on protected characteristics, including race, sex,
national origin, and disability. This memorandum defines "unlawful discrimination relating to
DEI" in the following way: "Unlawful discrimination related to DEI includes taking action
motivated, in whole or in part, by protected characteristics. To be unlawful, a protected
characteristic does not need to be the sole or exclusive reason for an agency's action."

115.    On February 5, 2025, Attorney General Bondi issued a memorandum to all
employees of the DOJ titled, "Ending Illegal DEI and DEIA Discrimination and Preferences
("**DOJ Memorandum 1**"). It purports to implement the DEI-2 Order, which it describes as
"making clear that policies relating to 'diversity, equity, and inclusion' ('DEI') and 'diversity,
equity, inclusion, and accessibility' ('DEIA') 'violate the text and spirit of our longstanding
Federal civil-rights laws' and 'undermine our national unity.'"

116.    DOJ Memorandum 1 directs the DOJ's Civil Rights Division to investigate and
penalize entities in both the private sector and federally funded educational institutions that it
considered to be engaged in DEI and DEIA policies and programs.

117.    The memorandum also directs the DOJ's Civil Rights Division and the Office of
Legal Policy to submit a report by March 1, 2025, recommending enforcement actions against DEI
and DEIA policies. The report must identify key sectors of concern; specific entities alleged to be
the most "egregious" DEI/DEIA "practitioners"; a plan for deterring DEI and DEIA policies
through criminal investigations and civil compliance actions, including up to nine targeted

investigations; potential litigation strategies, including interventions in pending cases, statements of interest, and amicus briefs; and additional regulatory and policy measures aimed at eliminating DEI and DEIA programs.

118.    Also, on February 5, 2025, the Attorney General Bondi issued a memorandum titled, "Eliminating Internal Discriminatory Practices" ("**DOJ Memorandum 2**") to all DOJ employees implementing the DEI-2 Order. It directs the elimination of DOJ DEI and DEIA programs, policies, and related initiatives.

119.    DOJ Memorandum 2 further directs, by March 15, 2025, the DOJ to assist OMB in reviewing and revising government-wide policies to eliminate references to DEI and DEIA in federal acquisition, contracting, grants, and financial assistance procedures.

120.    On February 7, 2025, the White House published "Memorandum for the Heads of Executive Departments and Agencies." In this public-facing memo, President Trump declared that "[i]t is the policy of my administration to stop funding NGOs that undermine the national interest" and the agencies "shall align future funding decisions with the interests of the United States and with the goals and priorities of my Administration, as expressed in executive actions."

121.    The deluge of agency actions and statements by the Trump Administration leave no doubt that the purpose of the Executive Orders is to suppress speech and viewpoints supportive of transgender people and diversity, equity, inclusion, and accessibility efforts with which the Administration disagrees.

**iv.    The Executive Orders Are Impermissibly Vague.**

122.    The challenged Executive Orders are replete with vague and undefined terms and phrases whose precise meanings are key to understanding the scope of the orders' prohibitions. Under the terms of the challenged Executive Orders, there is no objective way to determine which speech activities are permitted and which are prohibited, creating a broad chilling effect and inviting unpredictable, uneven, and discriminatory enforcement against recipients of federal funding, including Plaintiffs.

123.    For example, nowhere do the Executive Orders explain exactly what it means to "promote" so-called "gender ideology."

124.    Neither do the Executive Orders define the terms "diversity, equity, and inclusion," "DEI," "diversity, equity, inclusion, and accessibility," or "DEIA," despite such terms being fundamental to the Executive Orders. Similarly, the Executive Orders do not define the term "equity" when used independently from "diversity, equity, inclusion, and accessibility," even though Section 2(b) of the DEI-1 Order terminates "equity-related" grants and contracts, along with other DEI and DEIA activities.

125.    Section 3(c) of the DEI-2 Order uses both vague terminology and open-ended breadth in mandating OMB to "[e]xcise references to DEI and DEIA *principles, under whatever name they may appear*" from federal acquisition, contracting, grants, and financial assistance procedures. (Emphasis added.) Plaintiffs, therefore, are left speculating on what speech or activity might be considered DEI or DEIA "principles" even without using the actual terms "DEI" or "DEIA."

126.    In addition, the Executive Orders create additional ambiguity by distinguishing at times between DEIA that is "legal" from that which is "illegal." For example, in Section 2 of the DEI-2 Order, President Trump expresses a policy of terminating all "discriminatory and illegal preferences" and "combat[ting] illegal private-sector DEI preferences, mandates, policies, program, and activities." Similarly, Section 3(b) of the DEI-2 Order requires every federal contract or grant to include a certification from the contractor or grantee that "it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination law."

127.    The language in these provisions regarding illegality begs the question of who determines which diversity, equity, inclusion, and accessibility policies, programs, and activities are legal, as opposed to illegal, and pursuant to what criteria. Given the Trump Administration's actions already taken to eliminate DEIA from the federal workplace, it is likely that all DEIA policies, programs, and activities would be considered illegal by this Administration even without an investigation.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

128.    This is especially true because the Executive Orders provide no clear, objective standards for enforcement. In the absence of any objective standards, the Executive Orders give the Trump Administration unfettered discretion to enforce the prohibitions against federal contractors and grantees, inviting arbitrary and discriminatory enforcement subject to the whims of the decisionmaker.

129.    Despite being impermissibly vague, the Executive Orders include a range of serious penalties, including cancellation of existing contracts and grants; loss of eligibility for future government contracts and grants; and potential civil investigations, regulatory actions, and/or litigation. Thus, the vagueness of the Executive Orders' terms exacerbates the preexisting censorship of Plaintiffs' speech activities by producing an even greater chilling effect.

130.    Because the provision of effective and comprehensive housing and health care services, support, education, and advocacy for LGBTQ people and people living with HIV necessarily requires education about and awareness of the historical and ongoing inequities resulting from, among other things, a person's race, sex, and/or transgender status, data collection, and attention to health disparities, Plaintiffs have no way to discern how to differentiate between the acceptable provision of services in furtherance of their mission and the unacceptable "operation and promotion of DEI" programs and activities or unacceptable promotion of "gender ideology."

## C. Plaintiffs Have Been Injured by the Executive Orders.

### i.    Plaintiff SFAF

131.    SFAF promotes health, wellness, and social justice for communities affected by HIV through advocacy, education, community partnerships, and direct services. Over the past four decades, SFAF has been at the forefront of the fight against HIV and AIDS, providing free, comprehensive services to approximately 27,000 clients annually. These services include harm reduction, behavioral health care, sexual health care, HIV prevention and care, and community engagement initiatives tailored to diverse populations. SFAF's mission focuses on preventing HIV, educating the public, advocating for affected communities, and providing compassionate care for individuals living with or at risk of HIV. SFAF is committed to ensuring its services reach

those populations that are most affected by HIV, including Black, Indigenous, and People of Color ("**BIPOC**"); men who have sex with men; people who inject drugs; and transgender and non-binary individuals.

132.    SFAF relies on federal funding to provide these services. For Fiscal Year 2025–2026, SFAF is expected to receive approximately two million dollars in direct and indirect funding. Of this amount, more than $600,000 is directly funded through agreements with CDC, and the balance is indirectly funded by a variety of federal agencies through subcontracts and/or grants with state and local agencies.

133.    This funding supports a national model for HIV prevention, and enables SFAF to provide HIV prevention, testing, and treatment services to thousands of people living with or at risk of contracting HIV. Because of this funding, SFAF is able to expand comprehensive sexual health services to populations most affected by HIV and sexually transmitted infections ("**STIs**") and leverage feedback systems such as surveys, listening sessions, and focus groups to assess community needs and create equitable and inclusive clinic-level plans.

134.    The Executive Orders, if enforced, will not permit SFAF to receive these federal grants.

135.    Consequently, the Executive Orders will have a profound and damaging impact on all of SFAF's federally funded programs and services, which are critical in providing HIV prevention, sexual health services, and harm reduction efforts to the most vulnerable populations.

136.    For example, SFAF's core HIV prevention efforts rely on federal funding to provide services such as testing and treatment to underserved communities. The DEI-1 and DEI-2 Orders restrictions on DEI programs will severely limit SFAF's capacity to deliver services tailored to the unique needs of marginalized groups, including BIPOC, transgender and nonbinary individuals, and men who have sex with men—groups that face disproportionate barriers to accessing these life-saving health services.

137.    In addition, the Executive Orders' emphasis on eliminating recognition of transgender identity and restricting community-specific interventions hinders SFAF's ability to

address the social determinants of health—such as stigma, homelessness, and substance use—that disproportionately affect these groups. This, in turn, will exacerbate HIV prevalence within these communities.

138.    Similarly, SFAF receives funding to address the MPOX resurgence that disproportionately affects gay, bisexual, and other men who have sex with men, and transgender and gender non-binary individuals. The restrictions concerning DEI and acknowledging transgender people could lead to decreased MPOX vaccine acceptance and access, reducing the effectiveness of this program and potentially increasing the spread of MPOX among vulnerable groups.

139.    Targeting services to minority and transgender communities is essential for effective HIV treatment and prevention because these populations experience disproportionate rates of HIV due to systemic barriers. Decades of epidemiological research consistently demonstrates that tailored outreach, testing, and prevention services are more successful in reaching these communities, improving health outcomes, and reducing transmission rates. The CDC and other public health authorities have long recognized that interventions designed specifically for populations at higher risk are critical to ending the HIV epidemic. In line with this evidence, government contracts funding HIV outreach and care programs include requirements to target these communities, ensuring resources are directed where they are most needed and have the greatest positive public health impact. This approach is not only evidence-based but also essential to fulfilling public health goals and health equity mandates

140.    The Executive Orders fundamentally conflict with SFAF's commitment to addressing systemic barriers to health and SFAF's core values of promoting justice, dignity, courage, leadership, excellence, diversity, equity, and inclusion throughout its organization and the populations SFAF serves.

141.    Moreover, maintaining a diverse, inclusive staff is necessary and mission-critical to SFAF's core purpose. The success of SFSF's programs depends on SFAF's ability to recruit

and retain staff who reflect the communities the organization serves—an essential factor in delivering effective, culturally humble care.

142.     Consequently, the Executive Orders are an existential threat to SFAF's mission and the consequences will be devastating: reduced access to HIV prevention and care in communities already facing the highest barriers, increased mistrust in healthcare systems, higher rates of late HIV diagnosis, and lower rates of viral suppression. Decades of public health research confirm that one-size-fits-all approaches to HIV prevention and care fail to meet the needs of communities most affected by HIV.

### ii.     Plaintiff GLBT Historical Society

143.     Founded in 1985, the GLBT Historical Society is a global leader in LGBTQ+ public history. The GLBT Historical Society established and continues operating the first museum of LGBTQ+ history and culture in the United States, which it founded fourteen years ago. The GLBT Historical Society also established and still maintains the Dr. John P. DeCecco Archives, one of the largest repositories of LGBTQ+ historical materials in the world.

144.     The GLBT Historical Society collects, preserves, exhibits, and makes accessible to the public materials and knowledge to support and promote understanding of LGBTQ+ history, culture, and arts in all their diversity. The GLBT Historical Society's Archives and Special collections are among the largest and most extensive holdings in the world of materials about LGBTQ+ people, occupying more than 4,000 linear feet of storage.

145.     The GLBT Historical Society's 1,000+ collections provide source material to diverse researchers, including educators, students, journalists, filmmakers, professional scholars, artists and others. The publicly accessible reading room is available to researchers throughout the year and serves an incredibly high volume of remote researchers through its website, email, and phone reference services and digital collections. Visitors come from all over the world to engage with materials used in producing a wide array of exhibitions, books, academic publications, theses, documentaries, films, and works of visual and performing arts.

146.    The GLBT Historical Society (whose founding members and earliest collections included transgender people) would not be able to advance public knowledge and accurate history—invaluable resources for understanding the challenges of the present and inspiring dreams for a future of greater social justice for its community—without creating access to accurate representations of transgender, nonbinary, and gender-expansive people throughout time.

147.    For nearly twenty years, federal funding, mainly from Defendant NEH and Defendant NARA (through the National Historic Publications and Records Commission ("**NHPRC**"), has allowed the GLBT Historical Society to preserve, digitize, catalog, and make accessible thousands of materials for public research.

148.    Current funding from an open NHPRC grant of approximately $120,000 supports work to process, digitize, and create online access for collections related to LGBTQ+ Asian American/Pacific Islander people.

149.    The GLBT Historical Society also has an open NEH grant of approximately $10,000 that supports the purchase of new archival preservation supplies and a storage cabinet to ensure the continued care of the ever-expanding collections.

150.    Should the GLBT Historical Society lose federal funding as a result of its inability to comply with the Executive Orders, it would not be able to process, digitize, and make accessible priceless historical materials that help researchers, scholars, educators, students, and artists create tens of thousands of intellectual and artistic contributions that support a healthy and thriving civil society.

151.    The Executive Orders, if enforced, would inflict irreparable harm on the GLBT Historical Society and its community. They would jeopardize the GLBT Historical Society's ability to sustain its operations, staff, and programs that depend on federal funding. They would compromise the ability to fulfill the GLBT Historical Society's mission, vision, and values that guide its work. They would damage the ability to preserve and share the community's history, culture, and arts, which are essential for collective identity, memory, and resistance. They would

1  also deprive the public of the opportunity to access and learn from the GLBT Historical Society's

2  historical materials, which are vital for education, research, and artistic creation.

3          **iii.       Plaintiff SF Health Center**

4          152.    SF Health Center is a Federally Qualified Health Center ("**FQHC**") and has

5  operated in the San Francisco Bay Area for nearly forty years. SF Health Center is dedicated to

6  providing comprehensive health care services to underserved populations, including LGBTQ+

7  individuals (with a concerted focus on transgender individuals), people of color, individuals

8  experiencing homelessness, and people living with or vulnerable to HIV. Diversity, equity, and

9  inclusion are rooted in its mission to transform lives by advancing health and wellness for these

10  vulnerable and marginalized communities.

11          153.    SF Health Center has committed to ensuring its workforce composed of those with

12  the lived experience of its clients—48% of its 180 employees identify as trans or gender non-

13  conforming; 76% are people of color; and 28% identify as gay, lesbian, or bisexual. Of SF Health

14  Center's more than 5,000 patients, 25% are transgender or gender non-conforming,70% are people

15  of color, and 60% are unhoused or marginally housed. SF Health Center's commitment to diversity

16  has allowed it to provide lifesaving health outcomes to meet the needs of those communities it

17  serves.

18          154.    SF Heath Center currently receives several federal grants from various subagencies

19  of HHS, including CDC and SAMHSA, in an annual aggregate amount of over $1.5 million. SF

20  Health Center also has a multiyear grant from HRSA with an annual award of over $1.4 million

21  because of its designation as a Federally Qualified Health Center. SF Health Center also receives

22  pass-through federal funds through the San Francisco Department of Public Health totaling $2.2

23  million annually (in the form of HRSA Ryan White and Ending HIV Epidemic grants).

24          155.    The $1,505,500 in awards from the CDC and SAMHSA include the

25  Comprehensive High-Impact HIV Prevention Programs for Young Men of Color Who Have Sex

26  With Men and Young Transgender Persons of Color Grant in the amount of $400,000 per year;

27  grant funds under the Community-Based Approaches to Reducing Sexually Transmitted Diseases

28

award in the annual amount of $305,500; Minority AIDS Initiative: Prevention Navigator Program for Racial/Ethnic Minorities and High Risk Populations in the annual amounts of $300,000 and $500,000, respectively.

156.    Shortly after the Executive Orders were signed, SF Health Center received multiple termination/stop work orders. These included notices with respect to its CDC awards instructing it to "immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting 'diversity, equity, and inclusion' (DEI) at every level and activity, regardless of your location or the citizenship of employees or contractors, that are supported with funds from this award"; and to "immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity, regardless of your location or the citizenship of employees or contractors, that are supported with funds from this award."

157.    Because of the vaguely worded DEI-1 Order and DEI-2 Order which do not define the terms "diversity," "equity," and "inclusion" and the Gender Order's redefinition of gender to forbid the recognition of transgender people, the SF Health Center cannot understand how to comply with both the Executive Orders and the purpose of the federal grants and other legal obligations under those grants that the SF Health Center is required to provide.

158.    The Executive Orders directly threaten the termination of SF Health Center's programs and services that are grounded in historical health equity and racial justice underpinnings.

159.    The Executive Orders appear to dismiss data that informs the work that the SF Health Center performs which has revealed the institutional inequities that have disproportionately affected the delivery of care to the most vulnerable members of society. The Executive Orders' language effectively erases evidenced-based public health data, which demonstrates that communities of color, LGBTQ+ individuals, and people living with HIV experience disproportionately poor health outcomes. These disparities are rooted in historical and structural discrimination, including racism, xenophobia, misogyny, homophobia, and transphobia. To

address these inequities, the SF Health Center employs evidence-based, community-defined, culturally competent care models that acknowledge the unique needs and life experiences of its clients. SF Health Center's programs are designed to both treat illness and address the social determinants of health that contribute to persistent disparities.

160.    The SF Health Center provides care to the transgender community, which in particular, faces significant barriers to accessing health care. Transgender individuals are more likely to experience health care discrimination, economic insecurity, life-threatening violence, and homelessness, all of which contribute to poorer health outcomes. The services the SF Health Center provides include mental health support, HIV treatment and prevention, case management, and primary medical care. These treatments are proven to dramatically improve health outcomes for transgender people. The SF Health Center has already seen an uptick in depression, anxiety, and suicidal thoughts amongst its patients since the Executive Orders were signed.

161.    The Executive Orders fundamentally undermine SF Health Center's ability to continue to provide critical services. To comply with the Gender Order, SF Health Center would be forced to effectively deny the existence of transgender and gender-diverse people and abandon evidence-based practices that are essential to providing medical care to its transgender clients and at the core of its mission.

162.    Similarly, the DEI-1 Order's attack on DEI initiatives directly threatens SF Health Center's capacity to train staff in the cultural competencies necessary to serve its diverse client base. The Executive Orders will deny SF Health Center's ability to provide transgender-sensitivity trainings, equip healthcare providers with the skills to address implicit bias, understand cultural health beliefs, and build the rapport and trust required with clients from marginalized communities. These DEI programs are essential to SF Health Center's ability to help its providers gain comfort in treating racially and gender-diverse patients, increase awareness of racial health disparities, and improved fluency in gender-affirming medical terminology. The loss of DEI-informed practices will create barriers to culturally competent care, particularly for communities of color who already experience negative health outcomes due to systemic racism.

163. Public health principles demonstrate the importance of prioritizing services for populations with elevated health risks. SF Health Center's HIV prevention programs, for example, include targeted outreach and testing for transgender women of color, who face disproportionately high HIV acquisition rates. SF Health Center's Asian and Pacific Islander HIV programs address cultural barriers and shame that have prevented access to HIV and mental health resources. Their Black Health programming focuses on the specific mistrust of the prevailing medical and healthcare system to bridge access to providers who can build the necessary trust and rapport to combat stigma prevalent in communities of color.

164. If the Executive Orders are allowed to stand, SF Health Center will have to either abandon its mission to provide targeted, culturally competent care to marginalized communities, or forfeit the federal funding supporting its services. Without these resources, SF Health Center will be forced to reduce services, shutter programs, and turn away clients who rely on it for basic and essential healthcare.

### iv. Plaintiff LA LGBT Center

165. The mission of the LA LGBT Center is to fight bigotry and build a world where LGBT people thrive as healthy, equal, and complete members of society. Today the LA LGBT Center's approximately eight hundred employees provide services for more LGBTQ people than any other organization in the world, with more than 500,000 client visits per year.

166. The LA LGBT Center is the largest provider of services to LGBTQ people in the world. Many of the LA LGBT Center's patients come to it seeking culturally competent health care due to being denied care or being discriminated against based on their real or perceived sexual orientation, gender identity, transgender status, and HIV status. The LA LGBT Center's client population is disproportionately low-income and experiences high rates of chronic physical and mental conditions, homelessness, unstable housing, trauma and discrimination, and stigmatization in health care services. The client population is diverse with respect to race and class, and more than 55% of its patients self-report that they are non-white or of Latinx ethnicity. Many clients

come to the LA LGBT Center from different areas of California, other states, and even other nations to seek services in a safe and affirming environment.

167. Respecting transgender people and advancing their civil rights is central to the LA LGBT Center's identity, advocacy, and mission, and a necessary part of every aspect of the services it provides. Nearly every aspect of the services provided by the LA LGBT Center directly or indirectly affects the transgender community, and the LA LGBT Center has provided its services to over 6,000 transgender individuals over the past ten years—the majority of such services relating to their medical care.

168. The LA LGBT Center provides a wide spectrum of healthcare services, including, but not limited to, HIV treatment, testing, and prevention care, and mental health care. The LA LGBT Center has medical providers who specialize in the care of transgender patients and provide a full range of primary care services in addition to hormone therapy, pre- and post-surgical care, and trans-sensitive pap smears, pelvic exams, and prostate exams. The LA LGBT Center's broad array of healthcare services are all under one organization, from counseling and therapy to pharmaceutical and nutrition needs. In many cases, these services are quite literally lifesaving.

169. The LA LGBT Center also provides numerous mental health-related services, which are particularly important for the many patients who have experienced traumatic discrimination based on sexual orientation, gender identity, transgender status, HIV status, and other factors. The LA LGBT Center's health care providers have treated many patients who have experienced traumatic stigma and discrimination based on sexual orientation, gender identity, transgender status, sex stereotypes, HIV status, and/or other factors.

170. The LA LGBT Center is one of the nation's largest and most experienced providers of LGBTQ health and mental health care. As an FQHC, the LA LGBT Center is required to serve anyone, on a nondiscriminatory basis, who walks through its doors.

171. The LA LGBT Center is a direct and indirect recipient of several federal contracts and grants. A significant portion of the LA LGBT Center's revenue comes from federal programs, including, but not limited to, direct funding from the CDC and grants from the HRSA Bureau of

Primary Health Care under which the LA LGBT Center is an FQHC. The LA LGBT Center also receives federal funding for research programs and is currently a participant in multiple federally funded studies.

172.    The LA LGBT Center works hard in numerous ways to identify and address disparities in access to health care and patient health inequities based on race, sex, national origin, and LGBTQ status. The LA LGBT Center provides training to its own staff, as well as to external partners and to the public. Internal staff training educates the LA LGBT Center's staff about identifying and acknowledging disparities in underlying health conditions, cultural and historical barriers to care, and combating implicit bias that could interfere with patient-provider interactions, the ability of patients to receive equitable access to care, and patient outcomes.

173.    The LA LGBT Center has implemented a framework to train its staff about such issues, which is meant to acknowledge and address systemic racism and the role of implicit bias in contributing to health disparities, including anti-LGBTQ bias. The lack of such training would exacerbate healthcare disparities that LGBTQ people, trans people, and people of color face in the broader healthcare environment—an outcome directly contrary to the LA LGBT Center's grant mandates and fundamentally at odds with its mission to provide the highest-quality health care to patients without discrimination. Without addressing systemic obstacles to care, the LA LGBT Center cannot successfully fulfill the obligations of its federal funding.

174.    The Gender Order, by prohibiting the promotion of "gender ideology," seems to condition federal funding on the denial of the very existence of transgender people. It is impossible for the LA LGBT Center to fulfill its mission and provide any of its services to transgender patients and clients without acknowledging and recognizing transgender people for who they are. Part of the LA LGBT Center's mission is to "fight against bigotry" and to help "build a better world—a world in which LGBTQ people can be healthy, equal, and complete members of society." Accordingly, the LA LGBT Center's values of "Courage" and "Liberation" require it to "center the members of our community who need its care the most" and "to ensure the safety and freedom

of *all* LGBTQ+ people." By definition, this includes recognizing the existence, identities, and experience of the transgender and gender diverse community members.

175. The LA LGBT Center's mission includes ensuring LGBTQ individuals, particularly transgender people, of all backgrounds can be healthy, equal, and complete members of society. The Executive Orders make it difficult, if not impossible, for the LA LGBT Center to continue providing the same level of social, mental, and physical health care and related social services to its patients, external partners, and the public. The LA LGBT Center plainly cannot accomplish its mission—and its mandates under existing grants—should the Executive Orders be allowed to stand.

### v.    Plaintiff Prisma Community Care

176. Prisma Community Care is committed to providing barrier-free access to healthcare for all and is dedicated to providing services to advance health equity for diverse communities. Prisma Community Care does this by building trust with vulnerable communities through emphasizing the importance of having staff that is reflective of those communities. This includes people who are transgender, gender-expansive, BIPOC and/or Latinx. By promoting diversity, equity, inclusion and accessibility, Prisma Community Care has created a team that is able to cultivate a culture of trust and understanding among transgender, gender diverse, BIPOC and Latinx communities. Prisma Community Care's focus on affirming and inclusive services allows it to improve the health outcomes of all of its patients.

177. Prisma Community Care receives nearly $4 million in federal funding annually, both in direct contracts with federal agencies and in pass-through federal funds received from Arizona State agencies.

178. Prisma Community Care receives direct funding from the federal government via grants from HRSA under the Ryan White HIV/AIDS Program (as defined below) and through HHS under Title X of the PHSA. Prisma Community Care also receives indirect pass-through funding via subagencies of HHS, including the CDC and SAMHSA. The direct and indirect federal funds Prisma Community Care receives are critical to its ability to provide health services to

1    diverse communities, including BIPOC, LGBTQ+ and queer individuals, and those affected by

2    HIV. These funds are used to support services including Prisma Community Care's primary care

3    services; low- to no-cost HIV testing; rapid start initiation for HIV treatment; STI testing; PrEP

4    and nPEP therapy and navigation; family planning services; mental health services; nutrition

5    services; outreach and education; and more. Prisma Community Care would be required to

6    terminate almost 40% of its staff within one week without the direct and indirect federal funding.

7        179.    As part of this work, Prisma Community Care's programs provide outreach services

8    to BIPOC, queer, men who have sex with men, and transgender people, for HIV and STI education

9    and prevention. These programs use grant funds from HRSA, CDC, and PHSA grants, which

10   require Prisma Community Care to provide this outreach, education, and free HIV testing to these

11   targeted underserved populations.

12       180.    The grants from HRSA, CDC and PHSA require Prisma Community Care to submit

13   activity reports to ensure that the key populations are receiving the intended services. Therefore,

14   Prisma Community Care cannot determine how to comply with the Executive Orders without

15   simultaneously violating the requirements of these grants.

16       181.    In Prisma Community Care's grant terms and conditions, Prisma Community Care

17   is mandated to comply with all applicable federal and state laws, rules, and regulations. The grant

18   terms and conditions also expressly require Prisma Community Care to follow the anti-

19   discrimination mandates in Title VI of the Civil Rights Act of 1964, Section 504 of Rehabilitation

20   Act of 1973, Title II of the Americans with Disabilities Act of 1990, the Age Discrimination Act

21   of 1975, Title IX of the Education Amendment of 1972, and Section 1557 of the Affordable Care

22   Act, and expressly prohibit Prisma Community Care to discriminate based on race, national origin,

23   sex, age, or disability.

24       182.    Prisma Community Care has received demands in the HHS Payment Management

25   System funding portal that Prisma Community Care "immediately terminate, to the maximum

26   extent, all programs, personnel, activities, or contracts promoting 'diversity, equity, and inclusion'

27   (DEI) at every level and activity all DEI activities" and cease activities promoting "gender

28

ideology" that rely on CDC funds to comply with the Executive Orders. Given that Prisma Community Care's core mission depends on having a focus on diversity, equity, and inclusion to provide effective and compassionate care to historically marginalized groups, including people who are transgender and gender-diverse, it would be impossible for Prisma Community Care to comply with both the Executive Orders and the terms of its federal funds.

183.    Prisma Community Care serves over 30,000 people in Arizona by providing access to vital health services and support to individuals in diverse communities especially BIPOC, LGBTQ+ and queer individuals and those affected by HIV. Prisma Community Care's ability to function depends entirely on its commitment to diversity, equity and inclusion and its acknowledgement and understanding of gender diversity.

### vi.    Plaintiff NY LGBT Center

184.    Diversity, equity, and inclusion, and the recognition of and support for transgender individuals is woven into the very fabric of the NY LGBT Center's mission and are at the heart of the behavioral and mental health, substance use, and other services it offers by acknowledging that certain communities have been historically neglected and harmed by racism, transgender bias, sexism, and poverty. This includes LGBTQ people who are BIPOC, transgender, poor/working-class, living with HIV/AIDS, immigrants, and/or youth. The NY LGBT Center puts these communities at the center of all its work and is committed to serving all members of the LGBTQ community.

185.    More than $2 million of the NY LGBT Center's annual budget comes from federal funding, in both direct grants from federal agencies and in pass-through federal funds received from New York State agencies.

186.    The NY LGBT Center receives direct funding from the federal government via grants from SAMHSA and the Office of Victims of Crime in the DOJ (the "**DOJ OVC**"). The NY LGBT Center also receives indirect pass-through funding via various New York State agencies, including the New York State Office of Victim Services, New York State Department of Health, and the New York State Office of Addiction Services and Support ("OASAS"). The direct and

indirect federal funds the NY LGBT Center receives are critical to its ability to provide the range of important services it offers to members of the LGBTQ+ community. The federal funds the NY LGBT Center receives are also used to support several full-time employees whose work is necessary to provide these services.

187.    The NY LGBT Center's behavioral and mental health services represent a holistic approach to wellness and empowerment for the LGBTQ community. This includes recovery programming designed to help members of the LGBTQ community lead healthy lives through substance use treatment, mental health counseling, recovery groups, HIV/AIDS testing and education. The NY LGBT Center also provides services and programs designed for LGBTQ young people in a safe, inclusive, affirming environment where they can connect with peers, build leadership skills, and take care of their mental and physical health.

188.    It is well-researched and established that health disparities amplify due to the intersectionality of oppression. When it comes to those disproportionately affected by HIV, there are significant disparities for LGBTQ men of color and transgender women of color. The NY LGBT Center's services are designed to meet the needs of those whose health is most affected by social inequities. This includes those who experience the greatest barriers, have the least access, and are afraid to come forward for care due to stigma, mistrust, and traumatization. The NY LGBT Center offers a wide range of LGBTQ-specific outreach, prevention, and treatment services specifically designed to remove barriers and facilitate access to care. The NY LGBT Center offers education, outreach, economic stability, treatment, and prevention initiatives to address the disparities in access, service use, and outcomes for LGBTQ minority populations with substance use disorders and co-occurring substance use and mental health disorders who are at risk for or living with HIV/AIDS.

189.    As part of this work, the NY LGBT Center runs an HIV & Sexual Health Services program that provides HIV and Hepatitis C testing and community outreach services to BIPOC, queer, trans, and gender-nonconforming community members. This program is paid for by funds received under a five-year grant with SAMHSA called the "RYSULT Grant." The goal of the

RYSULT Grant as stated in the grant agreement with SAMHSA is to "provide training and education around the risks of substance misuse, education on HIV/AIDS to youth ages 13-24 living in NYC, specifically targeting racial minorities, and needed linkages to service provision for youth with HIV." Pursuant to the RYSULT Grant, the NY LGBT Center is to receive $200,000 per year from SAMHSA; those funds also support 2.8 full-time employees necessary to provide these services.

190.     The NY LGBT Center also provides medical insurance enrollment services to LGBTQ individuals in New York City pursuant to a grant from the New York State Department of Health using pass-through funds the state receives from CMS. This grant's goal is to "increase access to health insurance in the LGBT community" and the grant agreement expressly prohibits the NY LGBT Center from discriminating based on "gender and gender identity" (among other categories). This grant further specifies that the NY LGBT Center's "outreach will focus particularly on vulnerable and hard to reach populations, particularly the LGBTQ and Latinx." Pursuant to this grant, the NY LGBT Center is to receive approximately $500,000 per year through July 2025 to provide health insurance enrollment assistance to individuals eligible for insurance through the New York State health insurance marketplace under the federal Affordable Care Act. These funds also support 4.72 full-time employees necessary to provide these services.

191.     The NY LGBT Center provides the only licensed substance use program in New York City designed specifically to address the unique needs of LGBTQ youth. A significant part of this program is funded by SAMHSA under the name "SASHI 2." The NY LGBT Center is  to receive $500,000 per year under this five-year grant from SAMHSA and these funds are used to provide substance use treatment and prevention counseling and mental health counseling for the LGBTQ community in New York City. Using this funding, the NY LGBT Center provides programming to increase engagement in care for racial and ethnic underrepresented individuals ages thirteen and older with substance use disorders and co-occurring substance use and mental health disorders who are at risk for, or living with, HIV/AIDS and receive HIV/AID services/treatment.

192.     The service emphasis in the SAMHSA grant for SASHI 2 is "caring for those most at risk for HIV: men who have sex with men (MSM), especially young men who have sex with men ages 12–25; transgender individuals, especially those involved with sex work and transactional sex; HIV-negative partners of individuals living with AIDS; minorities in the LGBTQ+ community who are Black and/or Latino/Hispanic, low-income, and/or non-English speaking or English as a Second Language." The NY LGBT Center has designed its programming and activities to achieve this service emphasis. These funds also support 4.8 full-time employees necessary to provide these services.

193.     The NY LGBT Center was also awarded a five-year grant in 2024 by SAMHSA called the "PRIDE Grant." The PRIDE Grant is for five years and the NY LGBT Center is to receive $375,000 per year from SAMHSA. The funds received under the PRIDE Grant will be used to run a program to reduce the onset and progression of substance use and its related problems in LGBTQ youth through training and data collection. As part of this program, the NY LGBT Center will conduct training to increase the capacity of prevention providers and stakeholders throughout New York City to improve their ability to deliver affirming and inclusive services, including to support substance use capacity training for school substance use counselors and youth service workers on providing affirming substance use prevention services to LGBTQ youth in school and community settings across New York City. The funds the NY LGBT Center is to receive under the PRIDE Grant also support 1.3 full-time employees necessary to run the program.

194.     The NY LGBT Center also receives $149,136 per year in federal pass-through funds from OASAS via SAMHSA. The NY LGBT Center's grant from OASAS runs through September 2026 and requires the NY LGBT Center to provide Screening, Brief Intervention, and Referral to Treatment ("**SBRIT**") for high school-age students. SBRIT is an evidence-based approach used to identify, reduce, and prevent problematic substance use and connect young people to care when they are screened positive. The funds the NY LGBT Center receives from OASAS also support 2.7 full-time employees necessary to provide these services.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

195.    It is well-documented—and DOJ OVC's Human Trafficking Taskforce reports—that people identifying as LGBTQ suffer from violent crimes at a disproportionately higher rate than their non-LGBTQ counterparts. The work of the NY LGBT Center's staff is to understand the systemic obstacles to services that members of the LGBTQ community face due to their race, gender identity, immigration status, or other historically oppressed identities.

196.    The NY LGBT Center's work in this area is funded, in part, by a grant from the New York State Office of Victims' Services ("**OVS**") using pass-through federal funding OVS receives from the DOJ OVC. That grant requires the funding received by the NY LGBT Center to be used specifically to help LGBTQ individuals (a population OVS has identified as "Underserved") directly confront and heal from traumas resulting from violent crime. The NY LGBT Center receives $277,127 per year from this grant and those funds are used to provide case management, counseling services and resources for survivors of crime, including hate crimes and intimate partner violence. The funds received through the OVS grant also support 1.8 full-time employees.

197.    The NY LGBT Center also has a grant directly from the DOJ OVC pursuant to which the NY LGBT Center is contracted to receive $100,000 per year through September 2026. The funds received through this grant are to provide direct care to victims of crime, such as transportation, temporary hotel stays, food, and personal care. The funds received directly from DOJ OVC will support one full-time employee to administer the direct care and conduct intake for internal or external referrals for ongoing support.

198.    The NY LGBT Center also has an $856,000 grant from HRSA for a capital project to upgrade the HVAC system in its building and other necessary upgrades to its physical infrastructure. These upgrades are necessary to keep the NY LGBT Center's employees, visitors, and the community it serves healthy and to allow its space to continuing functioning.

199.    Many of the NY LGBT Center's grant agreements with the Agency Defendants or with state agencies administering pass-through funds from the Agency Defendants require that it

provide targeted services to underserved minority populations. By their terms, these grants require an "equity" lens that appears to violate the DEI prohibitions.

200.    Given the broad and vague language in the Executive Orders, however, the NY LGBT Center cannot understand how to comply to continue to receive federal funding. The DEI-1 Order and DEI-2 Order purport to prohibit "illegal DEI" initiatives, yet they fail to define what is meant by "DEI" and what now would be considered unlawful under federal law. It is therefore impossible for the NY LGBT Center—an entity with a focus on diversity, equity, and inclusion and historically marginalized groups, including members of the LGBTQ community—to determine what it can and cannot say and do that aligns with its mission but does not put its federal funding at risk. Similarly, it is impossible for the NY LGBT Center to determine whether it can make the representations the DOJ OVC, SAMHSA, and CMS are likely to require of it to continue to receive federal funds or whether it can use its HRSA grant to improve the facility where it carries out its mission.

201.    It is also not possible for the NY LGBT Center to operate without recognizing the transgender community, which the Gender Order would require it to ignore.

202.    The NY LGBT Center serves as a vital resource for the LGBTQ community, providing essential services, programs, and support to individuals of diverse sexual orientations, gender identities, and expressions. The NY LGBT Center's ability to function depends entirely on its commitment to inclusivity and its acknowledgment of transgender and gender-diverse individuals.

203.    One of the NY LGBT Center's core purposes is recognizing and affirming the existence of transgender and gender-diverse individuals. The Executive Orders' mandate to reject or refrain from acknowledging gender identity as distinct from sex assigned at birth would undermine the NY LGBT Center's foundational principles and its day-to-day operations. If the NY LGBT Center were compelled to comply, it would face the untenable choice of either violating its deeply held mission or risking legal consequences for noncompliance. Compliance with the

Executive Orders would dismantle the NY LGBT Center's identity, rendering it incapable of serving the community it was established to support.

204.    The Gender Order therefore presents an existential threat to the NY LGBT Center's mission and programs, and the well-being of its clients. Compliance would necessitate abandoning the recognition and affirmation of transgender and gender-diverse individuals, effectively erasing a significant portion of the community the NY LGBT Center exists to serve. Such a requirement is antithetical to the NY LGBT Center's values, would cause demonstrable harm to vulnerable populations, and would undermine critical public health efforts.

205.    If the NY LGBT Center is prohibited from receiving federal funding as a result of the Executive Orders, it will be required to eliminate roles and will be unable to continue to provide many of the important and necessary services it currently provides to an otherwise underserved population and that are supported by the funds it receives from SAMHSA, CMS, DOJ OVC, and HRSA.

**vii.    Plaintiff Bradbury-Sullivan**

206.    Plaintiff Bradbury-Sullivan serves the Greater Lehigh Valley by providing LGBTQ+ health programs, advocacy, peer support, arts and culture events, and community-building initiatives. Since 2014, it has been a lifeline for LGBTQ+ individuals, particularly transgender people and communities of color, through addressing health disparities and systemic barriers to care.

207.    The Executive Orders restricting DEI programs and recognition of the transgender community threaten the Bradbury-Sullivan's ability to serve its community and maintain critical funding. 62% of Bradbury-Sullivan's budget relies on federal grants, including CDC-funded health initiatives through the Pennsylvania Department of Health. The DEI-related orders place these funds at risk and would force Bradbury-Sullivan to scale back essential services.

208.    Bradbury-Sullivan provides culturally competent training to healthcare providers, schools, and businesses, ensuring that LGBTQ+ individuals receive equitable care. Programs like tobacco cessation, cancer screening education, and mental health advocacy rely on scientific, data-

driven discussions about implicit bias and systemic disparities. These topics are now potentially restricted by the Executive Orders that undermines the Bradbury-Sullivan's ability to address the root causes of LGBTQ+ health inequities. Currently, Bradbury-Sullivan has entered into a five-year contract to provide these educational services to a partner. Although the contract is only in its first year, the partner has cancelled the contract for the remaining four years because the partner does not want to be in potential violation of the Executive Orders.

209.    The Gender Order effectively erases transgender people from public health efforts, making it impossible for Bradbury-Sullivan to fulfill its mission. The DEI-related orders further block discussions of racial and LGBTQ+ health disparities, jeopardizing the Bradbury-Sullivan's ability to provide affirming healthcare referrals, training, and social services.

210.    LGBTQ+ youth, already at high risk for mental health challenges and family rejection, rely on Bradbury-Sullivan's peer support groups, caregiver programs, and resilience-building initiatives. The Executive Orders' restrictions on gender identity discussions could force these programs to shut down, which would cut off vital support.

211.    The Executive Orders put Bradbury-Sullivan's future at risk by endangering training programs, health services, and outreach efforts. Bradbury-Sullivan is preparing to close its education institute because of the Executive Orders. Partner organizations are already scaling back collaborations due to compliance concerns. Without intervention, Bradbury-Sullivan may be forced to cut services, lay off staff, or close entirely, leaving thousands of LGBTQ+ individuals without support.

**viii.    Plaintiff Baltimore Safe Haven**

212.    Baltimore Safe Haven was founded in 2018 as a mutual aid organization focused on providing life-saving support for survival sex workers and other marginalized TLGBQIA+ individuals. Their work began with a comprehensive wellness and outreach program, meeting people in overlooked parts of the city, providing safer sex education, overdose prevention tools, and peer support.

213.    Baltimore Safe Haven provides mobile outreach services and a drop-in center with a focus on basic needs and survival support, health and harm reduction services, community programming, and peer support, workforce support, and legal support. They launched their first housing program in 2020—an emergency and transitional housing program aimed at underserved youth aged 18–24—and have since expanded their housing support services to include homelessness prevention services aimed at assisting TLGBQIA+ individuals at risk of homelessness, emergency and transitional housing, permanent supportive housing for older adults, housing placement assistance, and housing stability support.

214.    Approximately 80% of Baltimore Safe Haven's budget comes either directly or indirectly (via pass-through funding administered by the State of Maryland and/or City of Baltimore) from federal agencies, including HUD, SAMHSA, and the CDC.

215.    For example, in 2024, Baltimore Safe Haven launched a capital campaign to establish its first permanent home—the Safe Haven Campus, a one-stop TLGBQIA+ housing and resource center, bringing together housing, harm reduction, healthcare, workforce development, and community-building initiatives under one roof. They secured $1 million in HUD Community Development funding to help with purchasing the building.

216.    Baltimore Safe Haven also receives approximately $3 million in operating funds via federal grant money. This includes two grants totaling nearly $1 million of HUD funding from the Mayor's Office of Homeless Services through the City of Baltimore: one from the HUD Youth Homelessness Demonstration Project to fund their transitional housing program for 18–24-year-olds, and one from HUD's Continuum of Care Program's Transitional Housing/Rapid Rehousing component to fund their transitional housing and rental assistance programs.

217.    Baltimore Safe Haven also receives pass-through CDC funding from the Baltimore City Health Department as part of the CDC's High Impact HIV and Surveillance Programs for Health Departments, part of the CDC's longstanding "Ending the HIV Epidemic" initiative. Baltimore Safe Haven's grant agreement with Baltimore City Health Department requires that

Baltimore Safe Haven use these funds to HIV treatment and prevention services specifically to the transgender community.

218.    Additionally, Baltimore Safe Haven receives over $600,000 of pass-through SAMSHA funding via the Maryland Department of Health. This funding is intended to support Baltimore Safe Haven's harm reduction initiative, with a focus on preventing overdoses and the transmission of HIV among TLGBQIA+ people living in survival mode in Baltimore.

219.    Respecting, affirming, and supporting transgender people is central to Baltimore Safe Haven's identity, advocacy, and mission, and a necessary part of every aspect of their service provision. Baltimore Safe Haven focuses on underserved communities, with programming purposely centered around Black transgender women, recognizing that this population experiences the most significant barriers created by racism, homophobia, transphobia, and sexism. The Executive Orders' mandate to reject or refrain from acknowledging gender identity as distinct from sex assigned at birth would undermine the Baltimore Safe Haven's foundational principles and its day-to-day operations. The Executive Orders would require Baltimore Safe Haven to ignore that Black transgender women do not have the same access to every measure of health and wellness, which would do tremendous harm to the TLGBQIA+ people who look to them for care and support. If Baltimore Safe Haven were compelled to comply, it would face the untenable choice of either violating its deeply held mission or risking legal consequences for noncompliance. Compliance with the Executive Orders would dismantle Baltimore Safe Haven's identity, rendering it incapable of serving the community it was established to support.

### ix.    Plaintiff FORGE

220.    FORGE has been operating since 1994 and offers programs and services to reduce the impact of trauma on transgender and nonbinary survivors of violence by empowering service providers, advocating for systems reform, and connecting survivors to wellness resources. Most of FORGE's work focuses on training service providers who work with transgender and nonbinary survivors of sexual assault, intimate partner violence, and hate crimes. Central to FORGE's

mission is the acknowledgement of transgender people's existence. Every aspect of the services FORGE provides directly or indirectly has an impact on the transgender community.

221.    In addition, FORGE's approach is informed by intersectionality, recognizing that the experiences of transgender and nonbinary people are further affected by other marginalized identities they may have, such as race, ethnicity, and disability, which necessitates a nuanced and comprehensive approach in all programs FORGE provides. Accordingly, all of its trainings emphasize DEI and DEIA principles because not only are transgender people an underserved, marginalized group, but transgender people of color, transgender people living with disabilities, and transgender youth face even greater levels of victimization and marginalization. Recognizing these intersections is critical to ensuring that the service providers FORGE trains are able to work effectively with different populations in the transgender community.

222.    Approximately 90% of FORGE's revenue arises from federal contracts and/or grants, including but not limited to grants from the DOJ OVC, DOJ's Office on Violence Against Women ("**DOJ OVW**"), DOJ's Office of Justice Programs, DOJ's National Institute of Justice, HHS, NIH, SAMHSA, and the National Institutes of Health National Institute on Alcohol Abuse and Alcoholism. FORGE's existing federally funded grants support various initiatives, including the development of training materials and direct support services for transgender and nonbinary people. The federal grants are explicit in the requests for proposals that organizations should, and in some cases must, focus on target populations, including transgender people and people of color.

223.    FORGE works with numerous community partners on grant-funded work. Currently, FORGE is a subgrantee on a project with the International Association of Forensic Nurses ("**IAFN**") on the National Tribal Clearinghouse on Sexual Assault funded by DOJ OVW. FORGE's work on this project focuses on survivor services for Two-Spirit people. Two-Spirit people are Native people whose gender and sexuality do not fit into the Western colonial paradigms of the gender binary articulated in the Executive Orders. IAFN has reported to FORGE that the program manager for this grant at OVW told them that the work with Two-Spirit people under the grant had to stop because of the Executive Orders.

224.    The Executive Orders force Plaintiffs to silence their speech and viewpoints relating to issues, such as persistent race and gender inequality, that are not only of great societal importance but also central to Plaintiffs' missions to advocate for and provide services to transgender people and other marginalized communities, even outside of a government contract or grant program, or forgo federal funding. That choice is an impossible one. While Plaintiffs cannot perform their work without addressing views and ongoing concerns related to the communities they serve, they also rely on federal funding to do that work. Thus, the Executive Orders place Plaintiffs in an untenable bind that results in a chilling effect on their speech and viewpoints.

### CLAIMS FOR RELIEF
#### COUNT I
#### U.S. Constitution, First Amendment
#### Free Speech Clause

225.    Plaintiffs repeat and incorporate by reference each and every allegation contained in Paragraphs 1 through 224 as if fully set forth herein.

226.    All Plaintiffs state this cause of action against all Defendants (including President Trump exclusively in his official capacity for purposes of declaratory relief), seek preliminary and permanent injunctions, and challenge the Executive Orders and any agency action seeking to implement the Executive Orders both facially and as applied to them.

227.    Plaintiffs' claim for relief arises from the principle of non-statutory review to enjoin Executive Officers and Departments seeking to enforce illegal, *ultra vires* Presidential action.

228.    The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech."

229.    The First Amendment provides strong protection against government attempts to control the topics discussed—and even more so, the *views* expressed—in public discourse. Accordingly, laws that restrict speakers from expressing certain viewpoints are a blatant and egregious form of government speech control that is presumed to be unconstitutional.

230.    All Plaintiffs engage in speech and advocacy to combat anti-LGBTQ discrimination, systemic racism, and sexism, and to advance equity. Such speech and advocacy

constitute core political speech, are critical to their missions, and are necessary to provide their services effectively. All Plaintiffs wish to continue engaging in such speech and advocacy.

231.    All Plaintiffs engage in such speech and advocacy in multiple ways. They conduct certain training of their own staff and of the staff of other federally-funded entities on topics relating to implicit bias, health disparities, and the needs of specific communities they serve. They do not conduct these training on behalf of the government itself, but for their own employees, their clients, and/or the populations they serve. They receive federal funding both directly and indirectly, including through other federal contractors and grantees. They perform outreach specifically to populations that experience systemic obstacles to accessing medical care, housing, and other services, including anti-transgender bias, sexism, and systemic racism. Plaintiffs' decision to conduct trainings that advance equity, diversity, inclusion, and accessibility, and acknowledge the personhood of transgender people constitutes protected First Amendment activity, as does their decision to acknowledge and address these issues in the provision of their services.

232.    The purpose and effect of the Executive Orders are to suppress constitutionally-protected First Amendment activity by targeting specific content and viewpoints through a range of mechanisms. The Executive Orders endorse idiosyncratic, fringe, unscientific, and counter-factual viewpoints with respect to (among other things): diversity, equity, inclusion, and accessibility programs; the existence of systemic obstacles to equality experienced by members of historically-discriminated-against populations; whether discrimination continues to the present day, whether advocating for an end to such discrimination and related disparities is a worthy exercise, whether transgender people even exist, and the legal landscape surrounding enforcement of civil rights laws.

233.    The Defendants have used the Executive Orders to engage in impermissible viewpoint and content discrimination by penalizing Plaintiffs' speech that expresses a contrary viewpoint to that of the government, including Plaintiffs' core political speech.

234. The Executive Orders penalize Plaintiffs for engaging in protected First Amendment activity, primarily by leveraging the federal funding that is key to their ability to operate and carry out their missions.

235. The Executive Orders further require agencies to terminate equity-related grants and ensure that no federal funding goes to grantees or contractors for the "promotion" of an understanding that transgender people exist.

236. The DEI-2 Order imposes coercive funding conditions that weaponize the False Claims Act (31 U.S.C. § 3729) to deter protected speech and expression related to diversity, equity, inclusion, and accessibility. The Gender Order deems having a gender identity that differs from one's sex assigned at birth to be a "false claim."

237. Section 3(b)(iv) of the DEI-2 Order requires that all federal contracts and grants include a provision certifying that recipients do not engage in DEI activities that violate civil rights laws. Given the vague and undefined nature of the term "illegal DEI," this condition creates a coercive and unconstitutional chilling effect by forcing federal grantees and contractors to either self-censor or risk prosecution under the False Claims Act.

238. The threat of civil investigations, potential False Claims Act liability, and the risk of funding termination disproportionately burden Plaintiffs and other nonprofit organizations, whose core missions involve advocacy for racial, gender, and LGBTQ equality.

239. These penalties are intended to chill the Plaintiffs from engaging in speech and related advocacy central to their missions and to coerce them to decline to engage in services and research essential to the health and welfare of the populations they serve for fear of lost contracts or funding.

240. Discrimination against speech based on its content and viewpoint is a violation of the First Amendment. Efforts to suppress speech based on the government's opposition to the speaker's view are unconstitutional.

241. Further, viewpoint and content discrimination are presumptively unconstitutional, requiring the government to justify its discrimination.

242.    The government is unable to circumvent these First Amendment protections by acting through private third parties or conditioning government spending on restrictions to speech.

243.    The Executive Orders and any related federal policy and directives violate the Free Speech Clause of the First Amendment in at least four respects.

244.    *First*, Defendants' threats under the Executive Orders and any related federal policy directives impermissibly burden and chill Plaintiffs' exercise of constitutionally protected speech, expression, and expressive conduct based on the content and viewpoint of their speech.

245.    *Second*, Defendants intend the Executive Orders and any related federal policy directives to coerce Plaintiffs to adopt, endorse, and comply with the government's own idiosyncratic viewpoint as if it were their own. The forced-choice framework imposed by the Executive Orders is to comply with viewpoint-based restrictions or lose federal funding. Plaintiffs are being forced to either abandon their missions or risk financial ruin, effectively silencing advocacy for racial justice, LGBTQ rights, and public health protections.

246.    *Third*, the Executive Orders and any related federal policy directives discriminate against those Plaintiffs who refuse to be chilled or coerced to comply with the government's preferred message for engaging in protected speech and expression of their own viewpoint. The Executive Orders and related actions make clear that they have the purpose of rooting out views about DEIA that the Administration disagrees with and replacing them with its own. The Executive Orders achieve that speech-restrictive purpose by chilling speech through multiple mechanisms.

247.    *Finally*, the Executive Orders and any related federal policy directives impose an unconstitutional condition on congressional funding by requiring Plaintiffs, as a condition of receiving public grants and contracts, to relinquish their First Amendment rights of free speech by refraining from speaking on a certain subject, i.e., DEIA. The Executive Orders are a mandate spun from whole cloth that is antithetical to the federal interests and goals of the programs.

248.    Viewpoint-based restrictions are prohibited, and content-based restrictions must satisfy strict scrutiny. The government lacks even a legitimate justification for its viewpoint and content restrictions, let alone the compelling one required here.

249.    The Executive Orders inflict current, direct First Amendment injury on Plaintiffs. Further, Plaintiffs face a realistic danger of sustaining ongoing and future injuries.

250.    Plaintiffs are entitled to a declaration that the Executive Orders violate the freedom of speech guaranteed by the First Amendment.

251.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Agency Defendants from enforcing or implementing the Executive Orders.

**COUNT II**
**U.S. Constitution, Fifth Amendment**
**Due Process Clause**

252.    Plaintiffs repeat and incorporate by reference each and every allegation contained in paragraphs 1 through 251 as if fully set forth herein.

253.    All Plaintiffs state this cause of action against all Defendants (including President Trump exclusively in his official capacity for purposes of declaratory relief), seek preliminary and permanent injunctions, and challenge the Executive Orders and any agency action seeking to implement the Executive Orders both facially and as applied to them.

254.    Plaintiffs' cause of action arises from the principle of non-statutory review to enjoin Executive Officers and Departments seeking to enforce illegal, *ultra vires* Presidential action.

255.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."

256.    Under the Fifth Amendment to the United States Constitution, a governmental enactment, such as the Executive Orders, is unconstitutionally vague if it fails to provide a person of ordinary intelligence with fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement. Differently stated, governmental enactments are unconstitutionally void for vagueness when their prohibitions are not clearly defined. Such enactments may also be void for vagueness if they inhibit First Amendment freedoms.

257.    Vague prohibitions inhibit freedom of speech when individuals do not know whether their speech is permitted and choose not to exercise their rights for fear of the consequences.

258.    The Executive Orders include vague and subjective terms that lend themselves to conflicting interpretations and appear designed to authorize discriminatory and arbitrary enforcement to achieve the maximum chilling effect on disfavored viewpoints.

259.    The Executive Orders leave Plaintiffs guessing about whether they can train their own staff who assist elderly people in finding housing about the accessibility needs of seniors in relation to housing. They leave Plaintiffs confounded about whether they can continue to research health disparities or tailor their outreach and resources to populations most affected by the HIV epidemic, including transgender women and Black men who have sex with men. Moreover, the Gender Order provides no definition of what constitutes "promotion" of gender ideology, leaving Plaintiffs guessing as to whether any acknowledgment of the existence of transgender people violates it.

260.    The Executive Orders fail to provide adequate notice as to which speech, advocacy, and activities may or may not be permitted in the performance of federal grants and/or contracts, or even permitted if funded by non-federal funds if Plaintiffs wish to continue to receive federal funding.

261.    In spite of the Executive Orders' vagueness, they include a range of penalties, including cancellation of existing contracts and loss of eligibility for future government contracts, discontinuation of federal grants, and potential False Claims Act liability. The Executive Orders require contractors and grantees to agree that compliance with the government's vague and undefined view is "material" to funding for purposes of the False Claims Act, thus invoking the specter of vexatious private litigation and significant monetary damages under that Act.

262.    Plaintiffs engage in speech, conduct trainings and research, provide services, and engage in advocacy that acknowledge systemic racism, sexism, anti-LGBTQ and other biases, as well as the very existence of transgender people, all of which are central to fulfillment of their missions. Plaintiffs do not know which of their activities are prohibited by the Executive Orders. Because of this uncertainty, they are justifiably fearful of conducting any activities that might

threaten their direct or indirect federal funding, in spite of these activities' centrality to their missions and ability to serve vulnerable and marginalized communities.

263.    The Executive Orders violate the Due Process Clause of the Fifth Amendment to the Constitution and are void for vagueness because they infringe on Plaintiffs' constitutionally-protected right to free speech and provide inadequate notice of the conduct they purport to prohibit.

264.    Plaintiffs are entitled to a declaration that the Executive Orders are unconstitutionally vague in violation of the Fifth Amendment.

265.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Agency Defendants from enforcing or implementing the Executive Orders.

**COUNT III**
***Ultra Vires* Presidential Action in Excess of Authority
Usurping the Legislative Function**

266.    Plaintiffs repeat and incorporate by reference each and every allegation contained in paragraphs 1 through 265 as if fully set forth herein.

267.    All Plaintiffs state this cause of action against all Defendants (including President Trump exclusively in his official capacity for purposes of declaratory relief), seek preliminary and permanent injunctions, and challenge the Executive Orders and any agency action seeking to implement the Executive Orders both facially and as applied to them.

268.    Plaintiffs' cause of action arises from the principle of non-statutory review to enjoin Executive Officers and Departments seeking to enforce illegal, *ultra vires* Presidential action.

269.    The U.S. Constitution vests Congress, not the President, with the exclusive authority over federal spending under Article I, Section 8, and Article I, Section 9, Clause 7. President Trump's Executive Orders usurp this power by unilaterally terminating or modifying federal grants and contracts, despite no congressional authorization for such actions.

270.    Article I of the Constitution vests Congress with the powers to make laws and control the public fisc. The Presentment Clause provides that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States." U.S. CONST. art. I, § 7, cl. 2. The Appropriations Clause provides

that no "Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. CONST. art. I, § 7, and the Spending Clause vests Congress with the power to use Treasury funds for the "general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1.

271.    Thus, it is Congress, not the President, who is vested with the power of the purse. The President does not have unilateral power to withhold federal funds that have been previously appropriated by Congress and signed into law, and the President does not have the power to impose his own conditions on the use of funds when Congress has not delegated to him the power to do so.

272.    As part of its power over the public fisc, Congress appropriates billions of dollars every year in social service, research, healthcare, and educational grants. Congress may specify how its grants are used, generally by passing statutes, or in the annual appropriations bill. None of the Congressional conditions placed on the grants administered or disbursed contain the unique restrictions described in the Executive Orders relating to "diversity, equity, inclusion, and accessibility," or the promotion of "gender ideology."

273.    No provision of the U.S. Constitution authorizes the executive to enact, amend, or repeal statutes, including appropriations approved by Congress and signed into law by the President. The executive cannot unilaterally amend or cancel appropriations that Congress has duly enacted.

274.    By directing agencies to terminate congressionally appropriated grants based on the President's own policy preferences, the Executive Orders attempt to amend, repeal, rescind, or circumvent duly enacted federal statutes or appropriations. These mandates exceed the President's powers under Article II, unconstitutionally infringe upon those powers vested in Congress, and attempt to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses. *See* U.S. CONST. art. I, § 7, cl. 2, 3.

275.    By directing agencies to terminate or withhold congressionally appropriated grants, the Executive Orders attempt to expend public funds to advance the President's policy preferences,

rather than those of Congress. This exceeds the President's powers under Article II and unconstitutionally infringes upon those powers vested in Congress.

276.     These actions exceed the President's powers under Article II, unconstitutionally infringe upon those powers vested in Congress, and attempt to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses.

277.     Plaintiffs are entitled to a declaration that the Executive Orders violate the constitutional principles of the separation of powers doctrine, and impermissibly claim for the executive power that is reserved to Congress.

278.     Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Agency Defendants from enforcing or implementing the Executive Orders.

**COUNT IV**
***Ultra Vires* Presidential Action in Excess of Authority**
**Contrary to Statutes**

279.     Plaintiffs repeat and incorporate by reference each and every allegation contained in paragraphs 1 through 278 as if fully set forth herein.

280.     All Plaintiffs state this cause of action against all Defendants (including President Trump exclusively in his official capacity for purposes of declaratory relief), seek preliminary and permanent injunctions, and challenge the Executive Orders and any agency action seeking to implement the Executive Orders both facially and as applied to them.

281.     Plaintiffs' cause of action arises from the principle of non-statutory review to enjoin Executive Officers and Departments seeking to enforce illegal, *ultra vires* Presidential action.

282.     Federal statutes and regulations specifically authorize Plaintiffs' equity-related services and advocacy, and efforts to eradicate discrimination against transgender people. President Trump does not have the power to override those statutes and prohibit grant recipients from doing precisely what Congress has directed, and what duly promulgated regulations prescribe. The Executive Orders are inconsistent with the U.S. Constitution's separation of powers clause.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

283.     The DEI-1 and DEI-2 Orders impose sweeping funding restrictions on federal contractors and grantees, directing agencies to terminate "equity-related" grants and contracts without lawful statutory basis. These actions violate the constitutional separation of powers and amount to an unconstitutional exercise of executive authority over federal appropriations.

284.     The DEI-1 and DEI-2 Orders are contrary to funding statutes applicable to Plaintiffs who receive funding through the HIV Health Care Services Program (also known as the "**Ryan White Program**"), 42 U.S.C. § 300ff, and Housing Opportunities for People with AIDS ("**HOPWA**"), 24 C.F.R. § 574.300.

285.     The statutory framework for the Ryan White Program constituted the initial national response to HIV and explicitly directs resources to underserved populations, reflecting Congress's intent to address disparities in access to healthcare for individuals living with HIV/AIDS. The Ryan White Program requires grant recipients to create HIV health services planning councils that reflect the demographics of individuals with HIV/AIDS in a given area, with particular consideration for disproportionately affected and historically underserved groups and subpopulations. 42 U.S.C. § 300ff-12(b)(1).

286.     The Ryan White Program also mandates that grant recipients target services to underserved populations, including minority populations, ex-offenders, individuals with comorbidities, low-income populations, inner-city populations, and rural populations. 42 U.S.C. § 300ff-52.

287.     The Ryan White Program established the Minority AIDS Initiative to evaluate and address racial and ethnic disparities in access to HIV care, with funding distributed based on the disproportionate impact of HIV/AIDS on racial and ethnic minorities. 42 U.S.C. § 300ff-121.

288.     Likewise, HOPWA regulations reinforce the prioritization of marginalized populations. HOPWA imposes affirmative outreach obligations on grantees to ensure all eligible individuals, including those at risk of discrimination based on race, national origin, sex, or disability, are aware of and can access HOPWA-funded housing and services. 24 C.F.R. § 574.603. Finally, the regulations explicitly define "family" in a manner inclusive of LGBTQ+ people,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    ensuring access to housing assistance regardless of sexual orientation or gender identity. 24 C.F.R.

2    574.3.

3    289.    The statutory framework for FQHCs, which applies to Plaintiffs SF Health Center

4    and LA LGBT Center, also mandates such organizations to provide medical care to "medically

5    underserved populations" and specific minority groups facing systemic barriers to healthcare

6    access. *See* 42 U.S.C. § 254b(a)(1). These populations include, but are not limited to, migratory

7    and seasonal agricultural workers, individuals experiencing homelessness, and residents of public

8    housing. Congress has further empowered states to determine medically underserved populations

9    eligible for funding through 42 U.S.C. § 254b-1.

10    290.    Congress has directly appropriated funds for specific minority populations,

11    including grants for Pacific Islander health services and medical workforce development (*see* 42

12    U.S.C. § 254c-1), as well as funding for diabetes prevention programs targeted at Native American

13    communities (*see* 42 U.S.C. § 254c-3). These statutory provisions demonstrate a clear legislative

14    intent to allocate federal healthcare resources toward minority communities with documented

15    medical disparities.

16    291.    The DEI-1 and DEI-2 Orders violate these statutory and regulatory mandates. The

17    HOPWA, Ryan White, and FQHC programs are structured to remediate systemic inequities in

18    healthcare and housing, and executive orders that disregard these obligations contradict the express

19    will of Congress.

20    292.    The Executive Orders also violate statutory and regulatory mandates applicable to

21    organizations that provide healthcare services and receive any form of federal financial assistance,

22    such as Plaintiff Health Centers. The Gender Order facially discriminates based on sex. For

23    example, it directs agencies to withhold grants from entities that "promote gender ideology,"

24    defined as acknowledging that a person's gender identity may differ from their sex assigned at

25    birth. The DEI-1 and DEI-2 Orders also restrict the ability of organizations to provide services in

26    a manner that complies with accessibility requirements set forth in federal statutes.

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

293.    Section 1557 of the Affordable Care Act ("**ACA**"), 42 U.S.C. § 18116, provides that an individual shall not "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance" on the basis of race, national origin, sex, age, or disability. Section 1908 of the Public Health Service Act ("**PHSA**"), 42 U.S.C. § 300w-7, similarly prohibits discrimination on the basis of sex in programs, services, and activities "receiving Federal financial assistance" through Preventive Health and Health Services Block Grants, which Defendant Kennedy allots as the Secretary of Defendant HHS. *See* 42 U.S.C. § 300w-1.

294.    Discrimination based on transgender status, including the failure to acknowledge a patient's gender identity, constitutes discrimination on the basis of sex under Section 1557 of the ACA and Section 1908 of the PHSA.

295.    Section 1557 further requires that covered entities take reasonable steps to provide meaningful access to its health programs or activities to individuals with limited English proficiency or with disabilities. *See*, *e.g.*, 45 C.F.R. §§ 92.201–92.205.

296.    Likewise, Section 1557 requires covered entities to train its employees as necessary and appropriate to carry out their functions consistent with the requirements of Section 1557 and its implementing regulations. *See* 45 C.F.R. § 92.9.

297.    Federal law—passed by both houses of Congress and signed by the President— prohibits medical institutions and healthcare entities receiving federal grants from discriminating based on race, national origin, sex, age, or disability as a condition of receiving federal financial assistance. The Gender Order attempts to override this statutory scheme with President Trump's unilateral declaration that federally funded institutions must repudiate the existence of transgender people. The DEI-1 and DEI-2 Orders attempt to override this statutory scheme with President Trump's unilateral declaration that federally funded institutions must not engage in efforts that promote "diversity, equity, inclusion, or accessibility."

298.    President Trump does not have the power to override Section 1557 of the ACA or Section 1908 of the PHSA and require federal grantees to engage in precisely the discrimination that those laws prohibit.

299.    When the President usurps congressional authority and infringes on the constitutional rights of individuals, the essential role of the courts is to "say what the law is." The Executive Orders should be declared unlawful, and the Agency Defendants should be enjoined from enforcing or implementing them.

300.    Federal statutes and regulations specifically authorize Plaintiffs' equity-related services and advocacy, and their efforts to eradicate discrimination against transgender people. President Trump does not have the power to override those statutes and prohibit grant recipients from doing precisely what Congress has directed, and what duly promulgated regulations prescribe. The Executive Orders are inconsistent with the Constitution's separation of powers clause.

301.    Plaintiffs are entitled to a declaration that the DEI-1, DEI-2, and Gender Orders are *ultra vires* because they impermissibly direct agencies to take actions in violation of statutory laws.

302.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Agency Defendants from enforcing or implementing the Executive Orders.

**COUNT V**
**Violation of the Fifth Amendment**
**Equal Protection**

303.    Plaintiffs repeat and incorporate by reference each and every allegation contained in paragraphs 1 through 302 as if fully set forth herein.

304.    All Plaintiffs state this cause of action against all Defendants (including President Trump exclusively in his official capacity for purposes of declaratory relief), seek preliminary and permanent injunctions, and challenge the Gender Order and any agency action seeking to implement it both facially and as applied to them.

305.    Plaintiffs' cause of action arises from the principle of non-statutory review to enjoin Executive Officers and Departments seeking to enforce illegal, *ultra vires* Presidential action.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

306.    The Fifth Amendment to the United States Constitution guarantees that no person shall be "deprived of life, liberty, or property, without due process of law."

307.    The Fifth Amendment's Due Process Clause makes the Fourteenth Amendment's guarantee of equal protection applicable to the federal government, its agencies, its officials, and its employees.

308.    The Gender Order discriminates against Plaintiffs based on sex and transgender status by depriving them of funding because they serve and advocate for an end to discrimination against transgender people.

309.    The Gender Order also discriminates based on sex and transgender status against the transgender people whom Plaintiffs serve. Plaintiffs assert claims on their own behalf and also on behalf of the people they serve, including patients, clients, and the patrons who visit the GLBT Historical Society to learn about their community's past. These patients, clients and patrons face barriers to asserting their own claims and protecting their own interests.

**A. The Gender Order is Motivated by Animus.**

310.    The Gender Order expressly discriminates based on transgender status on its face by expressing a disparaging, demeaning, idiosyncratic, and unscientific viewpoint about transgender people; repudiating the very existence of people who are transgender, deeming them "false"; and ordering their exclusion from government recognition and protection in every aspect of their daily lives, from identification documents to healthcare, housing, and employment, among other elements.

311.    The Gender Order was issued for the openly discriminatory purpose of expressing governmental disapproval of transgender people and rendering them unequal to others. It is a status-based classification of persons undertaken for its own sake, something the Constitution's Equal Protection Clause does not permit.

312.    Thus, the Gender Order imposes a broad and undifferentiated disability on a single named group: transgender people. Its sheer breadth is so discontinuous with the reasons offered for it that the Gender Order is inexplicable by anything but animus toward the class it affects.

313.    This animus-laden purpose is not a legitimate governmental interest and fails under any standard of review.

314.    Laws that target and discriminate against a class of people for the sole purpose of making them unequal violate equal protection.

**B.  The Gender Order Discriminates Based on Sex and Transgender Status.**

315.    The Gender Order facially creates a classification based on transgender status by repudiating the existence of transgender people, deeming them "false," and ordering their exclusion from government recognition and protection in numerous aspects of their lives.

316.    The Gender Order also facially creates a classification based on sex because it creates idiosyncratic and unscientific sex-based definitions for the purpose of exclusion and directs agencies to withhold grants from entities that "promote gender ideology."

317.    Discrimination on the basis of sex and transgender status is presumptively unconstitutional and subject to heightened scrutiny.

318.    The Gender Order lacks even a rational or legitimate justification, let alone the exceedingly persuasive or compelling one that is constitutionally required.

319.    The Gender Order also lacks adequate tailoring under any standard of review.

320.    The Trump Administration has been clear that its goal is to erase the transgender community from participation in society—an effort that results in the literal denial of equal protection and causes ongoing harm to the Plaintiffs and the people that they serve.

321.    Plaintiffs are entitled to a declaration that the Gender Order violates the equal protection component of the Fifth Amendment.

322.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Agency Defendants from enforcing or implementing the Gender Order.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek judgment against the Defendants for:

a.    A declaratory judgment under 28 U.S.C. § 2201(a) that the Executive Orders and their implementing agency actions are unlawful and unconstitutional;

1     b.     Preliminary and permanent injunctions enjoining Agency Defendants from

2           implementing and enforcing the Executive Orders;

3     c.     Costs and reasonable attorneys' fees as permitted by law; and

4     d.     Such further relief as the Court may deem just and equitable.

5  Dated this 20th of February, 2025.                    Respectfully,

6                                                s/  *Jennifer C. Pizer*
                                                 JENNIFER C. PIZER (SBN 152327)
7                                                *jpizer@lambdalegal.org*
8                                                LAMBDA LEGAL DEFENSE AND
                                                     EDUCATION FUND, INC.
9                                                800 South Figueroa Street, Suite 1260
                                                 Los Angeles, California 90017-2521
10                                               Telephone: (213) 382-7600

11                                               CAMILLA B. TAYLOR*
12                                               *ctaylor@lambdalegal.org*
                                                 KENNETH D. UPTON, JR.*
13                                               *kupton@lambdalegal.org*
                                                 LAMBDA LEGAL DEFENSE AND
14                                                   EDUCATION FUND, INC.
15                                               3656 North Halsted Street
                                                 Chicago, Illinois 60613-5974
16                                               Telephone: (312) 663-4413

17                                               JOSE ABRIGO*
18                                               *jabrigo@lambdalegal.org*
                                                 OMAR GONZALEZ-PAGAN*
19                                               *ogonzalez-pagan@lambdalegal.org*
                                                 LAMBDA LEGAL DEFENSE AND
20                                                   EDUCATION FUND, INC.
                                                 120 Wall Street, 19th Floor
21                                               New York, New York 10005-3919
                                                 Telephone: (212) 809-8585
22

23                                               [*Counsel block continued on next page*]

24

25

26

27

28

70

KAREN L. LOEWY*
*kloewy@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006-4101
Telephone: (202) 804-6245

PELECANOS*
*pelecanos@lambdalegal.org*
Boulder County, Colorado
Telephone: (213) 351-6051
c/o Jennifer C. Pizer, local counsel
    LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
    800 S. Figueroa St., Ste 1260
    Los Angeles, California 90017-2521

*Counsel for All Plaintiffs*

* Application for admission *pro hac vice*
forthcoming.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF