JENNIFER C. PIZER (SBN 152327)
*jpizer@lambdalegal.org*
PELECANOS*
pelecanos@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 South Figueroa Street, Suite 1260
Los Angeles, California 90017-2521
Telephone: (213) 382-7600

JOSE ABRIGO*
*jabrigo@lambdalegal.org*
OMAR GONZALEZ-PAGAN*
*ogonzalez-pagan@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005-3919
Telephone: (212) 809-8585

CAMILLA B. TAYLOR*
*ctaylor@lambdalegal.org*
KENNETH D. UPTON, JR*
*kupton@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3656 North Halsted Street
Chicago, Illinois 60613-5974
Telephone: (312) 663-4413

KAREN L. LOEWY*
*kloewy@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006-4101
Telephone: (202) 804-6245

*Appearance Pro Hac Vice*

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| SAN FRANCISCO AIDS FOUNDATION, et al.; <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al. <br><br> *Defendants*. | Case No. 4:25-cv-01824-JST <br><br> **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Date: Thursday, May 22, 2025 <br> Time: 2:00 pm PDT <br> Dept.: Oakland <br><br> Trial Date: None Set |

1    PLEASE TAKE NOTICE that on May 22, 2025, or as soon thereafter as they may be heard

2    by the Court, in the courtroom of the Honorable Judge Jon S. Tigar, located at Oakland Courthouse,

3    Courtroom 6 – 2nd Floor, 1301 Clay Street, Oakland, CA 94612, Plaintiffs will hereby and do move

4    pursuant to Rule 65 of the Federal Rules of Civil Procedure and Civil Local Rules 7-2 and 65-2 for a

5    preliminary injunction prohibiting Defendants from enforcing Executive Order Nos. 14,168, 14,151,

6    14,173, as set forth in detail in the Proposed Order attached hereto.

7    Without an order from the Court, these executive actions will continue to cause Plaintiffs

8    irreparable harm. This motion is based on this Notice; the Memorandum of Points and Authorities;

9    the Declarations of (1) Iya Dammons of Baltimore Safe Haven Corp., (2) Krista Brown-Ly of

10   Bradbury-Sullivan LGBT Community Center, (3) Michael Munson, of FORGE, Inc., (4) Roberto

11   Ordeñana of the Gay Lesbian Bisexual Transgender Historical Society, (5) Joe Hollendoner of Los

12   Angeles LGBT Center, (6) Dr. Katherine Duffy of Los Angeles LGBT Center, (7) Jeffrey Klein

13   of Lesbian and Gay Community Services Center, Inc. d/b/a The LGBT Community Center, (8)

14   Jessyca Leach of Prisma Community Care, (9) Dr. Tyler TerMeer of San Francisco Aids

15   Foundation, (10) Lance Toma of the San Francisco Community Health Center, and (11) Jose

16   Abrigo of Lambda Legal Defense and Education Fund, Inc. (Counsel for Plaintiffs); Proposed

17   Order; this Court's file; and any matters properly before the Court.

18   Dated this 3rd of March, 2025.                    Respectfully,

19

20   /s/ *Jennifer C. Pizer*                .
     JENNIFER C. PIZER (SBN 152327)
21   jpizer@lambdalegal.org
     LAMBDA LEGAL DEFENSE AND
22   EDUCATION FUND, INC.
     800 South Figueroa Street, Suite 1260
23   Los Angeles, California 90017-2521
     Telephone: (213) 382-7600

24   CAMILLA B. TAYLOR*
     ctaylor@lambdalegal.org
25   KENNETH D. UPTON, JR.*
     kupton@lambdalegal.org
26   LAMBDA LEGAL DEFENSE AND
     EDUCATION FUND, INC.
27   3656 North Halsted Street
     Chicago, Illinois 60613-5974
28   Telephone: (312) 663-4413

JOSE ABRIGO*
jabrigo@lambdalegal.org
OMAR GONZALEZ-PAGAN*
ogonzalez-pagan@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005-3919
Telephone: (212) 809-8585

KAREN L. LOEWY*
kloewy@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006-4101
Telephone: (202) 804-6245

PELECANOS*
pelecanos@lambdalegal.org
Boulder County, Colorado
Telephone: (213) 351-6051
c/o Jennifer C. Pizer, local counsel
    LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
    800 S. Figueroa St., Ste 1260
    Los Angeles, California 90017-2521

Counsel for All Plaintiffs
* Appearance *pro hac vice*

# TABLE OF CONTENTS

Page

I     INTRODUCTION ................................................................................................ 1

II    STATEMENT OF FACTS .................................................................................. 3

      A.    Plaintiffs Engage in Speech, Advocacy, and Services Advancing the Rights
            and Welfare of Transgender People, and Address Systemic Racism,
            Sexism, and Anti-LGBTQ Bias. ............................................................... 3

      B.    Plaintiffs Have a Shared Purpose and Must Be Able to Continue to
            Advocate for Those They Serve. ............................................................... 5

      C.    The Defendants ......................................................................................... 7

      D.    The Executive Orders ............................................................................... 8

            i.     The Gender Order Seeks to Erase Transgender People. ................ 8

            ii.    The DEI-1 and DEI-2 Orders Seek to Eliminate Diversity, Equity,
                   Inclusion, and Accessibility Policies and to Penalize Organizations
                   That Embrace Such Policies. ........................................................... 9

            iii.   The Executive Orders Harm Plaintiffs by Chilling Their Speech,
                   Frustrating Their Core Purposes, and Threatening Penalties. ....... 10

      E.    The Executive Orders Harm Plaintiffs and Those They Serve. ............... 11

III   LEGAL STANDARD ........................................................................................ 13

IV    ARGUMENT .................................................................................................... 13

      A.    Plaintiffs Have Standing. ......................................................................... 13

            i.     There is a Reasonable Likelihood the Executive Orders Will Be
                   Enforced, as Evidenced by Defendants' Actions to Date. ............ 14

            ii.    Plaintiffs Intend to Violate the Executive Orders as Plaintiffs'
                   Missions Run Directly Counter to the Executive Orders' Unlawful
                   Mandates. ...................................................................................... 14

            iii.   The Executive Orders Apply to Plaintiffs. ..................................... 15

      B.    Plaintiffs Are Likely to Succeed on the Merits. ...................................... 16

            i.     The Executive Orders Violate the Free Speech Clause of the First
                   Amendment. .................................................................................. 16

            ii.    The Executive Orders Violate the Due Process Clause of the Fifth
                   Amendment. .................................................................................. 18

            iii.   The Executive Orders Are Ultra Vires Because They Exceed the
                   President's Authority, Infringe Upon Congress's Powers, and
                   Violate Article I's Framework for Federal Legislation. ................. 20

            iv.    The Executive Orders Are Ultra Vires Because They Conflict with
                   Statutory Equity-Related and Nondiscrimination Requirements. .... 24

            v.     The Gender Order Violates the Equal Protection Clause. .............. 27

                   a.     The Gender Order Fails Any Level of Review. ................... 27
                   b.     The Gender Order Triggers Heightened Scrutiny. ............. 28
                   c.     The Gender Order Fails Heightened Scrutiny. .................... 29

      C.    Plaintiffs Are Suffering Irreparable Harm Necessitating Injunctive Relief. ......... 30

      D.    The Balance of Equities and the Public Interest Favor Plaintiffs. ........... 31

V     CONCLUSION ................................................................................................ 32

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
5
    570 U.S. 205 (2013) ................................................................................................. 17

6

*In re Aiken County*,
7
    725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, J.) ................................................. 23, 24

*All. for the Wild Rockies v. Cottrell*,
8
    632 F.3d 1127 (9th Cir. 2011) ................................................................................ 13

9

*Armstrong v. Exceptional Child Ctr., Inc.*,
10
    575 U.S. 320 (2015) ................................................................................................. 16

11

*C.P. v. Blue Cross Blue Shield of Ill.*,
    No. 3:20-CV-06145-RJB, 2022 WL 17788148 (W.D. Wash. Dec. 19, 2022) ...................... 26

12

13

*Cincinnati Soap Co. v. United States*,
    301 U.S. 308 (1937) ................................................................................................. 21

14

*City & County. of San Francisco v. Azar*,
15
    411 F. Supp. 3d 1001 (N.D. Cal. 2019) ................................................................. 16

16

*City & County of San Fransisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) .......................................................................... 21, 23

17

18

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ................................................................................................. 27

19

*Clinton v. City of New York*,
20
    524 U.S. 417 (1998) .......................................................................................... 21, 23

21

*County of Santa Clara v. Trump*,
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ........................................................ 21, 23, 24

22

*CTIA—The Wireless Ass'n v. City of Berkeley, Cal.*,
23
    928 F.3d 832 (9th Cir. 2019) ................................................................................. 30

24

*Decatur v. Paulding*,
    39 U.S. (14 Pet.) 497 (1840) ................................................................................. 27

25

26

*Dekker v. Weida*,
    679 F. Supp. 3d 1271 (N.D. Fla. 2023) ................................................................. 29

27

28

ii

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ............................................................................................ 13

*Doe v. Horne*,
  115 F.4th 1083 (9th Cir. 2024) .......................................................................... 29

*Doe v. Snyder*,
  28 F.4th 103 (9th Cir. 2022) .............................................................................. 26

*E. Bay Sanctuary Covenant v. Trump*,
  354 F. Supp. 3d 1094 (N.D. Cal. 2018) ............................................................ 31

*Hecox v. Little*,
  104 F.4th 1061 (9th Cir. 2024) .......................................................................... 29

*Hunt v. City of Los Angeles*,
  638 F.3d 703 (9th Cir. 2011) ........................................................................ 18, 20

*INS v. Chadha*,
  462 U.S. 919 (1983) ...................................................................................... 23, 24

*Kadel v. Folwell*,
  100 F.4th 122 (4th Cir. 2024) ............................................................................ 26

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) ........................................................................... 29

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
  567 U.S. 298 (2012) ............................................................................................ 17

*Koontz v. St. Johns River Water Mgmt. Dist.*,
  570 U.S. 595 (2013) ............................................................................................ 21

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ...................................................................................... 24, 27

*Lopez v. Candaele*,
  630 F.3d 775 (9th Cir. 2010) ........................................................................ 13, 14

*Massachusetts v. United States*,
  435 U.S. 444 (1978) ............................................................................................ 21

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) .............................................................................. 31

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
  No. 25-cv-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) ............. 1, 18, 19

iii

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown,*
    567 F.3d 521 (9th Cir. 2009) .................................................................................... 13

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,*
    No. 25-239 (LLA), 2025 WL 368852 (D.D.C. Feb. 3, 2025) ..................................... 21, 22, 24

*New York v. Trump,*
    No. 25 Civ. 39, 2025 WL 357368 (D.R.I. Jan. 31, 2025) ................................................. 22, 24

*Norsworthy v. Beard,*
    87 F. Supp. 3d 1104 (N.D. Cal. 2015) ......................................................................... 29

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ....................................................................................................... 22

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ................................................................................................... 17

*PFLAG, Inc. v. Trump,*
    No. 25-337-BAH, 2025 WL 510050 (D. Md. Feb. 14, 2025) ........................................ *passim*

*PFLAG, Inc. v. Trump,*
    No. 25-337-BAH, Dkt. No. 61 (D. Md. Feb. 13, 2025) ................................................. 1

*Powers v. Ohio,*
    499 U.S. 400 (1991) ................................................................................................... 16

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ................................................................................................... 16

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.,*
    908 F.3d 476 (9th Cir. 2018) ..................................................................................... 13

*Roman v. Wolf,*
    977 F.3d 935 (9th Cir. 2020) ..................................................................................... 31

*Romer v. Evans,*
    517 U.S. 620 (1996) ................................................................................................... 27, 28

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ................................................................................................... 16

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump,*
    508 F. Supp. 3d 521 (N.D. Cal. 2020) ....................................................................... 17, 20, 31

*Schmitt v. Kaiser Found. Health Plan of Wash.,*
    965 F.3d 945 (9th Cir. 2020) ..................................................................................... 26

iv

*Sessions v. Dimaya*,
  584 U.S. 148 (2018) ...................................................................................... 18, 19

*Texas v. Johnson*,
  491 U.S. 397 (1989) ............................................................................................ 17

*Train v. City of New York*,
  420 U.S. 35 (1975) .............................................................................................. 23

*Trump v. United States*,
  603 U.S. 593 (2024) ............................................................................................ 21

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973) ............................................................................................ 28

*U.S. House of Representatives v. Burwell*,
  130 F. Supp. 3d 53 (D.D.C. 2015) ...................................................................... 21

*United States v. Dickson*,
  40 U.S. (15 Pet.) 141 (1841) ............................................................................... 27

*United States v. Virginia*,
  518 U.S. 515 (1996) ............................................................................................ 29

*United States v. Windsor*,
  570 U.S. 744 (2013) ............................................................................................ 27

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ............................................................................. 31

*Washington v. Trump*,
  No. 2:25-cv-00244-LK, 2025 WL 509617 (W.D. Wash. Feb. 16, 2025) ........................ 16, 31

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ...................................................................................... 21, 23

*Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ................................................................................................ 22

**State Cases**

*Van Garderen v. Montana*,
  No. DV-23-541, 2023 WL 6392607 (Missoula Cnty. Dist. Ct., Mont. Sept. 27, 2023) ................................................................................................................ 29

**Federal Statutes**

2 U.S.C. §§ 683, 684 .............................................................................................. 21

1

31 U.S.C. §§ 3729(1), 3730 ............................................................... 10

2

42 U.S.C. §§ 254, 300 ........................................................ 22, 25, 26

3

**Other Authorities**

4

24 C.F.R. § 574.300 ....................................................................... 25

5

24 C.F.R. § 574.603 ....................................................................... 25

6

45 C.F.R. § 92.9 ............................................................................. 26

7

45 C.F.R. §§ 92.201–92.205 .......................................................... 26

8

9

Exec. Order No. 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025) ........................... 28

10

11

Executive Order No. 14,151, *Ending Radical and Wasteful DEI Programs and Preferencing*, 90 Fed. Reg. 8,339 (Jan. 20, 2025) ........................ *passim*

12

13

Executive Order No. 14,168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,650 (Jan. 20, 2025) ........................................................ *passim*

14

15

Executive Order No. 14,170, *Reforming the Federal Hiring Process and Restoring Merit to Government Service*, Fed. Reg. 8621 (Jan. 20, 2025) ............... 28

16

17

Executive Order No. 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8,633 (Jan. 21, 2025) ................ *passim*

18

Executice Order No. 14,183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) ............................................. 28

19

20

Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8,771 (Jan. 28, 2025) ........................... 28

21

Executive Order No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025) ......................................... 28

22

23

Executive Order No. 14,201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025) ................................................................ 28

24

U.S. CONST., Amendments I, V, XIV ...................................... *passim*

25

26

27

28

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I      INTRODUCTION**

3

4

5

6

7

8

9

10

11

Plaintiffs seek immediate injunctive relief to halt the implementation of three unlawful executive orders that are causing immediate, irreparable harm to Plaintiffs and the communities they serve. Immediately after taking office President Donald J. Trump[1] ("**President Trump**") issued Executive Order No. 14,168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,650 (Jan. 20, 2025) ("**Gender Order**"); Executive Order No. 14,151, *Ending Radical and Wasteful DEI Programs and Preferencing*, 90 Fed. Reg. 8,339 (Jan. 20, 2025) ("**DEI-1 Order**"); and Executive Order No. 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8,633 (Jan. 21, 2025) ("**DEI-2 Order**") (collectively, the "**Executive Orders**").[2]

12

13

14

15

16

17

18

19

20

The Executive Orders violate the fundamental separation of powers upon which the Constitution is based, directly conflict with existing statutes, and violate both the First and Fifth Amendments. The Gender Order is unconstitutional, facially discriminatory, and fundamentally un-American because it decrees that an entire group of people (transgender people) do not exist and makes clear that any organization who states otherwise will be targeted and penalized. Discriminating against transgender people is not just an effect of the Gender Order—it is its sole purpose. Similarly, the DEI-1 and DEI-2 Orders unlawfully bar speech that endorses ideas that President Trump's administration ("**Trump Administration**") disfavors—including notions of diversity, equity, inclusion, and accessibility for all. The Executive Orders further provide that

21

22

23

[1] Because in this lawsuit Plaintiffs seek only declaratory relief against President Trump, this Motion does not seek injunctive relief against him.

24

25

26

27

28

[2] As of this filing, the Gender Order has been temporarily enjoined, in part, on a nationwide basis. *See PFLAG, Inc. v. Trump*, No. 25-337-BAH, Dkt. No. 61 (D. Md. Feb. 13, 2025) (temporarily restraining defendants "from conditioning or withholding federal funding based on the fact that a healthcare entity or professional provides gender affirming medical care to a patient under the age of nineteen under Section 3(g) of [the Gender Order]. . ."). The DEI Orders have been preliminarily enjoined, in part, on a nationwide basis. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-cv-00333-ABA, 2025 WL 573764, at *31-32 (D. Md. Feb. 21, 2025) (preliminarily enjoining Section 2(b)(i) (the "Termination Provision" of the DEI-1 Order and Sections 3(b)(iv) (the "Certification Provision") and 4(b)(iii) (the "Enforcement Threat Provision") of the DEI-2 Order).

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES, CASE NO. 4:25-cv-01824-JST

1  anyone who engages in speech that does not align with the Trump Administration's views will have

2  their federal funding terminated and be subjected to civil investigations and heightened penalties.

3      By barring speech that the Trump Administration dislikes, the Executive Orders penalize

4  certain viewpoints—the greatest First Amendment sin. By weaponizing conditions on federal

5  funding as an enforcement mechanism, the President attempts to usurp constitutional powers that

6  are reserved solely for Congress. The Executive Orders also use impermissibly vague phrases that

7  exacerbate the chilling effect on speech in violation of the Fifth Amendment. In short, the Executive

8  Orders amount to an extraordinary abuse of power targeting some of this country's most vulnerable

9  and marginalized populations.

10     Plaintiffs are mission-driven nonprofits that specialize in the delivery of high-quality

11  healthcare, social, and other critical services to members of the lesbian, gay, bisexual, transgender,

12  and queer ("**LGBTQ**") community; an organization dedicated to ending the HIV/AIDS epidemic;

13  and a historical society whose mission is to preserve the history of the LGBTQ community. The

14  Executive Orders are designed to silence, defund, dismantle, and otherwise penalize Plaintiffs for

15  acknowledging the existence of transgender people, advocating for the rights of members of

16  LGBTQ and other historically marginalized communities, and providing humanitarian services in

17  an equitable manner.

18     The requested injunction is both legally warranted and necessary. Plaintiffs have a

19  reasonable likelihood of prevailing on their claims. The irreparable harm to Plaintiffs and the

20  communities they serve is severe, intentional, and undeniable. Without an injunction, Plaintiffs will

21  lose their ability to provide essential, lifesaving services and will be targeted by the government

22  with penalties that could cripple their organizations. Rates of HIV, AIDS and other communicable

23  diseases will increase. People served by Plaintiffs will suffer systemic, government-endorsed

24  discrimination, and lose healthcare, housing, employment, and dignity. For many who rely on

25  Plaintiffs' services, this is a matter of life or death. It is in the public interest to save lives by

26  enjoining these vague, discriminatory, and unconstitutional Executive Orders.

27

28

II      **STATEMENT OF FACTS**

    A.    **Plaintiffs Engage in Speech, Advocacy, and Services Advancing the Rights and Welfare of Transgender People, and Address Systemic Racism, Sexism, and Anti-LGBTQ Bias.**

Plaintiffs provide necessary services to members of the LGBTQ communities. Speech, advocacy, and services advancing the civil rights and welfare of transgender and other LGBTQ people, and addressing systemic racism, sexism, and anti-LGBTQ bias, are central to each Plaintiff's mission. All Plaintiffs receive federal funding to support their work. Declaration of Iya Dammons of Baltimore Safe Haven Corp. ("**Baltimore Decl.**") ¶¶ 8-9; Declaration of Krista Brown-Ly of Bradbury-Sullivan LGBT Community Center ("**Bradbury Decl.**") ¶ 7; Declaration of Michael Munson of FORGE, Inc. ("**FORGE Decl.**") ¶ 7; Declaration of Roberto Ordeñana of the Plaintiff Gay Lesbian Bisexual Transgender Historical Society ("**GLBT Decl.**") ¶ 14; Declaration of Jose Hollendoner of Los Angeles LGBT Center ("**LA LGBT (Hollendoner) Decl.**") ¶¶ 7, 11; Declaration of Jeffrey Klein of Lesbian and Gay Community Services Center, Inc. d/b/a The LGBT Community Center ("**NY LGBT Decl.**") ¶¶ 13-15; Declaration of Jessyca Leach of Prisma Community Care ("**Prisma Decl.**") ¶¶ 9-15; Declaration of Dr. Tyler TerMeer, of San Francisco Aids Foundation ("**SFAF Decl.**") ¶¶ 5-9; Declaration of Lance Toma, of the San Francisco Community Health Center ("**SFCHC Decl.**") ¶¶ 5-7.

    **Plaintiff San Francisco AIDS Foundation.** Plaintiff San Francisco AIDS Foundation ("**SFAF**") is a nonprofit organization that promotes health, wellness, and social justice for communities most affected by HIV, through sexual health and substance use services, advocacy, and community partnerships. SFAF Decl. ¶¶ 1, 3-4. As an essential part of its work, SFAF confronts and combats HIV-related health disparities among gay and bisexual men, transgender women, cisgender women, Black people, Latinx people, and, in particular, people residing at the intersections of these identities. *Id.* ¶¶ 3-4, 7, 10-12, 20-21. SFAF relies on federal funding, following a national model for HIV prevention, which enables SFAF to provide HIV prevention, testing, and treatment services to thousands of people living with or at risk of contracting HIV. SFAF Decl. ¶¶ 5-9. Because of this federal funding, SFAF extends comprehensive sexual health services to populations most affected by HIV and sexually transmitted infections and leverages

feedback systems such as surveys, listening sessions, and focus groups to assess community needs and create equitable and inclusive clinic-level plans. *Id*. ¶¶ 5-13.

**Plaintiff Gay Lesbian Bisexual Transgender Historical Society.** Plaintiff Gay Lesbian Bisexual Transgender Historical Society ("**GLBT Historical Society**") collects, preserves, and makes accessible materials to support and promote the understanding of LGBTQ+ history, culture, and arts. GLBT Decl. ¶ 4. The GLBT Historical Society's Archives and Special Collections are among the largest in the world, occupying more than 4,000 linear feet of storage and spanning more than a century's worth of LGBTQ+ history. *Id*. ¶¶ 5-7. Their work is centered on combating erasure of the LGBTQ+ community, which is critically important considering that the Executive Orders seek to erase the existence of transgender people. *Id*. ¶¶ 10, 16-24. The GLBT Historical Society receives federal grant funding to further this work. *Id*. ¶ 14.

**The LGBTQ Health Centers.** Plaintiffs Los Angeles LGBT Center ("**LA LGBT Center**"), Prisma Community Care ("**Prisma Community**"), and the Asian and Pacific Islander Wellness Center Inc. d/b/a San Francisco Community Health Center ("**SFCHC**") (collectively, "**Plaintiff Health Centers**") are community health centers that provide healthcare—including HIV prevention testing and treatment, STI testing, family planning, gender affirming care, nutrition, and mental health—social services, community, and/or support to low-income patients from a variety of backgrounds who frequently experience discrimination from other healthcare and social service providers on the basis of race, sex, HIV+, and LGBTQ status. LA LGBT (Hollendoner) Decl. ¶¶ 3-6; Prisma Decl. ¶¶ 3-5; SFCHC Decl. ¶¶ 3-4. Federal funding and/or contracts enable Plaintiff Health Centers to provide these lifesaving services to youth, seniors, domestic violence survivors, and patients with life-threatening conditions, among others. LA LGBT (Hollendoner) Decl. ¶¶ 7, 11; Prisma Decl. ¶¶ 9-15; SFCHC Decl. ¶¶ 3-7, 12. A core aspect of their missions is to advance the civil rights of LGBTQ people. *See, e.g.*, Prisma Decl. ¶¶ 1, 3-4, 8; SFCHC Decl. ¶¶ 3-4, 12-14, 19. Further, to care for their patients, Plaintiffs must acknowledge the discrimination and systemic barriers their patients experience when seeking healthcare. Declaration of Dr. Katherine Duffy of LA LGBT Center ("**LA LGBT (Dr. Duffy) Decl.**") ¶¶ 3-18.

**The LGBTQ Community Centers.** Plaintiff LGBTQ Community Centers, which include Plaintiffs SFCHC; LA LGBT Center; Lesbian and Gay Community Services Center, Inc. d/b/a The LGBT Community Center ("**NY LGBT Center**"); Bradbury-Sullivan LGBT Community Center ("**Bradbury-Sullivan**"); and Baltimore Safe Haven Corp. ("**Baltimore Safe Haven**"), offer myriad social services to members of the LGBTQ community, including youth and senior populations and multiple marginalized community members like Black transgender women, addressing their housing, employment, HIV testing and sexual health, substance use, and mental health needs, etc. Bradbury Decl. ¶¶ 2, 5-6, 13-16, 19, 23-25; LA LGBT (Hollendoner) Decl. ¶¶ 3-6; SFCHC Decl. ¶¶ 3-4, 12-14, 19; NY LGBT Decl. ¶¶ 15-19; Baltimore Decl. ¶¶ 3-7, 10-13. Their missions include advocacy for equality for all LGBTQ people. Bradbury Decl. ¶¶ 2, 5-6, 13-16, 19, 23-25; LA LGBT (Hollendoner) Decl. ¶ 3-6; SFCHC Decl. ¶¶ 3-4, 12-14, 19; NY LGBT Decl. ¶¶ 3-12, 15-19; Baltimore Decl. ¶¶ 3-7, 10-13. Plaintiff LGBTQ Centers receive federal funding to support these services. Bradbury Decl. ¶ 7; LA LGBT (Hollendoner) Decl. ¶¶ 7, 11; SFCHC Decl. ¶¶ 5-7; NY LGBT Decl. ¶¶ 13-15; Baltimore Decl. ¶¶ 8-9.

**FORGE.** Plaintiff FORGE, Inc.'s ("**FORGE**") focuses on training service providers who work with victims of sexual assault, intimate partner violence, stalking, and hate crimes to increase their knowledge of how to better serve transgender and nonbinary victims of crime. FORGE Decl. ¶¶ 3-6, 8-10, 15. FORGE also provides direct support, resources, and healing services to transgender survivors of violence. *Id*. FORGE receives federal funding to support the majority of services it provides. *Id*. ¶ 7.

## B. Plaintiffs Have a Shared Purpose and Must Be Able to Continue to Advocate for Those They Serve.

Plaintiffs save lives and preserve the history of LGBTQ communities—which is critical given that the Executive Orders seek to erase the existence of a group of people and disrupt their access to healthcare and social services. Collectively, Plaintiffs provide services to hundreds of thousands of people annually. *See, e.g.*, LA LGBT (Hollendoner) Decl. ¶ 3 (500,000 people); NY LGBT Decl. ¶ 4 (300,000 people); Prisma Decl. ¶ 5 (over 30,000 people); SFAF Decl. ¶ 4 (approx. 27,000 people).

To continue their work, Plaintiffs must be able to continue to acknowledge not only the existence of, but the equal dignity and humanity of the people they serve, including people who are transgender. *See, e.g.*, Baltimore Decl. ¶ 10 ("BSH's origin as an organization created by transgender people for transgender people makes it imperative that we not only fight injustices against transgender people but provide our services to our community in a culturally competent way. It is the cornerstone of our identity."); FORGE Decl. ¶19 ("[E]very aspect of our programming and services revolve[s] around transgender and nonbinary survivors and the providers who serve them."); LA LGBT (Dr. Duffy) Decl. ¶¶ 6-21; LA LGBT (Hollendoner) Decl. ¶ 5 ("Respecting transgender people and advancing their civil rights is central to the LA LGBT Center's identity, advocacy, and mission, and a necessary part of every aspect of the services we provide."); NY LGBT Decl. ¶¶ 31-34 ("One of the NY LGBT Center's core purposes is recognizing and affirming the existence of transgender and gender-diverse individuals. . . . Compliance with the Executive Order would dismantle the NY LGBT Center's identity, rendering us incapable of serving the community we were established to support."); SFCHC Decl. 19 ("Among the health services we provide are primary care, oral health, mental and behavioral health, HIV care, and gender-affirming medical care. For our transgender patients, affirmation and recognition of their identities is important and integral to the provision of all of these services").

In addition, Plaintiffs must continue to be able to direct their services and advocacy to communities most affected by the HIV/AIDS epidemic and to those most impacted by systemic barriers to healthcare, housing, and basic social services due to past and current discrimination—including Black, Latinx, and Asian and Pacific Islander communities, and transgender people. *See, e.g.*, FORGE Decl. ¶5 ("[A]ll of our trainings incorporate DEI and DEIA principles because not only are transgender people an underserved, marginalized group, but transgender people of color, transgender people living with disabilities, and transgender youth face even greater levels of victimization and marginalization."); SFAF ¶¶ 10, 11, 33 ("Targeted services for minority and transgender communities are essential for effective HIV treatment and . . . [the CDC] and other public health authorities have long recognized that interventions designed specifically for populations at higher risk are critical to ending the HIV epidemic."); Baltimore Decl. ¶ 12 ("Our

1    programming purposely centers around Black transgender women, recognizing that this population

2    experiences the most significant barriers created by racism, homophobia, transphobia, and

3    sexism.").

4         Plaintiffs advocate for an end to racism, sexism, and anti-LGBTQ bias and work to

5    document and ameliorate structural inequities, including health disparities and housing

6    discrimination, affecting these communities. *See e.g.*, Baltimore Decl. ¶¶ 10-13; FORGE Decl. ¶¶

7    5, 14, 19; LA LGBT (Hollendoner) Decl. ¶ 3; NY LGBT Decl. ¶¶ 5-12. To perform their work

8    effectively, Plaintiffs must be able to continue to advocate for equality for those they serve; embrace

9    their identities; be cognizant of the structural and societal barriers they experience; and train their

10   staff in diversity, equity, inclusion, and accessibility practices. *See, e.g.*, Baltimore Decl. ¶¶ 10-13;

11   Bradbury Decl. ¶¶ 13-17, 20; FORGE Decl. ¶¶ 5, 14, 19; GLBT Decl. ¶¶ 11-13; LA LGBT (Dr.

12   Duffy) Decl. ¶¶ 3-18; LA LGBT (Hollendoner) Decl. ¶ 5; NY LGBT Decl. ¶¶ 16-34; SFAF Decl.

13   ¶¶ 13-33, 45-46; SFCHC Decl. ¶¶ 19-20.

14         **C.    The Defendants**

15         Defendants include President Trump and the federal agencies and the highest-ranking

16   officials within those agencies responsible for implementing the Executive Orders, including the

17   U.S. Department of Justice ("**DOJ**"), Office of Federal Contract Compliance Programs

18   ("**OFCCP**"), and Office of Management and Budget ("**OMB**"). *See*, Compl. ¶¶ 26-43. Defendants

19   also include those federal agencies, and highest-ranking officials of those agencies, through whom

20   Plaintiffs receive, either directly or indirectly, the federal funding threatened by the Executive

21   Orders, including DOJ, U.S. Department of Labor ("**DOL**"), HHS, U.S. Department of Housing

22   and Urban Development ("**HUD**"), National Archives and Records Administration ("**NARA**"), and

23   National Endowment for the Humanities ("**NEH**").[3] *Id.*

24

25

26   _____

     [3] Defendants DOJ; Attorney General Pamela Bondi; DOL; Acting Labor Secretary Vince Micone;

27   OFCCP; Acting OFCCP Director Michael Schloss; OMB; OMB Director Russell Vought; HHS;
     HHS Secretary Robert K. Kennedy, Jr.; HUD; HUD Secretary Scott Turner; NARA; Deputy

28   Archivist William J. Bosanko; NEH; and NEH Chair Shelly C. Lowe are referred to collectively as
     the "**Agency Defendants**."

### D.    The Executive Orders[4]

#### i.    The Gender Order Seeks to Erase Transgender People.

The Gender Order expresses a disparaging and unscientific view of gender identity, repudiates the existence of transgender people, deems their identities to be "false," orders their exclusion from government recognition and protection, and seeks to coerce others to do the same by threatening termination of federal funding and other penalties.

Specifically, the Gender Order states that a person's sex is an "immutable biological classification as either male or female" that "does not include the concept of 'gender identity,'" and that it is the "policy of the United States to recognize two sexes, male and female" which "are not changeable." "Female" is defined as "a person belonging, at conception, to the sex that produces the large reproductive cell." "Male" is defined as "a person belonging, at conception, to the sex that produces the small reproductive cell." Per the Gender Order, "the Executive Branch will enforce all sex-protective laws to promote this reality" and the above definitions shall govern the application of Federal law and administration policy.

The Gender Order asserts that "gender ideology" "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." Section 3(e) of the Gender Order demands that agencies "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," which is described as "an internal and subjective sense of self, disconnected from biological reality. . . ." Section 3(g) of the Gender Order prohibits the use of federal funds "to promote gender ideology" and directs each agency to "assess grant conditions and grantee preferences" to meet this directive. The Gender Order does not explain what it means to "promote" gender "ideology." Section 7 requires Agencies to report their implementation of the Gender Order within 120 days. The Gender

---

[4] For the convenience of the Court, the Executive Orders are attached hereto as Exhibits A-C to the Declaration of Jose Abrigo, counsel for Plaintiffs.

1  Order thus penalizes federal grantees, including Plaintiffs, whose speech, trainings, research, and/or

2  services acknowledge the existence of transgender people and advocate for their equality.

3          **ii.**      **The DEI-1 and DEI-2 Orders Seek to Eliminate Diversity, Equity,**
   **Inclusion, and Accessibility Policies and to Penalize Organizations That**

4                 **Embrace Such Policies.**

5          The DEI-1 Order asserts that "diversity, equity, inclusion, and accessibility," ("**DEIA**") and

6  related programs are "illegal and immoral discrimination programs," and, among other things,

7  directs agencies to terminate all equity-related grants or contracts. The DEI-1 Order expressly

8  targets private actors, including Plaintiffs. For example, Section 2(b)(ii) directs agencies to provide

9  the Director of OMB with a "list" of contractors "who have provided DEI training or DEI training

10  materials to agency or department employees" and grantees "who received Federal funding to

11  provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities" in the

12  last four years.

13          The DEI-2 Order further asserts the illegality of DEIA and outlines specific mechanisms to

14  punish federal contractors and grantees that embrace or necessarily rely on principles of DEIA. The

15  DEI-2 Order directs all executive departments and agencies "to terminate all discriminatory and

16  illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement

17  actions, consent orders, and requirements" to "enforce our longstanding civil-rights laws and to

18  combat illegal private-sector DEI preferences, mandates, policies, programs, and activities."

19          Similar to the DEI-1 Order, the DEI-2 Order expressly targets private actors, including

20  Plaintiffs. Specifically, Section 3 instructs agencies to cease promoting diversity, requiring

21  contractors to engage in affirmative action, or encouraging workforce balancing based on race,

22  color, sex, sexual preference, religion, or national origin. Section 3 further directs agencies to

23  require grant award recipients to certify that they do not promote DEI and agree that compliance is

24  material for purposes of the False Claims Act. The DEI-2 Order also directs OMB to excise

25  references to DEI and DEIA principles from Federal acquisition, contracting, grants, and financial

26  assistance procedures.  Most alarmingly, the DEI-2 Order directs agencies "to advance in the

27  *private sector* the policy of individual initiative, excellence, and hard work," which the DEI-2 Order

28  asserts is inconsistent with DEI (emphasis added), and directs the Attorney General to submit a

report "*containing recommendations . . . to encourage the private sector to end illegal discrimination and preferences, including DEI*" (emphasis added).

Taken together, the DEI-1 and DEI-2 Executive Orders direct that DEIA policies and activities are wrong, immoral, fail to comply with federal law, and must cease. Defendants thus penalize federal grant recipients and contractors, including Plaintiffs, whose speech, trainings, research, and/or services support or require the consideration of DEIA efforts or traits—namely, those who seek to assist Black people, women, LGBTQ people, and people living with HIV in overcoming systemic barriers to equality resulting from past and current discrimination.

### iii.    The Executive Orders Harm Plaintiffs by Chilling Their Speech, Frustrating Their Core Purposes, and Threatening Penalties.

The Executive Orders are designed to silence, defund, and otherwise penalize Plaintiffs for acknowledging that transgender people exist and providing them with humanitarian services, which Plaintiffs cannot do without acknowledging people's diverse backgrounds and experiences, including race, color, sex, sexual orientation, gender identity, religion, national origin, health status, and/or financial status.

The Executive Orders' penalties extend beyond loss of funding. The DEI-2 Order invokes the False Claims Act, 31 U.S.C. §§ 3729–33, and its harsh treatment of "material" false statements to the government, thereby exposing Plaintiffs to private lawsuits, government prosecution, and penalties of up to three times the amount of the government's damages. 31 U.S.C. §§ 3729(1), 3730. This is especially troubling given that for many Plaintiffs, complying with the terms of their federal grants and the Executive Orders is impossible, because the grants require action that the Executive Orders prohibit. *See, e.g.,* LA LGBT (Hollendoner) Decl. ¶ 11, 23 ("Many of the LA LGBT Center's federally funded grants require the LA LGBT Center to acknowledge, address, and combat HIV stigma and discrimination...the LA LGBT Center plainly cannot accomplish its mission—and its mandates under existing grants—should the Executive Orders be allowed to stand…"). Of course, these unprecedented liabilities and the risk of funding loss has a chilling effect on Plaintiffs' free speech.

1    Further, the chilling effect that the Executive Orders have on speech is magnified by their

2    provisions directing officials to create lists of private individuals and organizations suspected of

3    opposing the Trump Administration's views. If Plaintiffs are placed on these lists, they will be

4    further targeted—either directly by government action or indirectly through reputational harms,

5    and attrition of staff and donors. Moreover, the Executive Orders do not make clear whether such

6    lists will be made public, which would invite harassment, hostility, or worse.

7         **E.      The Executive Orders Harm Plaintiffs and Those They Serve.**

8         The Executive Orders harm each of the Plaintiffs in irreparable ways. For example, SFAF

9    will not be able to provide, or will have to substantially reduce preventative care, healthcare, and

10   supportive services to individuals at risk of or living with HIV. SFAF Decl. ¶¶ 10-13, 34-47. GLBT

11   Historical Society will not be able to preserve and provide public access to LGBTQ history, culture,

12   and art, which is essential for education, research, collective identity, memory, and advocating for

13   equal rights. GLBT Decl. ¶¶ 21, 23-24. The LGBTQ Health Centers will be forced to reduce

14   services, cease core programs, and turn away people who rely on these organizations for low- or

15   no-cost essential healthcare, including HIV and STI treatment, testing, and prevention, mental

16   healthcare, and other essential services. *See, e.g.*, Prisma Decl. ¶ 25; SFCHC Decl. ¶¶ 9-12, 15; LA

17   LGBT (Dr. Duffy) Decl. ¶ 21. LGBTQ Community Centers will be forced to reduce or stop

18   providing vital humanitarian services, including food and essential goods, housing, homelessness

19   prevention, HIV and STI testing, mental healthcare, substance use treatment and prevention

20   counseling, social programs, employment and legal assistance, etc. *See, e.g.*, Baltimore Decl. ¶¶

21   10-12, 14; Bradbury Decl. ¶¶ 11-28; LA LGBT (Hollendoner) Decl. ¶¶ 21-23; NY LGBT Decl. ¶¶

22   16-27, 31-34. Similarly, FORGE, NY LBGT, and SFCHC will lose the ability to provide care and

23   prevention services to victims of violent crime, sexual assault, and intimate partner violence.

24   FORGE Decl. ¶¶ 13, 12; NY LGBT Decl. ¶¶ 27-30; SFCHC Decl. ¶¶ 9-12, 15.

25        In short, Plaintiffs cannot advertise, provide services, train staff, train other agencies or

26   providers, or accomplish their core mission and mandates under existing grants while

27   simultaneously complying with the Executive Orders. *See, e.g.*, Baltimore Decl. ¶¶ 10-14;

28   Bradbury Decl. ¶¶ 26-28; FORGE Decl. ¶¶ 21-20; GLBT Decl. ¶¶ 12-13, 24; NY LGBT Decl. ¶¶

11

1    16-34; LA LGBT (Hollendoner) Decl. ¶ 21; Prisma Decl. ¶ 25; SFAF Decl. ¶¶ 10-13, 34-47;

2    SFCHC Decl. ¶ 23 ("If the Executive Orders are allowed to stand, SFCHC will face the impossible

3    choice of abandoning our mission to provide targeted, culturally competent care to marginalized

4    communities, or forfeit the federal funding supporting many of our lifesaving services.").

5            These are not hypothetical harms. Many Plaintiffs have already received termination/stop

6    work orders and lost contracts or partnerships as a result of the Executive Orders. *See, e.g.*,

7    Bradbury Decl. ¶ 27; FORGE Decl. ¶¶ 8, 10, 12, Ex. 1; LA LGBT (Hollendoner) Decl. ¶ 16; NY

8    LGBT Decl. ¶¶ 35-36, Ex. A; SFCHC Decl. ¶ 8, Ex. A-D. FORGE has had to suspend grant

9    proposals in response to the Executive Orders. FORGE Decl. ¶¶ 16-17. Other Plaintiffs anticipate

10   that fear stemming from the Executive Orders will result in a loss of staff, donors, patrons, and

11   patients. *See, e.g.*, Bradbury Decl. ¶ 20; Baltimore Decl. ¶ 15; FORGE Decl. ¶¶ 18-19; LA LGBT

12   (Dr. Duffy) Decl. ¶¶ 18-21; LA LGBT (Hollendoner) Decl. ¶¶ 16, 21; SFCHC Decl. ¶¶ 18, 21-22.

13           Moreover, reducing or terminating Plaintiffs' services and programs will have dire

14   consequences—consequences that will most heavily burden the LGBTQ community, but will

15   negatively impact American society as a whole. Instances of communicable diseases like HIV,

16   Hepatitis, STIs, and MPOX will increase. Baltimore Decl. ¶ 14; LA LGBT (Dr. Duffy) Decl. ¶¶

17   18-21; SFAF Decl. ¶¶ 10-13, 34-47; SFCHC Decl. ¶ 25. Unemployment, homelessness, and

18   substance use will increase. Baltimore Decl. ¶ 14; SFCHC Decl. ¶ 25. More people will experience

19   discrimination and violence. Baltimore Decl. ¶ 14; SFCHC Decl. ¶ 25. Fewer people will have

20   access to necessary mental healthcare and community support, resulting in increased suicidality

21   and even death. Baltimore Decl. ¶ 14; SFCHC Decl. ¶ 25; *see also* LA LGBT (Dr. Duffy) Decl. ¶¶

22   11-12, 18-21. Street medicine teams and mobile outreach programs will no longer be able to

23   operate, ceasing work reversing overdoses and providing HIV-related testing and medication to

24   unhoused people and people engaging in survival sex work, and emergency shelters and transitional

25   housing will close, further exacerbating the nations' housing crisis. SFCHC Decl. ¶ 12; Baltimore

26   Decl. ¶¶ 2, 5, 16.

27

28

1       Stated directly, the Executive Orders are likely to cause some of Plaintiffs' "clients to die–
2  –either through self-harm, murder, untreated disease, overdose, or being arrested because they are
3  unhoused." Baltimore Decl. ¶ 14.

4  **III**     **LEGAL STANDARD**

5       A plaintiff seeking a preliminary injunction must show "that he is likely to succeed on the
6  merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance
7  of equities tips in his favor, and that an injunction is in the public interest." *Regents of the Univ. of Cal.*
8  *v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 505 n.20 (9th Cir. 2018) (quoting *Winter v. Nat. Res.*
9  *Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Under the "sliding scale" approach to preliminary
10  injunctions observed in this circuit, "the elements of the preliminary injunction test are balanced,
11  so that a stronger showing of one element may offset a weaker showing of another." *All. for the*
12  *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

13  **IV**     **ARGUMENT**

14      **A.**     **Plaintiffs Have Standing.**

15       "To have standing, a plaintiff must present an injury that is concrete, particularized, and
16  actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be
17  redressed by a favorable ruling." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019) (internal
18  quotation marks omitted). "As a general rule, in an injunctive case this court need not address
19  standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists*
20  *& Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).

21       First, Plaintiffs must show an injury in fact that constitutes "an invasion of a legally
22  protected interest which is (a) concrete and particularized, and (b) actual or imminent, not
23  conjectural or hypothetical." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010). "Because
24  constitutional challenges based on the First Amendment present unique standing considerations,
25  plaintiffs may establish an injury in fact without first suffering a direct injury from the challenged
26  restriction." *Id*. (internal quotation marks omitted). "In such pre-enforcement cases, the plaintiff
27  may meet constitutional standing requirements by demonstrating a realistic danger of sustaining a
28  direct injury as a result of the statute's operation or enforcement." *Id*. (internal quotation marks

omitted). In pre-enforcement cases, courts consider three related inquiries: (1) whether plaintiffs have shown a reasonable likelihood that the government will enforce the challenged law against them; (2) whether the plaintiffs have established that they intend to violate the challenged law; and (3) whether the challenged law is applicable to the plaintiffs, either by its terms or as interpreted by the government. *See id.* at 786.

### i.    There is a Reasonable Likelihood the Executive Orders Will Be Enforced, as Evidenced by Defendants' Actions to Date.

The government's preliminary efforts to enforce a speech restriction constitute strong evidence that pre-enforcement plaintiffs face a credible threat of adverse government action. *Lopez*, 630 F.3d at 786. Plaintiffs have submitted evidence showing that a substantial portion of their funding comes from federal contracts and grants. Baltimore Decl. ¶¶ 8-9; Bradbury Decl. ¶ 7; FORGE Decl. ¶ 7; GLBT Decl. ¶ 14; LA LGBT (Hollendoner) Decl. ¶¶ 7, 11; NY LGBT Decl. ¶¶ 13-15; Prisma Decl. ¶¶ 9-15; SFAF Decl. ¶¶ 5-9; SFCHC Decl. ¶¶ 5-7.

In addition, the Government has manifested a clear commitment to enforcing restrictions on federal contracts and grants, and Plaintiffs are likely to be subject to such enforcement. The Executive Orders themselves unambiguously express Defendants' intent to enforce restrictions on federal contracts and grants. *See* Gender Order § 3(g); DEI-1 Order § 2(b)(ii), (iii); DEI-2 Order §§ 3(b)(iv), 4.

Plaintiffs have received specific notices indicating the Government's intent to enforce the Executive Orders in the form of termination notices, stop work orders, etc. *See* Bradbury Decl. ¶¶ 20, 27; FORGE Decl. ¶¶ 8, 10, 12, Ex. 1; NY LGBT Decl. ¶¶ 35-36, Ex. A; Prisma Decl. ¶¶ 17-25, Exs. A-B; SFCHC Decl. ¶ 8, Ex. A-D. Given Plaintiffs' reliance on federal contracts and grants to serve their communities, and the Government's intent to enforce the Executive Orders against all federal contracts and grants, it is reasonably likely that the Executive Orders will be enforced against Plaintiffs.

### ii.    Plaintiffs Intend to Violate the Executive Orders as Plaintiffs' Missions Run Directly Counter to the Executive Orders' Unlawful Mandates.

Plaintiffs' missions are fundamentally implicated by the Executive Orders. *See, e.g.*, Bradbury Decl. ¶8 ("Executive Orders that restrict or alter the distribution of these funds place

Bradbury-Sullivan's operational capacity at significant risk, thereby directly impacting our ability to fulfill our mission and serve the LGBTQ+ community effectively."); Baltimore Decl. ¶¶ 10-14 ("There is simply no way to do our work and fulfill our mission in a way that does not directly center the experiences of marginalized TLGBQIA+ people."); FORGE Decl. ¶¶ 13, 18-20 ("FORGE plainly cannot accomplish our mission—and our mandates under existing grants— should the Executive Orders be allowed to stand."); LA LGBT (Hollendoner) Decl. ¶ 22 ("The Executive Orders make it difficult, if not impossible, for the LA LGBT Center to continue providing the same level of social, mental, and physical health care and related social services to its patients, external partners, and the public."); NY LGBT Decl. ¶¶30, 34 ("The Executive Order targeting 'gender ideology' presents an existential threat to the NY LGBT Center's mission, programs, and the well-being of its clients."); Prisma Decl. ¶¶ 1, 10, 25 ("Most of our federal funding explicitly requires us to participate in activities and to employ affirming language that appear to be considered 'diversity, equity, inclusion, or accessibility' efforts according to the Executive Orders."); SFAF Decl. ¶ 34 ("These executive orders directly threaten SFAF's mission. . . . We cannot afford to stand by as policies attempt to dismantle the very foundation of our work."); SFCHC Decl. ¶ 23 ("If the Executive Orders are allowed to stand, SFCHC will face the impossible choice of abandoning our mission to provide targeted, culturally competent care to marginalized communities, or forfeit the federal funding supporting many of our lifesaving services. . . .").

    As detailed in Plaintiffs' declarations submitted herewith, each of the Plaintiffs intends to continue the status quo, fulfilling their mission to provide support and services to the LGBT community and greater population, and necessarily violating the Executive Orders in the process.

### iii.    The Executive Orders Apply to Plaintiffs.

    All Plaintiffs receive federal funding and thus are subject to enforcement of the Executive Orders. Baltimore Decl. ¶¶ 8-9; Bradbury Decl. ¶ 7; FORGE Decl. ¶ 7; GLBT Decl. ¶ 14; LA LGBT (Hollendoner) Decl. ¶¶ 7, 11; NY LGBT Decl. ¶¶ 13-15; Prisma Decl. ¶¶ 9-15; SFAF Decl. ¶¶ 5-9; SFCHC Decl. ¶¶ 5-7.

    In addition to asserting claims on their own behalf, Plaintiffs assert equal protection claims on behalf of the people they serve, including the LGBTQ individuals who (a) are targeted by the

Gender Order, (b) will suffer direct injuries because of the intended erasure, and (c) face barriers to asserting their own claims. *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991) (acknowledging third-party standing to raise the equal protection rights of another); *see also City & County. of San Francisco v. Azar*, 411 F. Supp. 3d 1001, 1011 (N.D. Cal. 2019) (finding that physician plaintiffs had standing to bring claims on behalf of women seeking abortions and LGBTQ patients). Those individuals are not only the intended beneficiaries of the programs Congress has funded, but also at the heart of Plaintiffs' mission-driven services.

Finally, the injury threatened arises from, and thus is fairly traceable to, the Executive Orders and enjoining them would address Plaintiffs' injuries. Private parties may "sue to enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also Washington v. Trump*, No. 2:25-cv-00244-LK, 2025 WL 509617, at *7 (W.D. Wash. Feb. 16, 2025). Enjoining enforcement of the Executive Orders would redress the threat that restrictions on federal contracts and grants would irreparably impair Plaintiffs' ability to promote and apply concepts required by their missions and work.

**B.    Plaintiffs Are Likely to Succeed on the Merits.**

      **i.    The Executive Orders Violate the Free Speech Clause of the First Amendment.**

The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech." U.S. CONST., amend. I. The First Amendment provides robust protection against government attempts to control the topics discussed—and even more so, the *views* expressed—in public discourse. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Accordingly, laws that restrict speakers from expressing certain viewpoints are a blatant and egregious form of government speech control that is "presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-29 (1995).

The Executive Orders impermissibly chill the exercise of Plaintiffs' constitutionally protected speech based on the content and viewpoint of their speech. The Executive Orders also improperly penalize Plaintiffs for engaging in First Amendment activity by weaponizing the federal funding that is necessary for their missions and work, for a public official "may not deny a benefit

1  to a person on a basis that infringes his constitutionally protected interests—especially, his interest

2  in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

3      The Executive Orders mandate that recipients of federal funds not "promote" "gender

4  ideology" or "DEI" and related concepts that the Government dislikes. "It is, however, a basic First

5  Amendment principle that 'freedom of speech prohibits the government from telling people what

6  they must say.'" *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc*., 570 U.S. 205, 213 (2013)

7  [hereinafter "*AID*"] (quoting *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 61 (2006));

8  *see also Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012) ("The government

9  may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas

10  that it approves." (citations omitted)). "If there is a bedrock principle underlying the First

11  Amendment, it is that the government may not prohibit the expression of an idea simply because

12  society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989)

13  (collecting cases). The Government's attempt to do so by way of the Executive Orders is subject to

14  "the most exacting scrutiny." *Id*. at 412.

15      Requiring federal grantees to certify that they will not use grant funds to promote concepts

16  the Government considers offensive, even where the grant program is wholly unrelated to such

17  concepts, is a violation of the grantee's free speech rights. *See AID*, 570 U.S. at 218; *see also Santa*

18  *Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 528 (N.D. Cal. 2020) [hereinafter

19  "*Santa Cruz*"] (requiring federal grantees to certify they will not use grant funds to promote

20  concepts the Government considers "divisive" violated grantee's free speech rights). Like the

21  statute struck down in *AID*, the Executive Orders demand, as a condition of federal funding,

22  compliance with a speech restriction that by its nature "cannot be confined within the scope of the

23  Government program." *See AID*, 570 U.S. at 221.

24      In a strikingly similar case, Judge Freeman found that the plaintiffs were likely to succeed

25  on the merits of a First Amendment challenge to an executive order passed during President

26  Trump's first administration. *See Santa Cruz*, 508 F. Supp. 3d at 528. There, President Trump

27  issued an executive order requiring plaintiffs to censor or cease diversity trainings that were

28  fundamental to their missions on the pain of losing federal funding in the form of contracts and

grants. *See id.* at 542 (quoting Exec. Order, 85 Fed. Reg. at 60, 686–87). The court found that "[c]onditioning federal grants in this manner clearly would constitute a content-based restriction on protected speech." *Id*. This was particularly so where the executive order barred any promotion of "divisive" concepts using federal funds. *Id*.

The same logic applies equally to the Executive Orders, which bar Plaintiffs from promoting "gender ideology," "DEI," and/or related concepts on the pain of losing federal grant funding. This content-based restriction on speech is a flagrant First Amendment violation.

**ii.    The Executive Orders Violate the Due Process Clause of the Fifth Amendment.**

It is well settled that "'a basic principle of due process [is] that an enactment is void for vagueness if its prohibitions are not clearly defined.'" *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). In this case, a stringent vagueness test applies both because the Executive Orders abridge basic First Amendment freedoms and because they invoke heightened penalties, including pursuant to the False Claims Act. *See Sessions v. Dimaya*, 584 U.S. 148, 183 (2018) ("stringent vagueness test" applies to civil laws that violate the First Amendment or impose penalties similar to those found in criminal statutes (Gorsuch, J., concurring)); *see also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-cv-00333-ABA, 2025 WL 573764, at *25 (D. Md. Feb. 21, 2025) (applying stringent vagueness test and preliminarily enjoining, in part, the DEI Orders).

Under the terms of the Executive Orders, there is no objective way to determine which speech activities are permitted and which are prohibited. This creates a broad chilling effect and invites unpredictable, uneven, and discriminatory enforcement against recipients of federal funding, including Plaintiffs.

For example, the Executive Orders do not explain what it means to "promote" so-called "gender ideology." Neither do the Executive Orders define the terms "diversity, equity, and inclusion," "DEI," "diversity, equity, inclusion, and accessibility," or "DEIA," despite such terms being fundamental to the Executive Orders. Similarly, the Executive Orders do not define the term "equity" when used independently from "diversity, equity, inclusion, and accessibility," even

18

though Section 2(b) of the DEI-1 Order directs the termination of "equity-related" grants and contracts, along with other DEI and DEIA activities. Section 3(c) of the DEI-2 Order also uses impermissibly broad and vague terminology in mandating OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear" from Federal acquisition, contracting, grants, and financial assistance procedures. Plaintiffs, therefore, are left to speculate what speech or activity might be considered DEI or DEIA "principles" even without using the actual terms "DEI" or "DEIA." *See, e.g.*, SFCHC Decl. ¶ 9; LA LGBT (Hollendoner) Decl. ¶ 19.

The Executive Orders create additional ambiguity by distinguishing at times between DEIA that they consider "legal" from that which they consider "illegal." *See* DEI-2 Order § 2 (expressing a policy of terminating all "discriminatory and illegal preferences" and "combat[ting] illegal private-sector DEI preferences, mandates, policies, program, and activities"); *id.* § 3(b) (requiring federal contractors and grantees to certify they do "not operate any programs promoting DEI that violate any applicable Federal anti-discrimination law").

The language in these provisions regarding illegality begs the question of who determines what diversity, equity, inclusion, and accessibility policies, programs, and activities are legal, as opposed to illegal, and pursuant to what criteria. Given the Trump Administration's actions already taken to eliminate DEIA from the federal workplace, it is likely that all DEIA policies, programs, and activities would be considered illegal by this Administration even without an investigation. This is especially true because the Executive Orders provide no clear, objective standards for enforcement, while at the same time specifying a range of serious penalties, including cancellation of existing contracts and grants, loss of eligibility for future government contracts and grants, and potential civil investigations, regulatory actions, and/or litigation. In the absence of objective standards, the Executive Orders give the Trump Administration unfettered discretion to enforce the prohibitions against federal contractors and grantees, inviting arbitrary enforcement and discrimination that is subject to the whims of the decisionmaker. *See Nat'l Ass'n of Diversity Officers in Higher Educ.*, 2025 WL 573764, at *25 ("'Vague laws invite arbitrary power.'") (quoting *Sessions*, 584 U.S. at 175 (Gorsuch, J., concurring)). Thus, the vagueness of the Executive

1 Orders' terms exacerbates the preexisting censorship of Plaintiffs' speech activities by producing

2 an even greater chilling effect.

3       The provision of effective and comprehensive housing, healthcare, support, education, and

4 advocacy services for LGBTQ people and people living with HIV necessarily requires education

5 and awareness of the historical and ongoing inequities resulting from, among other things, a

6 person's race, sex, and/or transgender status, as well as corresponding data collection and attention

7 to health disparities. *See*, LA LGBT (Dr. Duffy) Decl. ¶¶ 6-21. Plaintiffs therefore have no way to

8 discern how to differentiate between the acceptable provision of services in furtherance of their

9 mission and the unacceptable "operation and promotion of DEI" programs and activities or

10 unacceptable promotion of "gender ideology."

11     *Santa Cruz* is instructive here as well. There, the court found the plaintiffs were likely to

12 succeed on the merits of their Fifth Amendment due process challenge regarding President Trump's

13 executive order banning the promotion of certain "divisive" concepts. 508 F. Supp. 3d at 543. The

14 court reasoned that the executive order was likely unconstitutional because it did not provide

15 sufficient clarity regarding what conduct was prohibited, and therefore posed a danger of arbitrary

16 and discriminatory application. *Id.* (citing *Hunt*, 638 F.3d at 712).

17       The same logic applies to the Executive Orders. For example, the Executive Orders are

18 unacceptably unclear on whether Plaintiffs would be in violation for conducting ordinary activities

19 like using gender pronouns in their e-mail signature blocks, or celebrating Black or Women's

20 History Months, or utilizing widely understood and accepted phrases such as "disadvantaged

21 communities," "environmental justice," "women's empowerment," or "gender-based violence," in

22 the execution of their work. The Executive Orders are so vague that no ordinary person can

23 understand what kind of conduct they prohibit. They are therefore unconstitutional.

24

25         **iii.**    **The Executive Orders Are *Ultra Vires* Because They Exceed the President's Authority, Infringe Upon Congress's Powers, and Violate Article I's Framework for Federal Legislation.**

26

27       The Executive Orders are *ultra vires* actions that exceed the bounds of Article II, infringe

28 upon Congress's authority to control the public fisc under Article I, and violate Article I's

Bicameralism and Presentment Clauses. "No matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). Congress authorizes and allocates funds for federal grants in the annual appropriations bill or by federal statute. Federal grants are federal law, and conditioning or cancelling federal grants amounts to amending or repealing federal law, which the Executive Branch has no constitutional or statutory authority to do. *See Clinton v. City of New York*, 524 U.S. 417, 444 (1998) (holding cancellations "are the functional equivalent of partial repeals of Acts of Congress"); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017) ("[T]he President does not have the power to place conditions on federal funds[.]"). That power lies with Congress. *See* U.S. CONST. art. I, § 7; *id*. art. I, § 8, cl. 1; *see also* 2 U.S.C. §§ 683, 684 (Impoundment Control Act, prohibiting the President or federal agencies from impounding lawfully appropriated funds).

"The Appropriations Clause of the Constitution gives Congress the exclusive power over federal spending." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239 (LLA), 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (internal quotation marks omitted); *see* U.S. CONST. art. I, § 9, cl. 7. The Appropriations Clause "was intended as a restriction upon the disbursing authority of the Executive [Branch]." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937); *see also U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015) ("Congress's power of the purse is the ultimate check on the otherwise unbound power of the Executive.").

Consistent with these principles, Congress "may impose appropriate conditions on the use of federal property or privileges." *Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *see generally Koontz v. St. Johns River Water Mgmt. Dist*., 570 U.S. 595 (2013). "Aside from the power of veto, the President is without authority to thwart congressional will by cancelling appropriations passed by Congress." *City & County of San Fransisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018).

The Executive Orders seek to usurp Congress's authority by conditioning federal grants on grantees not promoting "gender ideology" or "DEI." Gender Order § 3(g); DEI-1 Order § 2(b)(ii)-

21

(iii); DEI-2 Order § 3(b)(iv). Such commands attempt to give the President and executive agencies powers they do not have in blatant disregard for the Constitution and its carefully designed separation of powers.[5] *See PFLAG, Inc. v. Trump*, No. 25-337-BAH, 2025 WL 510050, at *1 (D. Md. Feb. 14, 2025) (granting TRO against, *inter alia*, Section 3(g) of the Gender Order in relation to gender affirming care, finding that the "case presents a straightforward question of separation of powers"); *New York v. Trump*, No. 25 Civ. 39, 2025 WL 357368, at *2-3 (D.R.I. Jan. 31, 2025) (issuing TRO against OMB directive to withhold federal funds); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25 Civ. 239, 2025 WL 368852, at *14 (D.D.C. Feb. 3, 2025).

The Constitution vests Congress, not the Executive, with authority over the public fisc, and Congress has imposed no conditions on federal grants related to promoting "gender ideology" or "DEI." When Congress intends to place conditions on federal funds, "it has proved capable of saying so explicitly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17-18 (1981); *see, e.g.*, Further Consolidated Appropriations Act, Pub. L. No. 118-47, § 526 (2024) (grant condition regarding the provision of sterile needles); *id*. § 202 (grant condition regarding salary caps).

The Ryan White HIV/AIDS Program, which provides grants to family-centered care for youth in communities disproportionately affected by HIV, exemplifies this incongruity. *See* 42 U.S.C. § 300ff; 42 U.S.C. § 300ff-71. Congress placed one condition on these grants: the funds may not be used to provide "individuals with hypodermic needles or syringes so that such individuals may use illegal drugs." 42 U.S.C. § 300ff-1. Congress did not condition such grants on whether the recipient promotes "gender ideology" or "DEI." Accordingly, the Executive Orders force a Presidential policy that is "incompatible with the expressed or implied will of Congress," *Zivotofsky v. Kerry,* 576 U.S. 1, 10 (2015), and unconstitutionally intrudes upon the Congressional prerogative to control the public fisc.

The Executive Orders not only usurp Congressional powers but also bypass the Legislative branch altogether to sidestep Article I's framework for passing laws. "Explicit and unambiguous

---

[5] The Trump Administration's actions since the Executive Orders were issued underscore the President's intent to disregard the separation of powers upon which our Constitution is based. On February 19, 2025, the White House published, on the platform X, a photo of President Trump dressed as a king, with a caption that reads, in part, "LONG LIVE THE KING!" *See* @WhiteHouse, X (Feb. 19, 2025, 2:31 PM), https://perma.cc/4JFY-9LB4.

provisions of the Constitution prescribe and define the respective functions of the Congress and of the Executive in the legislative process." *INS v. Chadha*, 462 U.S. 919, 945 (1983). Article I requires that every bill pass in both the House of Representatives and the Senate before it is presented to the President. U.S. CONST. art. I, § 7, cl. 2. If the President vetoes the bill, Congress may override his veto by a vote of two thirds of the Senate and the House. *Id.* art. I, § 7, cl. 3. These procedural "steps" are non-negotiable: they were designed "to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps." *Chadha*, 462 U.S. at 951, 957.

"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587; *see* U.S. CONST. art. II, § 3 (the President has an obligation to "take Care that the Laws be faithfully executed"). Rather, as the Supreme Court has unequivocally stated: "[t]he Constitution limits [the President's] functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Id.* If the President does not wish to disburse funds in the manner appropriated by Congress, "the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *see also* U.S. CONST. art. I, § 7, cl. 2, 3.

Article I does not allow the President to circumvent Bicameralism and Presentment by unilaterally amending or canceling federal appropriations via executive order. *See Clinton*, 524 U.S. at 448; *Train v. City of New York*, 420 U.S. 35, 38 (1975). "Where Congress has failed to give the President discretion in allocating funds, the President has no constitutional authority to withhold such funds and violates his obligation to faithfully execute the laws duly enacted by Congress if he does so." *County of Santa Clara*, 250 F. Supp. at 531 (citing *Clinton*, 524 U.S. at 439); *see also City & County of San Francisco*, 897 F.3d at 1234 ("[T]he President's duty to enforce the laws necessarily extends to appropriations."). As then-Judge Kavanaugh explained, "a President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program . . . [b]ut in those circumstances, even the President

does not have the unilateral authority to refuse to spend the funds." *In re Aiken County*, 725 F.3d at 261 n.1.

The Executive Orders are a clear violation of the Constitution because "attempt[s] [by the Executive Branch] to place new conditions on federal funds [are] an improper attempt to wield Congress's executive spending power and is a violation of the Constitution's separation of powers principles." *County of Santa Clara*, 250 F. Supp. 3d at 531. Congress has not imposed conditions on federal grants regarding gender ideology or DEI. "The Executive Branch has a duty to align federal spending and action with the will of the people as expressed through congressional appropriations, not through 'Presidential priorities.'" *New York*, 2025 WL 357368, at *2. Because the Executive Orders did not abide by the "single, finely wrought and exhaustively considered, procedure" for amending or repealing federal legislation, they are unlawful. *Chadha*, 462 U.S. at 951; *see also Nat'l Council of Nonprofits*, 2025 WL 368852, at *1 (granting preliminary injunction regarding OMB direction to federal agencies to pause federal financial assistance, reasoning that "appropriations of the government's resources is reserved for Congress, not the Executive Branch," and "a wealth of legal authority supports this fundamental separation of powers."); *PFLAG*, 2025 WL 510050, at *17 ("[T]he Executive Orders unconstitutionally intrude upon the Congressional prerogative to control the public fisc.") (citation omitted).

### iv. The Executive Orders Are *Ultra Vires* Because They Conflict with Statutory Equity-Related and Nondiscrimination Requirements.

"The Court has the authority to determine whether the Executive Orders are incompatible with the will of Congress." *PFLAG*, 2025 WL 510050, at *18 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024)). The Executive Orders are *ultra vires* because they impermissibly direct agencies to act in contravention of numerous laws and regulations and are therefore inconsistent with the Constitution's separation of powers clause. Federal statutes and regulations specifically authorize Plaintiffs' equity-related services and advocacy, and their efforts to eradicate discrimination against transgender and other LGBTQ people. The President does not have the power to override those statutes and prohibit grant recipients from doing precisely what Congress has directed, and what duly promulgated regulations prescribe.

1    The DEI-1 and DEI-2 Orders conflict with the funding statutes applicable to Plaintiffs who

2    receive funding through the Ryan White Program and the Housing Opportunities for People with

3    AIDS ("**HOPWA**") program, 24 C.F.R. § 574.300. *See, e.g.*, LA LGBT (Dr. Duffy) Decl. ¶ 5;

4    Prisma Decl. ¶¶ 9, 13; SFCHC Decl. ¶¶ 7, 23. The Ryan White Program's statutory framework

5    explicitly directs resources to disproportionately affected and historically underserved groups and

6    subpopulations, reflecting Congress's intent to address healthcare disparities for people living with

7    HIV/AIDS. 42 U.S.C. § 300ff-12(b)(1); *see also* 42 U.S.C. § 300ff-52 (mandating grant recipients

8    to target minority populations); 42 U.S.C. § 300ff-121 (establishing Minority AIDS Initiative to

9    evaluate and address racial and ethnic disparities in access to HIV care). Likewise, HOPWA

10   regulations reinforce the prioritization of marginalized populations. *See* 24 C.F.R. § 574.603

11   (affirmative outreach obligations for those at risk of discrimination based on race, national origin,

12   sex, or disability); 24 C.F.R. § 574.3 (defining "family" in a manner inclusive of LGBTQ+ people).

13   The statutory framework for Federally Qualified Health Centers ("**FQHCs**"), which applies

14   to Plaintiffs SFCHC and LA LGBT Center, also mandates them to provide medical care to

15   "medically underserved populations" and specific minority groups facing systemic barriers to

16   healthcare access. *See* 42 U.S.C. § 254b(a)(1); *see also* 42 U.S.C. § 254b-1 (authorizing states to

17   determine medically underserved populations eligible for funding). In addition, Congress has

18   directly appropriated funds for specific minority populations, including grants for Pacific Islander

19   health services and medical workforce development (42 U.S.C. § 254c-1), as well as funding for

20   diabetes prevention programs targeted at Native American communities (42 U.S.C. § 254c-3).

21   The HOPWA, Ryan White, and FQHC programs are structured to remediate systemic

22   inequities in healthcare and housing and to allocate healthcare resources toward minority

23   communities affected by health disparities. The DEI-1 and DEI-2 Orders disregard these statutory

24   obligations and contradict the express will of Congress by restricting organizations' ability to

25   provide services in a manner that complies with the requirements of these programs.

26   Moreover, the Gender Order facially discriminates based on sex. It directs agencies to

27   withhold grants from entities that "promote gender ideology," defined as "acknowledging that a

28

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF
POINTS AND AUTHORITIES, CASE NO. 4:25-cv-01824-JST

person's gender identity may differ from their sex assigned at birth." This violates federal law prohibiting grant recipients from discriminating on the basis of sex.

Discrimination based on transgender status, including the failure to acknowledge a patient's gender identity, constitutes discrimination on the basis of sex under Section 1557 of the Affordable Care Act ("**ACA**"), 42 U.S.C. § 18116, and Section 1908 of the Public Health Service Act ("**PHSA**"), 42 U.S.C. § 300w-7. Section 1557 of the ACA provides that an individual shall not, on the basis of race, national origin, sex, age, or disability "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."[6] It thus imposes on health entities an "affirmative obligation not to discriminate in the provision of health care." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 955 (9th Cir. 2020). Section 1908 of the PHSA similarly prohibits discrimination on the basis of sex in programs, services, and activities "receiving Federal financial assistance" through Preventive Health and Health Services Block Grants, which Defendant Kennedy allots as the Secretary of Defendant HHS. *See* 42 U.S.C. § 300w-1.

In *Bostock v. Clayton County*, a Title VII case, the Supreme Court held that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." 590 U.S. 644, 660 (2020). And because "[w]e construe Title IX's protections consistently with those of Title VII," *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022), there can be no doubt that "Section 1557 forbids sex discrimination based on transgender status." *C.P. v. Blue Cross Blue Shield of Ill.*, No. 3:20-CV-06145-RJB, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022); *see also Kadel v. Folwell*, 100 F.4th 122, 164 (4th Cir. 2024). The same reasoning extends to Section 1908 of the PHSA, which is nearly identical in wording to Section 1557 of the ACA. *See PFLAG*, 2025 WL 510050, at *18.

The Gender Order attempts to override federal statutes with President Trump's unilateral declaration that federally funded institutions must repudiate the existence of transgender people.

---

[6] Section 1557 further requires that covered entities take reasonable steps to provide meaningful access to their health programs or activities to individuals with limited English proficiency or with disabilities. *See, e.g.*, 45 C.F.R. §§ 92.201–92.205. Likewise, Section 1557 requires covered entities to train their employees as necessary and appropriate to carry out their functions consistent with the requirements of Section 1557 and its implementing regulations. *See* 45 C.F.R. § 92.9.

*See* Gender Order §§ 1, 2. The DEI-1 and DEI-2 Orders attempt to override federal statutes with President Trump's unilateral declaration that federally funded institutions must not engage in efforts that promote "diversity, equity, inclusion, or accessibility."

President Trump does not have the power to override Section 1557 of the ACA or Section 1908 of the PHSA by requiring federal grantees to engage in precisely the discrimination that those laws prohibit. Under these statutes, there is no scenario in which the new discriminatory condition imposed by the President does not conflict with the non-discrimination mandate set by Congress, because for entities like Plaintiff Health Centers, it does not matter what specific grants are at issue or what funding stream is used. When the President usurps congressional authority and infringes on the constitutional rights of individuals, the essential role of the judiciary is to "say what the law is." *Loper Bright Enters.*, 603 U.S. at 385 (summarizing the function of the Judiciary to interpret statutes dating back to the earliest decisions of the Supreme Court and citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *United States v. Dickson*, 40 U.S. (15 Pet.) 141, 162 (1841); *Decatur v. Paulding*, 39 U.S. (14 Pet.) 497, 515 (1840)). The Executive Orders should be declared unlawful, and the Agency Defendants should be enjoined from enforcing or implementing these unlawful orders.

### v.    The Gender Order Violates the Equal Protection Clause.

The Gender Order flagrantly violates Plaintiffs' right to equal protection. *See* U.S. CONST. amends. V, XIV; *United States v. Windsor*, 570 U.S. 744, 774 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."). It purposefully discriminates based on transgender status and it facially classifies based on transgender status and sex, failing any level of review.

### a.    The Gender Order Fails Any Level of Review.

The Gender Order fails any level of scrutiny because it is transparently motivated by a "bare desire to harm" transgender people. *Romer v. Evans*, 517 U.S. 620, 635 (1996) (citation omitted). Our Constitution forbids policies based on such "negative attitudes" and "irrational prejudice." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985). The Gender Order facially discriminates against transgender people by declaring they do not exist and deeming their identities

1    to be "false." Gender Order § 2(f). The Gender Order was issued for the openly discriminatory

2    purpose of expressing governmental disapproval of transgender people and rendering them unequal

3    to others. As one court recently put it, "[t]he Court cannot fathom discrimination more direct than

4    the plain pronouncement of a policy resting on the premise that the group to which the policy is

5    directed does not exist." *PFLAG*, 2025 WL 510050, at *19.

6          The context surrounding the Gender Order, including other executive actions, betrays its

7    underlying animus. For example, another executive order issued on January 27, 2025, deems

8    "adoption of a gender identity inconsistent with an individual's sex" to be in conflict with a

9    "commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life."[7] The

10   Gender Order challenged here is thus part of a far-reaching attack on transgender people who are

11   expressly targeted in a litany of President Trump's executive orders.[8] The degree of prejudice is

12   remarkable in its breadth and scope, and reinforces the Gender Order's unconstitutional purpose.

13   Disapproving of transgender people and enforcing state-mandated gender conformity is not an

14   incidental effect of the Gender Order; it is its purpose. It is a status-based classification of persons

15   undertaken for its own sake, which is forbidden by the Constitution's Equal Protection guarantee.

16   *Romer*, 517 U.S. at 634; *see also U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). There

17   can be no legitimate government interest in facially discriminatory executive action.

18                    **b.    The Gender Order Triggers Heightened Scrutiny.**

19         The Gender Order is subject to heightened scrutiny because it facially discriminates against

20   transgender people and classifies based on sex. The Gender Order defines sex as an "immutable

21   biological classification" that "does not include the concept of gender identity," and asserts that

22   transgender identities are invalid and "false" identities that "[do] not provide a meaningful basis

23

24   [7] Exec. Order No. 14,183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025).

25   [8] Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed.
26   Reg. 8,771 (Jan. 28, 2025); Exec. Order No. 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025); Exec. Order No. 14,170, *Reforming the*
27   *Federal Hiring Process and Restoring Merit to Government Service*, Fed. Reg. 8621 (Jan. 20, 2025); Exec. Order No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg.
28   8853 (Jan. 29, 2025); Exec. Order No. 14,201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025).

1    for identification and cannot be recognized as a replacement for sex." Gender Order §§ 2(a), (f)-

2    (g). If a law "discriminates based on transgender status, either purposefully or on its face,

3    heightened scrutiny applies." *Doe v. Horne*, 115 F.4th 1083, 1102 (9th Cir. 2024); *see also*

4    *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019). What is more, the Ninth Circuit has

5    held that "discrimination on the basis of transgender status is a form of sex-based discrimination"

6    for equal protection purposes. *Hecox v. Little*, 104 F.4th 1061, 1079 (9th Cir. 2024). "It is well-

7    established that sex-based classifications are subject to heightened scrutiny." *Id.* (citing *United*

8    *States v. Virginia*, 518 U.S. 515, 533-34 (1996)); *Virginia*, 518 U.S. at 555 ("[A]ll gender-based

9    classifications . . . warrant heightened scrutiny.").[9]

10                      **c.      The Gender Order Fails Heightened Scrutiny.**

11           "The application of intermediate scrutiny requires the government to show that its gender

12    classification is substantially related to an important governmental interest, 'requiring an

13    exceedingly persuasive justification.'" *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1120 (N.D. Cal.

14    2015) (quoting *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 702 (9th Cir. 1997)). The Gender

15    Order cannot survive any level of scrutiny, much less heightened scrutiny that must be applied here.

16           Disapproving of transgender people, discouraging people from expressing their gender

17    identities, and directing agencies and federal grantees to do the same are plainly illegitimate

18    purposes that demonstrate the Gender Order was issued for the purpose of discriminating against

19    transgender people. Such an objective is not a legitimate state interest. *See Horne*, 115 F.4th at

20    1104 (upholding finding of discriminatory purpose where a law's "burdens [] fall *exclusively* on

21    transgender women and girls" and the law was adopted "for the purpose of excluding transgender

22    girls from playing on sports teams"); *Hecox*, 104 F.4th at 1077 (same); *Dekker*, 679 F. Supp. 3d at

23    1292-93; *Van Garderen v. Montana*, No. DV-23-541, 2023 WL 6392607, at \*14 (Missoula Cnty.

24    Dist. Ct., Mont. Sept. 27, 2023), *aff'd sub nom.*, *Cross v. Montana*, 2024 MT 303, 560 P.3d 637

---

[9] Here, the Gender Order constitutes a sex classification in myriad ways. First, as noted above, it is a sex-based classification because it discriminates based on transgender status. Second, it is a sex-based classification on its face. *See Bostock*, 590 U.S. at 660; *see also Dekker v. Weida*, 679 F. Supp. 3d 1271, 1289-90 (N.D. Fla. 2023) ("If one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex."). Third, it discriminates based on sex stereotypes. *See Hecox*, 104 F.4th at 1080.

(Mont. 2024).

**C.    Plaintiffs Are Suffering Irreparable Harm Necessitating Injunctive Relief.**

"Irreparable harm is relatively easy to establish in a First Amendment case." *CTIA—The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 851 (9th Cir. 2019). "[A] party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim." *Id.* (cleaned up).

In addition, Plaintiffs' declarations provide substantial evidence that the restrictions on speech imposed by the Executive Orders, in conjunction with the vagueness of those restrictions, has chilled Plaintiffs' exercise of their free speech rights. *See, e.g.*, Baltimore Decl. ¶¶ 14-15 ("The Executive Orders attempt to erase even the word that describes who our people are and interrupt critical initiatives and services"); Bradbury Decl. ¶ 10 ("This forced adherence to the government's prescribed narrative is not only in direct tension with our mission . . . it also makes it impossible for the Center to conduct its training effectively, as the Center cannot openly and accurately discuss the systemic issues at the core of LGBTQ+ health disparities."); FORGE Decl. ¶¶ 8, 10-12, 18-20 (FORGE had grant-funded content removed from an agency's website and work paused on updates to that content; has been told that grant-funded work cannot include certain terms like "equal opportunity," "pronoun," and "accessibility;" and is no longer able to advertise or provide trainings); LA LGBT (Hollendoner) Decl. ¶¶ 16-18 ("Domestic violence and sexual assault providers across the country have already begun removing information about the LGBTQ inclusivity of their programs. These censorship actions are directly motivated by President Trump and his administration's assertions that their federal funding will be pulled. . . ."); SFCHC Decl. ¶¶ 15-18 ("Staff members have expressed confusion and fear about whether their clinical practices, which have been grounded in decades of medical and public health research, may now violate federal mandates.").

As aptly put by SFAF, "HIV advocates are once again being told to stay silent, forced into an impossible choice: speak the truth about systemic inequities and risk losing federal funding or comply with harmful restrictions that undermine life-saving services. But as the movement learned decades ago, **silence equals death**." SFAF Decl. ¶ 46.

30

1      The frustration of Plaintiffs' ability to carry out their core missions is itself irreparable harm.

2    *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (finding that ongoing harms

3    to the plaintiffs' organizational missions as a result of challenged statute established likelihood of

4    irreparable harm); *Santa Cruz*, 508 F. Supp. 3d at 546 (finding that organizations showed a

5    likelihood of irreparable harm based on the significant and serious ongoing harms to their

6    missions); *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N.D. Cal. 2018).

7       **D.    The Balance of Equities and the Public Interest Favor Plaintiffs.**

8      "Where the government is a party to a case in which a preliminary injunction is sought, the

9    balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940-41

10    (9th Cir. 2020). As discussed above, Plaintiffs have demonstrated a likelihood of success in proving

11    violations of their constitutional rights. "[I]t is always in the public interest to prevent the violation

12    of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned

13    up).

14      Moreover, the work Plaintiffs perform is extremely important, even essential, to historically

15    underserved communities. *See* Baltimore Decl. ¶¶ 3-7; Bradbury Decl. ¶¶ 2, 4-6; FORGE Decl.

16    ¶¶ 3-6; GLBT Decl. ¶¶ 3-19; LA LGBT (Dr. Duffy) Decl. ¶¶ 3-16; LA LGBT (Hollendoner) Decl.

17    ¶ 3-6; Prisma Decl. ¶¶ 1, 11-15; SFAF Decl. ¶¶ 11, 41-42; SFCHC Decl. ¶¶ 3-4. Plaintiffs' ability

18    to carry out their missions is impaired by the Executive Orders. Plaintiffs will suffer "a significant

19    adverse impact on their organizations and clients, and . . . the public interest is served by reducing

20    barriers to health care and other critical services for all communities." *Santa Cruz*, 508 F. Supp. 3d

21    at 547; *see also PFLAG*, 2025 WL 510050, at *23. Furthermore, "[t]he rule of law is secured by a

22    strong public interest that the laws 'enacted by their representatives are not imperiled by executive

23    fiat.'" *Washington v. Trump*, 2025 WL 509617, at *14 (quoting *E. Bay Sanctuary Covenant v.*

24    *Trump*, 932 F.3d 742, 779 (9th Cir. 2018)); *see also PFLAG*, 2025 WL 510050, at *23 ("Seeking

25    to effectively enact legislation by executive order clearly exceeds the bounds of Article II and thus

26    does not serve the public interest.").

27      On the other side of the scale, the Government's interest in mandating this administration's

28    viewpoint through expenditures of federal dollars is not in the public interest. To the extent that the

1   Government argues that it is in the public interest to curtail speech that promotes discrimination,

2   that is a gross mischaracterization of the speech Plaintiffs want to express and an insult to their

3   work of addressing discrimination and injustice towards historically underserved communities.

4   That this Government dislikes Plaintiffs' speech is irrelevant to the analysis.

5   **V       CONCLUSION**

6       Plaintiffs respectfully request the Court to enter the Preliminary Injunction in the form of

7   the Proposed Order submitted herewith, to enjoin the implementation of Executive Orders Nos.

8   14,168, 14,151, and 14,173.

9

10  Dated this 3rd of March, 2025.                    Respectfully,

11                                          /s/    *Jennifer C. Pizer*              .
                                            JENNIFER C. PIZER (SBN 152327)
12                                          jpizer@lambdalegal.org
                                            LAMBDA LEGAL DEFENSE AND
13                                          EDUCATION FUND, INC.
                                            800 South Figueroa Street, Suite 1260
14                                          Los Angeles, California 90017-2521
                                            Telephone: (213) 382-7600
15
                                            CAMILLA B. TAYLOR*
16                                          ctaylor@lambdalegal.org
                                            KENNETH D. UPTON, JR.*
17                                          kupton@lambdalegal.org
                                            LAMBDA LEGAL DEFENSE AND
18                                          EDUCATION FUND, INC.
                                            3656 North Halsted Street
19                                          Chicago, Illinois 60613-5974
                                            Telephone: (312) 663-4413
20
                                            JOSE ABRIGO*
21                                          jabrigo@lambdalegal.org
                                            OMAR GONZALEZ-PAGAN*
22                                          ogonzalez-pagan@lambdalegal.org
                                            LAMBDA LEGAL DEFENSE AND
23                                          EDUCATION FUND, INC.
                                            120 Wall Street, 19th Floor
24                                          New York, New York 10005-3919
                                            Telephone: (212) 809-8585
25

26

27

28

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF
POINTS AND AUTHORITIES, CASE NO. 4:25-cv-01824-JST

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAREN L. LOEWY*
kloewy@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006-4101
Telephone: (202) 804-6245

PELECANOS*
pelecanos@lambdalegal.org
Boulder County, Colorado
Telephone: (213) 351-6051
c/o Jennifer C. Pizer, local counsel
     LAMBDA LEGAL DEFENSE AND
     EDUCATION FUND, INC.
     800 S. Figueroa St., Ste 1260
     Los Angeles, California 90017-2521

Counsel for All Plaintiffs
 * Appearance *pro hac vice*

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF
POINTS AND AUTHORITIES, CASE NO. 4:25-cv-01824-JST