JENNIFER C. PIZER (SBN 152327)
jpizer@lambdalegal.org
PELECANOS*
pelecanos@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 South Figueroa Street, Suite 1260
Los Angeles, California 90017-2521
Telephone: (213) 382-7600

JOSE ABRIGO*
jabrigo@lambdalegal.org
OMAR GONZALEZ-PAGAN*
ogonzalez-pagan@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005-3919
Telephone: (212) 809-8585

CAMILLA B. TAYLOR*
ctaylor@lambdalegal.org
KENNETH D. UPTON, JR*
kupton@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3656 North Halsted Street
Chicago, Illinois 60613-5974
Telephone: (312) 663-4413

KAREN L. LOEWY*
kloewy@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006-4101
Telephone: (202) 804-6245

*Appearance Pro Hac Vice

Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| SAN FRANCISCO AIDS FOUNDATION, et al.;<br><br>　　　　　　　　*Plaintiffs*,<br><br>　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.<br><br>　　　　　　　　*Defendants*. | Case No. 4:25-cv-1824-JTS<br><br>**DECLARATION OF DR. KATHERINE DUFFY, MD, MPH, OF LOS ANGLES LGBT CENTER, IN SUPPORT OF PLAINTIFF'S COMPLAINT AND MOTION FOR PRELIMINARY INJUNCTION** |

I, Dr. Katherine Duffy, hereby state as follows:

1. I am the Chief Medical Officer at the Los Angeles LGBT Center ("LA LGBT Center"). I have served in this capacity since 2020. Additionally, I was formerly Medical Director of the Audre Lorde Health Program at the LA LGBT Center. I received my medical degree from the University of Illinois at Chicago and completed my residency at McGaw Medical Center of Northwestern University. I am board-certified in Family Medicine, and I hold certification in HIV Medicine. I am licensed to practice in the state of California. At the LA LGBT Center, I oversee all clinical services, programs, and staff, including primary care, gender affirming care, HIV care, sexual and reproductive health, behavioral health, psychiatry, substance use, and integrative medicine. I also maintain a panel of patients for whom I provide direct care.

2. I am submitting this Declaration in support of Plaintiffs' Complaint and Motion for Preliminary Injunction, which seeks to prevent Defendant agencies and their leadership from enforcing Executive Order No. 14168 "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Order"), issued January 20, 2025; Executive Order No. 14151 "Ending Radical and Wasteful DEI Programs and Preferencing" ("DEI-1 Order"), issued January 20, 2025; and Executive Order No. 14173 "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" ("DEI-2 Order"), issued January 21, 2025 (collectively, the "Executive Orders"), and related agency directives that seek to enforce these Presidential actions.

3. As the Chief Medical Officer, I oversee the health care of over 31,000 current patients who come to the LA LGBT Center for their care; I personally provide care to a panel of 300 patients. Most of my patients identify as LGBTQ, and approximately 30% of my panel includes people living with HIV. The patient population at LA LGBT Center is diverse with respect

1

DECLARATION OF DR. KATHERINE DUFFY IN SUPPORT OF PLAINTIFFS' COMPLAINT
AND MOTION FOR PRELIMINARY INJUNCTION, CASE NO. 4:25-cv-1824-JTS

to race and socioeconomic status. Approximately a third of our patients self-report that they are non-white and the majority are low income. Our patients are often medically and psychosocially complex, with high rates of chronic medical conditions and food instability. Like the rest of the LGBTQ community, our patients often have extensive histories of trauma and face significant barriers in health care access, including overt discrimination and stigmatization. Many of these patients come to me from different areas of California, other states, and even other nations to seek services in a safe and affirming environment.

4. I provide a wide spectrum of healthcare services, including, but not limited to, trauma-informed pelvic care; HIV treatment, testing and prevention; STI testing, treatment and prevention; comprehensive primary care and chronic disease management with an LGBTQ focus; and comprehensive gender affirming health care. I have worked in this field of medicine continuously since 2014 and have personally cared for over 2000 people in that time. For the entirety of my career, I have been committed to caring for underserved adolescents and adults, and from residency to the present day, I have practiced exclusively in urban Federally Qualified Health Centers ("FQHC").

5. As a director and healthcare provider with the LA LGBT Center, I oversee work funded by federal grants, including but not limited to work funded under the Ryan White Comprehensive AIDS Resources Emergency Act of 1990, under Section 330 of the Public Health Service Act as a FQHC, and from the Centers for Disease Control and Prevention ("CDC"). These grants account for a significant portion of my work and the healthcare services that I and those I supervise provide to patients. Losing the funding would significantly impact our ability to provide adequate healthcare to our medically vulnerable patients.

6. The purpose of these grants, which I help oversee at the LA LGBT Center, is frustrated by the Executive Orders. Many of the grants received by the LA LGBT Center are explicitly directed at serving low-income individuals and reducing health disparities based on race, LGBTQ status, and other factors. For example, the LA LGBT Center receives a Section 330 grant as a FQHC that enables us to serve as a safety net provider for medically underserved populations facing barriers to traditional care. We receive these government funds to provide services to patient populations who face barriers to accessing high-quality care from mainstream health service providers. Many medical and mental health professionals are not trained in the ways that sociocultural forces—including racism, heterosexism, and transphobia—can impact an individual's health status. Therefore, they are often ill-equipped to provide the care that our patients need. We have utilized our FQHC grant funds to develop a holistic, culturally and LGBT-competent model of care that addresses the individual and systemic forces impacting our patients' health and wellness. Similarly, the funds we receive from the Minority HIV/AIDS Fund are specifically directed to strengthening HIV prevention and care among individuals who are at the highest risk of infection, including gay and transgender individuals and people of color. These grants enable targeted outreach efforts in these communities that link these individuals to evidence-based HIV prevention efforts.

7. This work can succeed only when those of us at the LA LGBT Center who provide these services can receive training on the ways in which racism, sexism, heterosexism, and transphobia impact the communities we serve. This includes understanding how a community's historical interactions in the medical system have caused distrust of that system, as well as the role of individual healthcare providers and clinics in repairing that distrust. Our staff and clinicians are trained to practice cultural humility when interacting with patients. This includes training

clinicians to recognize the ways in which our own individual backgrounds and biases can present during patient interactions and strategies for ensuring that medical decision-making and patient communication are not impacted by these forces. The LA LGBT Center provides such training to our staff, including me. Such trainings are provided as part of an onboarding process for new hires, and additional training is provided around specific job roles.

8. As people living with HIV, LGBTQ individuals, and people of color, most of our patients already face considerable stigma, discrimination, and safety concerns. These forces can significantly impact health risk behaviors and the ability to obtain preventive care and treatment, ultimately leading to increased morbidity and mortality in these populations. Transgender and gender expansive individuals are a particularly vulnerable segment of our community and often report widespread harassment and experiences of violence. According to a 2023 report, one in four transgender individuals (25%) have been physically attacked because of their gender identity, gender expression, or sexual orientation.[1] The share rises to three in ten among transgender people of color (31%) and those who physically present as a gender different than their sex assigned at birth all or most of the time (30%).[2] Transgender people are more than four times as likely to be survivors of violent crime than their cisgender counterparts.[3] Given these safety concerns, it is unsurprising that transgender and gender expansive individuals face a disproportionate risk of developing depression and post-traumatic stress disorder.[4] Sadly, more than four in ten (43%) transgender adults report that they've had suicidal thoughts in the past year, a rate much higher

---

1 Kirzinger, A., Kearney, A., Montero, A., et al. (2022, March). KFF/The Washington Post Trans Survey. KFF. https://files.kff.org/attachment/REPORT-KFF-The-Washington-Post-Trans-Survey.pdf
2 See Footnote 1.
3 Flores A, Meyer I, Langton L, et al. Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018. *American Journal of Public Health* 2021 Apr;111(4):726-729.
4 Wanta J, Niforatos J, Durbak E, et al. Mental Health Diagnosis Among Transgender Patients in the Clinical Setting: An All-Payer Electronic Health Record Study. *Transgend Health*.2019 Nov 1;4(1):313–315.

4

DECLARATION OF DR. KATHERINE DUFFY IN SUPPORT OF PLAINTIFFS' COMPLAINT
AND MOTION FOR PRELIMINARY INJUNCTION, CASE NO. 4:25-cv-1824-JTS

than other adults (16%).[5] A quarter (26%) also report having an eating disorder, and 17% say they engaged in self-harming behaviors in the past year – six times the rate among other adults (3%).[6] Transgender and gender expansive individuals also experience higher rates of chronic disease than their cisgender counterparts, including asthma, COPD, diabetes, and HIV.[7] Though transgender and gender expansive individuals have higher rates of mental health issues and chronic disease, they are less likely to access and receive appropriate care. Nearly half (47%) of transgender adults say they did not get needed mental health care in the past year.[8] Nineteen percent of transgender people reported that they were refused medical care because of their gender identity.[9] When sick or injured, many transgender individuals report postponing medical care due to discrimination (28%) or lack of financial resources for medical care (48%).[10] For transgender and gender expansive individuals, accessing affirming care has been shown to significantly improve psychological functioning and quality of life in these patients.[11] Yet, these life-saving treatments remain out of reach for many in this community due to a variety of reasons, including the lack of insurance coverage and lack of availability of trans-competent providers. In one survey, nearly half (47%) of transgender adults say their healthcare providers know "not much" or "nothing" about how to provide care for transgender people.[12] In 31% of cases, medical providers not only

---

5 See Footnote 1.
6 See Footnote 1.
7 Dragon C, Guerino P, Ewald E, et al. Transgender Medicare Beneficiaries and Chronic Conditions: Exploring Fee-for-Service Claims Data. *LGBT Health*.2017 Dec 1;4(6):404–411.
8 See Footnote 1.
9 Grant J, Mottet L, Tanis J, et al. National Transgender Discrimination Survey Report on Health and Health Care. 2010.
10 See Footnote 8.
11 Bouman WP, Claes L, Brewin N, Crawford JR, Millet N, Fernandez-Aranda F, Arcelus J. Transgender and anxiety: a comparative study between transgender people and the general population. *Int J Transgenderism* 2017; 18(1):16–26 and Foster Skewis L, Bretherton I, Leemaqz SY,et al. Short-term effects of gender-affirming hormone therapy on dysphoria and quality of life in transgender individuals: a prospective controlled study. *Front Endocrinol* 2021; Jul 29;12:717766.
12 See Footnote 1.

5

DECLARATION OF DR. KATHERINE DUFFY IN SUPPORT OF PLAINTIFFS' COMPLAINT
AND MOTION FOR PRELIMINARY INJUNCTION, CASE NO. 4:25-cv-1824-JTS

lacked knowledge and training on transgender issues, providers simply refused to acknowledge the patients' gender identity at all.[13]

9. To avoid some of these tragic outcomes, healthcare providers must recognize and acknowledge their patients' diverse gender identities and develop care models that are gender affirming and trauma informed. In denying the existence of transgender and gender expansive individuals, the Gender Executive Order makes it impossible to address the health risks and disparities that our transgender and gender diverse patients experience, leading to worse health outcomes in this population. Improving the lives of transgender and gender expansive individuals starts with acknowledging their existence and creating models to support their unique needs. I advocate for all healthcare providers to receive training about the spectrum of gender identity and the ways in which affirming care can positive impact patients' health status. For instance, ensuring use of a patient's preferred name and pronoun can help restore trust with a patient and significantly improve willingness to engage in care. Using patients' correct names and pronouns are ways that healthcare providers can build trust with their transgender patients and significantly improve their patients' willingness to engage with medical and mental health care.

    a. LGBTQ patients often experience discrimination at the hands of other medical providers, including in life-threatening emergencies. I and the other providers that I supervise at the LA LGBT Center have treated many patients who have experienced significant medical trauma and discrimination as a result of explicit or implicit bias based on their sexual orientation, gender identity, sex and related sex stereotypes, and/or HIV status when seeking care from other providers. These experiences decrease

---

13 See Footnote 1.

6

DECLARATION OF DR. KATHERINE DUFFY IN SUPPORT OF PLAINTIFFS' COMPLAINT AND MOTION FOR PRELIMINARY INJUNCTION, CASE NO. 4:25-cv-1824-JTS

the likelihood of these patients presenting for medical care in the future, regardless of the seriousness of the circumstances. For example, I have seen multiple instances of a patient being misgendered by an emergency room physician or specialty care provider. These experiences can be devastating to a patient and lead to worsening dysphoria and depression. I have also heard accounts of medical providers who were unable to provide adequate care to our patients because they lacked understanding of the patient's anatomy and therefore were unable or unwilling to provide appropriate physical examination. In some instances, this had led to missed diagnoses and devastating patient outcomes.

b. A transgender patient who was sexually assaulted while a patient in a skilled nursing facility. This patient is unable to care for herself at home but due to her past experience of violence, is unwilling to consider a nursing home or higher level of care.

c. A transgender patient with a cervix who is male presenting and in care with a primary care provider who did not take a full history nor ever asked about gender identity. Given this lack of discussion, the primary care provider is unaware of the patient's anatomy and need for routine cervical cancer screening.

10. I, and the other providers that I supervise at the LA LGBT Center, also have treated many patients who have experienced past traumatic stigma and discrimination as a result of systemic racism and/or explicit or implicit bias based on race.

7

DECLARATION OF DR. KATHERINE DUFFY IN SUPPORT OF PLAINTIFFS' COMPLAINT
AND MOTION FOR PRELIMINARY INJUNCTION, CASE NO. 4:25-cv-1824-JTS

    a. Some patients have sought medical care from us after interactions with law enforcement that have resulted in injury.

    b. Our Black and Brown patients are more likely to report injuries or other health concerns after negative interactions with police.

    c. Our youth services department works with many youth of color who have unnecessary interactions with law enforcement simply because White neighbors disproportionately report young Black and Brown people to police for loitering.

11. These incidents constitute merely a handful of illustrations of the myriad ways in which our patient populations face barriers to care as a result of systemic racism, sexism, and anti-LGBTQ bias, including explicit or implicit bias on the part of healthcare providers on the basis of race, sex, and LGBTQ status. Such experiences are not only insulting and demoralizing for the patient, such as when a screening or treatment is denied or postponed, or the patient is discouraged from seeking medical care out of fear of repeated discrimination. Many of the LA LGBT Center's transgender patients and patients of color express strong distrust of the healthcare system generally, and a demonstrative reluctance to seek care outside the LA LGBT Center unless they are in a crisis or in extreme physical or mental distress.[14] This is because they want to avoid discrimination or belittlement. Such incentives to avoid regular check-ups and other medical care can result in

---

14 Thomas SD, Dempsey M, King RJ, Murphy M (2024) Health care avoidance and delay in the transgender population: a systematic review exploring associations with minority stress, *Transgender Health*; Kcomt, L., Gorey, K., Barrett, BJ., and McCabe, S., (2020, August), Healthcare Avoidance Due to Anticipated Discrimination Among Transgender People: A Call to Create Trans-Affirmative Environments, Elsevier; Seelman KL, Colón-Diaz MJP, LeCroix RH, Xavier-Brier M, Kattari L. Transgender Noninclusive Healthcare and Delaying Care Because of Fear: Connections to General Health and Mental Health Among Transgender Adults. Transgend Health. 2017 Feb 1;2(1):17-28.

8

DECLARATION OF DR. KATHERINE DUFFY IN SUPPORT OF PLAINTIFFS' COMPLAINT AND MOTION FOR PRELIMINARY INJUNCTION, CASE NO. 4:25-cv-1824-JTS

disease processes that are more advanced at diagnosis, less responsive to treatment, more expensive to treat, or even no longer curable in the case of some cancers.

12. It is extremely difficult to provide effective care after patients have been rejected or discriminated against by other providers. The patients' level of trust at that point is so low that they expect to be mistreated, stereotyped, and discriminated against. This requires providers at the LA LGBT Center to spend a significant amount of time trying to undo the damage (often cumulative, particularly with intersectional marginalized identities) of these past experiences. Patients who have been discriminated against have lost trust in the system and in healthcare providers. Discrimination creates added health stressors that damage the patient-physician relationship, resulting in inferior health outcomes for patients. It takes a long time to re-earn the trust patients hope for but are afraid to give us.

13. Training healthcare workers in culturally competent practices, including training to recognize and address implicit biases based on race, sex, and LGBTQ status, is part of a healthcare facility's overarching obligation to foster patients' well-being and to do no harm. Good medical care is based on trust as well as frank and full communication between the patient and their provider. In many, if not most encounters, providers need patients to fully disclose all aspects of their health history, sexual history, substance-use history, lifestyle, and gender identity in order to provide appropriate care for the patients' health, both physical and mental. Incomplete communication, or miscommunication, can have dangerous consequences. For instance, a patient who conceals or fails to disclose a same-sex sexual history may not be screened for HIV or other relevant infections or cancers. A patient who fails to fully disclose their gender identity and sex assigned at birth may not undergo medically-indicated tests or screenings (such as tests for cervical or breast cancer for some transgender men, or testicular or prostate cancer for some transgender

women). Patients need to feel safe to fully disclose all information relevant to their health care and potential treatment, which can be achieved only when patients are assured that the information they provide will be treated confidentially and with respect. This Executive Order directly threatens my ability to communicate effectively with my patient and to solicit the information necessary to develop an appropriate plan of care. When patients are unwilling to disclose their sexual orientation and/or gender identity to healthcare providers out of fear of discrimination and denial of treatment, or when healthcare providers are unable to ask about patients about these issues due to political concerns, patients' mental and physical health is critically compromised.

14. In sum, when patients experience discrimination in medical settings, whether intentional or as a result of implicit bias, medical mistrust between a patient and care provider increases, and the quality of patient care is compromised. Patients often stop seeking care or their care is detrimentally delayed out of fear of repeated discrimination and denials of care. As a result, patients' conditions remain untreated for a longer period of time, if they ever get treatment, causing more acute health conditions and disease processes, and increasing the eventual cost of their care. Some conditions can become incurable simply because of a delay in treatment. When medical staff fail to care for every patient in the best way that they can, putting patients' best interests at the center of medical care, medical mistrust is worsened, care is delayed, and health care becomes more expensive.

15. To overcome medical mistrust, healthcare providers must first acknowledge it exists. For example, to overcome medical mistrust among patients of color, providers must acknowledge and address patients' fears resulting from historical and continuing structural racism in medicine, including a history of unethical experimentation and abuse. As healthcare providers, we also must overcome medical mistrust among patients who individually have had negative interactions with

medical establishment, law enforcement, and other institutions that govern lives, or who are aware of such experiences among other members of their communities. We need to train our staff to address the issues that lead to medical mistrust.

16. As healthcare providers, we also must explicitly acknowledge and confront the role of implicit bias among healthcare workers as a contributor to medical mistrust and health disparities and inequities. Implicit or unconscious biases are embedded stereotypes about groups of people that are automatic, unintentional, deeply engrained, universal, and able to influence behavior. Such biases can influence peoples' judgment and cause them to behave in biased ways even when they are not intentionally acting based on prejudice. Research demonstrates that people hold implicit biases even when well-intentioned, resulting in actions and outcomes that do not necessarily align with a person's explicit intentions. Implicit bias among healthcare workers shapes their behavior and produces differences in diagnosis, treatment, and health outcomes along the lines of race, sex, and LGBTQ status. Many health disparities are inexplicable for any reason other than implicit bias on the part of healthcare providers.

17. The unclear wording in the Executive Orders that references DEI do not provide adequate definitions of the terms diversity, equity, and inclusion. Because of this, we are left with the threat that the entirety of our health center's programs and services could be at risk—and potentially come to an abrupt end. The DEI Executive Orders threaten the termination of our programs and services, which are grounded in historical health equity and racial justice underpinnings. The Executive Orders' prohibition on workplace trainings to address implicit bias and systemic racism and its prohibition on the use of certain grant funds to "promote" such concepts invites discrimination and damages public health, particularly when communities of color already face severe health disparities.

18. The Executive Orders seek to eliminate vital training tools and grant-funded targeted outreach to communities of color, women, and LGBTQ people, including efforts to address medical mistrust. This will result in sicker patients and lower participation with the healthcare system within these communities. We already have a problem with transgender people avoiding the emergency room when they need care out of fear of discrimination. After a person has been told enough times by an emergency room: "we don't serve your kind here," they are not likely to go back even if it means they might die. Healthcare providers must make particular efforts to provide affirming and culturally competent care, free of bias— whether explicit or implicit— in order to encourage people to seek the health care they need—not only for a patient's own sake but for the sake of the public health generally. LGBTQ people and members of other marginalized communities may otherwise avoid seeking medical care out of fear of being subjected to such discrimination in their most vulnerable moments. Indeed, the LA LGBT Center receives public funding to perform this work precisely because the Center enjoys greater trust among the communities it serves than does the government or other healthcare provider alternatives.

19. A large body of literature shows clear disparities in healthcare for Black people in America. Numerous studies also show that implicit and explicit bias exist among healthcare providers and that bias is related to negative health outcomes. In order to combat the clearly established and pervasive influence of racial bias in health outcomes, a group of White doctors at the LA LGBT Center has created a learning collaborative to prevent themselves from being part of the problem. They are using part of their time funded by federal grants to do this work. We are concerned that even these individual efforts to improve the quality of our care could be deemed non-compliant with the Executive Orders and risk the loss of our grants.

20. By undermining training requirements, and chilling employers, supervisors, and trainers from training staff about systemic racism, critical race theory, and implicit bias, the Executive Order is very likely to result in many more incidents of discrimination and greater harm to LGBTQ individuals, patients living with HIV, patients who are struggling with mental health or substance use issues, and especially patients of color, including the patients whom I treat and whose treatment I supervise. The Executive Orders try and keep us from addressing the very challenges the government funds us to address.

21. One of the guiding ethics of medicine is to treat all patients equally. However, systemic barriers to care can get in the way. Medical personnel see people in their most vulnerable states; the trust placed in us is sacred. The Executive Orders' suppression of concepts and ideas central to preventing discrimination against our patients frustrates the mission and activities of the LA LGBT Center, my mission and activities, and the guiding principle for healthcare professionals that we should do no harm. The Executive Orders make it difficult, if not impossible, for the LA LGBT Center to continue providing the same level of social, mental, and physical health care and related social services to its patients, external partners, and the public. The LA LGBT Center plainly cannot accomplish its mission—and its mandates under existing grants—should the Executive Orders be allowed to stand.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 25 2025

Respectfully submitted,

_____
Dr. Katherine Duffy