# EXHIBIT D

## BEHAVIORAL HEALTH RECOVERY SERVICES PROJECT
## SUBRECIPIENT AGREEMENT

This Behavioral Health Recovery Services Project ("BHRSP") Subrecipient Agreement (the "Agreement") is made and entered into as of **December 1, 2023** (the "Effective Date") by and between Sierra Health Foundation: Center for Health Program Management ("The Center") and **San Francisco AIDS Foundation**, a **Nonprofit Corporation** ("Subrecipient").

In consideration of the mutual covenants set forth herein, the parties agree as follows:

**1.**     **SERVICES TO BE PERFORMED BY SUBRECIPIENT**

1.01.    Prime Contract. The Center and the California Department of Health Care Services (the "Funder") entered into that certain Standard Agreement (#21-10382) dated November 1, 2021 and Amendment Number 1 dated October 12, 2022 (the "Prime Contract"), for the Behavioral Health Recovery Services Project (the "Project") whereby The Center serves as the administrative entity, awarding subrecipient agreements to organizations across California that provide behavioral health recovery services to individuals experiencing severe mental illness (SMI), serious emotional disturbance (SED) and substance use disorder (SUD). The overarching goal of the Project is to increase the number and quality of and utilization of culturally responsive behavioral health recovery services and programs statewide that are tailored to local needs.

The Center hereby engages Subrecipient, as an independent contractor, to render the Services defined in Section 2 in connection with the services to be performed under the Prime Contract and Subrecipient is willing to perform such Services subject to the terms and conditions set forth in this Agreement. Subrecipient has been provided with the opportunity to review the terms of the Prime Contract, a copy of which is available through the following link: Prime Contract Behavior Health Recovery Services Project. The terms of the Prime Contract are hereby incorporated into this Agreement by reference, in their entirety. Subrecipient shall be bound and obligated by the Prime Contract, and to The Center, in the same manner and to the same extent as The Center is bound to the Funder under the Prime Contract, including providing all information required by the Prime Contract, to the extent that the terms of the Prime Contract relate in any way, directly or indirectly, to the Services to be performed under this Agreement. Notwithstanding the foregoing or any contrary provision of this Agreement, nothing in this Agreement shall be construed as bestowing any rights or privileges on Subrecipient beyond what is provided for in the Agreement. Moreover, nothing in this Agreement shall be construed as limiting any rights or privileges of The Center otherwise allowed or provided for by the Agreement or the Prime Contract. In the event of any conflict, ambiguity, or inconsistency between or among the provisions, terms, or conditions of this Agreement, including the attachments hereto or any documents referred to herein, or between or among the provisions, terms, or conditions of this Agreement and the Prime Contract, the provision, term, or condition requiring the greater quantity or higher quality, or placing the greater burden on Subrecipient, shall govern and control.

1.02.    Status of Subrecipient. Subrecipient enters into this Agreement and will remain throughout the Term, as an independent contractor. Subrecipient agrees that Subrecipient does not and will not have any authority to act for, represent, obligate, or bind The Center in any way, nor in any way be deemed an agent, partner, joint ventures, employee, or in any other capacity a representative of The Center. Subrecipient agrees that Subrecipient is not entitled to the rights or benefits afforded to The Center's employees, including but not limited to disability or unemployment insurance, workers' compensation, medical insurance, sick leave, or any other employment benefit. Subrecipient is responsible for providing, at its own expense, disability insurance, unemployment insurance, workers' compensation insurance, and any other insurance, training, permits, and licenses for itself and for its employees and sub-subcontractors of any tier.

1.03.    Method of Performing Services. Subrecipient will perform the services described in the Scope of Services attached hereto as **Scope of Services & Work Plan Attachment** and incorporated herein by reference (the "Services"). By signing this Agreement, Subrecipient agrees to perform the Services in accordance with any applications submitted by Subrecipient and approved by The Center and in accordance with this Agreement including the attachments. Subrecipient further certifies that it meets all eligibility requirements for performance and payment for the Services including as agreed based on the application submitted by Subrecipient. Subrecipient will furnish all equipment, materials, tools, and supplies used in connection with the performance of the Services. Subject to the

terms of this Agreement, Subrecipient will determine the method, details, and means of performing the Services hereunder. The Center reserves the right in its sole discretion to determine the amount and allocation of work assigned to Subrecipient at all times during the Term.

1.04.    Term. The term of the Agreement period will commence on **December 1, 2023,** ("Effective Date") and will continue thereafter until **June 30, 2025,** (the "Expiration Date") or earlier termination in accordance with the terms of this Agreement (the "Term").

1.05.    Employees. Subrecipient shall not hire employees of The Center, or any organization related to the Center to perform any portion of the Services or any work arising in connection with the Services, including, without limitation, secretarial, clerical, and similar incidental or nonincidental services.

1.06.    Payment of Taxes. Subrecipient is responsible for paying when due all taxes, including penalties and interest, incurred in connection with Subrecipient's performance of the Services including, without limitation, income taxes, self-employment taxes, and other taxes, including estimated taxes, incurred as a result of any Compensation paid by The Center to Subrecipient for the Services rendered hereunder. Subrecipient will not be treated as an employee for purposes of disability income, Social Security taxes and benefits, federal unemployment compensation taxes, state unemployment insurance benefits, state wage and hour laws, and federal income tax withholding at sources. Subrecipient agrees to defend and indemnify The Center for any claims, costs, losses, fees, penalties, interest, or damages incurred by The Center resulting from Subrecipient's failure to comply with this Section. Subrecipient further agrees that in the event and to the extent Subrecipient is determined, by a court or agency with jurisdiction, to be an employee for purposes of a California Wage Order due to application of the "ABC" test set forth in the California Supreme Court case *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal.5th 903 (2018), Subrecipient will still be considered an independent contractor for purposes of this Agreement and all other laws.

1.07.    Compliance with Laws. Subrecipient, in the course of performance of the Services, shall comply with all applicable federal, state, and local laws, ordinances, rules and regulations (including without limitation all applicable labor, employment, immigration, and anti-discrimination laws, rules and regulations).

1.08.    Record Retention/Audit. Subrecipient agrees to maintain and preserve records related to this Agreement until three (3) years following (a) termination of this Agreement or (b) final payment to Subrecipient hereunder. Subrecipient further agrees to permit The Center or Funder (through their respective designated representatives) to have access to, examine, and audit any books, documents, papers, and records related to this Agreement and to allow interviews of any employees who might reasonably have information related to such books, documents, papers, or records.

Subrecipient agrees that The Center and Funder (through their respective designated representatives) will have the right at any time during the Term, during Subrecipient's normal business hours, to conduct monitoring activities including but not limited to on-site visits and desk reviews, with respect to the Services (including deliverables) being provided by Subrecipient hereunder and Subrecipient's compliance with this Section. Subrecipient further agrees to comply with all audit and record retention requirements of the Prime Contract. The provisions of this Section shall survive the termination of this Agreement.

## 2.    **COMPENSATION**

2.01.    Total Award Amount to Subrecipient. Total payments by The Center to Subrecipient in connection with the performance of Services under this Agreement, including fees, reimbursements, costs, travel, and any other payments made for services rendered, material provided, or other expenses (collectively, "Compensation"), whether paid pursuant to the invoice procedure described in Section 2.02 below shall not exceed **$250,000.00** ("Total Award Amount to Subrecipient").

2.02.    Compensation. In consideration for the Services provided in accordance with this Agreement, The Center will compensate Subrecipient pursuant to the Budget set forth in the **Budget Attachment**, attached hereto and incorporated herein by reference, subject to the not-to-exceed Total Award Amount to Subrecipient. The Center will pay Subrecipient for completion of the stated line items and deliverables approved by The Center and the submission

and approval of the required program and financial reporting as outlined in the Program and Financial Reporting Requirements set forth in the **Program and Financial Reporting Requirements Attachment** in accordance with the following fixed payment schedule:

a.   Payment 1 – 50% of total award amount upon execution of this Agreement and after all insurance requirements in the **Insurance Requirements Attachment** are met;

b.   Payment 2 – 40% of total award following the completion and approval of Program Reporting Requirements #1 through #10, Financial Reporting Requirements #1 through #4, and Evaluation Data Reporting Requirements #1 through #4;

c.   Payment 3 – 10% of total award following the completion and approval of Program Reporting Requirements #11 through #14; Financial Reporting Requirements #5 through #7, and Evaluation Data Reporting Requirements #5 through #6.

The Center will pay all approved Compensation owed to the Subrecipient hereunder by check mailed to the Subrecipient at the invoice address, or by electronic funds transfer to the financial institution authorized in writing by the Subrecipient, within thirty (30) days after The Center's receipt of an approved invoice. If The Center cannot determine whether an expense should be allowed because invoice detail, fiscal records, or backup documentation is nonexistent or inadequate according to generally accepted accounting principles or practices, The Center may disallow all questionable costs, and The Center may withhold payment. Upon receipt of adequate documentation supporting a disallowed or questionable expense, reimbursement may resume for the amount substantiated and deemed allowable.

Notwithstanding the foregoing or any contrary provision of the Agreement, The Center will have no obligation to pay Subrecipient until The Center has received funds for such payment from the Funder.

2.03.   Unauthorized Services. Any services not authorized under the terms of this Agreement shall be at the sole cost and expense of Subrecipient and will not be compensated by The Center or Funder and may in the sole and absolute discretion of The Center be deemed a material breach of this Agreement, and in no event shall an extension in the Term be granted on account of such unauthorized services.

**3.       REPRESENTATIONS, WARRANTIES, AND COVENANTS OF SUBRECIPIENT**

3.01.   Non-Exclusive Relationship. Except as expressly provided otherwise herein, this Agreement does not create an exclusive relationship between the parties. Subrecipient may in its discretion perform services for and contract with additional clients, persons, or companies during the Term. The Center may, in its sole discretion, engage other contractors to perform the same or similar work that Subrecipient will perform under this Agreement before, during, or after the Term.

3.02.   Conflict of Interest. Notwithstanding the foregoing Section 3.01, Subrecipient represents and covenants that it has no interest, direct or indirect, and shall have no such interest during the Term, that conflicts or would conflict in any manner with its relationship with The Center, performance of the Services under this Agreement, or any monetary or business interest of The Center or the Funder. The terms of this Section 3.02 shall bind Subrecipient and its employees, agents, sub-subcontractors of any tier, and third parties performing services or providing materials in connection with performance of the Services.

3.03.   All Licenses. Subrecipient represents, warrants, and covenants that Subrecipient maintains, and will maintain at all times during the Term, all licenses, permits, and other governmental approvals and authorizations required by state, local, and federal laws to perform the Services, and will promptly provide copies of any such licenses, permits, and any other governmental approvals and authorizations to The Center upon request.

3.04.   Sub-subcontractors. Subrecipient represents, warrants, and covenants to The Center that (a) except with The Center's express prior written consent, this Agreement shall be incorporated by reference in its entirety into all sub-

subcontracts of any tier, and (b) Subrecipient shall remain solely responsible for sub-subcontractors' performance and adherence to the terms of this Agreement.

3.05.    Performance; Industry Standards and Practices. Subrecipient warrants and covenants that the Services to be provided under this Agreement will be performed in a professional manner conforming to generally accepted industry standards and practices. The Center shall have the right to assess the quality and progress of the Services performed by Subrecipient at any time and without advance notice to Subrecipient, including, without limitation, by progress and performance reports that Subrecipient shall provide in a form and frequency as may be required by The Center in its sole discretion. Notwithstanding any prior approval of an invoice pursuant to Section 2.02, The Center reserves the right to withhold payment, nullify and obtain reimbursement from Subrecipient for any payment made,  terminate this Agreement, and/or take any other action to which it is entitled by law or this Agreement, as to any Services that The Center in its sole and absolute discretion determines to be incomplete, not satisfactory, or noncompliant with the Scope of Work or any other provision of this Agreement. Further, The Center may recover overpayments that The Center determines, in its sole and absolute discretion, by audit or otherwise, should not have been made to Subrecipient. Subrecipient agrees to reimburse any amounts, and/or return any overpayments, to The Center in accordance with this Section 3.05 within fifteen (15) days of demand by The Center.

3.06.    Copyright; Proprietary Rights. Subrecipient represents and warrants that the materials, if any, produced by Subrecipient under this Agreement are and will be original and do not and will not infringe upon any intellectual property rights of The Center or any third party.

3.07.    Return of Property of The Center. Upon the expiration or earlier termination of this Agreement, Subrecipient will return to The Center any and all property, documentation, records, equipment, intellectual property, and Confidential Information (defined in Section 7.01(a), below) that is the property of The Center.

## 4.    INSURANCE/INDEMNITY

4.01.    Insurance. Without limiting Subrecipient's duty of indemnification as set forth in Section 4.02 below, Subrecipient will obtain and maintain in force at all times during the Term insurance in accordance with the provisions of the **Insurance Requirements Attachment**, attached hereto and incorporated herein by reference, and in accordance with the provisions of the Prime Contract, (the "Insurance"), with insurers reasonably acceptable to The Center.

4.02.    Indemnification. To the fullest extent permitted by law, Subrecipient agrees to indemnify, defend, and hold The Center, the Funder, Sierra Health Foundation, and their respective officers, directors, agents, representatives, constituent entities, affiliates, volunteers, officials, parents, subsidiaries, governing boards, and employees (collectively, "Indemnitees") free and harmless from all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies (including, without limitation, interest, penalties, attorneys' fees, and costs) arising out of or connected with: (a) any breach by Subrecipient of any representation, warranty, covenant, or other obligation contained in this Agreement; (b) the performance by Subrecipient of the Services; or (c) any act or omission of any sub-subcontractor of any tier, suppliers, laborers, or any other person, firm, or corporation furnishing or supplying work, services, materials, or supplies in connection with the performance of the Services. Subrecipient's duty of indemnity under this Article 4 shall not be limited by the types or amounts of Insurance maintained by Subrecipient or Subrecipient's sub-subcontractors of any tier. Subrecipient acknowledges and agrees that The Center may offset the amount of any indemnification payment due pursuant to this Article 4 against any amounts otherwise due and payable to Subrecipient in connection with this Agreement including but not limited to amounts otherwise due and payable under Section 2.02. The provisions of this Article 4 shall survive the expiration or earlier termination of this Agreement.

## 5.    NONDISCRIMINATION

5.01.    Subrecipient agrees that Subrecipient and its employees, agents, and sub-subcontractors of any tier, if any, shall comply with all applicable federal, state, and local anti-discrimination laws, regulations, and ordinances, and shall not unlawfully discriminate, harass, or allow harassment against any of its employees or applicants for employment, any employees or agents of The Center, or any recipient of Services contemplated to be provided or

provided under this Agreement, based on race, ancestry, marital status, color, religious creed, political belief, national origin, ethnic group identification, gender, sexual orientation, age, medical condition (including HIV and AIDS), or physical or mental disability.  Subrecipient shall ensure that the evaluation and treatment of employees and applicants for employment, The Center employees and agents, and recipients of Services are free from such discrimination and harassment. Subrecipient represents that is in compliance with and covenants that it will continue to comply with the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 *et seq.*), the Fair Employment and Housing Act (Government Code § 12900 *et seq.*), Title VII of the Civil Rights Act of 1964 as amended, The Rehabilitation Act of 1973 (29 U.S.C. § 701 *et seq.*), including but not limited to Sections 503 and 504 and regulations and guidelines issued pursuant thereto.

5.02.    Subrecipient agrees to compile data, maintain records, post required notices, and submit reports, to evidence compliance with or permit effective enforcement of laws and this Article 5, and shall upon request by The Center provide evidence of compliance with this Article 5. Subrecipient shall include the complete terms of this Article 5 in all sub-subcontracts of any tier arising out of or related to this Agreement.

## 6.    <u>TERMINATION OF AGREEMENT</u>

6.01.    <u>Termination for Convenience</u>. The Center may, upon ten (10) days' prior written notice to Subrecipient, terminate this Agreement for any reason or for no reason. The Center will incur no liability to Subrecipient by reason of termination pursuant to this Section 6.01; provided, however, that Subrecipient may be paid, in accordance with the payment procedures and requirements of this Agreement for Services satisfactorily performed prior to the termination date and approved by The Center. In the event of termination under this Section 6.01, Subrecipient shall not be entitled to payment, including any overhead and/or profit, for Services not performed.

6.02.    <u>Termination on Occurrence of Stated Events</u>. This Agreement will terminate automatically on the occurrence of any of the following events:

(a)  Default under Section 6.03; or
(b)  Disability or death of Subrecipient; or
(c)  Expiration or earlier termination of the Prime Contract.

Notwithstanding any contrary provision in this Agreement, if The Center determines that it has not received or will not receive any portion of anticipated funding for this Agreement, then The Center may in its sole discretion, upon five (5) business days' prior notice to Subrecipient and without any liability to Subrecipient (a) revise the scope of the Services, or (b) terminate this Agreement.

6.03.    <u>Termination for Default</u>.

(a)  Subrecipient Default. If Subrecipient defaults in the performance of any of its obligations under this Agreement or materially breaches any provision of the Agreement, The Center may terminate this Agreement, after providing to Subrecipient five (5) business days' notice of the default or breach and Subrecipient's failure to completely cure the default or breach within such five (5)-business day time period. Termination will take effect upon communication of the notice of termination in accordance with Section 8.04.

(b)  The Center Default. If The Center defaults in its obligation to pay any approved amount due to Subrecipient under Section 2.02 within thirty (30) days following the date such payment is due, Subrecipient may terminate this Agreement by fifteen (15) days' prior written notice to The Center; provided, however, that if The Center pays the amount due within such fifteen (15)-day period, the Agreement shall continue in full force and effect as if no such default had occurred.

## 7.    <u>CONFIDENTIALITY</u>

7.01.    <u>Definitions</u>. For purposes of this Agreement:

(a) "Confidential Information" means all non-public or proprietary information disclosed before, on, or after the Effective Date, by The Center to Subrecipient, or deliverables provided by Subrecipient to The Center hereunder, whether disclosed orally or disclosed or accessed in written, electronic, or other form or media, and whether or not marked, designated, or otherwise identified as "confidential," including, without limitation: research, plans, or other information regarding The Center's or Subrecipient's program and operations, lists of Affiliates (defined in Section 7.01(b) below), identities of Affiliates, software, developments, inventions, processes, formulas, technology, designs, drawings, marketing, finances, or other business information; and

(b) "Affiliates" means, for purposes of this Article 7 and with respect to The Center, any partners, investors, donors, or third-party providers of goods or services to The Center, or any third parties to whom The Center provides goods or services.

7.02.    Confidentiality Obligations. At all times during the Term and thereafter, Subrecipient will: (a) use best efforts to protect and safeguard the confidentiality of all Confidential Information, (b) not access or use any Confidential Information, or cause or permit Confidential Information to be accessed or used, for any purpose other than in connection with compliance with this Agreement, (c) not disclose or cause or permit Confidential Information to be disclosed in any manner (except as may be required by law or pursuant to court order, provided that such disclosure does not exceed the extent of disclosure required by such law or court order), directly or indirectly, to any third person or entity, (d) immediately notify The Center of any breach of this Section 7.02 including without limitation unauthorized disclosure of Confidential Information, and (e) fully cooperate in any effort undertaken by The Center to enforce its rights under this Section 7.02.  On the expiration or earlier termination of this Agreement, Subrecipient will promptly return to The Center all Confidential Information in its possession.

7.03.    Subrecipients. The terms of this Article 7 shall extend to and bind Subrecipient's employees, agents, sub-subcontractors of any tier, and partners.

## 8.    **GENERAL PROVISIONS**

8.01.    Survival. The terms and conditions of Section 1.02 (Status of Subrecipient), Section 1.06 (Payment of Taxes), Article 3 (Representations, Warranties, and Covenants of Subrecipient), Article 4 (Indemnity), Article 7 (Confidentiality), and this Article 8 (General Provisions), will survive the expiration or earlier termination of this Agreement.

8.02.    Assignment. Subrecipient may not assign any of its rights, or delegate or subcontract any of its obligations, under this Agreement without the prior written consent of The Center. Any assignment or delegation in violation of the foregoing will be deemed null and void. Subject to the limitations contained in this Section 8.02, this Agreement will inure to the benefit of, be binding on, and be enforceable against each of the parties and their respective successors and permitted assigns.

8.03.    Force Majeure. Notwithstanding any provision of this Agreement to the contrary, in the event that performance by either party of any obligation under this Agreement is prevented, restricted, delayed, or interrupted by reason of any circumstance beyond the reasonable control and without the fault or negligence of the party affected, and which circumstance could not have been reasonably foreseen by said party, then upon prompt notice to the other party the affected party will be excused from performance to the extent and for the duration of such prevention, restriction, delay, or interruption. For avoidance of doubt, such circumstances shall not include the following (this is not intended to be a complete list): economic hardship; inability to obtain or delayed availability of sufficient labor or materials, unless due to an industry-wide materials shortage or labor strike; changes in market conditions; or non-catastrophic climatic conditions and geological events.

8.04.    Notices. Any notices, consents, waivers, and other communications hereunder must be in a writing and may be effected by: (a) personal delivery, (b) mail, registered or certified, postage prepaid with return receipt requested, or (c) electronic transmission ("e-mail") that provides for proof of receipt, to the parties at the addresses appearing below the parties' signature blocks to this Agreement. Either party may change such addresses by giving written notice to the other party in accordance with this Section 8.04.  Notices delivered personally will be deemed communicated upon receipt; mailed notices will be deemed communicated as of the earlier of the day of receipt or the third (3rd) day after mailing; and e-mailed notices will be deemed communicated as of the time shown on the proof of receipt.

8.05.    Amendments. No amendment to or modification of this Agreement will be effective unless it is in writing, identified as an amendment to or modification of this Agreement, and signed by the parties hereto.

8.06.    Entire Agreement of the Parties. This Agreement, together with the attachments hereto, constitutes the sole and entire agreement of the parties with respect to the subject matter hereof and supersedes any and all prior and contemporaneous understandings, agreements, representations, and warranties, whether oral or written, with respect to such subject matter.

8.07.    Partial Invalidity. If any provision of this Agreement is held by a court of competent jurisdiction or arbitrator to be invalid, void, or unenforceable, the remaining provisions will continue in full force and effect without being impaired or invalidated in any way.

8.08.    Attorneys' Fees. If any action at law or in equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, which may be set by the court in the same action or in a separate action brought for that purpose, in addition to any other relief to which that party may be entitled.

8.09.    Personnel and Work Rules. Subrecipient shall employ only competent, skilled, and properly trained personnel to perform the Services, and shall remove any Subrecipient personnel determined to be unfit for duty or to be acting in violation of any provision of this Agreement or the Prime Contract. In the event any Subrecipient personnel is removed pursuant to this provision, Subrecipient shall promptly replace such individual with another who is fully competent, skilled, and properly trained to perform the Services.

8.10.    Wage and Hour Regulations. At its sole cost and expense, Subrecipient shall comply with all wage and hour laws, rules, and regulations applicable to the Services. Upon request by The Center, Subrecipient shall provide all records and certifications to verify Subrecipient's compliance with this Section and applicable law.

8.11.    Licenses, Registration, Representations and Certifications. At all times, Subrecipient shall be properly registered and licensed to conduct business in the jurisdiction where the Services are to be performed  and shall, upon request by The Center, demonstrate that it is not subject to any debarment lists and is registered through the System for Award Management (SAM.gov) portal, and shall at its sole expense provide to The Center upon request any necessary representations and certifications, including, without limitation, as requested by The Center,  to demonstrate compliance with this Section.

8.12.    Further Assurances. Upon request by The Center at any time, Subrecipient shall provide further assurances including documentation, certification, or other writing requested by The Center, confirming its compliance with applicable laws, rules, and regulations, the Prime Contract, and this Agreement.

8.13.    Safety. Subrecipient will obtain and utilize all safety equipment required by law or reasonably necessary for the provision of the Services, including without limitation personal protective equipment, the expense of which safety equipment shall be borne by Subrecipient. Subrecipient will comply with all applicable provisions of OSHA regulations and industry standards. Additionally, Subrecipient and Subrecipient employees shall comply with The Center's safety rules, plans, and procedures applicable to performance of the Services. Subrecipient will provide to The Center a safety plan ("Safety Plan") upon demand by the Center. The Safety Plan will include the following: safety training required for Subrecipient's employees; emergency training required for Subrecipient's employees; procedures for reporting and mitigating hazards and accidents in the Services work area; experience modification

rate; the North American Industrial Classification System (NAICS) code of Subrecipient, as well as the NAICS national average rate for incidents in the code of Subrecipient, Subrecipient's OSHA recordable incident rate, including total case incident rate and lost day rate; and acknowledgement that Subrecipient and/or Subrecipient's employee may be removed at The Center's discretion for violation of The Center's safety policies and procedures.

8.14.    Governing Law, Jurisdiction, and Venue. This Agreement will be governed by and construed in accordance with the laws of the State of California, without giving effect to any conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any other jurisdiction than the State of California. Subject to the Dispute Resolution Provisions set forth in the **Dispute Resolution Provisions Attachment**, any action or proceeding by either of the parties to enforce this Agreement shall be brought only in any state or federal court located in the City and County of Sacramento, California. The parties irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any action or proceeding in such venue.

8.15.    Dispute Resolution. Any claim, dispute, or other matter arising out of or related to this Agreement (a "Dispute") shall be subject to resolution pursuant to the Dispute Resolution Provisions set forth in the **Dispute Resolution Provisions Attachment** attached hereto and incorporated herein.

8.16.    Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original (including copies sent to a party by facsimile or email transmission) as against the party signing such counterpart, but which together will constitute one and the same instrument.

8.17.    Headings. The section headings contained in this Agreement are for convenience only and shall not in any way be deemed to limit, construe, alter, or otherwise affect the meaning or interpretation of any section.

8.18.    Attachments. The following attachments hereto are incorporated by reference into the Agreement ("Attachments"):

**Attachment:**  Scope of Services & Work Plan
**Attachment:**  Budget
**Attachment:**  Program and Financial Reporting Requirements
**Attachment:**  Insurance Requirements
**Attachment:**  Dispute Resolutions Provisions
**Attachment:**  Special Terms and Conditions (Prime Contract)
**Attachment:**  HIPAA Business Associate Addendum
**Attachment:**  Schedule of Federal Funds

*(Signature page follows)*

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the Effective Date.

**The Center:**

BY : *Kaying Hang*

Kaying Hang
President

DATE: 4/25/2024

**Subrecipient:**

BY: *Dr. Tyler A. TerMeer*

Authorized Signer

DATE: 4/16/2024

**The Center**
**Program Contact:**
Nilda Valmores
Senior Program Officer
1321 Garden Highway, Suite 210
Sacramento, CA 95833

**Subrecipient Name and Address:**
**San Francisco AIDS Foundation**
Dr. Tyler TerMeer
CEO
1035 Market St
San Francisco, CA 94103

**Subrecipient Contact Information:**

█████████████

**Subrecipient Tax ID:**

████████

**Subrecipient SAM.gov UEI:**
L85GDP5FVVU5

**Contract Number:**
CA23BHR0402

**ATTACHMENT**

**Scope of Services & Work Plan**

**The Center shall:**

- Execute subcontract agreements with subrecipients identified by DHCS.
- Collect program and budget reports and submit reports to DHCS.
- Convene funded partners and other organizations identified by DHCS to provide technical assistance on administrative and program requirements and delivery of services.
- Communicate regularly with DHCS and subrecipients.
- Participate in HEAR US Program meetings.
- Support subrecipients with technical assistance in order that they may be more effective in fulfilling their work plans.

**Upon the Subrecipient Agreement execution, the Subrecipient shall support the goals of the Behavior Health Recovery Services Project of increasing access and utilization of culturally responsive care and services for BIPOC, 2S/LGBTQ+, people with livid disabilities, and other communities by ensuring:**

- Participation of specialized behavioral health-focused staff (i.e., peer providers, therapists, wellness, and recovery coaches, etc.) from the funded organizations in the standards of care development community of practice (at least monthly).
- Outreach, training, and engagement of funded partners' constituency (i.e., clients, consumers, family members, residents) in the standards of care development community of practice (at least monthly).
- Implementation of its BHRSP work plan.
- Provide all the necessary program, budget, and evaluation reports to The Center in a timely manner.
- Communication regularly occurs with The Center and its designated consultants.
- Participation in HEAR US Program meetings.
- Maintenance of pertinent financial and program records.

| BHRSP HEAR US Phase 2 Project Work Plan<br>San Francisco AIDS Foundation - Local Sustainability and Systems Change | | | |
|---|---|---|---|
| **1. Goal: Increase effectiveness and overall impact of the Treatment on Demand Coalition in San Francisco** | | | |
| Objective A: Increase engagement, structure, and consistency of Treatment on Demand Coalition meetings and activities | | | |
| Project Activities that support identified goal and objectives | Responsible Staff/Partners | Timeline | |
| a.  Recruit, hire, and train a Coalition manager to host and oversee follow-up from weekly and monthly coalition meetings | Ande Stone, Laura Thomas | Start Date | End Date |
| b. Plan and lead outreach and recruitment sessions to fortify diversity within the Coalition | | 11/1/2023 | 6/30/2024 |
| c. | | | |
| Objective B: Develop Treatment on Demand Coalition Strategic Plan | | | |
| Project Activities that support identified goal and objectives | Responsible Staff/Partners | Timeline | |
| a. Establish a core strategic planning committee of Coalition members to craft scope of work plans for and to hire lead strategic plan facilitator | Laura Thomas / Treatment on Demand Coalition members | Start Date | End Date |
| b. Facilitate strategic planning and brainstorm sessions with the Treatment on Demand Coalition | | 3/1/2024 | 9/1/2024 |
| c. Craft, review, and refine Strategic plan goals, activities, and plans to guide Coalition work of the following 5 years | | | |
| **2. Goal: Build support for evidence-based harm reduction, substance use, and behavioral health strategies and programs with key stakeholders** | | | |
| Objective A:  Proactively address community and business questions and concerns in neighborhoods where proposed harm reduction "Wellness Hubs" are proposed | | | |
| Project Activities that support identified goal and objectives | Responsible Staff/Partners | Timeline | |
| a.  Hold 4+ community engagement outreach sessions to share information and answer questions related to the expansion of services and benefits provided to neighborhoods and individuals | Coalition manager, Ande Stone, Laura Thomas, SFAF's Marketing & Communications team | Start Date | End Date |
| b. Develop and share Q&A digital and print materials sharing key information about expanded harm reduction services provided by Wellness Hubs | | 1/1/2024 | 7/31/2025 |
| c. Develop and implement a targeted media plan to share critical updates with the community about expanded harm reduction and behavioral health services | | | |

| Objective B:  Raise awareness and support for evidence-based, effective strategies related to overdose prevention, substance use treatment and recovery, and harm reduction in San Francisco. | | | |
|---|---|---|---|
| Project Activities that support identified goal and objectives | Responsible Staff/Partners | Timeline | |
| a. Successfully pitch and promote the work and expertise of the Treatment on Demand Coalition and members to media partners, securing positive coverage for programs and policies supported by the Coalition. | Coalition manager, Ande Stone, Laura Thomas, SFAF's Marketing & Communications team | Start Date | End Date |
| b. Establish and maintain ongoing communication and marketing channels (including a dedicated Coalition website page) to engage community members and key stakeholders in Coalition activities and advocacy opportunities. | | 1/1/2024 | 7/31/2025 |
| c. Develop and disseminate infographics, fact sheets, and other educational materials | | | |

ATTACHMENT

Budget

**The Center**
**REVISED Proposed Project Budget**
**HEADS Phase 2**
**SF 424b Fundable**

Start Date: 2/1/2023
End Date: 6/30/2025

| Name of Organization: | | Year 1 | | | Year 2 | | | Total | | | Budget Justification/Narrative |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | FTE | Total Project Budget Year 1 71054 / 409354 (4 Months) | Requested from The Center | Other Funding Committed to Project | Total Project Budget Year 2 71054 / 409825 (12 Months) | Requested from The Center | Other Funding Committed to Project | Total Project Budget | Requested from The Center | Other Funding Committed to Project | |
| **I. Personnel** | | | | | | | | | | | |
| Salaries | | | | | | | | | | | |
| 1 Community Coalition Manager | 1 | $47,500.00 | $47,500.00 | | $95,000.00 | $95,000.00 | | $142,500.00 | $142,500.00 | $0.00 | Community Coalition Manager - 1 full FTE at $95,000 per year |
| 2 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | provide position title and calculation details |
| 3 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | provide position title and calculation details |
| 4 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | provide position title and calculation details |
| 5 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | provide position title and calculation details |
| 6 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | provide position title and calculation details |
| 7 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | provide position title and calculation details |
| 8 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | provide position title and calculation details |
| Payroll Taxes and Benefits | | $12,825.00 | $12,825.00 | | $25,650.00 | $25,650.00 | | $38,475.00 | $38,475.00 | $0.00 | Fringe at 27% of salary cost. Fringe is inclusive of FICA, health and life insurance, disability, workers compensation and retirement |
| **Total of Salary and Benefits** | | $60,325.00 | $60,325.00 | $0.00 | $120,650.00 | $120,650.00 | $0.00 | $180,975.00 | $180,975.00 | $0.00 | |
| Consultant Fees | | | | | | | | | | | |
| 1 Policy advising support consultant | | $2,530.00 | $2,530.00 | | $1,265.00 | $1,265.00 | | $3,795.00 | $3,795.00 | $0.00 | Describe the basis of calculation |
| 2 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Describe the basis of calculation |
| 3 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Describe the basis of calculation |
| 4 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Consulting fees to lead 3 strategy and planning sessions at $1,000 per session, with Treatment on Demand coalition members. Develop coalition strategy plan at $2,000 fee for service. |
| **Total Personnel** | | $62,355.00 | $62,355.00 | $0.00 | $124,415.00 | $124,415.00 | $0.00 | $184,770.00 | $184,770.00 | $0.00 | |
| **II. Other Expenses** | | | | | | | | | | | |
| Office Supplies | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Strategy planning meeting supplies and gathering costs. Room rental $300. Office supplies $200. Ongoing coalition community meeting outreach and supplies. $50 per month. |
| Postage | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Describe the basis of calculation |
| Printing/Duplicating | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Print printing (quantity x 1,000; cost per unit x $0.10; total requested = $100). Flyer printing (quantity x $80; cost per unit = $0.10; total requested = $80.00; total requested = $80). Brochure printing (quantity x 200; cost per unit x $2; total requested = $400) |
| Information/Materials | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Describe the basis of calculation |
| Equipment | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Describe the basis of calculation |
| Rent Utilities | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Describe the basis of calculation |
| Travel | | $1,600.00 | $1,600.00 | | $1,600.00 | $1,600.00 | | $3,200.00 | $3,200.00 | $0.00 | Year 1 Year 2 Mileage at $0.655 per mile; for 157 miles; for each of 2 staff members |
| Maintenance (List) | | | | | | | | | | | |
| 1 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Describe the basis of calculation |
| 2 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Describe the basis of calculation |
| 3 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Describe the basis of calculation |
| 4 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Describe the basis of calculation |
| 5 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Describe the basis of calculation |
| 6 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Describe the basis of calculation |
| 7 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Describe the basis of calculation |
| 8 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | $0.00 | Describe the basis of calculation |
| **Total Other Expenses** | | $1,600.00 | $1,600.00 | $0.00 | $1,600.00 | $1,600.00 | $0.00 | $3,200.00 | $3,200.00 | $0.00 | |
| Indirect Rate | 33% | | | | | | | | | | |
| Indirect (up to 10% of direct costs) | | $21,105.15 | $21,105.15 | $0.00 | $40,524.95 | $40,524.95 | $0.00 | $62,020.10 | $62,020.10 | $0.00 | Indirectly negotiated indirect cost rate of 33% predetermined through 2025 |
| **Total Expenses** | | $85,060.15 | $85,060.15 | | $164,939.95 | $164,939.95 | | $250,000.00 | $250,000.00 | | |

* enter actual indirect rate %
Please review budget requirements in

**Unallowable Expenditures**

APPENDIX B – STANDARD FUNDING RESTRICTIONS The Center will incorporate the applicable federal and state rules and regulations into the terms and contracts of the contract agreements, notably 2 CFR 200 and 45 CFR Part 75. HHS codified the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for HHS Awards, 45 CFR Part 75. In Subpart E, cost principles are described and allowable and unallowable expenditures for HHS recipients are delineated. 45 CFR Part 75 is available at https://www.ecfr.gov/cgibin/retrieveECFRgp=1&SID=df3c54728d090168d3b2e780a6f6ca7c&ty=HTML&h=L&mc =true&n=pt45.1.75& r=PART. Unless superseded by program statute or regulation, follow the cost principles in 45 CFR Part 75 and the standard funding restrictions below.

SAMHSA funds were granted to the State and all funding restrictions are applicable to this funding opportunity and all sub-contracts. SAMHSA funds must be used for purposes supported by the program and <u>may not be used to</u>:

- Pay for services that can be supported through other accessible sources of funding, such as other federal discretionary and formula grant funds, (e.g., HHS, CDC, CMS, HRSA and SAMHSA), DOJ (OJP/BJA) and non-federal funds, third-party insurance, and sliding scale self-pay, among others.

- Exceed Salary Limitation: The Consolidated Appropriations Act, 2016 (Pub. L.113-76) signed into law on January 10, 2016, limits the salary amount that may be awarded and charged to SAMHSA grants and cooperative agreements. Award funds may not be used to pay the salary of an individual at a rate in excess of Executive Level II. The Executive Level II salary can be found in SAMHSA's standard terms and conditions for all awards at https://www.samhsa.gov/grants/grants-management/notice-awardnoa/standard-terms-conditions. This amount reflects an individual's base salary exclusive of fringe and any income that an individual may be permitted to earn outside of the duties to the applicant organization. This salary limitation also applies to sub awards/subcontracts under a SAMHSA grant or cooperative agreement. The Federal Executive Level II Salary Cap is currently $212,100.

- Pay for any lease beyond the project period.

- Pay for the purchase or construction of any building or structure to house any part of the program.

- Provide residential or outpatient treatment services when the facility has not yet been acquired, sited, approved, and met all requirements for human habitation and services provision. (Expansion or enhancement of existing residential services is permissible.)

- Funds may not be used, directly or indirectly, to purchase, prescribe or provide marijuana or treatment using marijuana. Treatment in this context includes the treatment of opioid use disorder. Grant funds also cannot be provided to any individual or organization that provides or permits marijuana use for the purposes of treating substance use or mental disorders.

- Religious organizations for explicit religious activities.

- Activities that exclusively benefit the members of sectarian or religious organizations.

- Partisan activities.

- Debt retirement.

- Operational deficits.

- Purchase of properties or vehicles or other major equipment. Major equipment is defined as property costing more than $5,000 with a life expectancy of one or more years.)

- Fundraising activities.

- Promotional items including, but not limited to, any clothing and commemorative items such as pens, mugs/cups, folders/folios, lanyards, and conference bags.

- Activities that supplant or duplicate existing programs.

- Reimbursement of costs incurred prior to the effective date of the Agreement.

- Reimbursement of costs not consistent or allowable according to local and state guidelines or regulations including, but not limited to, travel in excess of State rates and travel to states on the Prohibited States list.

- Personal protective equipment (PPE) for use by clients.

- Fentanyl or fentanyl analogs.

- Naloxone. Please refer to DHCS' Naloxone Distribution Project where eligible organizations may receive free nasal spray and injectable formulations of naloxone.

- Materials such as syringes, pipes, or other items used to support safer ingestion of illegal drugs; such materials may, however, be possessed and dispensed by authorized syringe services programs. Please contact the California Department of Public Health Harm Reduction Unit (sspinfo@cdph.ca.gov) or your county health department for assistance.

- Detoxification services unless it is part of the transition to MAT with extended-release naltrexone.

- Direct payments to individuals to enter treatment or continue to participate in prevention or treatment services.

- Cost related to medical procedures such as suturing or removal of sutures, abscess management etc. are not allowable. However, non-procedural medical items such as bandages, ice packs, and non-procedural first aid supplies that can be administered by participants are allowable.

- Clothing for participants, orthopedic and mobility devices, and document fees are unallowable under this funding. Patient supplies and materials that directly support access to programming and build trust, such as cold weather gear (gloves/hand warmers) or critical hygiene supplies are allowable. Staff time and costs related to case management, referrals to services, and support around accessing resources and completing applications as part of wrap-around care are allowable (just not the fees and direct items themselves).

- Items such as plates and utensils that are not critical to daily program operations are unallowable. Supplies critical to the daily function of the program such as paper towels and toilet paper are allowed.

- Media and advertisement costs must be directly related to contracted services. Any large costs pertaining to media would need approval from DHCS.

- Program Participation Incentives: non-cash incentives for program participants greater than $30 (incentives should be the minimum amount necessary to meet the program and evaluation goals).

- Direct payments to individuals to enter treatment or continue to participate in prevention or treatment services. Note: A recipient or treatment or prevention provider may provide up to $30 non-cash incentive to individuals to participate in required data collection follow up. This amount may be paid for participation in each required follow-up interview.

- Meals are generally unallowable unless they are an integral part of a conference grant or specifically stated as an allowable expense in the FOA. Funds may be used for light snacks, not to exceed $3.00 per person.

- Out-of-state travel (Organizations requesting funds for in-state travel must abide by DHCS travel guidance and partners will be subject to the same travel guidelines as state employees).

**ATTACHMENT**

**Program and Financial Reporting Requirements**

Contracts will cover activities for the period between December 1, 2023, to June 30, 2025. At a minimum, Subrecipients must be willing to participate in the following activities:

**Program Reporting Requirements**

| Number | Dates | Requirements |
|--------|-------|--------------|
| 1 | January 18, 2024 | Virtual Partner Launch (1.5 hours) |
| 2 | February 7, 2024 | Virtual Financial Meeting (1 hour) |
| 3 | February 22, 2024 | Virtual Roadmap to Improve Access and Equity for Communities in Recovery (1 hour) |
| 4 | February 29, 2024 | Virtual Partner Evaluation Meeting with UCLA (1 hour) |
| 5 | March 21, 2024 | Virtual Learning Collaborative Meeting #3 (2 hours) |
| 6 | May 23, 2024 | Virtual Learning Collaborative Meeting #5 (2 hours) |
| 7 | June 30, 2024 | Approved Detailed Action Plan for Work Plan |
| 8 | September 26, 2024 | Virtual Learning Collaborative Meeting #9 (2 hours) |
| 9 | October 24, 2024 | In-Person l Learning Collaborative Meeting #10 (2 hours) – midpoint |
| 10 | April 2024 – December 2024 (Dates TBD) | 9 Monthly Pod Check-ins |
| 11 | January 23, 2025 | Virtual Learning Collaborative Meeting #11 (2 hours) |
| 12 | March 20, 2025 | Virtual Learning Collaborative Meeting #13 (2 hours) |
| 13 | May 16, 2025 (due to Memorial Day weekend) | In-Person Learning Collaborative Meeting #15 (5 hours) – closing in person. |
| 14 | January 2025 – June 2025 (Dates TBD) | 6 Monthly Pod Check-ins |

Submit all financial reports and evaluation forms as requested.

**Financial Reporting Requirements**

| Number | Report Name | Report Due Date |
|--------|-------------|-----------------|
| 1 | Financial Report Q1 2024<br>12/1/2023 – 3/31/2024 | 4/19/2024 |
| 2 | Financial Report Q2 2024<br>4/1/2024 – 6/30/2024 | 7/19/2024 |
| 3 | Financial Report Q3 2024<br>7/1/2024 – 9/30/2024 | 10/18/2024 |
| 4 | Financial Report Q4 2024<br>10/1/2024 – 12/31/2024 | 1/17/2025 |
| 5 | Financial Report Q1 2025<br>1/1/2025 – 3/31/2025 | 4/18/2025 |
| 6 | Financial Report Q2 2025<br>4/1/2025 – 6/30/2025 | 7/18/2025 |
| 7 | Final Cumulative Report<br>12/1/2023 – 6/30/2025 | 7/30/2025 |

**Evaluation Data Reporting Requirements**

| Number | Report Period | Due to UCLA and Michigan Public Health Institute* |
|--------|---------------|---------------------------------------------------|
| 1 | 12/1/2023 – 3/31/2024 | 4/19/2024 |
| 2 | 4/1/2024 – 6/30/2024 | 7/19/2024 |
| 3 | 7/1/2024 – 9/30/2024 | 10/18/2024 |
| 4 | 10/1/2024 – 12/31/2024 | 1/17/2025 |
| 5 | 1/1/2025 – 3/31/2025 | 4/18/2025 |
| 6 | 4/1/2025 – 6/30/2025 | 7/18/2025 |

*Additional evaluation due dates to be determined.

**ATTACHMENT**

**Insurance Requirements**

**INSURANCE.** Subrecipient shall, at Subrecipient's sole cost and expense and with insurers reasonably approved by The Center with respect to any policy required hereunder, maintain in full force and effect for the entire term of this Agreement the following types of insurance:

    **a.**   **Commercial General Liability Insurance.** Subrecipient shall procure and maintain Commercial General Liability insurance written on an occurrence basis (Insurance Services Office, Form CG 00 01 or equivalent), limits of at least $1,000,000 per occurrence and at least $2,000,000 products/completed operations with a $2,000,000 general aggregate limit. Subrecipient shall not provide general liability insurance under any Claims Made General Liability form and will require The Center's approval if Subrecipient's General Liability policy contains a deductible greater than $25,000. The General Liability Insurance policy must expressly cover, without limitation, all liability to third parties arising out of or related to Subrecipient's services or other activities associated with this Agreement, including, without limitation, Subrecipient's obligations under the Indemnification section set forth in Article 4 of this Agreement.

    **b.**   **Additional Insureds added to General Liability Policy.** Sierra Health Foundation: Center for Health Program Management, the Funder, Sierra Health Foundation, and their respective officers, directors, agents, representatives, constituent entities, affiliates, volunteers, officials, parents, subsidiaries, governing boards, and employees shall be added as Insureds ("Additional Insureds") under each commercial general liability policy identified in the preceding paragraph above. Specifically, the policy shall include a combination of ISO forms CG2010 10/04 and CG 2037 10/04 or is equivalent. Furthermore, the policy shall apply as primary insurance and that any other insurance coverage carried by or otherwise available to an "Additional Insured" will be excess only and will not contribute with this insurance.

    **c.**   **Professional E&O Insurance.** Subrecipient shall procure and maintain, for a period of five (5) years following completion of this Agreement, errors and omissions liability insurance appropriate to their profession. Such insurance shall be in an amount not less than $1,000,000 per claim, $2,000,000 aggregate. Coverage shall be sufficiently broad to respond to the duties and obligations as is undertaken by Subrecipient in this Agreement.

    **d.**   **Workers Compensation Insurance.** Subrecipient shall procure and maintain Workers Compensation Insurance with minimum limits of $1,000,000 each for bodily injury by accident (per accident per person), bodily injury by disease (policy limit) and bodily injury by disease (each employee). Subrecipient must maintain such a policy and provide The Center with a certificate of insurance that includes a waiver of subrogation endorsement.

    **e.**   **Automobile Insurance.** Subrecipient shall procure and maintain Automobile Liability Insurance, including liability for all owned, hired and non-owned vehicles, with minimum limits of $1,000,000 combined single limit per occurrence; such coverage must be for (A) "any auto" or (B) "all owned autos, hired autos and non-owned autos". Furthermore, in the event that ten or more passengers are to be transported in any one such motor vehicle, the operator will also hold a State of California Class B driver's license and the Subrecipient must possess automobile liability insurance in the amount of $5,000,000 per occurrence for bodily injury and property damage combined. Said insurance must be obtained and made effective upon the delivery date of any motor vehicle reimbursed with grant funds made available under this Agreement. Such insurance shall cover liability arising out of a motor vehicle including owned, hired and non-owned vehicles. Subrecipient agrees to include an Additional Insured Endorsement naming Sierra Health Foundation: Center for Health Program Management, the Funder, Sierra Health Foundation, and their respective officers, directors, agents, representatives, constituent entities, affiliates, volunteers, officials, parents, subsidiaries, governing boards, and employees as additional insureds under ISO form CA 2048 or equivalent. Subrecipient will, as soon as practicable, furnish a copy of the certificate of insurance to The Center. The certificate of insurance will identify The Center contract number referenced on the signature page hereto**.**

    **f.**   **Improper Sexual Contact and Physical Abuse.** Subrecipient shall procure and maintain Sexual Abuse/Physical Abuse insurance coverage in an amount not less than $1,000,000 per claim.  The date of the inception of the policy must be no later than the first date of the anticipated work under this Agreement. It

shall provide coverage for the duration of this Agreement and shall be maintained twenty-four (24) months after expiration or earlier termination of this Agreement.

g.  **Cyber Liability Insurance** including first-party costs, due to an electronic breach that compromises Subrecipient's confidential data shall have a minimum limit per occurrence of $1,000,000. Claims made coverage is acceptable. Such coverage must include:

   o   Defense, indemnity and legal costs associated with regulatory breach (including HIPAA), negligence or breach of contract.

   o   Administrative expenses for forensic expenses and legal services.

   o   Crisis management expenses for printing, advertising, mailing of materials and travel costs of crisis management firm, including notification expenses.

   o   Identify event service expenses for identity theft education, assistance, credit file monitoring to mitigate effects of personal identity event, post event services.

The date of the inception of the policy must be no later than the first date of the anticipated work under this Agreement. It shall provide coverage for the duration of this Agreement and shall be maintained twenty-four (24) months after expiration of this Agreement.

h.  **General Insurance Provisions.** Subrecipient will provide evidence of such Insurance to The Center within five (5) business days after the Effective Date. The Certificate of Insurance must include the name of the Project. It is understood and agreed that The Center shall not pay any sum to Subrecipient under this Agreement unless all Insurance required by this Agreement is in force at the time that Services subject to such payment are rendered and Subrecipient has delivered evidence of same to The Center. Subrecipient agrees to provide, at least thirty (30) days prior to the expiration date of said insurance coverage, a copy of a new certificate of insurance evidencing continued coverage on an annual basis. Subrecipient's general liability, auto liability and Professional insurance must be issued by responsible insurance companies, maintaining an A.M. Best's Rating of A-VI or better. Upon failure of Subrecipient to furnish, deliver and maintain such insurance as above provided, this contract, at the election of The Center, may be suspended, discontinued or terminated. Failure of Subrecipient to purchase and/or maintain any required insurance shall not relieve Subrecipient from any liability or indemnification under the Agreement.

**ATTACHMENT**

**Dispute Resolution Provisions**

Any Dispute directly or indirectly involving the Funder shall be subject to resolution pursuant to the dispute resolution provisions of the Prime Contract. In addition, Disputes between The Center and Subrecipient that involve other third parties shall be governed, at the sole option of The Center, by the dispute resolution provisions applicable to the dispute as between The Center and such third parties. In the event of a Dispute between the parties to this Agreement that does not directly or indirectly involve the Funder, or such other third parties as to which The Center elects not to so employ the dispute resolution provisions unique to such third-party disputes, the following provisions of this **Attachment** shall govern resolution of the Dispute.

a)    <u>Meet and Confer</u>. In the event of any Dispute, a party shall first send written notice of the Dispute to the other party (a "<u>Dispute Notice</u>"). The parties shall first attempt to meet and confer in good faith to resolve by negotiation and consultation any Dispute set forth in the Dispute Notice. If a Dispute is not resolved within fifteen (15) business days after one party delivers the Dispute Notice to the other party, whether or not the parties (and/or their authorized representatives) meet and confer, either party may proceed pursuant to the procedures set forth below in this **Attachment**.

b)    <u>Procedure</u>. The Dispute shall be decided by general reference procedures pursuant to Code of Civil Procedure Section 638, as modified by the provisions of this **Attachment**, and any subsequent provisions mutually agreed upon in writing by the parties. Any variations from the statutory reference procedures set forth herein shall be deemed to be a stipulation by the parties to such revised procedures. Should any court or referee determine that the procedures set forth herein violate any statute, case law, rule or regulation, the terms of such statute, case law, rule or regulation shall control and govern.

c)    <u>Commencement</u>. The general reference proceeding shall be commenced by a request or a motion filed with the Presiding Judge of the Superior Court of the County of Sacramento, State of California ("Court").  Except to the extent modified herein, the reference shall be conducted in accordance with California law, including, but not limited to, the Code of Civil Procedure and the Evidence Code.

d)    <u>Referee</u>. The referee appointed by the Court shall be a retired judge who has served at least five (5) years in the courts of the State of California. The Court shall appoint only one referee. Subject to the award of fees and costs to the prevailing party in the general reference, The Center on the one hand, and Subrecipient, on the other hand, shall pay one-half (1/2) of the expenses of the general reference at the rate set by the Court pursuant to Code of Civil Procedure Sections 645.1 and 1023. In no event shall either The Center or Subrecipient be liable to the other for consequential, speculative, or punitive damages, and the referee shall not have the power to award such damages. The referee shall not have the right to convene a jury to be the trier of fact of any controversy hereunder. TO THE EXTENT PERMITTED BY LAW ALL PARTIES HERETO HEREBY WAIVE A JURY TRIAL OR PROCEEDING IN CONNECTION WITH ANY DISPUTE ARISING OUT OF THIS AGREEMENT.

e)    <u>Location of References</u>. All general reference proceedings hereunder shall, unless all parties hereto otherwise agree, be conducted in a mutually agreeable location in the County of Sacramento, State of California.

f)    <u>Provisional Relief</u>. Any party may, without waiving the right to general reference, prior to the time a referee is appointed by the Court, apply directly to the Court for provisional relief including, but not limited to, the filing of a complaint for the purpose of recording a lis pendens, attachment, receivership, injunction and motions to expunge a lis pendens.  At such time as the Court has appointed a referee, the Court may transfer any such proceeding for provisional relief to the referee for disposition.

g)    <u>Discovery</u>. Within twenty (20) days after appointment of the referee, each of The Center and Subrecipient shall serve on the other party all documents relevant to the Dispute and all documents that the party intends to offer as evidence during the reference proceedings. Each party shall be entitled to take one discovery deposition of each other party, to take three non-party depositions, and to propound twenty-five (25) special interrogatories pursuant to Code of Civil Procedure Section 2030.030.  The parties shall provide to the referee and to all other parties, within forty-five (45) days after appointment of the referee, a list of expert witnesses who will provide opinion testimony. The parties

shall be entitled to depose any designated expert prior to the commencement of the hearing. The referee shall resolve any discovery disputes between the parties. The general reference hearing must commence within three (3) months after appointment of the referee. The referee shall report his or her findings to the Court in the form of a statement of decision within twenty (20) days after the close of testimony, pursuant to Code of Civil Procedure Section 643. The Court shall enter judgment based upon the statement of decision.

h)    <u>Costs and Expenses</u>. The referee shall be authorized to award costs of the general reference, including, without limitation, attorneys' fees, expert fees, and fees assessed by the referee, to the prevailing party. The referee shall also be authorized to order other provisional and equitable remedies.

NOTICE:  BY INITIALING IN THE SPACE BELOW, YOU ARE AGREEING TO HAVE ANY DISPUTE SUBJECT TO THE GENERAL REFERENCE PROCEEDING PROVISIONS SET FORTH IN THIS **ATTACHMENT** HEARD BEFORE A REFEREE AND NOT A JUDGE, AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR BEFORE A JURY. BY INITIALING IN THE SPACE BELOW, YOU ARE GIVING UP SOME OF YOUR RIGHTS TO DISCOVERY, BUT WILL RETAIN YOUR RIGHTS OF APPEAL.  IF YOU REFUSE TO SUBMIT TO GENERAL REFERENCE PROCEEDING AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO PARTICIPATE IN THE GENERAL REFERENCE PROCEEDING UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS GENERAL REFERENCE PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING PROVISION AND VOLUNTARILY AGREE TO SUBMIT DISPUTES, OTHER THAN THOSE EXPRESSLY EXCLUDED ABOVE, TO A GENERAL REFERENCE PROCEEDING BEFORE A REFEREE, RATHER THAN A COURT OR JURY PROCEEDING.

The Center                                              Subrecipient

By: _*Kaying Hang*_                            By: _*Dr. Tyler A. TerMeer*_

   Kaying Hang                                          Authorized Signer

   President

**ATTACHMENT**

**Special Terms and Conditions (Prime Contract)**

This **Attachment** incorporates by reference the provisions from the Prime Contract which apply to this Subrecipient Agreement. Please reference the applicable provisions in Exhibit D(F).

1.  Federal Equal Employment Opportunity Requirements

2.  Travel and Per Diem Reimbursement (Reference Exhibit H)

3.  Procurement Rules

4.  Equipment Ownership/Inventory/Disposition (Section 4g. Motor Vehicles does not apply to this Agreement)

5.  Audit and Record Retention

6.  Site Inspection

7.  Federal Contract Funds

8.  Intellectual Property Rights

9.  Air or Water Pollution Requirements

10. Prior Approval of Training Seminars, Workshops or Conferences

11. Confidentiality of Information

12. Documents, Publication, and Written Reports

13. Debarment & Suspension Certification

14. Smoke-Free Workplace Certification

15. Officials Not to Benefit

16. Four-Digit Date Compliance

17. Prohibited use of State Funds for Software

18. Use of Small, Minority Owned & Women's Businesses

19. Suspension or Stop Work Notification

20. Public Communications

21. Compliance with Statutes & Regulations

22. Lobbying Restrictions & Disclosure Certification

**ATTACHMENT**

**HIPAA Business Associate Addendum**

Link for the HIPAA Business Associate Addendum

ATTACHMENT

Schedule of Federal Funds

There are Federal funds in this Agreement. Federal funding details for this Agreement are as follows:

| Catalog of Federal Domestic Assistance (CFDA) Title | CFDA# | Award Name and Federal Award Identification Number (FAIN) | Award Year | Federal Awarding Agency | Funding Amount |
|---|---|---|---|---|---|
| Block Grants for Community Mental Health Services (MHBG) | 93.958 | B09SM085337 | 2021 | Substance Abuse and Mental Health Services Administration (SAMHSA) | $125,000.00 |
| Block Grants for Prevention and Treatment of Substance Abuse (SABG) | 93.959 | B08TI083929 | 2021 | Substance Abuse and Mental Health Services Administration (SAMHSA) | $125,000.00 |

Total Federal Funds in this contract: $250,000.00

Were funds awarded for research and development activities? No

Subrecipient's SAM UEI Number is: L85GDP5FVVU5

Subrecipient shall comply with all Federal requirements including OMB requirements for Single Audits, in addition to The Center audit requirements for the purposes of contract monitoring as stated in this Agreement, as applicable.

At the sole discretion of The Center, the dollar amount payable from each Federal Funder in above may be changed upon written notice from The Center to Subrecipient so long as payments do not exceed the maximum total payment amount in accordance with this agreement.