PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
KENNETH W. BRAKEBILL (CABN 196696)
Acting Chief, Civil Division
CHRISTOPHER F. JEU (CABN 247865)
Assistant United States Attorney
60 South Market Street, Suite 1200
San Jose, California 95113
Telephone: (408) 535-5082
FAX: (408) 535-5066
Christopher.Jeu@usdoj.gov

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division
JOSEPH E. BORSON
Assistant Branch Director
PARDIS GHEIBI (D.C. Bar No. 90004767)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-3246
Email: pardis.gheibi@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| SAN FRANCISCO AIDS FOUNDATION, *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 25-cv-1824-JST<br><br>DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES<br><br>Hearing Date: May 22, 2025<br>Time: 2:00 pm<br>Judge: Hon. Jon S. Tigar<br>Place: Oakland Courthouse<br>Courtroom 1 |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................ 5

ARGUMENT ................................................................................................................................. 7

I.     PLAINTIFFS ARE NOT LIKELY TO ESTABLISH ARTICLE III JURISDICTION. ................. 7

     A.     Plaintiffs lack standing with respect to the majority of the provisions. ............................. 7

     B.     This Court lacks jurisdiction to review Plaintiffs' grant-termination claims. ................... 12

     C.     Plaintiffs' remaining claims are unripe for review. ............................................................ 14

II.    PLAINTIFFS' CHALLENGES LACK MERIT. ....................................................................... 14

     A.     Plaintiffs' Due Process Clause claims fail. ......................................................................... 15

          i.     Plaintiffs' facial challenges under the Due Process Clause to Presidential directives are categorically improper. ....................................................... 15

          ii.    Plaintiffs' Due Process claims fail on the merits. .................................................. 16

     B.     Plaintiffs' First Amendment claims fail. ............................................................................ 20

     C.     Plaintiffs' separation-of-powers challenges fail. ................................................................ 28

     D.     Plaintiffs' statutory arguments fail. ..................................................................................... 31

     E.     Plaintiffs' Equal Protection Clause claim fails. .................................................................. 31

III.   THE REMAINING FACTORS COUNSEL AGAINST GRANTING THE REQUESTED RELIEF. ................................................................................................................................... 34

     A.     Plaintiffs have not shown irreparable injury. ..................................................................... 34

     B.     The balance of the equities and public interest weigh squarely against relief. ................. 35

IV.   ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED AND PERMIT LAWFUL AGENCY ACTIVITY. ......................................................................................... 36

     A.     Injunctive relief should be limited to defendants agencies, Plaintiffs, and the provisions that affect them. ................................................................................................. 36

     B.     Relief should clarify that it preserves the Executive's discretionary authority. ................. 37

V.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND ACCOMPANY A BOND. ..................................................................................................... 37

1

CONCLUSION ............................................................................................................................. 38

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
4
    570 U.S. 205 (2013) ................................................................................................ 21, 22, 25

5

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC,*
6
    103 F.4th 765 (11th Cir. 2024) ........................................................................................ 27

7

*Am. Cargo Transp., Inc. v. United States,*
    625 F.3d 1176 (9th Cir. 2010) ........................................................................................ 27

8

*Arnett v. Kennedy,*
9
    416 U.S. 134 (1974) ............................................................................................................ 8

10

*Ballou v. McElvain,*
    29 F.4th 413 (9th Cir. 2022) ............................................................................................ 32

11

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
12
    591 U.S. 610 (2020) ...................................................................................................... 8, 37

13

*Bd. of Regents of State Colls. v. Roth,*
14
    408 U.S. 564 (1972) .......................................................................................................... 17

15

*Bennett v. New Jersey,*
    470 U.S. 632 (1985) .......................................................................................................... 12

16

*Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh,*
17
    295 F.3d 28 (D.C. Cir. 2002) ................................................................................ 4, 30, 31

18

*Califano v. Yamasaki,*
19
    442 U.S. 682 (1979) .......................................................................................................... 36

20

*Chicago Women in Trade v. Trump,*
    No. 25-cv-2005 (Feb. 21, 2025 N.D. Ill.) ........................................................................ 7

21

*City & County of San Francisco v. Trump,*
22
    897 F.3d 1225 (9th Cir. 2018) ........................................................................................ 29

23

*Clapper v. Amnesty Int'l USA,*
24
    568 U.S. 398 (2013) .......................................................................................................... 10

25

*Cnty. of Santa Clara v. Trump,*
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ............................................................................ 30

26

*Columbus Reg'l Hosp. v. United States,*
27
    990 F.3d 1330 (Fed. Cir. 2021) ...................................................................................... 12

28

FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 25-CV-01824 JST

*Cutter v. Wilkinson*,
    423 F.3d 579 (6th Cir. 2005) .................................................................................. 25

*Dellinger v. Bessent*,
    No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ....................................... 36

*Diamond v. Charles*,
    476 U.S. 54 (1986) ................................................................................................... 33

*Department of Education v. California*,
    604 U.S.---, 2025 WL 1008354 (U.S. Apr. 4, 2025) .............................................. 12, 13, 35

*Doe v. McHenry, III*,
    25-cv-286 (D.D.C. Jan. 30, 2025) ............................................................................ 34

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ................................................................................................. 15

*Fleck & Assocs., Inc. v. City of Phoenix*,
    471 F.3d 1100 (9th Cir. 2006) ................................................................................. 33

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .............................................................................................. 9, 33, 34

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................................................. 26

*Frederick Douglass Found., Inc. v. District of Columbia*,
    82 F.4th 1122 (D.C. Cir. 2023) ................................................................................ 27

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ................................................................................................. 37

*Freedom Republicans, Inc. v. FEC*,
    13 F.3d 412 (D.C. Cir. 1994) ................................................................................... 12

*FW/PBS, Inc. v. City of Dall.*,
    493 U.S. 215 (1990) ................................................................................................... 9

*G.L. Christian & Assocs. v. United States*,
    160 Ct. Cl. 1 (1963) ................................................................................................. 18

*Gizzo v. Ben-Habib*,
    44 F. Supp. 3d 374 (S.D.N.Y. 2014) ....................................................................... 17

*Goldberg v. Kelly*,
    397 U.S. 254 (1970) ................................................................................................. 17

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ............................................................................................. 15, 19

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002) ............................................................................................ 13

*Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*,
    463 U.S. 582 (1983) ............................................................................................ 24

*Hein v. Freedom From Religion Found., Inc.*,
    551 U.S. 587 (2007) ............................................................................................ 10

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013) ............................................................................................ 33

*Hotel & Motel Ass'n of Oakland v. City of Oakland*,
    344 F.3d 959 (9th Cir. 2003) ......................................................................... 4, 28

*Ireland v. Hegseth*,
    25-cv-1918 (D.N.J. Mar. 17, 2025) ................................................................. 34

*Jacobson v. Fla. Sec'y of State*,
    974 F.3d 1236 (11th Cir. 2020) ....................................................................... 11

*Johnson v. United States*,
    576 U.S. 591 (2015) ............................................................................................ 15

*Jones v. Trump*,
    25-cv-401 (D.D.C. Feb. 10, 2025) ................................................................... 34

*Kashem v. Barr*,
    941 F.3d 358 (9th Cir. 2019) ........................................................................... 16

*Kingdom v. Trump*,
    25-cv-691 (D.D.C. Mar. 10, 2025) .................................................................. 34

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ............................................................................................ 33

*Laird v. Tatum*,
    408 U.S. 1 (1972) ................................................................................................ 10

*Leathers v. Medlock*,
    499 U.S. 439 (1991) ............................................................................................ 22

*Levine v. Vilsack*,
    587 F.3d 986 (9th Cir. 2009) ........................................................................... 12

*Lewis v. Casey*,
    518 U.S. 343 (1996) ............................................................................................ 36

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..................................................................................7, 10, 11

*Maryland v. King,*
    567 U.S. 1301 (2012) ............................................................................................. 5, 35

*Matos ex rel. Matos v. Clinton Sch. Dist.,*
    367 F.3d 68 (1st Cir. 2004) ......................................................................................... 10

*Maynard v. Cartwright,*
    486 U.S. 356 (1988) ..................................................................................................... 15

*Mayor & City Council of Balt. v. Consumer Fin. Prot. Bureau,*
    Civ. No. MJM-25-458, 2025 WL 814500 (D. Md. Mar. 14, 2025) .......................... 14

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ........................................................................................ 18

*Mills v. United States,*
    742 F.3d 400 (9th Cir. 2014) ........................................................................................ 33

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1866) ........................................................................................ 36

*Moe v. Trump,*
    25-cv-10195 (D. Mass. Jan. 26, 2025) ......................................................................... 34

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ...................................................................................................... 20

*Munaf v. Geren,*
    553 U.S. 674 (2008) ......................................................................................................... 7

*Murthy v. Missouri,*
    144 S. Ct. 1972 (2024) ..................................................................................................... 8

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,*
    ---F. Supp. 3d---, 2025 WL 573764 (D. Md. Feb. 21, 2025) .................................... 6, 26

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,*
    ---F. Supp. 3d---, 2025 WL 750601 (D. Md. Mar. 10, 2025) ......................................... 7

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,*
    No. 25-1189, ECF No. 29 (4th Cir.  Mar. 14, 2025) ............................................ *passim*

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) ................................................................................... 3, 18, 22, 23

*Nat'l Urban League v. Trump,*
    No. 25-cv-471 (Feb. 19, 2025 D.D.C.) ............................................................................. 7

*New Vision Photography Program, Inc. v. District of Columbia,*
    54 F. Supp. 3d 12 (D.D.C. 2014) .......................................................................... 17, 23

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................... 7, 35

*Northrop Grumman Corp. v. United States*,
    46 Fed. Cl. 622 (2000) ............................................................................. 18, 29

*Nw. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*,
    325 F.R.D. 671 (W.D. Wash. 2016) ................................................................. 34

*Orr v. Trump*,
    25-cv-10313 (D. Mass. Feb. 7, 2025) ............................................................. 34

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ......................................................................... 17, 22, 23

*PFLAG, Inc. v. Trump*,
    25-cv-337 (D. Md. Feb. 4, 2025) ................................................................... 34

*Pioneers Mem'l Healthcare Dist. v. Imperial Valley Healthcare Dist.*,
    745 F. Supp. 3d 1088 (S.D. Cal. 2024) ......................................................... 33

*Powers v. Ohio*,
    499 U.S. 400 (1991) ....................................................................................... 34

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
    421 F.3d 1 (1st Cir. 2005) .............................................................................. 17

*Regan v. Tax'n With Representation of Wash.*,
    461 U.S. 540 (1983) ......................................................................................... 4

*Rice v. Paladin Enters., Inc.*,
    128 F.3d 233 (4th Cir. 1997) ......................................................................... 27

*Rosenberger v. Rector & Visitors of University of Virginia*,
    515 U.S. 819 (1995) ....................................................................................... 22

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ..................................................................... 4, 21, 22, 32

*S&D Maintenance Co. v. Goldin*,
    844 F.2d 962 (2d Cir. 1988) .......................................................................... 17

*Santa Cruz Lesbian & Gay Community Center v. Trump*,
    508 F. Supp. 3d 521 (N.D. Cal. 2020) ........................................................... 16

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) ....................................................................................... 29

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ................................................................................. 15, 16

*Simon v. E. Ky. Welfare Rts. Org.*,
   426 U.S. 26 (1976) ................................................................................................................ 11

*Sossamon v. Lone Star State of Tex.*,
   560 F.3d 316 (5th Cir. 2009), *aff'd*, 563 U.S. 277 (2011) .................................................. 27

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .............................................................................................................. 7

*SurvJustice Inc. v. DeVos*,
   2019 WL 1434141 (N.D. Cal. Mar. 29, 2019) ..................................................................... 34

*Texas v. United States*,
   523 U.S. 296 (1998) ......................................................................................................... 2, 14

*Tirrell v. Edelblut*,
   24-cv-00251 (D.N.H. Feb. 12, 2025) ................................................................................... 34

*Town of Castle Rock v. Gonzalez*,
   545 U.S. 748 (2005) .............................................................................................................. 17

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ......................................................................................................... 8, 37

*Trump v. New York*,
   592 U.S. 125 (2020) ......................................................................................................... 2, 14

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
   ---F. Supp. 3d---, 2025 WL 763738 (D.D.C. Mar. 11, 2025), *injunction pending appeal denied*,
   No. 25-5066 (D.C. Cir. Mar. 28, 2025) ................................................................................ 13

*U.S. ex rel. Purcell v. MWI Corp.*,
   807 F.3d 281 (D.C. Cir. 2015) ............................................................................................. 24

*U.S. Postal Serv. v. Gregory*,
   534 U.S. 1 (2001) .................................................................................................................. 27

*United States v. Am. Library Ass'n*,
   539 U.S. 194 (2003) .............................................................................................................. 22

*United States v. Hansen*,
   599 U.S. 762 (2023) ......................................................................................................... 20, 27

*United States v. Salerno*,
   481 U.S. 739 (1987) .............................................................................................................. 28

*United States v. Texas*,
   599 U.S. 670 (2023) .............................................................................................................. 28

*Univ. of Tex. v. Camenisch,*
  451 U.S. 390 (1981) ........................................................................................... 36

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
  455 U.S. 489 (1982) ........................................................................... 3, 20, 29

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
  576 U.S. 200 (2015) ........................................................................................... 32

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................................ 7, 34

*Ysursa v. Pocatello Educ. Ass'n,*
  555 U.S. 353 (2009) ........................................................................................... 22

**STATUTES**

20 U.S.C. § 954 ........................................................................................................ 18

28 U.S.C. § 1346 ...................................................................................................... 12

28 U.S.C. § 1491 ........................................................................................................ 2

42 U.S.C. § 2000d-1 ................................................................................................ 23

**RULES**

Fed. R. Civ. P. 65 ..................................................................................................... 37

**REGULATIONS**

2 C.F.R. § 200.340 ............................................................................................ 18, 29

48 C.F.R. § 31.205-42 ............................................................................................. 35

48 C.F.R. § 49.502 ................................................................................................... 18

48 C.F.R. § 49.201 ................................................................................................... 35

**EXECUTIVE ORDERS**

*Ending Radical and Wasteful Government DEI Program and Preferencing,*
  Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ..................... 5, 6, 8, 30

*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government,*
  Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ......................... 6, 30, 32

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity,*
  Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ........................... *passim*

*Commencing the Reduction of the Federal Bureaucracy,*
   Exec. Order No. 14,217, 90 Fed. Reg. 10,577 (Feb. 19, 2025) ...........................................................11

**INTRODUCTION**

The President is permitted to have policy priorities. He is further permitted to align government funding and enforcement strategies with those policy priorities to the extent permitted by law. To that end, in his first days in office, the President issued three Executive Orders, which, among other things, included four provisions that steered agency discretion with respect to federal funding. Specifically, three provisions (together, Funding Provisions) directed all federal agencies to (1) as "allowed by law," terminate "equity-related" grants or contracts (Termination Provision); (2) "as permitted by law, to end the Federal funding of gender ideology,"  (Funding Gender Ideology (FGI) Provision); and, (3) "ensure grant funds do not promote gender ideology," (Promoting Gender Ideology (PGI) Provision). Another provision directed the Director of the Office of Management and Budget (OMB) to "[e]xcise references to" diversity, equity, inclusion (DEI) and diversity, equity, inclusion, accessibility (DEIA) "principles . . . from Federal acquisition, contracting, grants, and financial assistance procedures," (Contract Terms Provision).

The Executive Orders also instructed the Executive Branch with respect to one of this administration's enforcement priorities—namely, to enforce federal antidiscrimination laws against unlawful DEI and DEIA programs. To that end, these provisions directed the Attorney General to coordinate with other federal agencies to produce a report recommending a plan of action for deterring DEI programs that constitute "illegal discrimination or preferences," (Reporting Provision), and required agencies to ensure that their grantees/contractors certify that they do not operate any DEI programs that "violate any applicable Federal anti-discrimination laws," (Certification Provision).

Plaintiffs, nonprofit organizations, bring facial challenges to these Executive Orders in a lawsuit that resembles an action brought in the United States District Court for the District of Maryland, which raised similar challenges to provisions of two of the three Executive Orders that relate to DEI. There, although the district court initially granted plaintiffs' motion for a preliminary injunction, the Fourth Circuit unanimously stayed the injunction in full. In doing so, "the judges of th[e] panel unanimously agree[d] that . . .the government is likely to succeed in demonstrating that the challenged provisions of the Executive Orders—all of which are directives from the President to his officers—do not violate the First

or Fifth Amendments." Order at 9, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* (*Diversity Officers*), No. 25-1189, ECF No. 29 (4th Cir. Mar. 14, 2025) (Rushing, J., concurring).

Much like *Diversity Officers*, this suit suffers from a fundamental flaw: although it identifies specific agency actions, it does not challenge any of those actions in a discrete, as-applied posture; instead, it sets its sight on the Executive Orders themselves. But the Executive Orders are merely directives from the President to his own subordinates; they do not directly regulate any primary conduct. As such, Plaintiffs' challenge is fundamentally misdirected. *See id.* ("[T]his case does not challenge any particular agency action implementing the Executive Orders. Yet, in finding the Orders themselves unconstitutional, the district court relied on evidence of how various agencies are implementing, or may implement, the Executive Orders. That highlights serious questions about the ripeness of this lawsuit and plaintiffs' standing to bring it as an initial matter."); *id.* at 8 (Harris, J., concurring) ("This case, however, does not directly challenge any [agency enforcement] action, and I therefore concur."); *id.* at 5 n.2 (Diaz, CJ., concurring) (joining Judge Harris' concurrence and further noting that "the Orders only purport to direct executive policy and actors").

Predictably, Plaintiffs' novel challenge to Presidential directives to subordinates is inherently riddled with jurisdictional defects and hinges on far-fetched applications of the law. As an initial matter, Plaintiffs lack standing to bring most of their claims. While they purport to challenge the entirety of the three Executive Orders, they do not even allege that they are injured by most of those Orders' provisions, and lack standing to challenge the Orders in gross. And where they do purport to allege injury, their harms are either too speculative or might not be remedied by the sought injunction. For similar reasons, most of Plaintiffs' claims are not ripe for review because they depend on a series of future Executive actions that "may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Although Plaintiffs assert ripe claims arising from grant terminations, this Court lacks jurisdiction over those claims, which must be brought in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a), as the Supreme Court recently emphasized.

Plaintiffs' claims—all facial—also fail on the merits. This is in part because, "on their face, [the

Executive Orders] are of distinctly limited scope. The Executive Orders do not purport to establish the illegality of all efforts to advance diversity, equity or inclusion, and they should not be so understood." *Diversity Officers*, at 7 (Harris, J., concurring).

Plaintiffs' Fifth Amendment vagueness challenge is premised on a fundamental misapplication of the Due Process vagueness doctrine—which is generally reserved for criminal statutes—to presidential directives to subordinates. *See id.* at 5 n.2 (Diaz, CJ., concurring) ("[W]here the Orders only purport to direct executive policy and actors, [the panel] do[es not] find vagueness principles outcome determinative"). Even if the Fifth Amendment vagueness standard was applicable, Plaintiffs' claims would still fail. With respect to the Funding Provisions and the Contract Terms Provision, Plaintiffs fail to assert a protectable property interest under the Due Process Clause, which generally does not apply to routine federal contracts/grants. Moreover, these four provisions pertain to government funding, and as the Supreme Court has held, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). The Certification and Reporting Provisions pertain to the government's actions as "sovereign"—but even there, the vagueness doctrine has no bite because the provisions do not declare any *new* conduct unlawful. "Instead, the so-called 'Certification' and '[Reporting]' provisions apply only to conduct that violates *existing* federal anti-discrimination law." *Diversity Officers*, at 7 (Harris, J., concurring) (emphasis added). And even if those provisions purported to identify any new legal obligations, any injunction on vagueness grounds would be premature in this pre-enforcement posture. Federal agencies are still in the process of evaluating and implementing the President's Executive Orders, and have already issued additional guidance, including since the complaint was filed. The Court should not "assume that the [government] will take no further steps to minimize the dangers of arbitrary enforcement." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc*., 455 U.S. 489, 504 (1982). Instead, it should give the government the opportunity to "sufficiently narrow potentially vague or arbitrary interpretations of the [directives]." *Id*.

Plaintiffs' First Amendment arguments are similarly meritless. As for the Funding Provisions, the Supreme Court has long held that when it comes to what the government affirmatively chooses to fund, a

"decision not to subsidize the exercise of a fundamental right does not infringe the right." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 549 (1983)). The Executive Orders do not "authorize the termination of grants based on a grantee's speech or activities outside the scope of the funded activities. Rather, the 'Termination' provision directs the termination of grants, subject to applicable legal limits, based only on the nature of the grant-funded activity itself." *Diversity Officers*, at 7 (Harris, J., concurring). The same is true of the remaining two Funding Provisions. Such funding decisions based on policy priorities have long been constitutionally permissible. Plaintiffs' First Amendment challenges to the Reporting and Certification Provisions also fail for the simple reason that neither provision targets constitutionally protected speech—they both "apply only to conduct that violates existing federal anti-discrimination law." *See id.*

Plaintiffs also argue that the Funding Provisions and the Certification Provision violate separation of powers. But Plaintiffs fail to show—as they must in a facial posture—that these provisions are unconstitutional in all of their applications. *See Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 971 (9th Cir. 2003). With respect to the Funding Provisions, even if this Court had jurisdiction over such claims, it is clear that, at least in some instances, the Executive may terminate contracts/grants for its own convenience. Doing so here—as the Executive has done for decades in innumerate contexts— does not violate the separation of powers. *See Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). Plaintiffs' separation-of-powers challenge to the Certification Provision is also futile because the provision does not impose a new requirement at all—it merely requests that recipients certify that they are honoring their preexisting obligations to abide by anti-discrimination laws in operating any DEI programs.

Additionally, Plaintiffs' argument that the Funding Provisions violate certain statutory requirements is simply a repackaged version of their separation-of-powers argument and fails for similar reasons. At bottom, any allegation that an agency has terminated a contract/grant in violation of a statutory mandate simply identifies a qualm with the agency action—not the Executive Orders. Lastly, Plaintiffs— as nonprofit organizations—have failed to adequately assert an Equal Protection claim because they have failed to identify a discriminatory government conduct directed at themselves, and they cannot assert third-

party standing on behalf of their individual clients.

Beyond the merits, Plaintiffs also fail to satisfy the remaining prongs for injunctive relief. Plaintiffs' irreparable-harm argument is mostly derivative of their argument on the merits and fails for similar reasons. Moreover, Plaintiffs' requested relief is neither in the public interest nor equitable. Whereas the government will indisputably suffer an irreparable harm if it "is enjoined by a court from effectuating [the law]." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted).

Lastly, if the Court is inclined to grant Plaintiffs' requested relief, Defendants respectfully request that—consistent with Plaintiffs' own request—any relief be appropriately narrowed to just Plaintiffs and agency defendants.

## BACKGROUND

On January 20, 2025, the President issued Executive Order 14,151, 90 Fed. Reg. 8339, *Ending Radical and Wasteful Government DEI Program and Preferencing* (EO 14,151). As relevant here, this Executive Order includes the Termination Provision, which directs that within 60 days of the Order's issuance, each "agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM" shall "terminate, to the maximum extent *allowed by law*, . . . 'equity-related' grants or contracts." *Id.* § 2(b)(i) (emphasis added).

On January 21, 2025, the President issued Executive Order 14,173, 90 Fed. Reg. 8633, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (EO 14,173). This second Executive Order's "purpose" is to ensure that the federal government is "enforcing our civil-rights laws" by "ending *illegal* preferences and discrimination." *Id.* § 1 (emphasis added). As relevant here, the Order includes the Reporting, Certification, and Contract Terms Provisions. The Reporting Provision directs the Attorney General, in consultation with agencies, to "submit a *report* to the Assistant to the President for Domestic Policy containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end *illegal* discrimination and preferences." *Id.* § 4(b) (emphases added). That report will include a "proposed strategic enforcement plan," *id.*, with, among other things, a plan of action "to deter DEI programs or principles" that "*constitute illegal discrimination*

*or preferences*" wherein agencies will identify, as part of that plan of action, "potential civil compliance investigations" of certain large entities, *id.* § 4(b)(iii) (emphasis added). Moreover, the Certification Provision provides that the "head of each agency shall include in every contract or grant award" a "term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that *violate* any applicable *Federal anti-discrimination laws*." *Id.* § 3(b)(iv)(B) (emphases added). That certification will be material to government payment decisions. *Id.* § 3(b)(iv)(A). Lastly, the Executive Order also includes a Contract Terms Provision, which instructed the OMB Director to "[e]xcise references to DEI and DEIA principles . . . from Federal acquisition, contracting, grants, and financial assistance procedures." *Id.* § 3(c)(ii).

On January 20, 2025, the President issued Executive Order 14,168, 90 Fed. Reg. 8615, entitled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (EO 14,168). As is relevant here, EO 14,168 includes a Funding Gender Ideology (FGI) Provision, which provides, among other things, that "[a]gencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e). It also includes a Promoting Gender Ideology (PGI) Provision, which provides that "Federal funds shall not be used to promote gender ideology" and that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g). All EOs make clear that they must be "implemented consistent with applicable law." EO 14,151 § 4(b); EO 14,173 § 8(b); EO 14,168 § 8(b).

On February 20, 2025, Plaintiffs brought this action. ECF No. 1. On February 21, 2025, the United States District Court for the District of Maryland issued a nationwide preliminary injunction on the implementation of the Termination, Certification, and Reporting Provisions. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, ---F. Supp. 3d---, 2025 WL 573764 (D. Md. Feb. 21, 2025).[1] On March

---

[1] The court enjoined the implementation of the Termination and Certification Provisions in full, and the Reporting Provision in part. The court did not enjoin the Attorney General (or any agency) from identifying "[a] plan of specific steps or measures to deter DEI programs or principles . . . that constitute illegal discrimination or preferences." *Diversity Officers*, 2025 WL 573764, at *24 n.13 (quoting EO 14,173 § 4(b)(iii)). The court later entered an order stating that the injunction applied to all federal executive branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, ---F. Supp. 3d---, 2025 WL

3, 2025, Plaintiffs filed their Motion for a Preliminary Injunction. ECF No. 47 (PI).

On March 14, 2025, a three-judge panel of the Fourth Circuit granted the government's motion to stay the preliminary injunction in *Diversity Officers*. As Judge Rushing explained in her concurrence, the panel "unanimously agree[d] that the entire substance of the preliminary injunction must be stayed, not just trimmed back in scope," because "the government has made a 'strong showing' that it 'is likely to succeed on the merits,'" and "that the challenged provisions of the Executive Orders—all of which are directives from the President to his officers—do not violate the First or Fifth Amendments." *Diversity Officers*, at 9 (Rushing, J., concurring).

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20. Finally, when "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs cannot satisfy these requirements.

## I.   PLAINTIFFS ARE NOT LIKELY TO ESTABLISH ARTICLE III JURISDICTION.

### A.  Plaintiffs lack standing with respect to the majority of the provisions.

To establish standing, a plaintiff must show an "injury in fact," a causal connection between the injury and the defendant's conduct, and a likelihood that "the injury will be redressed by a favorable

---

750601 (D. Md. Mar. 10, 2025). Additionally, two other lawsuits challenging the Executive Orders are pending. *Nat'l Urban League v. Trump*, No. 25-cv-471 (Feb. 19, 2025 D.D.C.) (the parties have concluded district-court briefing on the PI motion; oral argument was heard on March 19); *Chicago Women in Trade v. Trump*, No. 25-cv-2005 (Feb. 21, 2025 N.D. Ill.) (the court issued a TRO on March 27 with respect to the Termination Provision (limited to Plaintiff and the Department of Labor) and the Certification Provision (enjoining the Department of Labor nationwide); oral argument on the PI motion was heard on April 10).

FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 25-CV-01824 JST

decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). As the party invoking federal jurisdiction, Plaintiffs "bear[] the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted).

Importantly, as the Supreme Court clarified this past Term, "for every defendant, there must be at least one plaintiff with standing to seek an injunction." *Murthy v. Missouri*, 144 S. Ct. 1972, 1988 (2024). Simply put, instead of asserting standing "'in gross,'" Plaintiffs must do the work to untangle "'*each* claim they press' against *each* defendant." *See id.* (emphasis added) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). Plaintiffs fail to meet their burden.

At the outset, Plaintiffs do not even assert speculative (let alone Article III) harm with respect to many of the provisions in the Executive Orders. Indeed, for the most part, instead of challenging specific provisions of the Executive Orders, Plaintiffs challenge the Executive Orders as a unified whole. *See, e.g.*, PI at 10 ("The Executive Orders are designed to silence, defund, and otherwise penalize Plaintiffs"); *Id.* at 20 ("[T]he Executive Orders are unacceptably unclear."); *id.* ("The Executive Orders are *ultra vires* actions that exceed the bounds of Article II."). This framing all but drops any pretense that Plaintiffs seek to litigate a case or controversy; instead, Plaintiffs' lawsuit is a transparent request for a judicial rollback of the Executive's policy priorities. Putting aside the troubling separation-of-powers implications of such a judicial order, Plaintiffs lack standing to assert any such claim, and this Court lacks jurisdiction to grant it.

Plaintiffs, at most, only have standing to challenge any particular provision that has directly caused (or will imminently cause) Plaintiffs harm. As the Supreme Court has established, "plaintiffs who successfully challenge one provision of a law may lack standing to challenge *other* provisions of that law." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 626-27 (2020). This presumption is buttressed by the severability provisions in all three Executive Orders. *See* EO 14,151 § 3; EO 14,173 § 6; 14,168 § 8(d). The Executive Orders are comprised of dozens of separate provisions directing federal agencies to engage in a range of actions (most of which have little to do with Plaintiffs). Take, for instance, the Government DEI Provision, which directs the OMB Director to terminate the government's *own* diversity

and equity "mandates, requirements, programs, [and] activities." EO 14,173 § 3(c)(iii); *see also id.* § 3(c)(i) (providing that the OMB Director "[r]eview and revise, as appropriate, all Government-wide processes, directives, and guidance"). An injunction against this provision would mandate, for instance, that agencies continue requiring DEI training for their own employees. There is no colorable argument that the Constitution somehow compels DEI training for government employees. *See Arnett v. Kennedy*, 416 U.S. 134, 168 (1974) ("[T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs."). But even more fundamentally, Plaintiffs clearly lack standing to bring such a claim in the first instance, as that provision does not affect them. This Court should refuse to reach the merits of any provision that Plaintiffs lack standing to challenge. *See FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215, 230 (1990) (refusing to reach the merits of certain provisions "because petitioners ha[d] failed to show they ha[d] standing to challenge them").

At most, Plaintiffs seemingly attempt to assert injury with respect to six provisions: Termination Provision, PGI Provision, FGI Provision (three Funding Provisions), Contract Terms Provision, Certification Provision, and Reporting Provision. But even with respect to these provisions, most of Plaintiffs' purported injury is speculative.

***Frustration of mission.*** Plaintiffs' chief complaint is that the Executive Orders generally frustrate their organizational missions. *See, e.g.*, PI at 14-15 ("Plaintiffs' missions are fundamentally implicated by the Executive Orders."); Decl. of Tyler Termeer, Chief Executive Officer of the San Francisco AIDS Foundation ¶ 35, ECF No. 47-9 (SFAF Decl.) ("These executive orders directly threaten SFAF's mission."); Decl. of Michael Munson, Executive Director of FORGE ¶¶ 13, 18-20, ECF No. 47-3 (FORGE Decl.) ("FORGE plainly cannot accomplish our mission—and our mandates under existing grants— should the Executive Orders be allowed to stand."); Decl. of Krista Brown-ly, Executive Director of the Bradbury-Sullivan LGBT Community Center ¶ 4, ECF No. 47-2 (Bradbury-Sullivan Decl.) ("These Executive Orders threaten Bradbury-Sullivan's ability to fulfill its mission, deliver critical health and community services, and maintain financial stability."). But as the Supreme Court reiterated this past Term, to establish organizational standing, plaintiffs "must show far more than simply a setback to the organization's abstract social interests," and "impair[ment]" to plaintiffs' "ability to provide services and

achieve their organizational mission" does not satisfy standing. *Food & Drug Admin. v. All. for Hippocratic Med.* (*FDA*), 602 U.S. 367, 394 (2024) (citations omitted). As such, Plaintiffs' general assertions of frustration are insufficient for purposes of Article III standing.

**Regulatory uncertainty.** Plaintiffs also allege that the Executive Orders have created an atmosphere of uncertainty. *See, e.g.*, Decl. of Lance Toma of San Francisco Community Health Center ¶ 26, ECF 47-10 ("[T]he uncertainty is overwhelming."); *id.* ¶ 18 (alleging "some clients have reported increased anxiety about the continuity of their care, fearing that the federal government's actions signal a broader rollback of LGBTQ health protections"). But such allegations are insufficient under Article III. After all, regulatory uncertainty necessarily follows many new policy announcements, and an injunction "should not issue merely to calm the imaginings of the movant." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004).

**Chilled speech.** Relatedly, Plaintiffs also allege an impending "chilling effect on speech." PI at 2. But "[a]llegations of a subjective 'chill' are not an adequate substitute" in the standing inquiry. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18 (2013) (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). Yet, Plaintiffs' alleged "chilling effect" based on their fear of future prosecution is purely subjective. The Certification and Reporting Provisions "apply only to conduct that violates existing federal anti-discrimination law." *Diversity Officers*, at 7 (Harris, J., concurring). Thus, for instance, any allegation of self-censorship based on an assumption that recipients must "certify that they do not promote DEI," PI at 9, is objectively unreasonable because any such self-censorship is based on a misreading of the Certification Provision, which only requires recipients to certify that any DEI programs they operate do not violate antidiscrimination law—not that they do not operate any DEI programs at all.

**Loss of federal funding.** To the extent that Plaintiffs attempt to allege that they will suffer harm in the future due to federal funding cuts, those allegations are too speculative to satisfy Article III standing. *See Clapper*, 568 U.S. at 409 (explaining that any allegation of "threatened injury must be *certainly impending*" (citation omitted)). Plaintiffs assert in broad terms that they do, in fact, receive federal funds. *See, e.g.*, Bradbury-Sullivan Decl. ¶ 7 ("Approximately sixty-two percent (62%) of our budget depends on [federal] funds."); FORGE Decl. ¶ 7 ("Approximately 90% of FORGE's revenue arises from federal

programs and grants."); Decl. of Jeffrey Klein, of Chief Operating Officer of the LGBT Community Center ¶ 13, ECF No. 47-7 (alleging that "12% of the NY LGBT Center's annual budget" comes from federal funding). But the mere fact that Plaintiffs' organizations receive federal funding is not nearly "concrete and particularized" enough to challenge *specific* funding decisions (let alone announcement of specific funding priorities). *See Lujan*, 504 U.S. at 560-61; *cf. Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007) ("[I]f every federal taxpayer could sue to challenge any Government expenditure, the federal courts would cease to function as courts of law and would be cast in the role of general complaint bureaus.").

At most, Plaintiffs have only alleged Article III standing with respect to disrupted federal grants or contracts. *See, e.g.*, Suppl. Decl. of Roberto Ordenana, Executive Director of the GLBT Historical Society ¶ 9, ECF No. 56 (Suppl. Ordenana Decl.) (identifying a terminated National Endowment for the Humanities (NEH) grant); Suppl. Decl. of Joe Hollendoner, Chief Executive Officer of the Los Angeles LGBT Center ¶ 3, ECF No. 57 (Suppl. Hollendoner Decl.) (identifying a terminated National Institutes of Health (NIH) grant); *Id.* ¶ 24 (identifying a terminated NIH grant); Suppl. Decl. of Tyler Termeer, Chief Executive Officer of San Francisco AIDS Foundation ¶ 3, ECF No. 58 (Suppl. SFAF Decl.) (identifying a terminated NIH grant and a terminated Substance Abuse and Mental Health Services Administration (SAMHSA) grant).

But even with respect to Plaintiffs' alleged terminated grants, Plaintiffs have failed to allege that the terminations are "fairly . . . trace[able] to the challenged action." *Lujan*, 504 U.S. at 560-61 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976)). The Executive Orders did not terminate any particular fund or program; rather, they merely provided policy directives to federal agencies to execute consistent with all applicable law. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (plaintiff failed to demonstrate standing where "a different, independent official" had control over the action which allegedly harmed the plaintiff). Plaintiffs have entered termination letters from defendant agencies into the record, but none state that the grants were terminated pursuant to the Executive Orders. *See* Suppl. Ordenana Decl. Ex. B, ECF No. 56-2 (citing a different Executive Order issued on February 19, 2025, *Commencing the Reduction of the Federal Bureaucracy*, Executive Order 14217, 90

Fed. Reg. 10,577 (Feb. 19, 2025), which "mandates that the NEH eliminate all non-statutorily required activities and functions"); Suppl. Hollendoner Decl. Ex. C, ECF No. 57-3 (explaining that the NIH grant has been terminated pursuant to "the policy of NIH not to prioritize such research programs" with no mention of the Executive Orders), Suppl. Hollendoner Decl. Ex. E, ECF No. 57-5 (same); Suppl. SFAF Decl. Ex. C, ECF No. 58-3 (same). These termination letters only serve to highlight Plaintiffs' redressability problem: even if this Court granted relief against the Executive Orders, that would not prevent defendant agencies from exercising their own independent authorities to determine whether, consistent with law, any termination of a fund/contract would be warranted. Consequently, neither Plaintiffs nor this Court can "begin to predict on this record what impact," if any, invalidating the Executive Orders would have. *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 419 (D.C. Cir. 1994); *see also Levine v. Vilsack*, 587 F.3d 986, 994–95 (9th Cir. 2009) (rejecting redressability guesswork).

But in any event, even if this Court concludes that Plaintiffs' loss of funding satisfies Article III, this Court lacks jurisdiction over Plaintiffs' funding claims under the Tucker Act. *See infra* I.B.

**B.  This Court lacks jurisdiction to review Plaintiffs' grant-termination claims.**

In challenging the government's grant terminations, Plaintiffs seek, in essence, an order to enforce the government's contractual obligation to pay. That triggers jurisdiction in the Court of Federal Claims under the Tucker Act, which provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a); *see id.* § 1346(a)(2) ("[T]he district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States.").

The Supreme Court reiterated this principle in its recent stay order in *Department of Education v. California*, 604 U.S.---, 2025 WL 1008354, at *1 (U.S. Apr. 4, 2025). There, plaintiffs challenged the termination of federal grants related to DEI under the Administrative Procedure Act (APA). The Court concluded that the government is likely to succeed in showing that jurisdiction over plaintiffs' suit lays in the Court of Federal Claims under the Tucker Act, because the remedy granted by the district court was ultimately an order to "enforce [the government's] contractual obligation to pay money." *Id.*

The funds at issue in California were government grants, not contracts. In applying the Tucker Act, however, the Court did not distinguish between government contracts and grants. Rightly so: "many . . . federal grant programs" are "much in the nature of a contract." *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (citation omitted); *see also Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) ("grant agreements [are] contracts when the standard conditions for a contract are satisfied").

Moreover, the fact that Plaintiffs here raise Constitutional claims as opposed to APA claims is of no moment. The Court's reasoning applies with as much force here as it does in an APA suit. After all, the Court focused on the remedy sought by plaintiffs and the basis of plaintiffs' claims. A suit belongs in the Claims Court when the source of plaintiffs' asserted right is a contract and what plaintiffs seek amounts to contractual remedies. *See California*, 2025 WL 1008354, at *1 (jurisdiction lies in the Claims Court when the suit is "based on 'any express or implied contract with the United States'" and the remedy seeks "to enforce a contractual obligation to pay money" (citations omitted)). That is true here. The source of Plaintiffs' funding claims are their grant agreements with the federal government—they would have no claim at all with respect to the Funding Provisions if not for their grant agreements. Indeed, in their Proposed Order, Plaintiffs explicitly identify their sought remedy as enforcement of the government's obligations under their agreements—including the obligation to pay money. *See* Proposed Order at 2-3, ECF No. 47-12 (seeking an injunction to prevent Defendants from "[t]erminat[ing] or modify[ing] existing governmental contracts with or grants to Plaintiffs"). Accordingly, this Court lacks jurisdiction over Plaintiffs' termination claims.

For similar reasons, this Court also lacks jurisdiction over Plaintiffs' pre-termination claims, which are merely unripe versions of their post-termination claims. A request to enjoin any future termination of contracts/grants—just like a request to reinstate already terminated contacts/grants—seeks, in essence, an "enforce[ment] [of the government's] contractual obligation to pay money." *California*, 2025 WL 1008354, at *1 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). In fact, plaintiffs in *California* also sought "an injunction against further unlawful terminations" along with their request for reinstatement of already terminated grants. Opp'n to Application at 25, *Dep't of Educ. v. California*, No. 24A910 (U.S. Mar. 28, 2025). Tellingly, the Supreme Court stayed the injunction in full

1    without distinguishing between plaintiffs' claims.

2          At bottom, in seeking an injunction against the Funding Provisions, Plaintiffs "want[] the

3    Government to keep paying up." *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, ---F. Supp. 3d---, 2025

4    WL 763738, at *5-6 (D.D.C. Mar. 11, 2025), *injunction pending appeal denied*, No. 25-5066 (D.C. Cir.

5    Mar. 28, 2025) (per curiam). That is true regardless of whether the government is ordered to reinstate

6    Plaintiffs' agreements or honor its ongoing contractual obligations. Either way, granting Plaintiffs' request

7    would amount to an order to "enforce [the government's] contractual obligation to pay money." *California*,

8    2025 WL 1008354, at *1. As such, this Court lacks jurisdiction over challenges to the Funding Provisions,

9    which belong in the Court of Federal Claims under the Tucker Act.

10          **C.  Plaintiffs' remaining claims are unripe for review.**

11          Plaintiffs' claims—other than their grant-termination claims, which this Court lacks jurisdiction

12    over—are unripe for review. "A case is fit for adjudication when the action in controversy is final and not

13    dependent on future uncertainties." *Mayor & City Council of Balt. v. Consumer Fin. Prot. Bureau*, Civ.

14    No. MJM-25-458, 2025 WL 814500, at *16 (D. Md. Mar. 14, 2025) (citation omitted). Plaintiffs'

15    remaining claims are based on speculations regarding *possible* actions that agencies *might* take under the

16    Executive Orders.

17          Plaintiffs' non-funding claims primarily pertain to the Certification and Reporting Provisions, both

18    of which "apply only to conduct that violates existing federal anti-discrimination law." *Diversity Officers*,

19    at 7 (Harris, J., concurring); *see* EO 14,173 §§ 3(b)(iv)(B), 4. Indeed, the DEI Executive Orders

20    underscore that limitation by using "illegal" 14 times. Plaintiffs' claims, therefore, are contingent upon

21    several layers of future actions that are not only hypothetical but also contradictory; all claims assume that

22    agencies will not only take actions that will adversely affect Plaintiffs but will do so both in service of the

23    Executive Orders' directives *and* in violation of the Executive Orders' directives to stay within the

24    confines of the law. These "contingent future events that may not occur as anticipated, or indeed may not

25    occur at all," render Plaintiffs' claims unripe. *Trump*, 592 U.S. at 131 (quoting *Texas*, 523 U.S. at 300).

26    Ultimately, this suit is merely a broad, unripe challenge to a change in the Executive's policy priorities.

27    **II.    PLAINTIFFS' CHALLENGES LACK MERIT.**

28    FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
      CASE NO. 25-CV-01824 JST
                              14

**A.  Plaintiffs' Due Process Clause claims fail.**

Plaintiffs assert facial void-for-vagueness challenges under the Fifth Amendment's Due Process Clause. Plaintiff argues that the Executive Orders allow for "arbitrary enforcement and discrimination" and fail to give fair notice to Plaintiffs about what conduct is prohibited. *See* PI at 18-20. These challenges fail at the threshold and on the merits.

> i.    *Plaintiffs' facial challenges under the Due Process Clause to Presidential directives are categorically improper.*

As a preliminary matter, the void-for-vagueness doctrine under the Fifth Amendment is inapplicable here. As Chief Judge Diaz explained in his concurrence in *Diversity Officers*, "where the Orders only purport to direct executive policy and actors . . . vagueness principles [are not] outcome determinative." *Diversity Officers*, at 5 n.2 (Diaz, CJ., concurring). This conclusion makes sense. The vagueness doctrine traditionally "guarantees that ordinary people have 'fair notice' of the conduct *a statute* proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality) (emphasis added). And while courts have applied the doctrine outside of the statutory context, they have done so with respect to direct regulations of primary conduct. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." (citation omitted)). There is good reason for the doctrine's limited reach. The Due Process Clause prohibits uneven enforcement, and ensures notice, of requirements with which the public must comply. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). No such concerns arise when the President gives his subordinates an unclear directive. That is true whether the directive is made informally (in a conversation) or formally (in an Executive Order).

But even putting aside the inapplicability of the Due Process Clause to presidential directives to subordinates, Plaintiffs' challenge suffers from yet another threshold flaw: it is facial in nature. The appropriate posture for Due Process vagueness challenges is as-applied. That is because "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any

specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).

The Supreme Court carved out a limited exception to the general rule against facial Fifth Amendment challenges in *Johnson v. United States*, where it upheld a facial vagueness challenge to the violent-felony residual clause of the Armed Career Criminal Act. 576 U.S. 591 (2015). But the *Johnson* exception is exceedingly narrow. Indeed, the Supreme Court has only applied *Johnson* once outside the criminal context, and even there, it justified the extension of *Johnson* to a civil-removal statute by explaining that "deportation is a particularly severe penalty, which may be of greater concern to a convicted alien than any potential jail sentence." *Dimaya*, 584 U.S. at 157 (citation omitted). Following *Johnson* and *Dimaya*, the Ninth Circuit has clarified that "[t]o the extent *Johnson* and *Dimaya* bypassed as-applied challenges and proceeded directly to facial vagueness, that approach appears to have turned on the exceptional circumstances of the provisions at issue." *Kashem v. Barr*, 941 F.3d 358, 376-78 (9th Cir. 2019) (citation omitted). Whatever *Johnson*'s reach may be for facial Fifth Amendment challenges in the criminal and removal context, it surely has no application to presidential directives to subordinates.[2]

Simply put, Plaintiffs' facial Fifth Amendment challenge demands a stunning expansion of the doctrine. Not only does Plaintiffs' theory lack basis in the law but it also raises serious separation-of-powers concerns. Opening the door to such challenges would allow courts to engage in searching judicial review of all presidential policy directives, which by their nature often necessarily outline policy initiatives and priorities in broad terms. Under Plaintiffs' theory, however, courts can effectively prohibit the President from directing executive officials unless he can do so with the same degree of specificity required of a criminal statute. This Court should reject Plaintiffs' invitation to scrutinize presidential policy directives under the demanding standard traditionally reserved for statutes and regulations that proscribe primary conduct.

   *ii.*  *Plaintiffs' Due Process claims fail on the merits.*

---

[2] In support of their Fifth Amendment claim, Plaintiffs cite to *Santa Cruz Lesbian & Gay Community Center v. Trump*, 508 F. Supp. 3d 521, 545 (N.D. Cal. 2020). *See* PI at 20. To the extent the district court in *Santa Cruz* upheld a facial Fifth Amendment challenge outside of the *Johnson* exception, it did so in contravention of instructions from the Ninth Circuit in *Kashem*, and therefore lacks any persuasive authority.

Even if the Court reaches the merits of Plaintiffs' facial Due Process claims, it should reject them. Plaintiffs asserts their Due Process challenges to the provisions by invoking two categories of protected interests with respect to the various provisions: (1) loss and potential loss of contracts/grants (Funding Provisions and Contract Terms Provisions), and (2) potential enforcement action (Certification and Reporting Provisions). Both sets of claims fail.

***Loss of contracts/grants.*** In order to assert a claim under the Due Process Clause, Plaintiffs must identify a liberty or property interest that is protected by the Fifth Amendment in the first place. With respect to the Funding Provisions and Contract Terms Provision, Plaintiffs fail to establish that their purported contracts/grants are protected by the Due Process Clause.

"The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation omitted). Applying these principles, the Supreme Court has identified a narrow set of government benefits—so-called "new property"—that are protected under the Due Process Clause. *See Perry v. Sindermann,* 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly,* 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collecting cases). But the protections afforded to this narrow set have not been extended to "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev*., 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."); *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) ("The Supreme Court has never held that government contracts for goods and services create property interests protected by due process." (citation omitted)).

The distinction makes sense. As the Second Circuit explained in *S & D Maintenance Co. v. Goldin*, in the "new property" line of cases "the Due Process Clause [was] invoked to protect something more than an ordinary contractual right. Rather, procedural protection [was] sought in connection with a state's

revocation of a status, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure." 844 F.2d 962, 966 (2d Cir. 1988). The same logic does not extend to "contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a governmental contractor." *Id.* at 967.

Here, Plaintiffs have not shown that it has any constitutionally protected entitlement-like contracts/grants that will be subject to termination. Government contracts generally allow for "[t]ermination for the convenience of the Government," 48 C.F.R. § 49.502, as do many government grants, *see* 2 C.F.R. § 200.340(a)(4) (authority to terminate award "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities"). In fact, courts have upheld the government's right to terminate a contract for convenience even absent a termination clause. *See G.L. Christian & Assocs. v. United States*, 160 Ct. Cl. 1 (1963) (reading a termination for convenience clause into the contract by operation of law); *see also Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622, 626 (2000) ("The Government's right to terminate a contract for convenience is broad."). That is the antithesis of a constitutionally protected entitlement.

Finally, Plaintiffs' vagueness argument fails on the substance. Plaintiffs argue that the Funding Provisions are unconstitutionally vague because they purport to limit government funding based on criteria they do not define—such as, "equity-related" or "gender ideology." PI at 18-19. In scrutinizing this text, Plaintiffs urge this Court to employ a "stringent vagueness test." *Id.* at 18. But in *Finley*, the Supreme Court rejected application of any such demanding vagueness standard to government funding decisions. 524 U.S. 569. There, plaintiffs brought vagueness challenges under the First and Fifth Amendments to a funding provision that required the National Endowment for the Arts to "take[] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* at 572 (quoting 20 U.S.C. § 954(d)(1)). The Supreme Court acknowledged that "[t]he terms of the provision are undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns." *Id.* at 588. But, the Court reasoned, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 589; *see also id.* (cautioning that "[t]o accept [plaintiffs'] vagueness

argument would be to call into question the constitutionality of . . . valuable Government programs and countless others like them" that "award[] scholarships and grants on the basis of subjective criteria such as 'excellence'"). This court should similarly reject Plaintiffs' invitation to impose a demanding vagueness standard on the government when it "is acting as patron rather than as sovereign." *Id.*; *see also Meriwether v. Hartop*, 992 F.3d 492, 518 (6th Cir. 2021) ("There is substantially more room for imprecision in regulations bearing only civil, or employment, consequences, than would be tolerated in a criminal code." (citation omitted)).

*Potential Future Enforcement.* Plaintiffs bring Due Process Clause challenges to the Certification and Reporting Provisions by alleging that the provisions fail to give proper notice of prohibited conduct and provide for arbitrary future enforcement. These claims fail on the merits.

The Due Process Clause requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108. As discussed above, while this doctrine demands scrutiny of statutes and regulations that identify a *new* conduct for punishment, the provisions do no such thing. "Instead, the so-called 'Certification' and '[Reporting]' provisions apply only to conduct that violates *existing* federal anti-discrimination law." *Diversity Officers*, at 7 (Harris, J., concurring) (emphasis added); *see also* EO 14,173 § 3(b)(iv)(B) (Certification Provision demands that Plaintiffs certify that they do not operate programs that "violate any applicable Federal anti-discrimination laws") *and id.* § 4(b) (Reporting Provision only concerns "illegal discrimination and preferences"). Neither penalize any new conduct; they merely prioritize the enforcement of existing antidiscrimination laws, which Plaintiffs do not challenge as unconstitutionally vague. Thus, Plaintiffs have no legitimate concern that they will not be given a "reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108.

Arguing otherwise, Plaintiffs maintain that these federal-law qualifiers are not helpful because the government has not specified which DEI programs *it* considers illegal. PI at 19. Once again, Plaintiffs' argument erroneously assumes that the provisions purport to penalize conduct *beyond* those prohibited by existing antidiscrimination laws. They do not. As such, all Plaintiffs must do is comply with federal law

itself—longstanding federal statutes that are not challenged here on vagueness or any other grounds. Moreover, any lack of clarity over when DEI runs afoul of those statutes is not attributable to the Executive Order and would not be remedied by its invalidation. And in any future enforcement, Plaintiffs are free to defend themselves by maintaining that their conduct is lawful. But none of that is remotely ripe, let alone a sound basis for preemptively enjoining the government from enforcing antidiscrimination laws.

Accordingly, even if the Court were inclined to demand more specificity than the Executive Orders provide, any injunction on due process grounds would be premature in this pre-enforcement posture where courts must not "assume that the [government] will take no further steps to minimize the dangers of arbitrary enforcement." *Vill. of Hoffman Ests.*, 455 U.S. at 504. To the contrary, courts must consider the possibility that, prior to enforcement, the government "will sufficiently narrow potentially vague or arbitrary interpretations of the [directives]." *Id.* Indeed, federal agencies have already began providing guidance on the scope of the Executive Orders. For instance, on February 5, 2025, Office of Personnel Management (OPM) issued *Further Guidance Regarding Ending DEIA Offices, Programs and Initiatives*, in which it expanded on the type of activity that constitutes "unlawful discrimination related to DEI." *See* OPM Guidance at 1 (attached hereto as Ex. A).[3] And on March 19, 2025, the U.S. Department of Justice (DOJ) and the U.S. Equal Employment Opportunity Commission (EEOC) provided additional guidance on the types of DEI activities that could violate Title VII. *See* EEOC Memorandum (attached hereto as Ex. B).[4] This Court should reject Plaintiffs' invitation to enjoin the government before it has had the opportunity to further "narrow potentially vague or arbitrary interpretations of the [directives]," prior to enforcement. *Vill. of Hoffman Ests.*, 455 U.S. at 504.

### B.  Plaintiffs' First Amendment claims fail.

---

[3]  The Guidance provides that "[u]nlawful discrimination related to DEI includes taking action motivated, in whole or in part, by protected characteristics. To be unlawful, a protected characteristic does not need to be the sole or exclusive reason for an agency's action.  Among other practices, this includes ending unlawful diversity requirements for the composition of hiring panels, as well as for the composition of candidate pools (also referred to as 'diverse slate' policies)." Ex. A at 1.

[4]  This memorandum explains that "[u]nder Title VII, DEI initiatives, policies, programs, or practices may be unlawful if they involve an employer or other covered entity taking an employment action motivated—in whole or in part—by an employee's or applicant's race, sex, or another protected characteristic." Ex. B.

"Even in the First Amendment context, facial challenges are disfavored." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024). Plaintiffs fail to establish that the Executive Orders "prohibit[] a substantial amount of protected speech relative to [their] plainly legitimate sweep," as required to establish facial unconstitutionality. *United States v. Hansen*, 599 U.S. 762, 770 (2023) (citation omitted). As such, Plaintiffs are not likely to succeed on the merits of their First Amendment facial challenges.

**Funding Provisions.** Plaintiffs argue that Funding Provisions violate the First Amendment because they amount to viewpoint and content-based discrimination. Plaintiffs' claims fail because these provisions pertain to government's sponsorship of speech—not regulation of it.

It is well established that government spending is not subject to traditional First-Amendment scrutiny. The Supreme Court has long been clear that First Amendment concerns are far less pronounced when the government acts as patron to subsidize speech, as opposed to when it acts as sovereign to regulate it. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . . . In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Rust*, 500 U.S. at 193. Thus, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*AID*), 570 U.S. 205, 214 (2013) (collecting cases).

While government funding is not free from the First Amendment in all respects, the relevant First Amendment limitation is the prohibition against an unconstitutional "condition." *Id.* at 213-15. Under this limitation, the government may "specify the activities [it] wants to subsidize," but it cannot "leverage funding to regulate speech *outside* the contours of the programs itself." *Id.* at 214-15 (emphasis added). For example, limitations on the use of federal funds for a specific purpose—such as "promot[ing] or advocat[ing] [for] the legalization or practice of prostitution or sex trafficking"—is constitutionally permissible, *id.* at 217-18 (citation omitted), but outright conditioning federal funds on a pledge to a policy "explicitly opposing prostitution or sex trafficking" is not, *id.* at 210 (citation omitted). The latter amounts to an unconstitutional condition because it regulates speech even on the recipients' "own time and dime."

*Id.* at 218-19.

But, as Judge Harris explained in her concurrence in *Diversity Officers*, the Termination Provision does not "authorize the termination of grants based on a grantee's speech or activities outside the scope of the funded activities." *Diversity Officers*, at 7 (Harris, J., concurring). The same is true of the PGI and FGI Provisions. *See* EO 14,168 §§ 3(e), 3(g). As such, none impose an unconstitutional condition on Plaintiffs' speech or amount to viewpoint discrimination; rather, as permitted under *Rust* and *AID*, the provisions align the government's sponsorship of activities with its policy priorities. In doing so, the Funding Provisions do not seek to regulate a grantee's speech "outside the contours of" any such policy initiatives—*i.e.*, they do not prohibit entities from engaging in protected speech on their "own time and dime." *AID*, 570 U.S. at 218. The Supreme Court has repeatedly held that the government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See, e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas"); *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality) (a "decision not to subsidize the exercise of a fundamental right does not infringe the right" (quoting *Rust*, 500 U.S. at 193)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (government "is not required to subsidize First Amendment rights"). Simply put, the government is permitted to have policy priorities, and it does not violate the First Amendment by not affirmatively funding programs that do not align with those policies.

In support of their challenge, Plaintiffs invoke *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 828-29 (1995). But *Rosenberger* is inapposite; there, the Supreme Court "found the viewpoint discrimination unconstitutional, not because funding of 'private' speech was involved, but because the government had established a limited public forum." *Finley*, 524 U.S. at 598-99 (Scalia, J., concurring). Here, Plaintiffs make no such showing.

Plaintiffs' reliance on *Perry* does not fare any better. As explained above, *Perry* comes from the "new property" line of cases where the Court carved out a special protection for entitlement-like government benefits. In *Perry* itself, the Court identified an entitlement-like benefit in the form of a tenured teaching position. 408 U.S. 593. The same protections have not been extended to government

contracts and grants. *See supra* II.A.ii; *Cf. New Vision*, 54 F. Supp. 3d at 29 ("Outside of the employment context, courts have resisted application of due-process principles to government contracts.").

Lastly, Plaintiffs have no meaningful argument that the Funding Provisions are vague and therefore impose a "chilling" effect on protected speech because any such argument has been foreclosed by the Supreme Court's decision in *Finley*. *See supra* II.A.ii. As the Court explained in *Finley*, no First Amendment concern exists even though, "as a practical matter, [government-funding recipients] may conform their speech to what they believe to be the . . . decisionmaking criteria in order to acquire funding." 524 U.S. at 589. At bottom, when the government acts "as patron," it does not infringe on constitutionally protected speech even when it articulates funding standards with "imprecision." *Id.*; *see also id.* at 599 (Scalia, J., concurring) ("Insofar as it bears upon First Amendment concerns, the vagueness doctrine addresses the problems that arise from government *regulation* of expressive conduct . . . not government grant programs.").

**Certification Provision.** Plaintiffs' First Amendment challenge to the Certification Provision suffers from a fatal flaw: Plaintiffs have no First Amendment right to violate federal antidiscrimination laws in the first place. The provision merely requires Plaintiffs to certify that they do not operate any DEI programs that "violate any applicable Federal anti-discrimination laws." EO 14,173 § 3(b)(iv)(B). As such, the Certification Provision is "distinctly limited scope." *Diversity Officers*, at 7 (Harris, J., concurring). And the Executive Order expressly makes clear that it "does not prevent" entities "from engaging in First Amendment-protected speech." EO 14,173 § 7(b). There is nothing unlawful about requiring recipients of federal contracts or grants to affirm that any DEI programs that they operate comply with antidiscrimination laws and further requiring recipients to acknowledge that the government considers compliance with such laws material to its payment decisions. Importantly, this provision imposes no new requirements on primary conduct. It neither adopts any new construction of antidiscrimination law nor declares all DEI to be illegal. Rather, it simply requires recipients to certify their compliance with existing legal obligations under the "applicable" federal civil rights laws such as Title VI of the Civil Rights Act of 1964, which apply to all recipients of federal assistance, 42 U.S.C. § 2000d-1—laws that are binding independent of any certification requirement. There is no First

Amendment problem with instructing agencies to require a certification that these existing legal obligations are being honored.

That is not novel. It has been true for decades that "[e]very application for Federal financial assistance must, 'as a *condition* to its approval and the extension of any Federal financial assistance,' contain assurances that the program will comply with Title VI *and* with all requirements imposed pursuant to the executive regulations issued under Title VI." *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629-30 & n.22 (1983) (Marshall, J., dissenting) (citing regulations from Departments of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Housing and Urban Development, Interior, Justice, Labor, State, Transportation, and Treasury). These "assurance[s]" of compliance are "given in consideration of" federal aid, "and the federal government extends assistance in reliance on the assurance of compliance"—but the obligations of Title VI apply regardless of any certification. *Id.* at 630 (citation omitted). The requirement here is no different: while the provision addresses unlawful DEI programs specifically—a subset of the potential ways in which federal funding recipients might violate antidiscrimination law—that limitation merely renders it narrower than scores of certifications signed by recipients of federal assistance attesting that they are complying with Title VI in every respect. Plaintiffs neither argue that these longstanding requirements are unconstitutional nor explain why their breadth is constitutionally required. At bottom, the certification "does not place upon a recipient [any] unanticipated burdens because any recipient must anticipate having to comply with the law." *Id.*

For similar reasons, requiring recipients to sign this Certification Provision for purposes of the False Claims Act, EO 14,173 § 3(b)(iv)(B), does not raise First Amendment concerns. As the D.C. Circuit has explained, the False Claims Act "does not reach an innocent, good-faith mistake about the meaning of an applicable rule," nor "claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015). That provides ample protection against the sort of unfair liability that may worry Plaintiffs.

Plaintiffs complain that the clause concerning Federal anti-discrimination laws does not limit the provision's scope because "it is likely that all DEIA policies, programs, and activities would be considered

illegal by this Administration." PI at 19. This argument fails on every level. For starters, recipients will be asked to certify compliance with the anti-discrimination laws, not with the government's interpretation of them. And as discussed above, good-faith errors on this subject would not give rise to False Claims Act liability. Moreover, as two judges on the *Diversity Officers*' Fourth Circuit panel expressly recognized, "[t]he Executive Orders do not purport to establish the illegality of all efforts to advance diversity, equity or inclusion, and *they should not be so understood*." *Diversity Officers*, at 7 (Harris, J., concurring) (emphasis added); *see also id.* at 4 (Diaz, CJ., concurring) (joining Judge Harris' concurrence). At bottom, Plaintiffs' assertions are irreconcilable with the Executive Order's text, which does not adopt any new construction of antidiscrimination law nor declare all DEI illegal; rather, it requires entities to certify that they are not operating illegal DEI programs, not that they are not operating any DEI programs. The Certification Provision merely directs agencies to expressly remind counterparties about those obligations under antidiscrimination laws and their materiality to the government's payment decisions. None of this implicates the First Amendment.

Plaintiffs' reliance on *AID* to argue that the provision amounts to an unconstitutional condition is similarly unpersuasive. PI at 17. In *AID*, under the relevant policy requirement, "[a] recipient [could not] avow the belief dictated by the Policy Requirement when spending [federal] funds, and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime." 570 U.S. at 218. Here, unlike in *AID*, the Certification Provision does not limit Plaintiffs' Free Speech by compelling or restricting their speech. Plaintiffs remain free to engage in protected speech that espouses any viewpoint they want, including advocating for whatever DEI activities they prefer. *See* EO 14,173 § 7(b). The provision simply restricts the recipient's ability to engage in illegal discrimination while also securing federal funding—discrimination that would be illegal even without federal funding. Such restrictions on illegal conduct do not amount to an unconstitutional condition.

On this score, the Sixth Circuit's decision in *Cutter v. Wilkinson* is particularity informative. 423 F.3d 579 (6th Cir. 2005). Following reversal and remand from the Supreme Court on a separate First Amendment challenge to the Religious Land Use and Institutionalized Persons Act (RLUIPA), the Sixth Circuit examined whether the government imposed an unconstitutional condition on federal funds under

*Rust* when it conditioned funds to state prison officials on compliance with the RLUIPA. *Id.* at 588. The court reasoned that the condition did not violate the *Rust* standard because recipients had "no constitutional right, much less a fundamental constitutional right, to limit the exercise of religion by inmates" in the first instance. *Id.* Similarly, here, requiring recipients to certify that they are in compliance with the law does not amount to an unconstitutional "condition."

**Reporting Provision.** Plaintiffs' First Amendment challenge to the Reporting Provision also fails. The provision directs the Attorney General to submit a report to "inform and advise" the President "so that [the] Administration may formulate appropriate and effective civil-rights policy." EO 14,173 § 4(b). That report shall "contain[] recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI." *Id.* Among other things, the report shall identify "steps or measures to deter DEI programs or principles . . . that constitute illegal discrimination or preferences" and identify "potential civil compliance investigations" of large corporations, associations, foundations, and institutions of higher education. *Id.* § 4(b)(iii).

First, Plaintiffs' challenge to this provision is woefully unripe. The provision merely compels the submission of a report regarding how to address a particular category of unlawful action. There is no live case or controversy involving any such potential enforcement action stemming from that report, which is far too inchoate to be challenged at this time. Even the district court in *Diversity Officers* denied in part plaintiffs' request to enjoin the Reporting Provision "to the extent it is merely a directive from the President to the Attorney General to identify '[a] plan of specific steps or measures to deter DEI programs or principles . . . that constitute illegal discrimination or preferences.'" 2025 WL 573764, at *24 n.13 (alterations in original) (quoting EO 14,173 § 4(b)(iii)). That denial makes sense; it is hard to see how anyone would have standing to challenge the drafting of a DOJ report, or how a directive to draft a report could be unconstitutional. But that is all the Reporting Provision does. It does not authorize, or require, any enforcement action. It merely directs the Attorney General to draft a report regarding how the President's policies can be achieved by enforcing existing law. Enforcement is left to agency (or presidential) discretion. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) (explaining that "report

to the President [that] carries no direct consequences" for parties is "not final and therefore not subject to review" under the APA).

Plaintiffs' claim also fails on the merits. To begin with, the provision does not purport to target a First Amendment right at all. As two judges on the Fourth Circuit's *Diversity Officers* panel expressly recognized, the provision "appl[ies] only to conduct that violates existing federal anti-discrimination law." *Diversity Officers*, at 7 (Harris, J., concurring); *see also id.* at 4-5 (Diaz, CJ., concurring) (joining Judge Harris' concurrence). Plaintiffs have no First Amendment right to engage in illegal *conduct. See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 243-44 (4th Cir. 1997); *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777-79 (11th Cir. 2024).

Thus, Plaintiffs' argument—premised on the assumption that future enforcement action will erroneously target legal DEI—is belied by the provision's text. "The Executive Orders do not purport to establish the illegality of all efforts to advance diversity, equity or inclusion, and they should not be so understood." *Diversity Officers*, at 7 (Harris, J., concurring). Moreover, Plaintiffs' argument relies on the unfavored presumption that the government will execute the Executive Order's directive in bad faith and ignore its own declaration to only target illegal conduct. Plaintiffs provide no factual basis for this assumption other than mere speculations about bad-faith future enforcement action, which cannot sustain a facial challenge. *Cf. Hansen*, 599 U.S. at 782, 785 (rejecting First Amendment overbreadth challenge because plaintiff relied on "hypotheticals" and "speculative shot at the bad"). And in any event, such speculations are contrary to the presumption of good faith that courts routinely accord the government. *See, e.g.*, *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) (referring to the "presumption of regularity" that "attaches to the actions of Government agencies"); *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) ("[U]nlike in the case of a private party, [the courts] presume the government is acting in good faith."); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) ("[G]overnment actors . . . are accorded a presumption of good faith because they are public servants, not self-interested private parties."), *aff'd*, 563 U.S. 277 (2011).

Relatedly, any argument that enforcement actions would be motivated by something other than targeting unlawful discrimination amounts to a selective-enforcement claim, which arises in an as-applied

posture. *See Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1137-38 (D.C. Cir. 2023) (explaining that to assert a selective-enforcement claim, a plaintiffs must "demonstrate he was singled out for enforcement from among others similarly situated," which is "a fact-intensive and case-specific comparative inquiry" (citation omitted)).

Plaintiffs' challenge to the Reporting Provision is nothing more than an attempt to halt the Executive's pronouncement of its enforcement priorities based on Plaintiffs' fear that the Executive might not stick to its word when it says that it will only pursue illegal actions. At a very fundamental level, Plaintiffs' theory would kneecap the Executive's enforcement authority. *See United States v. Texas*, 599 U.S. 670, 678 (2023) ("Under Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" (citation omitted)). Under Plaintiffs' theory, even when the Executive announces that its enforcement priorities will target only illegal conduct, Plaintiffs could nevertheless preemptively halt any investigation and enforcement by speculating that the Executive may also impermissibly target legal conduct. The Court should reject Plaintiffs' invitation to encroach on the Executive's Article II authority to set its enforcement priorities under the guise of protecting Free Speech.[5]

### C.  Plaintiffs' separation-of-powers challenges fail.

Plaintiffs also argue that the Funding Provisions and the Certification Provision violate separation of powers by exceeding the President's Article II powers and improperly infringing on Congress' Article I powers. *See* PI at 20-24. "To bring a successful facial challenge outside the context of the First Amendment, 'the challenger must establish that no set of circumstances exists under which the [provision] would be valid.'" *Hotel & Motel Ass'n of Oakland*, 344 F.3d at 971 (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987)). Plaintiffs' arguments fall far short of meeting this standard.

***Funding Provision.*** With respect to the Funding Provisions—again, assuming this Court has jurisdiction to hear such challenges, which it does not—Plaintiffs argue that "[f]ederal grants are federal

---

[5] In any potential individual enforcement action, Plaintiffs would, of course, have the opportunity to argue their conduct does not violate the law. But they cannot halt an announcement of enforcement priorities at the outset based on the possibility that a hypothetical future enforcement may target legal conduct.

law, and conditioning or cancelling federal grants amounts to amending or repealing federal law, which the Executive Branch has no constitutional or statutory authority to do." PI at 21. This argument fails.

To begin with, in making this argument, Plaintiffs conveniently omit any reference to government contracts. To be sure, Plaintiffs' grants are ultimately funded through appropriations—but that is true for government contracts as well. After all, no federal funds can be paid without appropriations. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 207 (2020) (noting that most agencies rely on the annual appropriations process for funding). But in any event, Plaintiffs have brought a facial challenge; as such, they cannot invoke specific applications of the provisions, while ignoring others. Instead, they must show that each provision is unconstitutional "in all of its applications." *Vill. of Hoffman Ests.*, 455 U.S. at 495. As explained above, there are undisputedly instances where the Executive can terminate contracts for convenience without congressional approval. *See* II.A.ii. Indeed, any holding to the contrary would upend decades of precedent providing the Executive ample leeway in contract terminations. *See Northrop Grumman Corp.*, 46 Fed. Cl. at 626. Additionally, the Executive may in some instances, without seeking congressional approval, terminate grants "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). As such, Plaintiffs cannot establish—as they must in a facial posture—that every termination of a government grant/contract would violate separation of powers.

Plaintiffs' reliance on *City & County of San Francisco v. Trump*, to support their argument is unavailing. 897 F.3d 1225 (9th Cir. 2018). There, the court concluded that the Executive Order sought to "withhold properly appropriated funds" in violation of the separation of powers, *id.* at 1235, because it unequivocally cut *all* grants from sanctuary cities except for those "deemed necessary for law enforcement purposes," *id.* at 1239 (citation omitted). In light of the Executive Order's clear directive to withhold congressionally appropriated funds, the court concluded, the Order's "consistent with law" qualifier could not "override [its] clear and specific language." *Id.* In other words, the court found that the Executive Order was unconstitutional in every instance, and therefore, unconstitutional on its face.

By contrast, here, the Funding Provisions do not unequivocally compel agencies to improperly withhold congressionally appropriated funds. Instead, the Executive Orders provide general directives to

agencies to align government funding with policy priorities while explicitly directing them to yield to any and all applicable laws before terminating any grant/contact. *See* EO 14,151 § 2(b)(i) (directing federal agencies to "terminate, to the maximum extent allowed by law . . . all . . . 'equity-related' grants or contracts"); Exec. Order 14,168 § 3(e) (providing, among other things, that "[a]gencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology"), *id.* § 8(b) (providing that the Executive Order must be "implemented consistent with applicable law"). In this way, these qualifiers mirror the one that appeared in the Executive Order at issue in *Allbaugh*, 295 F.3d 28. There, the Executive Order "provide[d] that, to the extent permitted by law, no federal agency, and no entity that receives federal assistance for a construction project, may either require bidders or contractors to enter, or prohibit them from entering, into a project labor agreement (PLA)." *Id.* at 29. As the *Allbaugh* court recognized, the permitted-by-law qualifier "instructs the agency to follow the law." *Id.* at 33. As an example, the court explained, "if an executive agency, such as the FEMA, may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order," then it may not. *Id.* The court went on to conclude that "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far as the present record reveals, is above suspicion in the ordinary course of administration." *Id.*

The same is true here. Ultimately, if Plaintiffs are dissatisfied with a specific determination in the future, their remedy is to sue over that determination in a court with proper jurisdiction—not to enjoin the directives at the outset with respect to every federal grant and contract.

***Certification Provision.*** Plaintiffs' argument with respect to the Certification Provision is similarly unavailing. While "*new* conditions on federal funds" may implicate separation of powers, *see Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 516 (N.D. Cal. 2017) (emphasis added), no such concern arises when the Executive merely reinforces preexisting legal obligations. As explained above, the requirement that federal funding recipients follow the law is not new. *See supra* II.B. For decades, federal agencies have required recipients to certify their compliance with federal laws, including antidiscrimination laws. *Id.* The Certification Provision requires recipients to certify that they are honoring

their preexisting obligation to follow the law with respect to DEI programs in particular. That limitation merely renders it narrower than routine compliance-with-law certifications, which Plaintiffs do not challenge as unconstitutional.

### D.  Plaintiffs' statutory arguments fail.

Plaintiffs also argue that the Funding Provisions violate statutory requirements. *See* PI at 24-27. This argument is a repackaged version of their separation-of-powers argument, and fails for similar reasons. *See supra* II.C. Once again, the Executive Orders limit any termination to the extent it is independently permitted by law—including statutes identified by Plaintiffs (if applicable), such as Section 1557 of the Affordable Care Act, Section 1908 of the Public Health Service Act, and Title VII. As was the case in *Allbaugh*, "[i]n the event that an agency does contravene the law in a particular instance," Plaintiffs may challenge *that* termination as inconsistent with an applicable law. 295 F.3d at 33.

Plaintiffs' argument on this score further highlights that their claims are fundamentally misdirected. To the extent any termination flouts any particular statute or regulation, Plaintiffs' qualm is with the termination (i.e., agency action) that allegedly violated the law—not the Executive Orders that instruct agencies to follow the law. Take, for instance, Plaintiffs' argument with respect to the Ryan White Program. *See* PI at 25. Plaintiffs argue that the applicable statute and regulation bar the termination of their Ryan White grants. *Id.* If that is correct (which Defendants do not concede), the Termination Provision would instruct agencies to yield to the statutory and regulatory mandates and refrain from terminating those grants. In this hypothetical, any subsequent termination would not only contravene the applicable laws, but also the Executive Orders' express instructions to follow the law.[6] Simply put, any allegation that an agency acted beyond the scope of a funding provision by terminating a grant in violation of a particular statute does not establish that the provision itself violates that statute—much less on its face.

### E.  Plaintiffs' Equal Protection Clause claim fails.

---

[6] Defendants do not concede—and this Court need and should not address—whether termination of Plaintiffs' Ryan White grants would violate the applicable statutes and regulations. Any such claim is not properly part of this litigation, which only challenges the Executive Orders. Moreover, this Court lacks jurisdiction over any such termination claim, which would be channeled to the Court of Federal Claims under the Tucker Act. *See supra* I.B.

FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 25-CV-01824 JST

It is black-letter law that only government *action* can violate the Equal Protection Clause. *See Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022) ("The central inquiry in an Equal Protection Clause claim is whether a government action was motivated by a discriminatory purpose."). Yet, in challenging EO 14,168 under the Equal Protection Clause, Plaintiffs fail to identify any action (let alone, discriminatory action) by the government that allegedly violates their Equal Protection rights. *See* PI at 27-28. Plaintiffs attempt to distract away from this fatal shortcoming by seemingly equating the Executive Order's rhetoric to discriminatory action. *See id.* (alleging that the EO 14,168 "facially discriminates against transgender people by *declaring* they do not exist and *deeming* their identities to be 'false'" (emphases added)). But such allegations about government rhetoric are inadequate. As the Supreme Court has made clear, "as a general matter, when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015). Absent any allegation that any of the Executive Order's provisions amount to discriminatory conduct against Plaintiffs under the Equal Protection Clause, this Court lacks jurisdiction to enjoin the Executive Order's language. *See id.* at 207 ("[I]t is the democratic electoral process that first and foremost provides a check on government speech.").

Notably, Plaintiffs do not explicitly argue that the FGI and PGI Provisions violate the Equal Protection Clause—rightly so. After all, these provisions do not purport to withhold federal funding based on any protected characteristic of the recipients; they merely realign the government's funding of particular *topics*. Such content-based funding determinations have long been upheld as constitutional. *Rust*, 500 U.S. at 201 ("The Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected.").

Tellingly, Plaintiffs do not explicitly challenge any provision of EO 14,168 that pertains to individuals. For good reason: Plaintiffs—as nonprofit organizations—lack standing to challenge such provisions. Take, for instance, the provision regarding "government-issued identification documents." *See* EO 14,168 § 3(d). Needless to say, Plaintiffs do not apply for, nor receive, passports and visas, and therefore lack standing to challenge this provision. At bottom, EO 14,168 is only relevant to Plaintiffs so far as it pertains to funding. Plaintiffs cannot sidestep their standing hurdle with respect to the Order's

non-funding provisions by framing their challenge as one directed at the "Executive Order" in gross.

Nor can Plaintiffs overcome their standing hurdle through a feeble attempt at third-party standing and "assert equal protection claims on behalf of the people they serve." PI at 15-16. For starters, the Court need not reach the issue of third-party standing because Plaintiffs have not satisfied Article III standing with respect to themselves and their Equal Protection claim. "[E]ven when [the Court] ha[s] allowed litigants to assert the interests of others, the litigants themselves still must have suffered an injury in fact." *FDA*, 144 S.Ct. 1563 n.5 (citation omitted)*; see also Pioneers Mem'l Healthcare Dist. v. Imperial Valley Healthcare Dist.*, 745 F. Supp. 3d 1088, 1098 (S.D. Cal. 2024) ("[B]ecause Article III standing is a 'jurisdictional prerequisite to the consideration of any federal claim,' any arguments about third-party standing are moot here if Petitioner cannot satisfy Article III." (citation omitted)). As the Supreme Court reiterated this past Term, "[t]he third-party standing doctrine does not allow doctors to shoehorn themselves into Article III standing simply by showing that their patients have suffered injuries or may suffer future injuries." *FDA*, 144 S.Ct. 1563 n.5; *see also Hollingsworth v. Perry*, 570 U.S. 693, 708-09 (2013) (reiterating the holding in *Diamond v. Charles*, 476 U.S. 54 (1986), where the Court "refused to allow Diamond, a pediatrician engaged in private practice in Illinois, to defend the constitutionality of the State's abortion law" "because Diamond was not able to assert an injury in fact of his own"). Similarly, here, because Plaintiffs have not asserted their own standing with respect to the non-funding provisions of EO 14,168, they cannot assert third-party standing with respect to those provisions.

But even if Plaintiffs had satisfied Article III standing, they fail to sufficiently assert third-party standing on behalf of their individual clients. As a general rule, third-party standing is "disfavored." *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105 n.3 (9th Cir. 2006); *see also Mills v. United States*, 742 F.3d 400, 407 (9th Cir. 2014) ("Courts 'typically decline to hear cases asserting rights properly belonging to third parties rather than the plaintiff.'" (citation omitted)). An exception to this rule applies only when the party seeking third-party standing shows that: (1) it has "a 'close' relationship with the person who possesses the right" and (2) there is "a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citation omitted). Plaintiffs, despite carrying the burden, do not even attempt to make this showing. Specifically, Plaintiffs do not, and cannot, show that

their individual clients' ability to protect their own interest has been "sufficiently hindered to warrant third-party standing." *Nw. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*, 325 F.R.D. 671, 690 (W.D. Wash. 2016). To the contrary, individual plaintiffs have already challenged Executive Order 14,168 on various grounds, including Equal Protection. *See, e.g., Orr v. Trump*, 25-cv-10313 (D. Mass. Feb. 7, 2025) (a group of individuals filed a putative class action with respect to Executive Order 14,168 asserting Equal Protection claims); *Kingdom v. Trump*, 25-cv-691 (D.D.C. Mar. 10, 2025) (another putative class action with respect to Executive Order 14,168 pursuant to the Equal Protection Clause); *see also Moe v. Trump*, 25-cv-10195 (D. Mass. Jan. 26, 2025); *Doe v. McHenry, III*, 25-cv-286 (D.D.C. Jan. 30, 2025); *PFLAG, Inc. v. Trump*, 25-cv-337 (D. Md. Feb. 4, 2025); *Jones v. Trump*, 25-cv-401 (D.D.C. Feb. 10, 2025); *Tirrell v. Edelblut*, 24-cv-00251 (D.N.H. Feb. 12, 2025); *Ireland v. Hegseth*, 25-cv-1918 (D.N.J. Mar. 17, 2025). Indeed, many of these individual plaintiffs acted more expeditiously than the instant Plaintiffs did to litigate their own claims. These "pending litigation involving similarly situated plaintiffs asserting their own claims against the same defendants challenging the same government action . . . . cuts directly against [any] allegation[] of hindrance." *SurvJustice Inc. v. DeVos*, 2019 WL 1434141, at *8 (N.D. Cal. Mar. 29, 2019). Simply put, this is not a case where potential individual litigants face "daunting" barriers or have "little incentive" to litigate their own claims. *Powers v. Ohio*, 499 U.S. 400, 414-15 (1991). As such, Plaintiff organizations need not—and, in fact, cannot—litigate individuals' claims for them.

Because Plaintiffs have failed to identify any discriminatory government conduct against themselves—and cannot assert third-party standing on behalf of their individual clients—their Equal Protection Claim fails outright.

### III.  THE REMAINING FACTORS COUNSEL AGAINST GRANTING THE REQUESTED RELIEF.

#### A.  Plaintiffs have not shown irreparable injury.

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Plaintiffs' argument with respect to irreparable harm is largely duplicative of their arguments on the merits, *see* PI at 30, and therefore fails for similar reasons, *see supra* II. Additionally, Plaintiffs allege irreparable

harm to their "ability to carry out their core missions." *Id.* at 31. But "impair[ment]" to plaintiffs' "ability to provide services and achieve their organizational missions" does not satisfy standing, *FDA*, 602 U.S. at 394, let alone amount to irreparable harm.[7]

### B. The balance of the equities and public interest weigh squarely against relief.

Lastly, Plaintiffs cannot establish that the balance of equities and the public interest favor granting the extraordinary remedy of a preliminary relief. These final two factors merge in cases where relief is sought from the government. *Nken*, 556 U.S. at 435.

In arguing that the public interest weighs in their favor, Plaintiffs mostly repackage their arguments on the merits, which are futile, s*ee supra* II, and advocate for certain policy initiatives. Meanwhile, on the other end of the balancing test, any injunction here would effectively disable defendant agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities. "[A]ny time [the government] is enjoined by a court from effectuating [laws], it suffers a form of irreparable injury." *King*, 567 U.S. at 1303 (citation omitted). Moreover, the public would suffer harm if the government were enjoined from following the President's directive to enforce and effectuate antidiscrimination laws.

Additionally, where the government is legally entitled to make decisions about the disbursement or allocation of federal funds and contracts but is nonetheless enjoined from doing so, such funds may not be retrievable afterwards. *See California*, 2025 WL 1008354, at *1 (considering, for purposes of the *Nken* standards, that plaintiffs did "not refute[] the Government's representation that it is unlikely to recover the grant funds once they are disbursed[, that no] grantee 'promised to return withdrawn funds should its grant termination be reinstated,' and the District Court declined to impose bond" (citation omitted)). By contrast, if Plaintiffs' contracts are terminated in accordance with their terms, they may be entitled to recovery of costs, or even reasonable profits. *See supra* p. 35 n.7. Relatedly, a broad preliminary injunction would have a significant chilling effect on the President's and his advisors' ability to lawfully direct and guide

---

[7] Indeed, Plaintiffs do not even attempt to allege irreparable financial harm—rightly so. If any of Plaintiffs' funds or contracts are terminated, Plaintiffs may have the opportunity to dispute the termination, and, if successful, might retain the funds. Notably, a termination for convenience provides for compensation to the contractor for termination costs and often a reasonable allowance for profit. 48 C.F.R. §§ 49.201, 31.205-42.

government spending decisions and enforcement priorities. Agencies may feel obligated to forgo pursuing legally permissible actions in furtherance of the President's policy priorities—independent of the Executive Orders—for fear of risking contempt. Thus, the balance of equities favors the government and relief should be denied.

## IV. ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED AND PERMIT LAWFUL AGENCY ACTIVITY.

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). In line with this principle, to the extent the Court intends to grant Plaintiffs' request for a preliminary injunction, such relief should be narrowly tailored to apply only to defendant agencies, Plaintiffs, and the provisions that affect them, and to leave intact the Executive's discretion to engage in further consideration of the topic at hand and implement new policies consistent with law.

### A. Injunctive relief should be limited to defendant agencies, Plaintiffs, and the provisions that affect them.

Consistent with Plaintiffs' request, any injunction should be limited to defendant agencies and Plaintiffs only. *See* Proposed Order. Plaintiffs' request is consistent with the purpose of a preliminary injunction "to preserve the relative position *of the parties* until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasis added); *see Lewis v. Casey*, 518 U.S. 343, 360 (1996) (providing that an injunction should not provide "a remedy beyond what [is] necessary to provide relief" to the injured parties). Although Plaintiffs name the President as a defendant, they properly refrain from seeking any injunction against the President himself. *See* PI at 1 n.1 (Plaintiffs "do[] not seek injunctive relief against [the President]"). The Supreme Court has long recognized that courts have no authority to second-guess "discretion[ary]" acts taken by the President "in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499, 501 (1866); *see also Dellinger v. Bessent,* No. 25-5028, 2025 WL 559669, *10 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (outlining the President's immunity from judicial encroachment).

Moreover, any injunction should be limited to the provisions that Plaintiffs have sufficiently

alleged affect them, as opposed to the Executive Orders in gross. Plaintiffs have no standing to challenge the remaining provisions, *Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. at 626-27, and the Court can "sever[] any 'problematic portions while leaving the remainder intact,'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010).

### B. Relief should clarify that it preserves the Executive's discretionary authority.

If the Court enters Plaintiffs' request for relief in any form, that order should be limited to mitigate (albeit not eliminate) the significant harms it would cause to the Executive's abilities to exercise its lawful statutory authority and discretion. To that end, Defendants respectfully request that any preliminary relief clarify that it does not prohibit the President from reissuing a different directive or Executive Order and does not limit the defendant agencies from taking actions pursuant to their legal authority to regulate in furtherance of the substantive policy priorities in the Executive Orders.

Moreover, Defendants respectfully request that any preliminary relief be appropriately narrowly tailored to preserve the Executive's authority to enforce federal antidiscrimination laws. *See TransUnion LLC*, 594 U.S. at 429 ("[T]he choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch."). That is the normal equitable remedy, and anything broader would constitute a significant intrusion on the separation of powers.

### V.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND ACCOMPANY A BOND.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

Defendants also respectfully request that any injunctive relief accompany a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond

FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 25-CV-01824 JST

1  is appropriate here given that any preliminary relief would potentially mandate that the Executive spend

2  money that may not be recouped once distributed.

3  **CONCLUSION**

4  For these reasons, this Court should deny Plaintiffs' Motions for a Preliminary Injunction.

5

6  Respectfully submitted,

7

8  YAAKOV M. ROTH
Acting Assistant Attorney General

9  Civil Division

10  JOSEPH E. BORSON

11  Assistant Branch Director

12  PATRICK D. ROBBINS (CABN 152288)

13  Acting United States Attorney
KENNETH W. BRAKEBILL (CABN 196696)

14  Acting Chief, Civil Division
CHRISTOPHER F. JEU (CABN 247865)

15  Assistant United States Attorney
60 South Market Street, Suite 1200

16  San Jose, California 95113
Telephone: (408) 535-5082

17  FAX: (408) 535-5066
Christopher.Jeu@usdoj.gov

18

19  */s/ Pardis Gheibi*

20  PARDIS GHEIBI (D.C. Bar No. 90004767)
Trial Attorney, U.S. Department of Justice

21  Civil Division, Federal Programs Branch
1100 L Street, N.W.

22  Washington, D.C. 20005

23  Tel.: (202) 305-3246
Email: pardis.gheibi@usdoj.gov

24

25  *Attorneys for Defendants*

26

27

28  FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 25-CV-01824 JST

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on April 11, 2025, I electronically filed this document with the Court by using

3   the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

4

5                                                    */s/ Pardis Gheibi*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28