JENNIFER C. PIZER (SBN 152327)
*jpizer@lambdalegal.org*
PELECANOS*
*pelecanos@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 South Figueroa Street, Suite 1260
Los Angeles, California 90017-2521
Telephone: (213) 382-7600

JOSE ABRIGO*
*jabrigo@lambdalegal.org*
OMAR GONZALEZ-PAGAN*
*ogonzalez-pagan@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005-3919
Telephone: (212) 809-8585

CAMILLA B. TAYLOR*
*ctaylor@lambdalegal.org*
KENNETH D. UPTON, JR*
*kupton@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3656 North Halsted Street
Chicago, Illinois 60613-5974
Telephone: (312) 663-4413

KAREN L. LOEWY*
*kloewy@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006-4101
Telephone: (202) 804-6245

* *Appearance pro hac vice.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

------------------------------------------------------- x

SAN FRANCISCO AIDS FOUNDATION;
   *et al.*,

          *Plaintiffs*,

   v.

DONALD J. TRUMP, in his official capacity
   as President of the United States; *et al.*,

          *Defendants*.

------------------------------------------------------- x

Case No. 4:25-cv-01824-JST

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

THE EXECUTIVE ORDERS' CHALLENGED PROVISIONS.................................................. 2

ARGUMENT ............................................................................................................................ 3

I.    Plaintiffs Have Established Article III Jurisdiction ......................................................... 3

    A.    Plaintiffs Have Alleged, and Offered Evidence of, Concrete Injuries Caused by the Executive Orders and their Implementation. .................................................. 3

    B.    Plaintiffs Have Standing to Challenge the Grant Termination Provisions. ............ 5

    C.    The Tucker Act Is Inapplicable and This Court Has Jurisdiction.......................... 7

II.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims ....................................... 8

    A.    The Executive Orders Violate the First Amendment. ............................................ 8

    B.    The Executive Orders Violate the Fifth Amendment's Due Process Clause........ 14

    C.    The Gender Order Violates the Fifth Amendment's Equal Protection Clause..... 17

    D.    The Orders Are Ultra Vires as They Violate the Separation of Powers. .............. 22

III.  Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction....................... 24

IV.   The Balance of Equities and Public Interest Favor Relief ............................................... 24

V.    Defendants' Request for a Bond Under Rule 65(c) Should Be Denied........................... 25

VI.   Defendants' Request for a Stay Pending Appeal Should Be Denied............................... 25

CONCLUSION...................................................................................................................... 25

Appendix A - Challenged Provisions ........................................................................ App A - 1

Appendix B - Statute Chart...................................................................................... App B - 1

Appendix C - Terminated Grants Chart.................................................................... App C - 1

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013).........................................................................................11, 12

*Arroyo González v. Rosselló Nevares*,
305 F.Supp.3d 327 (D.P.R. 2018)................................................................21

*Babbit v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979)...............................................................................5

*Baggett v. Bullitt*,
377 U.S. 360 (1964)..............................................................................16

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020).............................................................................18

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)...........................................................................7, 8

*Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002)...............................................................23

*Chicago Women in Trades v. Trump ("CWIT")*,
No. 25 C 2005 (N.D. Ill. Apr. 14, 2025) (Dkt. 68).......................5, 7, 10

*City & Cnty. of San Francisco v. Azar*,
411 F.Supp.3d 1001 (N.D. Cal. 2019)............................................19, 21

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018)...........................................................23

*Cnty. of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017).................................................23

*Craig v. Boren*,
429 U.S. 190 (1976)..........................................................................19

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022)............................................................7

*Cutter v. Wilkinson*,
423 F.3d 579 (6th Cir. 2005).............................................................12

ii

*Dekker v. Weida,*
    679 F.Supp.3d 1271 (N.D. Fla. 2023) .................................................................18

*Dep't. of Educ. v. California,*
    604 U.S. ---, 145 S. Ct. 966 (2025) ......................................................................8

*Diaz v. Brewer,*
    656 F.3d 1008 (9th Cir. 2011) .............................................................................25

*Doe #1 v. Trump,*
    944 F.3d 1222 (9th Cir. 2019) .............................................................................25

*Doe #1 v. Trump,*
    957 F.3d 1050 (9th Cir. 2020) .............................................................................25

*Doe v. Horne,*
    115 F.4th 1083 (9th Cir. 2024) ...........................................................................18

*Doe v. United States,*
    372 F.3d 1308 (Fed. Cir. 2004) ............................................................................8

*Elrod v. Burns,*
    427 U.S. 347 (1976) ...................................................................................4, 8, 24

*F.V. v. Barron,*
    286 F.Supp.3d 1131 (D. Idaho 2018) .................................................................21

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ............................................................................................18

*F.C.C. v. Fox Television Studios, Inc.,*
    567 U.S. 239 (2012) ......................................................................................15, 17

*Food & Drug Admin. v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ................................................................................4, 11, 16

*HIAS, Inc. v. Trump,*
    985 F.3d 309 (4th Cir. 2021) ..............................................................................23

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ................................................................................................15

*Humanitarian Law Project v. U.S. Treasury Dep't,*
    578 F.3d 1133 (9th Cir. 2009) .............................................................................17

*Isaacson v. Mayes,*
    84 F.4th 1089 (9th Cir. 2023) .............................................................................15

iii

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951) ................................................................................13, 17

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003) ...................................................................25

*June Med. Servs. L.L.C. v. Russo*,
    591 U.S. 299 (2020) ..................................................................................20

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ..................................................................24

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) ..................................................................18

*Laird v. Tatum*,
    408 U.S. 1 (1972) ...................................................................................8, 12

*Legacy Health Sys. v. Hathi*,
    No. 23-35511, 2024 WL 2843034 (9th Cir. June 5, 2024) ......................20

*LSO, Ltd. v. Stroh*,
    205 F.3d 1146 (9th Cir. 2000) ....................................................................5

*Manrique v. Kolc*,
    65 F. 4th 1037 (9th Cir. 2023) ..................................................................25

*Martin v. United States*,
    649 F.2d 701 (9th Cir. 1981) ......................................................................7

*Meachum v. Fano*,
    427 U.S. 215 (1976) ..................................................................................17

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ....................................................................7

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ....................................................................24

*Miller v. Carlson*,
    768 F. Supp. 1331 (N.D. Cal. 1991) .........................................................25

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) ..............................................................................8, 12

*Nat'l Urban League v. Ross*,
    977 F.3d 698 (9th Cir. 2020) ....................................................................25

iv

*Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*,
No. 25-1189 (4th Cir. Mar. 14, 2025) (Dkt. 29) ............................................4, 11, 24

*Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*,
No. 1:25-cv-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) ....................................24

*Norsworthy v. Beard*,
87 F.Supp.3d 1164 (N.D. Cal. 2015) ....................................................................18

*Norwood v. Harrison*,
413 U.S. 455 (1973).........................................................................................20

*PFLAG, Inc. v. Trump*,
No. 25-337-BAH, 2025 WL 685124 (D. Md. Mar. 4, 2025)........................17, 22, 23

*Powers v. Ohio*,
499 U.S. 400 (1991)..........................................................................................20

*Reeve Aleutian Airways, Inc. v. United States*,
982 F.2d 594 (D.C. Cir. 1993) ...........................................................................17

*Robins v. Spokeo, Inc.*,
867 F.3d 1108 (9th Cir. 2017) ..............................................................................4

*Rosenberger v. Rector & Visitors of U. Va.*,
515 U.S. 819 (1995)...........................................................................................10

*San Bernardino Physicians' Servs. Med. Grp., Inc. v. San Bernardino Cnty.*,
825 F.2d 1404 (9th Cir. 1987) .............................................................................16

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
508 F. Supp. 3d 521 (N.D. Cal. 2020) ................................................9, 15, 17, 25

*Shilling v. United States*,
No. 25-cv-241-BHS, 2025 WL 926866 (W.D. Wash. Mar. 27, 2025)....................24

*Virginia v. Black*,
538 U.S. 343 (2003)...........................................................................................11

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)...........................................................................................14

*Washington v. Trump*,
No. 25-807, 2025 WL 553485 (9th Cir. Feb. 19, 2025) .......................................25

*Washington v. Trump*,
No. 2:25-cv-00244-LK, 2025 WL 659057 (W.D. Wash. Feb. 28, 2025)..............19, 21, 23, 24

v

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ..................................................................19

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    485 F.Supp.3d 1 (D.D.C. 2020)....................................................19, 20, 21

*Woodhull Freedom Found. v. United States*,
    948 F.3d 363 (D.C. Cir. 2020)...................................................................15

*Woonasquatucket River v. Dep't of Agric.*,
    No. 1:2025-cv-00097 (D.R.I. Apr. 15, 2025) (Dkt. 45)...............................7

**Rules**

Fed. R. Civ. P. 7(b)(1)....................................................................................25

Fed. R. Civ. P. 65(c) ......................................................................................25

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION,
CASE NO. 4:25-cv-01824-JST

**PRELIMINARY STATEMENT**

Plaintiffs challenge three Executive Orders that violate their constitutional rights to free speech, due process, and equal protection, and that disregard fundamental principles of separation of powers. Defendants have already enforced the Orders against Plaintiffs, not only by terminating their grant funding based on Plaintiffs' speech that the Government does not like but also by insisting Plaintiffs exclude a protected class of people—transgender persons—from programs intended to benefit them. Defendants argue that the President may issue and direct the Agency Defendants to enforce such unlawful orders with impunity and that Plaintiffs' only recourse is to wait until the Agency Defendants take *additional* steps to implement the President's facially discriminatory and illegal directives. Defendants' procedural gaslighting turns preliminary injunction law on its head. Defendants are already implementing the Orders to cancel Plaintiffs' funding because Plaintiffs espouse views the Administration opposes. *See infra,* Section I.A. Defendants have sent Plaintiffs and partner organizations clear and specific threats that the government will continue taking adverse action because of the Orders—including action punishing them for purely private speech. Because Defendants are inflicting irreversible financial and constitutional injuries now, the Court has jurisdiction to enjoin further irreparable harm.

Plaintiffs are likely to prevail on the merits of their claims.  First, the Orders improperly restrict free speech. Defendants claim the Orders merely reflect the President's "policy priorities" for government-funded speech. Opp'n Br. 4 (Dkt. 61). But the Orders target more than government "patron[age]." *Id*. at 18. The record shows Plaintiffs' funding was or will be terminated and their speech censored because their grants are "equity-related;" their organizations "promote" so-called "gender ideology" by acknowledging the existence of transgender people; or they provide health and social services in an equitable manner, often pursuant to statutory requirements. The record thus shows that the Administration has targeted Plaintiffs for enforcement of the Orders because it disapproves of their speech and the Congressionally authorized programs Plaintiffs implement. Briefly, the Administration pejoratively deems as "illegal" speech it dislikes.

Second, Defendants fail to explain how the Orders meet due process requirements. Instead,

Defendants boldly claim that due process is not required so vagueness is permissible. Defendants also say that key provisions of the Orders "target only illegal conduct." *Id.* at 28. But Defendants prove Plaintiffs' vagueness point by failing to elucidate the line between "illegal" DEI and DEI that is permissible. Defendants' own actions enforcing the Orders suggest they interpret them to mean that all efforts supporting DEIA are unlawful. For example, the Attorney General, *a Defendant in this action*, stated that the Orders "mak[e] clear that policies relating to" DEI and DEIA "violate the text and spirit of our longstanding Federal civil-rights laws."[1]

Third, the Gender Order violates the constitutional guarantee to equal protection because it is premised on an unprecedented degree of facially discriminatory animus against transgender people and any organization that acknowledges their identities or advocates for their rights.

Finally, the Orders usurp spending power expressly delegated to Congress. In fact, the Orders directly conflict with specific statutes, including statutes mandating or encouraging the exact types of activities (like the equitable inclusion of all people, including transgender people) the Orders now deem "illegal" or conditioning federal funding on non-discrimination.

In sum, the Executive Orders have caused and are continuing to cause harm to Plaintiffs' constitutional rights and funding. Defendants flatly refuse to acknowledge these harms and seek to evade fundamental constitutional boundaries that this Court should uphold.

## THE EXECUTIVE ORDERS' CHALLENGED PROVISIONS

Plaintiffs move this Court to declare that these specific provisions of the Executive Orders are unconstitutional, to enjoin their enforcement, and to order recission of any funding terminations or other implementation of the Orders against Plaintiffs: Section 3(e) of the Gender Order (the "**Gender Termination Provision**"); Section 3(g) of the Gender Order (the "**Gender Promotion Provision**"); Section 4(d) of the Gender Order (the "**Intimate Spaces Provision**"); Section 2(b)(i) of the DEI-1 Order (the "**Equity Termination Provision**"); Section 2(b)(ii)(C) of the DEI-1 Order

---

[1] Off. of the Att'y Gen., DOJ, *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline (attached to the Supplemental Declaration of Jose Abrigo ("Abrigo Supp. Decl.") as **Ex. R-16**).

(the "**List Provision**"); Section 3(c)(ii) of the DEI-2 Order (the "**DEIA Principles Provision**"); Section 3(c)(iii) of the DEI-2 Order (the "**Diversity Termination Provision**"); Section 3(b)(iv)(A)-(B) of the DEI-2 Order (the "**Certification Provision**"); and Section 4(b) of the DEI-2 Order (the "**Enforcement Threat Provision**").  *See* Appendix A.

## ARGUMENT

### I.    Plaintiffs Have Established Article III Jurisdiction.

Federal courts undisputedly are open to claims that the government is violating and threatening to violate constitutional rights or causing concrete financial injury. Plaintiffs properly seek injunctive relief here because Defendants are presently chilling and censoring their speech, cutting their funding, and sending them written threats of future cuts.

### A.    Plaintiffs Have Alleged, and Offered Evidence of, Concrete Injuries Caused by the Executive Orders and their Implementation.

Defendants begin their misplaced attack on Plaintiffs' standing by "defeating" a phantom argument. Plaintiffs do *not* challenge the Executive Orders "as a unified whole." Opp'n Br. 8. Instead, Plaintiffs challenge specific sections of the Executive Orders that have already injured, or threaten imminent injury to, Plaintiffs, their patients, and clients. *See infra*, 3-4; *see also* Compl. ¶¶ 65, 72, 82-84, 88, 92-94, 96-97, 99, 124-126, 237 (Dkt. 1). Defendants concede as much, stating, "Plaintiffs seemingly attempt to assert injury with respect to six provisions." Opp'n Br. 9.

Defendants then argue that Plaintiffs' injuries are "speculative." *Id*. Defendants are wrong. Plaintiffs have alleged two primary forms of injury to themselves caused by the Orders' challenged provisions—(i) chilled speech and (ii) the loss of funding appropriated by Congress, which impacts their operations—and have submitted unrebutted evidence these injuries have occurred or are imminent. Plaintiffs also allege the denial of equal protection to their patients and clients caused by the Gender Order and its implementation. *See infra,* Section II.C.

***Loss of Federal Funding and Operational Harms.*** That Plaintiffs' federal funding will be terminated pursuant to the Orders is not speculation; *it has already happened*. *See Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1118 (9th Cir. 2017) (injury not speculative where "both the

challenged conduct and the attendant injury have already occurred"). Defendants HHS (through its component, NIH) and/or NEH have already terminated funding to San Francisco AIDS Foundation ("SFAF"), LA LGBT Center, and GLBT Historical Society in accordance with the Executive Orders' mandates.[2] *See* Dkts. 56 ¶ 9 & Ex. A (Dkt. 56-1); 57 ¶¶ 14–16, 24 & Exs. C, E (Dkts. 57-3, 57-5); Dkt. 58 ¶¶ 9–10, 19 & Ex. C, E (Dkts. 58-3, 58-5); *see also* Appendix C.  This loss of federal funding causes operational harm such as being unable to provide critical healthcare and social services and having to fire staff. In other words, the Orders and their implementation have "directly affected and interfered with [Plaintiffs'] core [mission-driven] activities," sufficient to confer standing.  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

**_Chilled Speech._** The injury to Plaintiffs' protected speech independently establishes injury. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (loss of First Amendment freedoms constitutes injury). Indeed, Defendants do not dispute that a chilling effect on protected speech is an injury-in-fact sufficient for Article III standing. Opp'n Br. 10. Instead, Defendants claim that Plaintiffs' fears that they will lose their funding and may be prosecuted under the False Claims Act ("FCA") if they engage in speech recognizing the existence of transgender people and the importance of diversity, equity, inclusion, and accessibility are "objectively unreasonable." *Id.*

These fears, however, are objectively reasonable because Defendants have already terminated funding based on Plaintiffs' speech. *See infra* at 6-7. Additionally, LA LGBT Center has been told it must remove terms like "LGBT" (which is in the organization's name), "queer," "trans," and "transgender" from its materials or else its grant from the Office of Family Violence

---

[2] This case, therefore, is distinguishable from *National Association of Diversity Officers in Higher Education v. Trump ("Diversity Officers")*, No. 25-1189 (4th Cir. Mar. 14, 2025) (Dkt. 29), a non-binding Fourth Circuit opinion upon which Defendants rely heavily. Although granting a stay of a nationwide preliminary injunction pending appeal, each member of the *Diversity Officers* panel made clear that their analysis would be different if, like here, the administration took specific actions to enforce the Orders. *See id.* at 4 n.1 (Diaz, C.J., concurring) ("I . . . reserve judgment on how the administration enforces these executive orders, which may well implicate cognizable First and Fifth Amendment concerns."); *id.* at 7 (Harris, J., concurring) ("But my vote to grant the stay comes with a caveat" that agency enforcement actions "may well raise serious First Amendment and Due Process concerns"); *id.* at 9 (Rushing, J., concurring) (expressing view that claims were not justiciable where "this case does not challenge any particular agency action implementing the Executive Orders").

and Prevention Services ("OFVPS"), a component of HHS, will be terminated. Dkt. 57 ¶¶ 28–32. Likewise, FORGE was informed by a partner organization that Defendant DOJ program officers required censorship of certain language in grant funded work. Dkt. 47-3 ¶ 10. Considering Defendants' treatment of similarly situated organizations, public pronouncements regarding imminent enforcement, and direct threats of terminations, those Plaintiffs who have not yet had their funding terminated are objectively reasonable in fearing termination of their funding if they engage in speech that the Administration dislikes. *See Chicago Women in Trades v. Trump ("CWIT")*, No. 25 C 2005 (N.D. Ill. Apr. 14, 2025) (Dkt. 68), at 23–26. *See also infra*, at 12–13.

Further, Plaintiffs have standing to challenge, pre-enforcement, the Orders' restrictions on speech because Plaintiffs have "demonstrate[ed] a realistic danger of sustaining a direct injury as a result of the [Executive Orders'] operation or enforcement." *Babbit v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979). Indeed, "when the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *LSO, Ltd. v. Stroh,* 205 F.3d 1146, 1155 (9th Cir. 2000). Here, enforcement is imminent where Defendants have announced they will apply the Orders vigorously and have sent termination notices or threats.

**B.      Plaintiffs Have Standing to Challenge the Grant Termination Provisions**.

Defendants concede that Plaintiffs have "alleged Article III standing with respect to disrupted federal grants or contracts," Opp'n Br. 11, but nonetheless claim that Plaintiffs' lack standing because the terminations are not "fairly . . . trace[able] to the [Executive Orders]." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-615 (1992)). Defendants' argument relies on the false claim that notices Plaintiffs received did not cite the Executive Orders. *Id.* But multiple Plaintiffs received notices from multiple Defendants that *did* expressly cite the DEI-2 Order or the Gender Order as the only basis for terminating grants. These notices are quoted in the Complaint (Compl. ¶¶ 110–113), were quoted again in Plaintiffs' declarations, and were attached in full as exhibits;[3] Defendants simply chose to ignore this evidence.

---

[3] Dkts. 47-7 ¶ 35 & Ex. A; 47-8 ¶¶ 18, 20 & Exs. A–B; 47-10 ¶ 8 & Exs. A–D.

Prior to the filing of this case, Prisma Community and San Francisco Community Health Center ("SFCHC") received notices from the CDC, a component of HHS, threatening termination of federal funding awards explicitly based on the DEI-2 Order. *See* Dkts. 47-8 Ex. A; 47-10 Exs. A–B. SFCHC also received a notice from HHS threatening termination of an award for HIV prevention program explicitly based on the Gender Order. *See* Dkt. 47-10 ¶ 8(c) & Ex. C.[4] Similarly, NY LGBT Center received a notice from HRSA, a component of HHS, threatening termination of grant funds pursuant to the DEI-2 Order and the Gender Order. *See* Dkt. 47-7 ¶ 35.

Instead of addressing these termination notices that are fatal to their traceability argument, Defendants only address the most recent termination notices Plaintiffs GLBT Historical Society, SFAF, and LA LGBT Center received after this lawsuit was filed. Opp'n Br. 11-12. Although those termination notices do not expressly reference the Executive Orders (seemingly evolving in response to court proceedings), that is irrelevant; all Plaintiffs must do is show that the Orders are being enforced against Plaintiffs or that enforcement is imminent, which is established by the earlier notices received by Prisma Community Care, SFCHC, and NY LGBT Center.

Regardless, the termination notices Defendants selectively choose to focus on make clear that their purpose is to implement the Executive Orders. For example, in March 2025, LA LGBT Center and SFAF both received termination notices from NIH, a component of HHS, terminating grants intended (i) to identify and address factors contributing to racial inequities in HIV care under which LA LGBT Center is a subawardee; (ii) to investigate health disparities and outcomes among transgender and gender-diverse populations; and (iii) to study the effectiveness of a post-exposure prophylaxis to prevent bacterial sexually transmitted infections in a target population of transgender women and men who have sex with men. Dkts. 57 ¶¶ 5–17, 20–26; 58 ¶¶ 5–11; *see also* Appendix C. According to the notices, the grants were terminated because they "no longer effectuate agency priorities." Dkts. 57-3, 57-5, 58-3. But the termination notices do not identify any specific agency priorities and instead simply mirror the language of the DEI-1 and DEI-2

---

[4] That termination was eventually rescinded against HHS's will pursuant to a temporary restraining order issued on January 31, 2025, by a federal district court in Rhode Island. Dkt. 47-10 Ex. D.

Orders and the Gender Order, claiming that:

- "Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness," Dkt. 57-5; or

- "Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities." Dkts. 57-3, 58-3.

### C.  The Tucker Act Is Inapplicable and This Court Has Jurisdiction.

Plaintiffs' claims are constitutional, not contractual in nature. They are not founded upon any express or implied contract with the United States, nor do Plaintiffs seek money damages for breach of contract. Rather, Plaintiffs seek only declaratory and injunctive relief. These facts are fatal to Defendants' argument that jurisdiction lies exclusively in the Court of Federal Claims. Opp'n Br. 12. In fact, such argument was already rejected in *CWIT*. No. 25 C 2005, Dkt. 29 at 17–22; *see also Woonasquatucket River v. Dep't of Agric.*, No. 1:2025-cv-00097 (D.R.I. Apr. 15, 2025) (Dkt. 45), at 28–35.

An action does not fall within the exclusive jurisdiction of the Court of Federal Claims simply because it implicates a contract. *See Megapulse, Inc. v. Lewis,* 672 F.2d 959, 968 (D.C. Cir. 1982) ("[T]he mere fact that a court may rule on a contract issue does not . . . automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have."). Rather, an action invokes the Tucker Act's jurisdiction only when the claim is "in substance" a contract claim. *Martin v. United States*, 649 F.2d 701, 704–05 (9th Cir. 1981); *see also Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1110 (D.C. Cir. 2022) (Tucker Act did not apply to statutory claims implicating contract rights).

That Plaintiffs seek injunctive relief is likewise fatal to Defendants' Tucker Act argument as the Court of Federal Claims "has no power to grant equitable relief." *Bowen v. Massachusetts,* 487 U.S. 879, 905 (1988). Indeed, injury to Plaintiffs' free speech rights can *only* be remedied by injunctive or other equitable relief. *Elrod*, 427 U.S. at 373 (holding "[money] damages are . . . not an adequate remedy" for the loss of First Amendment rights). Defendants attempt to avoid this by

reframing Plaintiffs' request for an injunction into a claim for money damages because Defendants may be required to continue to fund Plaintiffs' grants. Opp'n Br. 13. This argument is misplaced, however, because "the fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893; *see also Doe v. United States*, 372 F.3d 1308, 1313–14 (Fed. Cir. 2004).

*Department of Education v. California*, 604 U.S. ---, 145 S. Ct. 966 (2025), is inapposite. Plaintiffs there were challenging grant terminations under the Administrative Procedures Act, a claim which Plaintiffs do not bring. Moreover, the plaintiffs in *California* did not assert any claims regarding the infringement of a constitutional right or a chilling effect on free speech. Nothing in the Tucker Act divests this Court of jurisdiction to remedy constitutional harms.

## II.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

### A.    The Executive Orders Violate the First Amendment.

The Orders' challenged provisions violate the First Amendment and justify the need for immediate preliminary relief. The Enforcement Threat Provision and the Certification Provision both directly restrict speech based on viewpoint and content. Also, these two provisions, as well as five others—the Diversity Termination, Equity Termination, Gender Termination, Gender Promotion, and List Provisions—have the unlawful purpose and effect of chilling disfavored speech. "[G]overnmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights" violate the First Amendment if they have a "deterrent, or 'chilling,' effect" on speech. *Laird v. Tatum*, 408 U.S. 1, 11 (1972); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) ("a government official cannot do indirectly what she is barred from doing directly" to "punish or suppress disfavored speech").

By their plain terms, the Orders are designed to silence and chill private speech that supports viewpoints the Administration dislikes. The DEI-2 Order's text directs officials to work to end DEI in the "private sector." DEI-2 Order § 4. The Gender Order further directs Defendants to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Gender Order § 3(g). By "direct[ing] agency heads to review all grant programs to

1  determine which grants may be conditioned on the recipient's certification that federal funds will

2  not be used to promote concepts" the Administration dislikes, the Orders "[c]ondition[] federal

3  grants in [a] manner [that] clearly … constitute[s] a content-based restriction on protected speech."

4  *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 542 (N.D. Cal. 2020).

5        Moreover, the Court is not limited to reviewing "the Executive Order's text," as encouraged

6  by Defendants. Opp'n Br. 25. Rather, the Court may review Defendants' own words and actions

7  regarding how they interpret and enforce the Executive Orders. Defendants have made abundantly

8  clear that they view all "DEI" programs as "illegal," and their intent is to end all DEI efforts, and

9  consequently chill speech, in both the public and private sectors.

10        The President's own statements reveal the Administration's unconstitutional plan to attack

11  private speech. Before issuing the Orders, the President committed not only to "end all of the

12  Marxist diversity, equity, and inclusion policies across the entire federal government," but also to

13  "ban these unlawful policies from . . . the private sector as well." Abrigo Supp Decl. **Ex. R-13**.

14  During his address to Congress, the President announced: "We've ended the tyranny of so-called

15  Diversity, Equity, and Inclusion policies all across the entire federal government and indeed the

16  private sector and our military." *Id.* **Ex. R-1**. A particularly egregious example is HUD's invoking

17  the Executive Orders to cancel grants based on "key words" in an organization's "website or

18  LinkedIn Profile"—that is, their purely private speech. *Id.* **Ex. R-11**. Another is Defendant HHS's

19  issuance of a Secretarial Directive to "avoid[] the expenditure of federal funds on programs, or

20  *with contractors or vendors, that promote or take part in diversity, equity, and inclusion ('DEI')*

21  *initiatives*." *Id.* **Ex. R-2** (emphasis added). Another is the instruction to LA LGBT Center to

22  remove terms like "LGBT," (which is in the organization's name), "queer," "trans," and

23  "transgender" as a condition for its OFVPS grant, Dkt. 57 ¶ 31, and the instruction to FORGE to

24  not use terms like "equal opportunity," "pronoun," "intersectionality," "accessibility," and

25  "historical trauma," Dkt. 47-3 ¶ 10.

26        Through the Certification Provision, the Administration targets Plaintiffs' speech that is

27  beyond the contours of any federal grants they receive. Thus, the Orders and Defendants' actions

28

implementing them impose penalties for Plaintiffs' privately held viewpoints. When government takes aim at private expression of particular ideas or viewpoints, the First Amendment provides protection. *See Rosenberger v. Rector & Visitors of U. Va.*, 515 U.S. 819, 828 (1995) ("[T]he government may not regulate speech based on its substantive content or the message it conveys.").

For this reason, the district court in *CWIT* recently preliminarily enjoined sections of the DEI-1 and DEI-2 Orders, finding that plaintiffs were likely to succeed on the merits of their First Amendment claims. *See CWIT*, No. 25 C 2005, Dkt. 29 at 26. The court stated: "Although the government may use conditions to 'define the federal program,' it may not 'reach outside' the program to influence speech." *Id.* at 24 (quoting *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.* ("*AID*"), 570 U.S. 205 (2013)).[5]

Defendants offer a scattershot response to Plaintiffs' First Amendment challenge but fail to confront how the provisions—individually and collectively—chill speech opposed by the Administration. *First*, Defendants defend the Certification Provision on the ground that it "merely requires Plaintiffs to certify that they do not operate any DEI programs that 'violate any applicable Federal anti-discrimination laws.'" Opp'n Br. 23. As one court recently put it, the problem with this argument is that the meaning of the Certification Provision "is left entirely to [Plaintiffs'] imagination." *CWIT*, No. 25 C 2005, Dkt. 29 at 25. The Executive Orders do not define the term "DEI" itself or refer to any source indicating that term's meaning as used in the Order—let alone what might make any given "DEI" program violate Federal antidiscrimination laws. Despite arguing that the Certification Provision only implicates "illegal" DEI programs, the government has studiously declined to shed any light on what this means. If anything, Defendant HHS has made clear that it considers *all* DEI programs and initiatives to be unlawful, demanding that

---

[5] As *CWIT* noted, "[t]he government conceded at oral argument that the Certification Provision attempts to regulate grantees' speech outside of their federally-funded programs." *CWIT*, No. 25 C 2005 at 24 (citing TRO transcript where the government stated: "[W]e're not arguing that the Certification Provision doesn't apply outside of the grants or contracts. It does. It plainly does."). "The provision on its face makes clear that a counterparty must certify that it does not operate any program that promotes DEI, irrespective of whether the program is federally funded." *Id.*; *see also* Abrigo Supp. Decl. **Ex. R-12**.

Harvard University "immediately shutter *all diversity, equity, and inclusion (DEI) programs,* offices, committees, positions, and initiatives, under whatever name, and *stop all DEI-based policies.*" Abrigo Supp. Decl. **Ex. R-10**. Regardless, the Executive Orders are not so limited by either their language or their enforcement; the plain text of the Orders, along with Defendants' actions since the Orders were issued, make clear that Defendants seek to suppress all efforts promoting DEI, regardless of whether such efforts are considered "legal" or "illegal." *See supra* at 9*, infra* at 15–16.

Moreover, the Certification Provision's application to activities that are not federally funded puts Plaintiffs in the impossible position of either revising all programmatic activity so that none of it "promote[s] DEI" (whatever that means), declining to make a certification and thus lose their grants, or risk making a certification that will be deemed false and thus subject them to investigation or liability under the FCA. Even assuming that the Certification Provision is limited to promoting whatever the government now contends is "illegal DEI," it is bedrock First Amendment canon that advocating for violation of the law cannot be proscribed unless it rises to incitement. *See Virginia v. Black*, 538 U.S. 343, 359 (2003) (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy . . . of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").[6]

*Second*, Defendants defend the Certification Provision in a way that does not actually address Plaintiffs' claim that the provision imposes an unconstitutional condition in violation of free speech under *AID*. The Certification Provision is just like the unconstitutional condition in *AID* because it not only requires contractors and grantees to certify that they will not engage in prohibited speech as part of their government-funded work; it requires them to certify that they will not engage in such speech *at all* as a condition for federal funding. Defendants insist that *AID*

---

[6] Plaintiffs previously noted that Defendants place undue weight on non-binding concurrences in the stay decision in *Diversity Officers*. *Compare* Opp'n Br. 25, *with* footnote 2, *supra*. Nor did *Diversity Officers* address the Gender Order. Coupled with Defendants' own words and enforcement actions, this case is distinguishable from *Diversity Officers*.

is distinguishable because the Certification Provision "simply restricts the recipient's ability to engage in illegal discrimination while also securing federal funding—discrimination that would be illegal even without federal funding." Opp'n Br. 25. Again, although the provision references "Federal anti-discrimination laws," DEI-2 Order § 3(b)(iv)(B), this reference is meaningless where the Orders and Defendants' actions make clear that, in practice, the Administration seeks to dismantle all DEI programs. *See supra* at 9, *infra* at 15–16.

Defendants rely on *Cutter v. Wilkinson*, 423 F.3d 579 (6th Cir. 2005), to argue that requiring compliance with the law "does not amount to an unconstitutional 'condition.'" Opp'n Br. 26. But Plaintiffs are not seeking government funds to support unlawful activities, as was the issue in *Cutter*. Plaintiffs do not engage in unlawful discrimination of any kind. Rather, Defendants have themselves made clear that they view all speech supporting DEI and acknowledging the reality that transgender people exist—including constitutionally protected speech that does not discriminate—as unlawful. Defendants cannot block off a whole arena of protected speech by incorrectly labeling it discriminatory or illegal.

*Third*, Defendants do not seriously challenge Plaintiffs' argument that the Orders, taken as a whole, chill speech. "It is established that 'governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights.'" *Laird*, 408 U.S. at 12–13. Thus, even if individual terms, taken in isolation, do not directly restrict speech outside of government-funded programs, the challenged provisions' overall purpose and chilling effect—revealed by Defendants' own words—do exactly that. "The First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech." *Vullo*, 602 U.S. at 189 (quoting *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 67 (1963)).

*Fourth*, in disputing the chilling effects of the Certification Provision, Defendants reject any allegation of self-censorship as "objectively unreasonable" and "based on a misreading of the Certification Provision, which only requires recipients to certify that any DEI programs they operate do not violate anti-discrimination law—not that they do not operate any DEI programs at

all." Opp'n Br. 10. These are hollow assurances in light of the Orders' text and Defendants' actions, which demonstrate radical departures from longstanding interpretations of antidiscrimination law.

In addition, Defendants argue that any chill created by the threat of FCA liability is dispelled by the fact that an intent-based defense remains available to Plaintiffs. Opp'n Br. 24–25. Organizations may well be able to assert defenses grounded in scienter to the extent the government brings an enforcement action or litigation under the FCA. The availability of these defenses does not ameliorate the threat of an investigation or potential liability under the statute and the chilling effects that flow from that threat. Plaintiffs still must guess what Defendants believe federal antidiscrimination laws mean in the context of well-established, widely accepted DEI programs. This unconstitutional overbreadth has a chilling effect on speech.

*Fifth*, Defendants' rebuttal as to the Enforcement Threat Provision entirely misses the point. Opp'n Br. 26-28. This provision directs the Attorney General to create a list of "potential civil compliance investigations" for organizations that engage in "illegal discrimination and preferences, including DEI." DEI-2 Order § 4(b). Requiring government officials to produce lists of private citizens expressing disfavored views is precisely the type of government action that the Supreme Court has recognized as raising significant constitutional concerns.

In *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951), the Court considered a government list-making operation that closely resembles the ones ordered here. The executive order at issue in *McGrath* directed DOJ to collect and disseminate the names of private organizations that it determined were "totalitarian, fascist, communist," "subversive," or promoted what the administration at the time deemed as antigovernment views. *Id*. at 125. Entities that were placed on the list filed suit asserting constitutional violations. *Id*. at 132–33. Although the plurality in *McGrath* decided a narrower question—ruling that plaintiffs adequately stated a claim, *id.* at 142—Justice Black addressed the chilling effects of "governmental blacklists" in a concurring opinion that speaks directly to the Executive Orders here. *Id*. at 142–44 (Black, J., concurring). Justice Black wrote that the government's list-making "effectively punishe[d] many organizations and their members merely because of their political beliefs and utterances," which "smacks of a

most evil type of censorship" and "cannot be reconciled with the First Amendment." *Id*. at 143. Justice Black's concerns resonate today where the Administration's actions bear troubling similarities to government action that has long been recognized as unconstitutional.

*Sixth*, Defendants contend that Plaintiffs' challenges interfere with the executive branch's "enforcement priorities based on Plaintiffs' fear that the Executive might not stick to its word when it says it will only pursue illegal actions," arguing that "Plaintiffs' theory would kneecap the Executive's enforcement authority." Opp'n Br. 28. Defendants do not cite any authority for the notion that such vague allusions to "enforcement authority" or "enforcement priorities" can justify their encroachment on free speech. Nor can they. Allowing Defendants to erode First Amendment guarantees through shallow appeals to "enforcement priorities" would only invite further abuses.

*Finally*, Defendants do not explain or address the fact that the Gender Order restricts Plaintiffs' speech as it pertains to their acknowledgement of transgender people's existence and identities. By prohibiting speech that recognizes transgender people's existence or identities (defined as "gender ideology" in the Gender Order) in the operation of any federally funded programs, regardless of the program's purpose, the Gender Order specifically targets speech that the Administration disfavors and seeks to impose a discriminatory viewpoint upon Plaintiffs.

In short, the Orders are sweeping attempts by the government to control and chill private speech. This our Constitution forbids: under the First Amendment, "[a]uthority . . . is to be controlled by public opinion, not public opinion by authority." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943).

## B.    The Executive Orders Violate the Fifth Amendment's Due Process Clause.

Defendants do not seriously dispute that the Executive Orders are vague. Instead, they argue that due process concerns do not apply to the Executive Orders which "only purport to direct executive policy and actors." Opp'n Br. 15. This is demonstrably false where Defendants have already taken steps to terminate Plaintiffs' funding based on the Orders' unlawful directives.

Defendants erroneously characterize Plaintiffs' claims as solely facial challenges. Opp'n Br. 15. But Plaintiffs bring both facial and as-applied challenges to the Executive Orders and their

1    implementing agency actions. *See* Compl. ¶ 226 (Plaintiffs "challenge the Executive Orders and

2    any agency action seeking to implement the Executive Orders both facially and as applied to

3    them"); *see id*. ¶¶ 253, 267, 280, 304. In any event, to the extent that Defendants have not yet

4    enforced some of the provisions directly against some Plaintiffs such that the posture is still

5    arguably "pre-enforcement," Plaintiffs' claims also readily support a pre-enforcement facial

6    vagueness challenge. Defendants' arguments to the contrary lack merit.

7        Defendants overstate the extent to which pre-enforcement facial vagueness challenges are

8    disfavored. Although the Supreme Court has foreclosed pre-enforcement facial vagueness

9    challenges for plaintiffs whose conduct is "clearly proscribed" by a vague law such that they

10    cannot claim lack of fair notice, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010), that

11    principle does not extend to pre-enforcement facial vagueness challenges premised on the

12    vagueness doctrine's second consideration: the risk of arbitrary enforcement. *See F.C.C. v. Fox*

13    *Television Studios, Inc.*, 567 U.S. 239, 252–53 (2012) (assuming vagueness challenges remain

14    available when based on an enforcement-discretion theory). A pre-enforcement challenge is proper

15    here where Plaintiffs challenge the Orders both for lack of fair notice and for their potential for

16    arbitrary enforcement. *See Isaacson v. Mayes,* 84 F.4th 1089, 1098–99 (9th Cir. 2023) (rejecting

17    "district court's suggestion that . . . vagueness challenges, cannot be reviewed before enforcement"

18    because the court must "decide whether the harm is sufficiently likely so that the litigant need not

19    wait until the harm occurs"); *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 369 (D.C.

20    Cir. 2020); *Santa Cruz*, 508 F.Supp.3d at 543–45.

21        The only vague element of the Orders that Defendants engage with is the reference to

22    discriminatory DEI in the Certification Provisions. Defendants argue that these provisions are not

23    vague because they merely require Plaintiffs to comply with "existing" law. Opp'n Br. 10. But the

24    Certification Provisions do not exist in a vacuum. Nearly everything else in the Orders, along with

25    Defendants' statements and actions, says the opposite: that the Administration views *all* DEI as

26    illegal. In places, the Orders categorically refer to "illegal DEI," without distinguishing between

27    legal DEI and a subset that is supposedly unlawful; the U.S. Attorney General issued a

28

memorandum interpreting the Orders as "making clear that policies relating to 'diversity, equity, and inclusion' ('DEI') and 'diversity, equity, inclusion, and accessibility' ('DEIA') 'violate the text and spirit of our longstanding Federal civil-rights laws' and 'undermine our national unity,'" Abrigo Supp. Decl. **Ex. R-16**; and in implementing the Orders, Defendants have canceled funding for programs that are even tangentially related to DEIA, without any indication that they have deemed those programs illegal *See*, *e.g.*, *Id.* **Exs. R-4**, **R-7** (noting research grants terminations for terms like "race," "ethnicity," "BIPOC," "underrepresented," "vulnerable population," among others), **R-8, R-9, R-11**.

That is why the references to discriminatory DEI in the Certification and Enforcement Threat Provisions are vague. An ordinary person has no way of knowing whether their expression relating to DEI satisfies Defendants' conception of "legal" DEI where Defendants refuse to explain the distinction between "legal" and "illegal" DEI. Instead, those affected have censored and will continue to censor their speech to avoid any speech relating to DEI and "restrict[] their conduct to that which is unquestionably safe." *Baggett v. Bullitt*, 377 U.S. 360, 368 (1964). That violates due process and inhibits free speech. *See*, *e.g.*, *id.* (invalidating for vagueness an oath requiring teachers to forswear an "undefined variety" of behavior considered "subversive" to the government).

Defendants try to circumvent the requirement of due process by arguing that the Orders do not implicate an interest that due process protects. This is not the law. In *Board of Regents of State Colleges v. Roth*, the Supreme Court recognized that all manner of government benefits can implicate due process. 408 U.S. 564, 576–77 (1972). Indeed, Plaintiffs may have a property interest in their grants and contracts. *See*, *e.g.*, *San Bernardino Physicians' Servs. Med. Grp., Inc. v. San Bernardino Cnty*., 825 F.2d 1404, 1407–08 (9th Cir. 1987).

Due process also protects against the deprivation of liberty interests, which are implicated here. For example, the D.C. Circuit has recognized that private entities have a protected liberty interest in being free from government action that causes reputational harms, which can occur when the government terminates work with a contractor or grantee. *See*, *e.g.*, *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993) (a government contractor has a

"liberty interest in avoiding the damage to its reputation and business caused by a stigmatizing suspension"). In addition, the Orders' threats to place Plaintiffs on various lists implicate protected interests. *See, e.g., McGrath,* 341 U.S. at 143 (Black, J., concurring).

Failing that, Defendants argue that due process requirements do not apply to the Executive Orders because the Orders merely direct the Presidents' subordinates, and "do not directly regulate primary conduct." Opp'n Br. 25. Defendants offer no real support for their rule cabining the reach of due process in that way. The Due Process Clause itself is not so limited. Rather, "[t]he touchstone of due process is protection of the individual against arbitrary action of government," *Meachum v. Fano*, 427 U.S. 215, 226 (1976) (citation omitted)—a principle that does not turn on the form of the enactment. There is no dispute due process applies beyond statutes. *See Fox Television Studios*, 567 U.S. at 253. And, when presidents have issued executive orders that affect protected interests in ways that confer standing, courts have had no trouble recognizing that such orders must comport with due process. *See, e.g., Humanitarian Law Project v. U.S. Treasury Dep't,* 578 F.3d 1133, 1146 (9th Cir. 2009); *Santa Cruz*, 508 F.Supp.3d at 545. That is the case here.

## C.    The Gender Order Violates the Fifth Amendment's Equal Protection Clause.

Notably, Defendants do not seek to defend the Gender Order and its implementation on the merits. That makes sense because the Gender Order and its implementation are premised on an unprecedented degree of animus that should shock the conscience of any person, let alone our justice system, and renders it unconstitutional. Indeed, one "cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." *PFLAG, Inc. v. Trump*, No. 25-337-BAH, 2025 WL 685124, at *23 (D. Md. Mar. 4, 2025). Instead, Defendants argue that Plaintiffs are unlikely to succeed on their equal protection claim because, according to Defendants, Plaintiffs (1) purportedly do not challenge discriminatory conduct against transgender people but rather merely "rhetoric," and (2) fail sufficiently to assert third-party standing on behalf of their individual patients and patrons. Neither argument has merit.

First, Plaintiffs challenge the Gender Order's directives and implementing agency actions

conditioning federal funding on the requirement that Plaintiffs repudiate the identities and very existence of their transgender patients and patrons, and deny services to them. *See* Dkt. 47 at 29. The Gender Order requires agencies to "ensure grant funds do not *promote gender ideology*" and "*to end the Federal funding of gender ideology*," which it defines as the recognition that a person may have a gender identity that differs from their birth sex. Gender Order §§ 2(f), 3(e), (g) (emphasis added). At their core, the Gender Order and its implementing agency actions seek to prohibit transgender people from accessing federally funded healthcare and social services if such services are provided in a way that acknowledges and respects their identities. As a result, transgender people are prohibited from accessing federally funded healthcare and HIV services, emergency housing, domestic violence and sexual assault survivor services, or other services,[7] or the benefits from scientific and health research because of their transgender status. *But see*, *e.g.*, Dkt. 47-5 ¶ 5 ("Respecting transgender people … is central to the LA LGBT Center's identity, advocacy, and mission, and a necessary part of every aspect of the services we provide.").

For example, to effectively provide healthcare services and "avoid [] tragic outcomes" that "ultimately lead[] to increased morbidity and mortality," "healthcare providers must recognize and acknowledge their patients' diverse gender identities and develop care models that are gender affirming and trauma informed." Dkt. 47-6 ¶¶ 8–9. Yet, NIH has cancelled hundreds of research grants that mention or relate to transgender people because, in light of the Gender Order's animus-laden proclamation that being transgender is a "false claim," Gender Order § 2(f), NIH has now baselessly determined that "[r]esearch programs based on gender identity are often unscientific … and do nothing to enhance the health of many Americans … [and] ignore … biological realities." Abrigo Supp. Decl. **Ex. R-5** at 6; *id.* **Exs. R-4, R-7, R-8, R-9**. But "[g]ender identity is real," *Dekker v. Weida*, 679 F.Supp.3d 1271, 1278 (N.D. Fla. 2023), *appeal argued*, No. 23-12155 (11th Cir. Nov. 22, 2024), and no matter how much the Administration proclaims otherwise, so are

---

[7] Plaintiffs provide emergency and transitional housing that is federally funded and respectful of transgender people's identities. *See* Dkts. 47-1 ¶¶ 6, 8–9; 47-10 ¶¶ 12(e), 24. The Gender Order, however, limits Plaintiffs ability to provide housing services that are respectful of their transgender clients' identities. *See* Gender Order §§ 4(c), (d).

1 transgender people. This Court, the Ninth Circuit, and the Supreme Court have so acknowledged.[8]

2     By choosing to turn its back on the health needs of transgender people, the government is

3 endangering the health of countless transgender Americans, but also of every American. *See*

4 *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1, 60–61

5 (D.D.C. 2020); *see also* Dkts. 47-5 ¶ 13; 47-6 ¶ 18; 47-7 ¶ 34; 47-9 ¶¶ 31, 33, 40; 47-10 ¶¶ 13, 17,

6 25. And because of the Gender Order, Defendant HHS has taken concrete governmental actions

7 to terminate funding *impacting Plaintiffs* for health research that benefits transgender people like

8 Plaintiffs' clients and patrons. *See* Dkts. 57 ¶¶ 20–27; 58 ¶¶ 5–13. As noted, LA LGBT Center has

9 been informed that it must eliminate terms like "LGBT," "queer," "trans," and "transgender" in

10 relation to its $2.25 Million OFVPS grant.  Dkt. 57 ¶¶ 31–32.

11     The federal funding restrictions imposed by the Gender Order impact health services and

12 research as well as social services, including those relating to domestic violence, which all are

13 barred if the programs acknowledge the existence of transgender people because doing so in the

14 operation of such programs is considered the "promotion of gender ideology." In other words, the

15 Gender Order and its implementation restrict *who receives funding* and *who can access federally*

16 *funded services*, not merely what the services funded are.

17     Second, it is well established that health and social services providers can assert the equal

18 protection rights of their patients and patrons. *See*, *e.g.*, *Craig v. Boren*, 429 U.S. 190, 195 (1976);

19 *Washington v. Trump*, 847 F.3d 1151, 1160 (9th Cir. 2017); *Washington v. Trump*, No. 2:25-cv-

20 00244-LK, 2025 WL 659057, at *8 (W.D. Wash. Feb. 28, 2025); *Whitman-Walker Clinic*, 485

21 F.Supp.3d at 34–36 ("The health-provider Plaintiffs … have standing to assert the equal-protection

22 … rights of third-party LGBTQ patients."). Indeed, this Court has recognized Plaintiff LA LGBT

23 Center's ability to do so. *See City & Cnty. of San Francisco v. Azar*, 411 F.Supp.3d 1001, 1011

24 (N.D. Cal. 2019).

---

26 [8] *See*, *e.g.*, *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020); *Farmer v. Brennan*, 511 U.S. 825

27 (1994); *Doe v. Horne*, 115 F.4th 1083 (9th Cir. 2024); *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019); *Norsworthy v. Beard*, 87 F.Supp.3d 1164, 1187 (N.D. Cal. 2015).

"For a litigant to have standing to assert claims on a third party's behalf, the litigant must have suffered an injury in fact; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." *Legacy Health Sys. v. Hathi*, No. 23-35511, 2024 WL 2843034, at *1 (9th Cir. June 5, 2024); *see also Powers v. Ohio*, 499 U.S. 400, 410–11 (1991). Defendants neither dispute that Plaintiffs suffer an injury-in-fact through the termination of funding for their services nor that chilled speech and viewpoint discrimination constitute injury in fact. Rather they argue that Plaintiffs must establish their own standing for the equal protection claim. Opp'n Br. 33–34. They got the test wrong.

The question is not whether Plaintiffs have their own equal protection claim[9] but rather whether they have suffered an injury-in-fact sufficient to grant them *standing in the case*. Plaintiffs clearly do. *See supra* Section I.A–B. Because the funding restrictions apply directly to federal funding recipients, Plaintiffs are best positioned to litigate this case. The Supreme Court has explained that plaintiffs are "generally permitted … to assert third-party rights in cases where the enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 318 (2020) (cleaned up and emphasis added), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). "In such cases, … 'the obvious claimant' and 'the least awkward challenger' is the party upon whom the challenged statute imposes 'legal duties and disabilities.'" *Id.* at 319 (quoting *Craig*, 429 U.S. at 196–97). The actual and threatened loss of funding under the Gender Order constitutes an injury-in-fact to Plaintiffs; they are parties upon whom the Order's enforcement imposes duties and disabilities. Thus, the injury-in-fact requirement is easily met.

"For the [close relationship] requirement to be fulfilled, the relationship between the

---

[9] Plaintiffs *do* suffer direct injury from the threat to deny them federal funding unless they exclude a protected class of people from their services in violation of the Constitution's equal protection guarantee. It is axiomatic that the government may not contract with "private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). Thus, Plaintiffs have direct standing to challenge Defendants' violation of equal protection *vis-à-vis* coercive unconstitutional conditions placed on them.

litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Whitman-Walker Clinic*, 485 F.Supp.3d at 35 (cleaned up). "Here, there can be no doubt that the health-provider Plaintiffs will be motivated, effective advocates for their LGBTQ patients." *Id.* (cleaned up). "Doctors and their patients have a confidential relationship." *City and Cnty. of San Francisco*, 411 F.Supp.3d at 1011; *see also Washington*, 2025 WL 659057, at *8. Defendants do not argue otherwise. The close relationship requirement is easily met here. *See* Dkts. 47-1 ¶ 11; 47-2 ¶ 24; 47-3 ¶ 3; 47-4 ¶¶ 7, 13, 21; 47-5 ¶¶5, 9, 20; 47-6 ¶¶ 18, 21; 47-7 ¶ 33; 47-8 ¶¶ 7-8; 47-9 ¶ 42; 47-10 ¶¶ 14–17.

Third, Defendants argue that Plaintiffs have failed to show "that their individual clients' ability to protect their own interest has been sufficiently hindered." Opp'n Br. 33–34 (cleaned up). Not so. "[D]ue to the sensitive nature of the subject matter, fear of retaliation from the federal government, and lack of capacity and/or financial resources, [] Plaintiffs' patients [and clients] are hindered from protecting their own interests." *Washington*, 2025 WL 659057, at *8. No one disputes that "transgender people have been the subject of a long history of discrimination that continues to this day." *F.V. v. Barron*, 286 F.Supp.3d 1131, 1145 (D. Idaho 2018). And disclosing a person's transgender status, particularly now, "exposes transgender individuals to a substantial risk of stigma, discrimination, intimidation, violence, and danger." *Arroyo González v. Rosselló Nevares*, 305 F.Supp.3d 327, 333 (D.P.R. 2018). Indeed, it "chills speech and *restrains engagement in the democratic process in order for transgender[ people] to protect themselves from the real possibility of harm and humiliation*." *Id.* (emphasis added). Defendants point to a few cases where individual plaintiffs, *mostly under pseudonyms*, have sued over discrete aspects of the Gender Order. Opp'n Br. 34. None, however, involve the type of challenge brought here. Besides, this "prong 'does not require an absolute bar from suit.'" *Whitman-Walker Clinic*, 485 F.Supp.3d at 36 (quoting *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002)). "It is enough that patients' fear of stigmatization operates as a powerful deterrent to bringing suit." *Whitman-Walker Clinic*, 485 F.Supp.3d at 36. Plaintiffs have shown "some hindrance" to the ability of their patients, clients, and patrons to vindicate their rights. *See*,

1    *e.g.*, Dkts. 47-1 ¶¶ 11, 14; 47-4 ¶ 11; 47-5 ¶¶ 13, 21; 47-6 ¶¶ 8, 18, 21; 47-7 ¶¶ 9, 17; 47-9 ¶¶ 19,

2    21; 47-10 ¶¶ 10, 14, 21–22. The provisions directly impacting Plaintiffs and their transgender

3    patients, clients, and patrons should be enjoined.

### D.    The Orders Are Ultra Vires as They Violate the Separation of Powers.

5        The Orders improperly usurp Congress's spending power by directing that grants or

6    contracts authorized by Congress be cancelled based on conditions not set by Congress.

7    Defendants' rebuttal rests on the faulty premise that "Plaintiffs have brought a facial challenge."

8    Opp'n Br. 29. Plaintiffs allege both facial and as-applied challenges. *See supra*, at 15.

9        Defendants argue the Orders are beyond judicial review because "the Executive may in

10   some instances, without seeking congressional approval, terminate grants, 'to the extent authorized

11   by law, if an award no longer effectuates the program goals or agency priorities.'" Opp'n Br. 29

12   (quoting 2 C.F.R. § 200.340(a)(4)). Yet, Defendants point to no delegation of authority permitting

13   them to condition federal funding on the promotion of DEIA or gender ideology. "Notably, the

14   Supreme Court has struck down agencies' attempts to extrapolate broad authority under narrow

15   delegations of power." *PFLAG*, 2025 WL 685124, at *16. "Where, as here, the plain text and stated

16   purpose of the Executive Orders evince a clear intent to unlawfully restrict federal funding without

17   congressional authorization, the mere inclusion of the phrase 'consistent with applicable law'

18   cannot insulate these Executive Orders from review." *Id.* at *18.

19       Moreover, "to the extent authorized by law" includes whether the Orders are lawful under

20   the Constitution, which they are not. As the Executive Orders and Defendants own words make

21   clear, Plaintiffs' contracts and grants are being terminated because Plaintiffs engage in speech that

22   the Administration does not like, including by operating DEI programs and respecting transgender

23   peoples' identities. This is not a lawful reason to terminate a grant award.

24       Defendants' attempt to distinguish *City & County of San Francisco v. Trump*, 897 F.3d

25   1225 (9th Cir. 2018), is not persuasive. Defendants have taken the position that any organizations

26   that operate "DEI" programs or that "promote" "gender ideology" will have their grant funding

27   terminated. This is therefore exactly like the situation in *City & County of San Francisco*. As one

28

1    court has held, "[b]ecause … Sections 3(e) and (g) of the Gender Ideology EO purport to condition

2    congressionally appropriated funds in a manner that effectively rewrites the law, they usurp

3    Congress's legislative role and thus amount to an end run around the separation of powers."

4    *Washington*, 2025 WL 659057, at *12.

5           Defendants point to *Building & Construction Trades Department, AFL-CIO v. Allbaugh*,

6    295 F.3d 28 (D.C. Cir. 2002), because of the permitted-by-law qualifiers in the Executive Orders

7    (also known as a savings clause). Opp'n Br. 30. But the Ninth Circuit distinguished *Allbaugh* in

8    *City & County of San Francisco*, finding the savings clause "does not and cannot override [the

9    executive order's] meaning." *Id*. at 1240. The court further concluded that the government's

10   argument would lead it into "an intellectual cul-de-sac," as interpreting "consistent with the law"

11   as immunizing an executive order would make "judicial review . . . a meaningless exercise." *Id*.;

12   *see also HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) (agreeing that "[t]he President

13   cannot immunize his Order from scrutiny" by using a savings clause). This Court need not ignore

14   the ways in which the Executive Orders are being interpreted and enforced by Defendants just

15   because the Executive Orders include qualifying language. *See PFLAG*, 2025 WL 685124, at *18.

16          Next, Defendants attempt to distinguish *County of Santa Clara v. Trump*, 250 F. Supp. 3d

17   497 (N.D. Cal. 2017), on the basis that the Orders "merely reinforce[] preexisting legal

18   obligations." Opp'n Br. 30. But the Administration's still undisclosed reinterpretation of federal

19   antidiscrimination laws is a radical departure from how those statutes were interpreted in the past,

20   and in any event, the Orders target much more than unlawful conduct. *See supra* Section I.A.

21          Finally, as noted in Plaintiffs' Motion (pp. 24–27) and Appendix B, the Orders conflict

22   with statutes that authorize funding to support Plaintiffs' work or condition Plaintiffs' federal

23   funding on not discriminating based on sex. *See PFLAG*, 2025 WL 685124, at *22–24 (holding

24   Section 3(g) of the Gender Order violates Section 1557 of the ACA and Section 1908 of the PHSA

25   and therefore "Plaintiffs are likely to succeed on the merits of their *ultra vires* statutory claim").

26

27

28

1    **III.    Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction**.

2         "[T]he 'deprivation of constitutional rights unquestionably constitutes irreparable injury.'"

3    *Shilling v. United States*, No. 25-cv-241-BHS, 2025 WL 926866, at *25 (W.D. Wash. Mar. 27,

4    2025) (quoting *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017)). This includes the loss

5    of First Amendment freedoms "for even minimal periods of time." *Elrod*, 427 U.S. at 373. Even

6    "a prospective violation of a constitutional right constitutes irreparable injury for purposes of

7    seeking equitable relief." *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (cleaned up). The

8    Orders violate Plaintiffs' constitutional rights, *supra*, Section II.A–C, and there is nothing

9    speculative about it, *supra* Section I.A–B. They also impose other irreparable harms, including

10   threatening the health and wellbeing of Plaintiffs' patients and clients. *See Washington*, 2025 WL

11   659057, at *26; Mot. at 30–31.

12   **IV.    The Balance of Equities and Public Interest Favor Relief**.

13        The balance of equities and the public interest support injunctive relief. Defendants largely

14   rehash arguments rejected by other courts. They assert that "any injunction here would effectively

15   disable almost a dozen federal agencies, as well as the President himself, from implementing the

16   President's priorities consistent with their legal authorities," Opp'n Br. 35, which is the same

17   argument *verbatim* that they made in *Diversity Officers*, and which that District Court dismissed.

18   *Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump,* No. 1:25-cv-00333-ABA, 2025 WL

19   573764, at *28 (D. Md. Feb. 21, 2025). Contrary to the prediction that an injunction would

20   hamstring the government, the District of Maryland noted they may "promulgate regulations, take

21   litigating positions, propose legislation, or any number of other steps" consistent with the law. *Id*.

22        Here, Defendants' litigation position cannot align with the public interest because

23   Defendants' actions violate constitutional rights. There can be few matters of greater public interest

24   than protecting citizen's constitutional rights. *Shilling*, 2025 WL 926866, at *28; *see also*

25   *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Relief is necessary here because Plaintiffs

26   provide crucial public services and "the public interest is served by reducing barriers to health care

27   and other critical services for all communities." *Santa Cruz*, 508 F.Supp.3d at 547.

28

**V.      Defendants' Request for a Bond Under Rule 65(c) Should Be Denied**.

District courts have discretion to not require a bond. *See Diaz v. Brewer,* 656 F.3d 1008, 1015 (9th Cir. 2011). Defendants' request for a bond should be denied. First, a preliminary injunction does not pose any realistic likelihood of harm on Defendants. *See*, *e.g.*, *Jorgensen v. Cassiday,* 320 F.3d 906, 919 (9th Cir. 2003) ("[F]iling of a bond [may be dispensed] when … there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."). Second, a bond would effectively deny Plaintiffs judicial review to which they are entitled. *See, e.g.*, *Miller v. Carlson*, 768 F. Supp. 1331, 1340 (N.D. Cal. 1991) (finding courts may dispense with bonds where a requiring one would effectively deny access to judicial review).

**VI.     Defendants' Request for a Stay Pending Appeal Should Be Denied**.

Defendants' stay request is procedurally improper. *See* Fed. R. Civ. P. 7(b)(1). Even so, a stay is not warranted because Defendants cannot meet the stay factors. *Manrique v. Kolc*, 65 F. 4th 1037, 1040 (9th Cir. 2023). Plaintiffs' likelihood of success on the merits precludes Defendants' showing *they* will likely succeed. *See Washington v. Trump*, No. 25-807, 2025 WL 553485, at *3 (9th Cir. Feb. 19, 2025). And Defendants fail to show that they face "irreparable injury" likely to occur "before the appeal is decided." *Doe #1 v. Trump*, 957 F.3d 1050, 1058–59 (9th Cir. 2020).

The Court also should deny the request for an administrative stay, the purpose of which is to preserve the *status quo*. *See Nat'l Urban League v. Ross*, 977 F.3d 698, 700–01 (9th Cir. 2020). The relief Plaintiffs seek preserves the *status quo ante litem* and Defendants face no immediate harm warranting emergency relief. *See Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019).

## CONCLUSION

The Court should enter an injunction consistent with the amended proposed order provided.

Dated this 18th of April, 2025.                        Respectfully,

                                                      /s/       *Jennifer C. Pizer*                        .
                                                      JENNIFER C. PIZER (SBN 152327)
                                                      jpizer@lambdalegal.org
                                                      LAMBDA LEGAL DEFENSE AND
                                                      EDUCATION FUND, INC.
                                                      800 South Figueroa Street, Suite 1260
                                                      Los Angeles, California 90017-2521
                                                      Telephone: (213) 382-7600

                                                      CAMILLA B. TAYLOR*
                                                      ctaylor@lambdalegal.org
                                                      KENNETH D. UPTON, JR.*
                                                      kupton@lambdalegal.org
                                                      LAMBDA LEGAL DEFENSE AND
                                                      EDUCATION FUND, INC.
                                                      3656 North Halsted Street
                                                      Chicago, Illinois 60613-5974
                                                      Telephone: (312) 663-4413

                                                      JOSE ABRIGO*
                                                      jabrigo@lambdalegal.org
                                                      OMAR GONZALEZ-PAGAN*
                                                      ogonzalez-pagan@lambdalegal.org
                                                      LAMBDA LEGAL DEFENSE AND
                                                      EDUCATION FUND, INC.
                                                      120 Wall Street, 19th Floor
                                                      New York, New York 10005-3919
                                                      Telephone: (212) 809-8585

                                                      KAREN L. LOEWY*
                                                      kloewy@lambdalegal.org
                                                      LAMBDA LEGAL DEFENSE AND
                                                      EDUCATION FUND, INC.
                                                      815 16th Street NW, Suite 4140
                                                      Washington, DC 20006-4101
                                                      Telephone: (202) 804-6245

                                                      PELECANOS*
                                                      pelecanos@lambdalegal.org
                                                      Boulder County, Colorado
                                                      Telephone: (213) 351-6051
                                                      c/o Jennifer C. Pizer, local counsel
                                                          LAMBDA LEGAL DEFENSE AND
                                                          EDUCATION FUND, INC.
                                                          800 S. Figueroa St., Ste 1260
                                                          Los Angeles, California 90017-2521

                                                      Counsel for All Plaintiffs

                                                      * Appearance *pro hac vice*

# Appendix A
## Challenged Provisions

| Executive Order 14168 – The Gender Order | |
|---|---|
| Section 3(e) (the "**Gender Termination Provision**") | Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages.  Agency forms that require an individual's sex shall list male or female, and shall not request gender identity.  **Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology**. |
| Section 3(g) (the "**Gender Promotion Provision**") | **Federal funds shall not be used to promote gender ideology**.  Each agency shall assess grant conditions and grantee preferences and **ensure grant funds do not promote gender ideology**. |
| Section 4(d) (the "**Intimate Spaces Provision**") | Agencies shall effectuate this policy by taking appropriate action to **ensure that intimate spaces** designated for women, girls, or females (or for men, boys, or males) **are designated by sex and not identity**. |

| Executive Order 14151 – DEI-1 Order | |
|---|---|
| Section 2(b)(i) (the "**Equity Termination Provision**") | (i) **terminate, to the maximum extent allowed by law,** all DEI, DEIA, and "environmental justice" offices and positions (including but not limited to "Chief Diversity Officer" positions); **all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts;** and all DEI or DEIA performance requirements for employees, contractors, or grantees. |
| Section 2(b)(ii)(C) (the "**List Provision**") | (ii) provide the Director of the OMB with a list of all: … (C) **Federal grantees who received Federal funding to provide or advance DEI, DEIA**, or "environmental justice" **programs, services, or activities** since January 20, 2021. |

| Executive Order 14173 – DEI-2 Order | |
|---|---|
| Section 3(c)(ii) (the "**DEIA Principles Provision**") | **Excise references to DEI and DEIA principles, under whatever name they may appear, from** Federal acquisition, **contracting, grants, and financial assistance procedures** to streamline those procedures, improve speed and efficiency, lower costs, and comply with civil-rights laws. |
| Section 3(c)(iii) (the "**Diversity Termination Provision**") | **Terminate all "diversity," "equity," "equitable decision-making," "equitable deployment of financial and technical assistance," "advancing equity," and like mandates, requirements, programs, or activities**, as appropriate. |
| Section 3(b)(iv)(A)-(B) (the "**Certification Provision**") | (iv)   The head of each agency **shall include in every contract or grant award**: (A)  A term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and (B)  A term **requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that** violate any applicable Federal anti-discrimination laws. |

App. A - 3

| Section 4(b) (the "**Enforcement Threat Provision**") | (b)  To further inform and advise me so that my Administration may formulate appropriate and effective civil-rights policy, the Attorney General, within 120 days of this order, in consultation with the heads of relevant agencies and in coordination with the Director of OMB, shall submit a report to the Assistant to the President for Domestic Policy containing **recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI.**  The report shall contain a proposed strategic enforcement plan identifying:<br>(i)    Key sectors of concern within each agency's jurisdiction;<br>(ii)   The most egregious and discriminatory DEI practitioners in each sector of concern;<br>(iii)  A plan of **specific steps or measures to deter DEI programs or principles (whether specifically denominated "DEI" or otherwise)** that constitute illegal discrimination or preferences.  As a part of this plan, each agency shall identify up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500 million dollars or more, State and local bar and medical associations, and institutions of higher education with endowments over 1 billion dollars;<br>(iv)  Other **strategies to encourage the private sector to end illegal DEI discrimination** and preferences and comply with all Federal civil-rights laws;<br>(v)   Litigation that would be potentially appropriate for Federal lawsuits, intervention, or statements of interest; and<br>(vi)  Potential regulatory action and sub-regulatory guidance. |
|---|---|

1
2

**APPENDIX B**
**Statutory Provisions Related to Funding Sources**

| Funding Source | Plaintiff(s) | Statutory/Regulatory Provision |
|---|---|---|
| Federal financial assistance from the U.S. Department of Health and Human Services, including any of its components such as CDC, HRSA, NIH, and SAMHSA | SF AIDS Foundation (Dkt. 47-9 ¶¶ 6-9; Dkt. 58 ¶¶ 3, 5-21)<br><br>SF Community Health Center (Dkt. 47-10 ¶¶ 5-8)<br><br>LA LGBT Center (Dkt. 47-5 ¶¶ 7-11; Dkt. 57 ¶¶ 3, 5-28)<br><br>Prisma Community Care (Dkt. 47-8 ¶¶ 9-16)<br><br>Bradbury-Sullivan Center (Dkt. 47-2 ¶ 7)<br><br>NY LGBT Center (Dkt. 47-7 ¶¶ 13-14, 18-19) | "Except as otherwise provided for in this title (or an amendment made by this title), **an individual shall not, on the ground prohibited under** title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), **title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.),** the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, **any health program or activity, any part of which is receiving Federal financial assistance**, including credits, subsidies, or contracts of insurance." 42 U.S.C. §18116(a) (emphasis added). |
| U.S. Department of Health and Human Services (HRSA) – Public Health Service Act Funding | SF Community Health Center (Dkt. 47-10 ¶ 6)<br><br>LA LGBT Center (Dkt. 47-6 ¶ 10) | "**No person shall on the ground of sex** or religion **be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity funded in whole or in part with funds made available under this part**." 42 U.S.C. § 300w-7(a)(2) (emphasis added). |
| U.S. Department of Health and Human Services (HRSA) – Federally Qualified Health Centers (FQHCs) | SF Community Health Center (Dkt. 47-10 ¶ 6)<br><br>LA LGBT Center (Dkt. 47-5 ¶ 11) | "For purposes of this section, **the term "health center" means an entity that serves a population that is medically underserved … .**" 42 U.S.C. § 254b(a)(1) (emphasis added).<br><br>"A State may award **grants to health care providers who treat a** |

App. B - 1

| | | |
|---|---|---|
| | | **high percentage**, as determined by such State, **of medically underserved populations** or other special populations in such State." 42 U.S.C. § 254b-1(a) (emphasis added). |
| U.S. Department of Health and Human Services (CDC and HRSA) – Ryan White HIV/AIDS Program (RWHAP) | SF AIDS Foundation (Dkt. 47-9 ¶ 9) SF Community Health Center (Dkt. 47-10 ¶ 7) LA LGBT Center (Dkt. 47-5 ¶ 11) Prisma Community Care (Dkt. 47-8 ¶¶ 9, 13) Baltimore Safe Haven (Dkt. 47-1 ¶ 9b) Bradbury-Sullivan Center (Dkt. 47-2 ¶ 7) | "To be eligible for assistance under this subpart, the chief elected official described in subsection (a)(1) shall establish or designate an HIV health services planning council that shall reflect in its composition the demographics of the population of individuals with HIV/AIDS in the eligible area involved, **with particular consideration given to disproportionately affected and historically underserved groups and subpopulations**. Nominations for membership on the council shall be identified through an open process and candidates shall be selected based on locally delineated and publicized criteria. Such criteria shall include a conflict-of-interest standard that is in accordance with paragraph (5)." 42 U.S.C. § 300ff-12(b)(1) (emphasis added).<br><br>"Underserved populations. Entities described in paragraph (1) **shall serve underserved populations which may include minority populations and Native American populations**, ex-offenders, individuals with comorbidities including hepatitis B or C, mental illness, or substance abuse, low-income populations, inner city populations, and rural populations." 42 U.S.C. § 300ff-52(a)(2) (emphasis added).<br><br>"For the purpose of carrying out activities under this section to evaluate and **address the** |

| | | |
|---|---|---|
| | | **disproportionate impact of HIV/AIDS on, and the disparities in access, treatment, care, and outcomes for, racial and ethnic minorities (including African Americans, Alaska Natives, Latinos, American Indians, Asian Americans, Native Hawaiians, and Pacific Islanders)**, … The Secretary shall develop a formula for the awarding of grants under subsections (b)(1)(A) and (b)(1)(B) that ensures that **funding is provided based on the distribution of populations disproportionately impacted by HIV/AIDS**." 42 U.S.C. § 300ff-121(a) (emphasis added). |
| U.S. Department of Health and Human Services (NIH) – NIH Research Funding | SF AIDS Foundation (Dkt. 47-9 ¶ 9; Dkt. 58 ¶¶ 3, 5-13)<br><br>LA LGBT Center (Dkt. 47-5 ¶ 11; Dkt. 57 ¶¶ 3, 5-27)<br><br>FORGE (Dkt. 47-3 ¶¶ 7, 11) | "In carrying out the purposes of section 241 of this title, the Secretary, acting through **the Director of NIH—shall assemble accurate data to be used to assess research priorities**, including—(A) information to better evaluate scientific opportunity, public health burdens, and progress in **reducing health disparities**; and (B) data on study populations of clinical research, funded by or conducted at each national research institute and national center, which—(i) **specifies the inclusion of**—(I) women; (II) **members of minority groups**; (III) relevant age categories, including pediatric subgroups; and (IV) other demographic variables as the Director of the National Institutes of Health determines appropriate; … ." 42 U.S.C. § 282(b)(4) (emphasis added).<br><br>"In the case of clinical research, the catalog shall as appropriate, identify study populations by demographic variables, including biological and |

social variables and relevant age categories (such as pediatric subgroups), and determinants of health, that **contribute to research on minority health and health disparities**." 42 U.S.C. § 283(a)(4)(B) (emphasis added).

"The Director of the National Institutes of Health shall, as appropriate, **encourage efforts to improve research related to the health of sexual and gender minority populations**, including by—(1) **facilitating increased participation of sexual and gender minority populations in clinical research** supported by the National Institutes of Health, and reporting on such participation, as applicable; (2) **facilitating the development of valid and reliable methods for research relevant to sexual and gender minority populations**; and (3) addressing methodological challenges." 42 U.S.C. § 283p (emphasis added).

"The Associate Director for Special Populations [of the National Institute of Mental Health] **shall**— (A) **develop and coordinate research policies and programs to assure increased emphasis on the mental health needs of** women and **minority populations**; (B) **support programs of basic and applied social and behavioral research on the mental health problems of** women and **minority populations**; (C) **study the effects of discrimination on institutions and individuals**, including majority institutions and individuals; (D) support and develop research designed to eliminate institutional discrimination; and (E) **provide increased emphasis on the**

**concerns of** women and **minority populations in training programs, service delivery programs, and research endeavors of the Institute**." 42 U.S.C. § 285p(e)(2) (emphasis added).

"The general purpose of the National Institute on Minority Health and Health Disparities … is the **conduct and support of research, training, dissemination of information, and other programs with respect to minority health conditions and other populations with health disparities**." 42 U.S.C. § 285t (emphasis added).

"The Director of the Institute **shall make awards of grants or contracts to designated biomedical and behavioral research institutions** under paragraph (1) of subsection (c), or to consortia under paragraph (2) of such subsection, **for the purpose of assisting the institutions in supporting programs of excellence in biomedical and behavioral research training for individuals who are members of minority health disparity populations or other health disparity populations**." 42 U.S.C. § 285t-1 (emphasis added).

"In conducting or supporting clinical research for purposes of this subchapter, **the Director of NIH shall**, subject to subsection (b), **ensure that … members of minority groups are included as subjects in such research**." 42 U.S.C. § 289a-2(a)(1)(B).

"**The Director of NIH … shall conduct or support outreach programs for the recruitment of**

| | | |
|---|---|---|
| | | women and **members of minority groups as subjects in projects of clinical research**." 42 U.S.C. § 289a-2(a)(2). |
| U.S. Department of Health and Human Services – Centers for Medicare & Medicaid Services – Medical Insurance Enrollment | NY LGBT Center (Dkt. 47-7 ¶ 19) | "**conducting outreach to and enrolling vulnerable and underserved populations eligible for medical assistance** under this subchapter or for child health assistance under subchapter XXI, including children, **unaccompanied homeless youth**, children and youth with special health care needs, pregnant women, **racial and ethnic minorities**, rural populations, victims of abuse or trauma, individuals with mental health or substance-related disorders, and **individuals with HIV/AIDS**." 42 U.S.C § 1396w-3(b)(1)(F) (emphasis added). |
| U.S. Department of Health and Human Services (OFVPS) – Office of Family Violence Prevention Services Funding | LA LGBT Center (Dkt. 57 ¶¶ 3, 28) | "Each such application shall— … describe how the State or Indian tribe will **involve community-based organizations, whose primary purpose is to provide culturally appropriate services to underserved populations**, including how such community-based organizations can assist the State or Indian tribe in **addressing the unmet needs of such populations** … ." 42 U.S.C. § 10407(a)(2)(E) (emphasis added). |
| | | "Funds awarded to eligible entities under subsection (a) shall be used to provide shelter, supportive services, or prevention services to adult and youth victims of family violence, domestic violence, or dating violence, and their dependents, which may include— … prevention services, including **outreach to underserved populations**." 42 |

| | | |
|---|---|---|
| | | U.S.C. § 10408(b)(1)(H) (emphasis added). |
| | | "The term '**underserved populations**' has the **meaning given the term in section 12291(a) of Title 34**. For the purposes of this chapter, the Secretary has the same authority to determine whether a population is an underserved population as the Attorney General has under that section 12291(a) of Title 34." 42 U.S.C. § 10402(14) (emphasis added). |
| | | "The term '**underserved populations'** means populations who face barriers in accessing and using victim services, and **includes populations underserved because of** geographic location, religion, **sexual orientation, gender identity,** underserved racial and ethnic populations, populations underserved because of special needs (such as language barriers, disabilities, alienage status, or age), and any other population determined to be underserved by the Attorney General or by the Secretary of Health and Human Services, as appropriate." 34 U.S.C. § 12291(46). |
| U.S. Department of Housing and Urban Development – Housing Opportunities for Persons With AIDS (HOPWA) Program | SF Community Health Center (Dkt. 47-10 ¶¶ 7, 23) <br><br> LA LGBT Center (Dkt. 47-6 ¶ 5) <br><br> Prisma Community Care (Dkt. 47-8 ¶¶ 9, 13) | "**Affirmative outreach.** A grantee or project sponsor must adopt procedures to **ensure that all persons who qualify for the assistance, regardless of their race, color, religion, sex, age, national origin, familial status, or handicap, know of the availability of the HOPWA program**, including facilities and services accessible to persons with a handicap, and maintain evidence of |

App. B - 7

| | | |
|---|---|---|
| | | implementation of the procedures." 24 C.F.R. § 574.603(b). |
| | | "*Family* is defined in 24 CFR 5.403 and includes one or more eligible persons living with another person or persons, regardless of actual or perceived sexual orientation, **gender identity**, or marital status, who are determined to be important to the eligible person or person's care or well-being, and the surviving member or members of any family described in this definition who were living in a unit assisted under the HOPWA program with the person with AIDS at the time of his or her death." 24 C.F.R. § 574.3 (emphasis added). |
| U.S. Department of Housing and Urban Development – (a) Youth Homelessness Demonstration Program; and (b) Continuum of Care Program – Transitional Housing/Rapid Rehousing Component | Baltimore Safe Haven (Dkt. 47-1 ¶¶ 6, 9) | "It is the purpose of this chapter-- … **to provide funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans**." 42 U.S.C. § 11301(b)(3) (emphasis added). |
| | | "The purposes of this part are-- … **to provide funding for efforts by nonprofit providers** and State and local governments **to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness** … ." 42 U.S.C. § 11381 (West) |
| | | "The Secretary shall award grants, on a competitive basis, and using the selection criteria described in section 11386a of this title, to carry out eligible activities under this part for projects that meet the program requirements under section 11386 of this title, either by directly awarding |

| | | |
|---|---|---|
| | | funds to project sponsors or by awarding funds to unified funding agencies." 42 U.S.C. § 11382(a). |
| | | "**Special populations.** All eligible costs are eligible to the same extent for **program participants who are unaccompanied homeless youth; persons living with HIV/AIDS; and victims of domestic violence, dating violence, sexual assault, or stalking.**" 24 C.F.R. § 578.53(c) (emphasis added). |
| U.S. Department of Justice – Office of Violence Against Women Funding and Violence Against Women Act (VAWA) Funding | LA LGBT Center (Dkt. 47-5 ¶¶ 7, 13)<br><br>FORGE (Dkt. 47-3 ¶ 7) | "Grants under this subchapter shall provide personnel, training, technical assistance, data collection and other resources for the more widespread apprehension, prosecution, and adjudication of persons committing violent crimes against women, for the protection and safety of victims, and specifically, for the purposes of-- … developing, enlarging, or strengthening programs and projects to provide services and responses **targeting** male and female victims of domestic violence, dating violence, sexual assault, or stalking, whose ability to access traditional services and responses is affected by their **sexual orientation or gender identity**, as defined in section 249(c) of Title 18." 34 U.S.C. § 10441(b)(19) (emphasis added). |
| | | "A State applying for a grant under this subchapter shall-- … submit to the Attorney General-- … the **demographic characteristics of the populations to be served, including age, disability, race, ethnicity, sexual orientation, gender identity, and language** |

background." 34 U.S.C. § 10446(i)(2)(iv) (emphasis added).

"The term 'underserved populations' means populations who face barriers in accessing and using victim services, and includes populations underserved because of geographic location, religion, **sexual orientation, gender identity, underserved racial and ethnic populations, populations underserved because of special needs (such as language barriers, disabilities, alienage status, or age),** and any other population determined to be underserved by the Attorney General or by the Secretary of Health and Human Services, as appropriate." 34 U.S.C. §12291(a)(46) (emphasis added).

"No person in the United States shall, on the basis of actual or perceived **race, color, religion, national origin, sex, gender identity (as defined in paragraph 249(c)(4) of Title 18), sexual orientation, or disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or in part with funds made available under** the Violence Against Women Act of 1994 (title IV of Public Law 103-322; 108 Stat. 1902), the Violence Against Women Act of 2000 (division B of Public Law 106-386; 114 Stat. 1491), the Violence Against Women and Department of Justice Reauthorization Act of 2005 (title IX of Public Law 109-162; 119 Stat. 3080), the Violence Against Women Reauthorization Act of 2013, and any other program or activity funded in whole or in part with funds

| | | appropriated for grants, cooperative agreements, and other assistance administered by the Office on Violence Against Women." 34 U.S.C. § 12291(b)(13)(A) (emphasis added). |
|---|---|---|
| U.S. Department of Justice – (a) Office for Victims of Crime and (b) National Institute of Justice | FORGE (Dkt. 47-3 ¶ 7) NY LGBT Center (Dkt. 47-7 ¶ 14) | "There shall be a Senior Policy Advisor on Culturally Specific Communities within the Office of Justice Programs who shall, under the guidance and authority of the Assistant Attorney General of the Office of Justice Programs--(1) advise on the administration of **grants related to culturally specific (as defined in section 12291(a) of this title) services and contracts with culturally specific organizations**; … (6) **ensure access to grants and technical assistance for culturally specific organizations** and analyze the distribution of funding in order to **identify barriers for culturally specific organizations**." 34 U.S.C. § 10112(a) (emphasis added). "The **term 'culturally specific' means primarily directed toward racial and ethnic minority groups** (as defined in section 1707(g) of the Public Health Service Act (42 U.S.C. 300u-6(g))." 34 U.S.C.A. § 12291(a)(8) (emphasis added). |
| National Endowment for the Humanities | GLBT Historical Society (Dkt. 47-4 ¶ 14; Dkt. 56 ¶ 3) | "It is vital to a democracy to honor and **preserve its multicultural artistic heritage** as well as support new ideas, and therefore it is essential to provide financial assistance to its artists and the organizations that support their work." 20 U.S.C. § 951(10) (emphasis added). "The purpose of the [National Foundation on the Arts and the |

Humanities] shall be to develop and promote a broadly conceived national policy of support for the humanities and the arts in the United States, and for institutions which **preserve the cultural heritage of the United States** pursuant to this subchapter." 20 U.S.C. § 953(b) (emphasis added).

"In the administration of this subchapter no department, agency, officer, or employee of the United States shall exercise any direction, supervision, or control over the policy determination, personnel, or curriculum, or the administration or operation of any school or other non-Federal agency, institution, organization, or association." 20 U.S.C. § 953(c).

"The Chairperson … is authorized to enter into arrangements, including contracts, grants, loans, and other forms of assistance, to-- … (4) **initiate and support programs and research which** have substantial scholarly and cultural significance and that reach, or **reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community**; … In selecting individuals and groups of exceptional talent as recipients of financial assistance to be provided under this subsection, the Chairperson **shall give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented**." 20 U.S.C. § 956(c) (emphasis added).

App. B - 12

**APPENDIX C**
**PLAINTIFFS' TERMINATED GRANTS**

| Plaintiff | Federal Award ID Number | Grant Amount | Status | Defendant Agency | Grant Description |
|---|---|---|---|---|---|
| GLBT Historical Society | PG-300781-24 Ordenana Supp. Decl. Ex. A. | $10,000.00. Ordenana Supp. Decl. ¶ 3 & Ex. A. | Terminated April 2, 2025. Ordenana Supp. Decl. ¶ 9 & Ex. B. | National Endowment for the Humanities | This grant, issued as part of the American Tapestry initiative, was intended to support the purchase, shipping, and installation of preservation furniture for the storage and preservation of approximately 1,500 rare and unique LGBTQ archival posters within GLBT Historical Society's Dr. John P. De Cecco Archives and Special Collections. Ordenana Supp. Decl. ¶ 5. |
| SFAF | 1R0 1AI181732-01A1. TerMeer Supp. Decl. Ex. A. | $52,822.00. TerMeer Supp. Decl. ¶ 8 & Ex. B. | Terminated March 18, 2025.  TerMeer Supp. Decl. ¶ 9 & Ex. C. | Department of Health and Human Services (HHS) | To study the effectiveness of Doxy-PEP, a post-exposure prophylaxis to prevent bacterial |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | sexually transmitted infections like chlamydia, gonorrhea, and syphilis. TerMeer Supp. Decl. ¶ 5. |
| SFAF | B09SM085337 & B08TI083929. TerMeer Supp. Decl. Ex. D. | $125,000. TerMeer Supp. Decl. ¶ 14 & Ex. D. | Terminated March 24, 2025. TerMeer Supp. Decl. ¶ 19 & Ex. E. | Department of Health and Human Services (HHS) | To fund SFAF's work enhancing access and equity in substance use treatment services through strengthening the Treatment on Demand Coalition by organizing and working with other behavioral health recovery service providers to expand substance use treatment and address racial disparities in overdose and treatment outcomes in San Francisco. TerMeer Supp. Decl. ¶ 16. |
| LA LGBT Center | 1R01DA061345-01. Hollendoner Supp. Decl. ¶¶ 5, 8 & Exs. A, B. | $2,068,560 over eight years. Hollendoner Supp. Decl. ¶ 8. | Terminated March 24, 2025. Hollendoner Supp. Decl. ¶ 14 & Ex. C. | Department of Health and Human Services (HHS) | To study the intersection of race and substance use and HIV outcomes in Los Angeles |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | County under the project title: "Race & Place: The Impacts of Racial Inequality on Substance Use and HIV Outcomes in Los Angeles." Hollendoner Supp. Decl. ¶¶ 5, 7. |
| LA LGBT Center | 4R00DA055508-03 | $12,536. Hollendoner Supp. Decl. ¶ 21 & Ex. D. | Terminated March 21, 2025. Hollendoner Supp. Decl. ¶ 24 & Ex. E. | Department of Health and Human Services (HHS) | To investigate health disparities and outcomes among transgender and gender-diverse populations, focusing on substance use, mental health, and barriers to healthcare access to inform evidence-based interventions and improve public health strategies. Hollendoner Supp. Decl. ¶ 20. |