# EXHIBIT R-14

**Statement of Former Equal Employment Opportunity Commission (EEOC) Officials on Employer Diversity, Equity, and Inclusion Efforts**

**April 3, 2025**

Dear Legal Community:

On March 19, 2025, EEOC Acting Chair Andrea Lucas issued a document entitled "What You Should Know About DEI-Related Discrimination at Work" ("Acting Chair's document").[1]

The Acting Chair's document seems designed to convey the message that initiatives to advance diversity, equity, and inclusion ("DEI"), which the document does not define, are fraught with legal peril. This document ignores important aspects of applicable law, as well as the reality that proactive efforts are still needed in America's workplaces to provide equal opportunity for all employees and applicants. To the extent the Acting Chair's document chills such efforts, we believe it does a grave disservice to employers, their employees, and America's economy.

Under well-established legal principles discussed below, employers lawfully may – and indeed should – take proactive steps to identify barriers that have limited the opportunities of applicants and employees based on any protected characteristic. Properly constructed, such efforts are <u>not</u> discriminatory. To the contrary, they can help prevent and address the discrimination that continues to deny equal employment opportunities to qualified workers and applicants and prevents employers from utilizing the full talent of our communities.

**An Employer's "Interest in Diversity"**

Many employers recognize the importance of having a diverse and inclusive workforce. Research is clear that such workforces can increase the economic bottom line for companies and can enhance productivity and innovation across the board for all organizations.[2] In addition, it is well-established law that employers may express their interest in providing equal opportunity by having a policy that embraces diversity and by working to address barriers.[3]

---

[1] This document was issued by the Acting Chair without a Commission vote and thus represents her views. We therefore describe this document as the Acting Chair's Document.

[2] Examples include Katherine W. Phillips, *How Diversity Makes Us Smarter*, Scientific American (2014)(summarizing research on positive aspects of diversity on innovation, decision-making and productivity); McKinsey, *Diversity Matters Even More* (2023) (global data shows that companies with the largest representation of women and the highest level of ethnic diversity in executive leadership were nearly 40% more likely to financially outperform compared with the companies with the lowest levels of diversity – and that this gap has grown over time).

[3] *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599 (9th Cir. 2004) (goal of diversity policy to reduce sexual orientation discrimination is consistent with goals of civil rights laws); *Bernstein v. St. Paul Companies, Inc.*, 134 F. Supp. 2d 730, 739 (D. Md. 2001) ("A company's (or its CEO's) commitment to 'diversity,' if expressed in terms of creating opportunities for employees of different races and both genders, or fostering workplace tolerance, is not proof of discriminatory motive with respect to any specific hiring decision."); *Lutes v. Goldin*, 62 F. Supp. 2d 118, 131 (D.D.C.1999) (concern for ensuring equal

1

Unfortunately, the Acting Chair's document suggests that an employer having an *interest* in having a diverse workforce means that the employer will use illegal race and sex-based preferences to serve that interest.[4] That is simply not true. Employers can and do adopt effective and lawful mechanisms to support diversity by advancing equal opportunity for *all* employees, without the use of illegal preferences.

**Training to Promote Inclusion, Belonging, and Equal Opportunity**

Employers have deployed a wide range of training to prevent discrimination, including harassment in the workplace. Common workplace training teaches employees how to recognize, avoid, and report forms of harassment and discrimination based on protected characteristics. Other training provides employees with an opportunity to learn about different perspectives and experiences in the workplace. Recently, some skills-building training has focused on how to create respectful workplaces for everyone.[5]

Many types of training can help employers meet their legal obligation to prevent harassment and other forms of discrimination in the workplace.[6] Indeed, the EEOC has stressed in Commission-approved documents – which represent the agency's official position – the importance of training to advance this goal.[7]

Despite that precedent, the Acting Chair's document discourages employers from providing "DEI-related training" (a term that the document does not define) by raising the specter of exposure to hostile work environment liability because of the way in which

---

opportunity and removing barriers does not support a claim of discrimination when there is no evidence of any preference for one group over the other).

[4] Question 9 in the Acting Chair's document asks the following: "Can an employer justify taking an employment action based on race, sex, or another protected characteristic because the employer has a business necessity or interest in "diversity," including preferences or requests by the employer's clients or customers?" The document's answer is the following: "No. Employers violate Title VII if they take an employment action motivated—in whole or in part—by race, sex, or another protected characteristic. Title VII explicitly provides that a 'demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination.' . . . Title VII does not provide any 'diversity interest' exception to these rules."

[5] *See* Chai R. Feldblum & Victoria A. Lipnic, EEOC, *Select Task Force on the Study of Harassment in the Workplace*, at 23-30 (June 2016) (describing range of training and summarizing research on utility of training.)

[6] *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (discussing affirmative defense to harassment liability available where, among other things, an employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" such as by informing employees of internal anti-harassment policies).

[7] *See, e.g.,* EEOC, Amicus Brief in *Vavra v. Honeywell International, Inc.,* No. 23-2823 (7th Cir. Feb. 6, 2024) at 14-20; EEOC Strategic Enforcement Plan, Fiscal Years 2024-2028 at 18 (stating that "the EEOC will support employer efforts to implement lawful and appropriate diversity, equity, inclusion, and accessibility (DEIA) practices that proactively identify and address barriers to equal employment opportunity, help employers cultivate a diverse pool of qualified workers, and foster inclusive workplaces."); EEOC's Guidance on Race and Color Discrimination (Apr. 19, 2006), Section IX, *Proactive Prevention* (encouraging employers "to reduce the likelihood of Title VII violations and to address impediments to equal employment opportunity" through proactive measures such as conducting self-analyses and enhancing outreach).

2

the training is conducted. For example, the document states that liability could arise when the training is unwelcome, "depending on the facts." The document then states that "an employee may be able to plausibly allege or prove that a diversity or other DEI-related training created a hostile work environment."[8]

Facts *are* very important in this area. Indeed, it is rare for employees to meet the necessary legal standard to establish that a "DEI-related training" created a hostile work environment.

As the Acting Chair's document itself acknowledges, an unlawful hostile work environment hinges not on whether conduct or remarks make an employee uncomfortable, but on whether the conduct or remarks are based on a legally protected characteristic and are "so frequent or severe that a reasonable person would consider [them] intimidating, hostile, or abusive."[9] In fact, courts have been clear that an employee's general discomfort with a training focused on race, sex, or another protected characteristic is not sufficient to create a hostile work environment. That is because discomfort is not equivalent to harassment.

Most diversity training does not single out a specific group for criticism or allow inappropriate physical contact, as alleged in a few cases where the allegations were sufficient to allow plaintiffs to proceed on their claims of harassment based on training. In one case, the plaintiff survived a motion to dismiss because he alleged that women during a sexual harassment training touched his genitals during a simulation.[10] In another case, the plaintiff survived a motion to dismiss because he alleged that he was required to attend numerous conferences and trainings that "ascrib[ed] negative traits to white people or white teachers without exception and as flowing inevitably from their race," and had to endure a consistent barrage of negative comments about white people.[11] The Acting Chair's document would have been more helpful if it had explained to employers that their training should not include such approaches.[12]

---

[8] In response to question 10 regarding training, the Acting Chair's document states: "In discrimination cases involving anti-discrimination trainings, courts have ruled in favor of plaintiffs who present this type of evidence" of "how the training could be discriminatory – for example, in design or execution," "or, at the motion-to-dismiss stage, who make plausible allegations that explain how the training was discriminatory." The document's citation is to the Brief of EEOC as Amicus Curiae in Support of Neither Party, *Vavra v. Honeywell International, Inc.*, No. 23-2823 (7th Cir. Feb. 6, 2024) at 21. The Acting Chair's document does not reference the Guidance on Harassment voted on by the Commission and issued last year. [Enforcement Guidance on Harassment in the Workplace](#) (CVG 2024-1, April 29, 2024), which addresses training. Because the Guidance on Harassment was approved by a majority vote of the Commission after extensive public comment, it represents the Commission's official view.

[9] *See* Acting Chair's document, Response to Question 10.

[10] *Hartman v. Pena*, 914 F. Supp. 225 (N.D. Ill. 1995).

[11] *De Piero v. Pa. State Univ.*, No.23-cv-2281, 2024 WL 128209, at *7 (E.D. Pa. Jan. 11, 2024). After a full factual record was developed, the employer moved for summary judgment, which the court granted in March of this year. *De Piero v. Pa. State Univ.*, 2025 WL 723029 (E.D. Pa. March 6, 2025).

[12] The Acting Chair's document does not cite a number of cases where plaintiffs' alleged harassment claims based on trainings lost at a later stage of the case, when employers filed motions for summary judgment following development of the factual record through discover*y,* even after surviving a motion to dismiss. *Chislett v. New York City Dept. of Educ.,* 723 F. Supp.3d 285 (S.D.N.Y. 2024), *appeal docketed,*

3

**Employee Resource Groups**

Employee Resource Groups, Employee Business Groups, affinity groups or entities by other names are typically established to foster mutual support for groups of employees. These kinds of voluntary workplace employee resource groups can help employees thrive and do their best work.

The Acting Chair's document recognizes that employee resource groups must – and can – be implemented consistent with anti-discrimination law. But the language used in the document may unnecessarily heighten employers' concern about establishing groups that are formed around the goal of sharing common interests and experiences, including those that focus on issues of race, gender, ethnicity, religion, veteran status, sexual orientation, gender identity, or disability.[13]

Under the law, there is no prohibition on organizing voluntary employee resource groups to address common experiences and provide a supportive environment. To ensure these programs are fair and non-discriminatory, such groups should be open to all employees. For example, an employer may establish a group dedicated to supporting women in the workplace, but all employees – regardless of gender – should be permitted to join the group on the same terms. The group may restrict participation to those who support the objectives of the group in a manner that applies equally to all employees regardless of background. An employer must also apply the same approval process and criteria, including for material support, to employees who are interested in organizing an employee resource group that address common experiences of men or non-binary employees.

**A Positive Forward-Looking Framework for Employers**

It is important for employers to have guidance on a positive forward-looking framework for lawful ways to increase diversity and remove barriers to equal employment opportunity in their workplaces. Unfortunately, the Acting Chair's document is inadequate to that task. Accordingly, in addition to the legal efforts described above, we discuss below some other legally permissible efforts that can be a part of a comprehensive effort to promote equal opportunity.

---

24-972 (2d Cir. 2024); *Shannon v. Cherry Creek Sch. Dist.*, 2022 WL 4364151 (D. Colo. Sept. 21, 2022); *see also Young v. Colorado Dept. of Corrections,* 94 F.4th 1242 (10th Cir. 2024) (affirming district court's dismissal of harassment claim based on mandatory diversity training)*. See also* [Barrett v. Dep't of Agriculture](#), Appeal No. 2019005478 (Mar. 7, 2024) (EEOC ruling that the Department of Agriculture did not discriminate against an employee based on his religion when it did not exempt him from a mandatory training about the need to treat all customers and employees with courtesy and respect, including members of the LGBTQI+ community.)

[13]The Acting Chair's document says: "In the context of DEI programs, unlawful segregation can include limiting membership in workplace groups, such as Employee Resource Groups (ERG), Business Resource Groups (BRGs), or other employee affinity groups, to certain protected groups." A more complete statement would clarify that this means that membership in such groups should be open to all, but not that there is any restriction on establishing a voluntary group around a particular affinity.

4

Casting a Wide Recruitment Net

If employers continue to focus on the same small set of places to advertise job openings and recruit candidates or employ word-of-mouth methods, it will not be surprising if their applicant pool misses qualified talent. Prospective employees with relevant skills may not learn about the opportunities if they are not a part of these networks. This can result in a skewed applicant pool that leaves out talented candidates based on protected traits such as sex, race, national origin, religion, age, disability, veteran's status or other irrelevant factors like wealth and class. It also means that the employer may not receive applications from the full complement of qualified talent, which hinders that employer's ability to hire the best candidate for the job.

One way that employers can lawfully address this problem is to broaden their talent acquisition strategy and expand the range of sourcing channels in which they advertise their job listings and increase outreach to areas where they may not have previously recruited. These may include historically Black colleges and universities, women's colleges, smaller and local colleges and universities, community colleges, and vocational and trade schools, as appropriate for the skills needed for the job.

Expanded recruitment initiatives also may include reviewing the qualifications and selection criteria for a job or promotion and adjusting them if the employer concludes that a particular requirement creates a barrier to some qualified candidates while not actually being necessary to successful job performance. For example, an employer may decide that a four-year college degree is not necessary to perform a job, thus opening up that opportunity to people with vocational or on-the-job training or two-year college degrees.[14]

Collecting Workforce Data for Barrier Analysis

Another important best practice for employers is to examine their current workforce and applicant pool to ensure compliance with applicable civil rights laws. This means collecting and, more importantly, understanding a variety of demographic information about their employees and applicants.

Such data collection is crucial for employers to identify and correct any barriers to equal opportunity before those barriers result in a lawsuit.[15] Collecting and examining data in order to understand where there may be barriers to equal employment opportunity based on race, sex, or other characteristics protected by Title VII raises no legal concern. This includes evaluating hiring, promotion, and compensation systems to fairly

---

[14] *See* 42 U.S.C. §2000e-2. *See also* Equal Employment Opportunity Commission, Facts About Race/Color Discrimination.

[15] For the utility of demographic data, see EEOC's Race Discrimination Guidance. That Guidance explains that "while a racially diverse workforce cannot immunize an employer from liability for specific acts of discrimination, the more racially diverse the relevant part of the employer's workforce is, the less credible would be the claim of discrimination. Statistical evidence also is important in determining whether the employer has a systemic pattern or practice of discriminating…." (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978)).

5

treat all workers. Of course, the demographic data should be collected on a voluntary basis and kept separate from job application materials; individual level demographic information should not be shared with hiring officials or those involved with making employment selection decisions.[16]

**Moving Forward to Strengthen Equal Opportunity**

We are in a critical moment for our nation's journey toward equality for all. Keeping the doors of opportunity open to everyone, regardless of background, is fundamental to making the American Dream a reality in our workplaces. The practices we have shared here support all employees in reaching their potential. They help employers build healthy and respectful workplace cultures, break down stereotypes and favoritism, expand opportunity, and more strongly anchor employment decisions in merit and success. They also ensure that employers carry out the equal opportunity mandate of federal law.

Our federal civil rights offices and officials should not be intimidating or discouraging employers who are working to advance these goals. Instead, these offices and officials should endorse the lawful proactive steps to identify and address discrimination that we have discussed in this statement.

Signatories

/s/

Charlotte A. Burrows (Commissioner, 2015-2025; Chair, 2021-2025)

Chai R. Feldblum (Commissioner, 2010-2019)

Karla Gilbride (General Counsel, 2023-2025)

Christine Griffin (Commissioner, 2006-2009; Vice Chair, 2009)

Stuart J. Ishimaru (Commissioner, 2003-2012; Acting Chair, 2009-2010)

P. David Lopez (General Counsel, 2010-2016)

Peggy R. Mastroianni (Legal Counsel, 2011-2017)

Jocelyn Samuels (Commissioner, 2020-2025; Vice Chair 2021-2025)

Ellen Vargyas (Legal Counsel, 1994-2000)

Jenny R. Yang (Commissioner, 2013-2018; Vice Chair, 2014; Chair 2014-2017)

---

[16] See Lynn Clements, David Cohen and Victoria Lipnic, Workforce Data Considerations After DEI Order, Law 360 (February 27, 2025) (detailing considerations for continuing to collect workforce data.)