# EXHIBIT R-15

**Open Letter to the Federal Contractor Community
from Former U.S. Department of Labor Officials**

April 15, 2025

For over six decades, America has upheld a fundamental promise: when businesses work for our federal government, they commit to a higher standard – they must actively combat discrimination and create opportunities for all workers. In 1965, after the passage of the Civil Rights Act of 1964, President Lyndon B. Johnson issued Executive Order (EO) 11246 - Equal Employment Opportunity, prohibiting discrimination by federal contractors on the basis of race, color, religion, and national origin – later expanded to include sex, sexual orientation and gender identity.[1] In the 60 years since, through Republican and Democratic Administrations, this Executive Order has also required those who do business with the federal government to regularly review their employment practices for potential discrimination, and make good faith efforts to remedy any problems they identified. These federal contractors employ over 20 percent of the American workforce.

Compliance with EO 11246 did not involve race, gender, or other preferences or quotas. Rather, the implementing regulations promoted merit in hiring, compensation, and promotion practices, as well as compliance with bedrock civil rights law by ensuring qualified individuals were not excluded based on their background. These programs have expanded opportunities and fostered work environments where employees can reach their potential and drive innovation and organizational performance.

On the second day of the Administration, the Trump Administration issued EO 14173, which revoked EO 11246, gutting its protections.[2] Equally troubling, the Administration is using threats and intimidation to deter contractors from engaging in lawful actions to promote diversity, equity, inclusion, and accessibility (DEIA) initiatives.[3]

---

[1] President Johnson sought to ensure that the promise of non-discrimination in the Civil Rights Act of 1964 would lead to a meaningful expansion of economic opportunity, as he explained delivering a commencement address at Howard University in 1965. Heather Timmons, *Why LBJ signed executive order 11246 that Trump rescinded*, Reuters (Jan. 23, 2025), *available at* https://www.reuters.com/world/us/why-president-johnson-signed-executive-order-1965-that-trump-rescinded-2025-01-23/. For more about this history, see The Institute for Workplace Equality, *Executive Order 11246: 50 Years of Equality at Work*, https://www.youtube.com/watch?v=8JcPpBZYlxM.
[2] EO 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*. 90 Fed. Reg. 8633 (Jan. 21, 2025). EO 11246 was part of a long line of executive actions stretching back to 1941, supported by both Democratic and Republican administrations, to ensure taxpayer dollars were not used to discriminate based on race or other protected characteristics. Congress also passed laws addressing discrimination by federal contractors based on disability and veterans' status and those statutory frameworks remain in force.
[3] Jory Heckman, *Federal contractor watchdog office seeks to 'deter DEI' at firms working with agencies*, Federal News Network, (March 25, 2025), *available at* https://federalnewsnetwork.com/contracting/2025/03/federal-contractor-watchdog-office-seeks-to-deter-dei-at-firms-working-with-agencies/.

**Open Letter to the Federal Contractor Community from Former U.S. Department of Labor Officials**

As former officials of the U.S. Department of Labor's (DOL) Office of Federal Contract Compliance Programs (OFCCP), the federal agency responsible for enforcing EO 11246, and former Solicitors of Labor who supported that enforcement work, we write because decades of progress to create good jobs and fair merit-based workplaces are now at risk. We seek to help federal contractors and other employers navigate this complex environment, providing clarity about their options and obligations under the law.[4]

In implementing EO 14173, the new Director of OFCCP, Catherine Eschbach, issued troubling statements indicating a fundamental misunderstanding of the agency's work, describing OFCCP's past activities as significantly "out of step if not . . . contradictory to the nation's laws." She then announced plans to take steps she has no authority to take. She stated that the federal government is considering investigations and enforcement actions against federal contractors designed to "deter DEI programs or principles." She also proposes to review the affirmative action program documents contractors prepared and submitted when EO 11246 was in force, to identify potential investigation targets.[5]

Federal, state, and local civil rights laws, including Title VII of the Civil Rights Act of 1964, continue to protect America's workers, but President Trump's decision to abandon EO 11246's proactive enforcement program leaves employees who work for federal contractors more vulnerable to discrimination. The Administration's subsequent actions, including these statements by Director Eschbach, have also fueled widespread concern and uncertainty, leaving federal contractors – and other employers across the nation – unsure about their obligations under our civil rights laws. Many employers find themselves caught between long standing commitments to equal opportunity for all their employees and complex risks from multiple directions.

We write to explain why, despite the chaos and confusion, contractors should carefully weigh the risks of backing away from employment practices to promote equal opportunity for all. Conducting self-assessments, including data analysis to detect and prevent discrimination, has helped employers thrive by leveraging the full talent across America. This work also protects employers from liability by ensuring compliance with federal, state, and local anti-discrimination laws. OFCCP also carries out a Congressional mandate for DOL to provide equal opportunity for veterans and people with disabilities – and this mandate remains in effect.[6] Despite this clear Congressional

---

[4] This document contains general legal information and the views of the authors and is provided for educational purposes only. It is not legal advice. Readers should seek advice from qualified counsel for their specific situations.

[5] Heckman, *supra* note 3*, see also* OFCCP News Release, *US Department of Labor Appoints Catherine Eschbach as Director of the Office of Federal Contract Compliance Programs*
(March 24, 2025), *available at* https://www.dol.gov/newsroom/releases/ofccp/ofccp20250324.

[6] OFCCP is charged with enforcing Section 503 of the Rehabilitation Act of 1973, which requires contractors to promote and provide equal opportunity for qualified individuals with disabilities, and the Vietnam Era Veterans' Readjustment Act of 1974, which applies requirements to qualified protected veterans who work for federal contractors and subcontractors.

2

**Open Letter to the Federal Contractor Community from Former U.S. Department of Labor Officials**

requirement, DOL has halted any work by DOL employees to protect workers with disabilities and veterans to fulfill DOL's enforcement responsibilities.[7]

Continuing effective discrimination prevention programs is also fully lawful. As explained in more detail below, these Administration actions are contrary to well-established law. First, the President may not override Congressional civil rights mandates by executive order. Second, the Administration's coercive attempts to prevent contractors from engaging in good faith efforts to ensure equal opportunity improperly threaten due process and free speech protections. Third, there is no basis to retroactively impose liability now for contractors' past good faith efforts to comply with OFCCP's regulations. Indeed, President Trump cannot have it both ways, revoking EO 11246, but somehow still allowing the agency to investigate contractors and take enforcement action against their diversity, equity, inclusion, and accessibility programs.

Because the Administration's actions are legally unsound and harmful to workers, employers, and America's economy, we urge federal contractors to carefully evaluate how they can best achieve the equal opportunity commitments they have made through their diversity, equity, inclusion, and accessibility programs. These programs not only serve important business and risk management objectives, but also uphold fundamental civil rights protections and promote fair treatment and opportunity for all workers. At the end of this letter, we provide some specific recommendations concerning how employers can take legal and effective actions that promote these objectives.

**President Trump Unlawfully Targets Employers Over Their Diversity, Equity, Inclusion, and Accessibility Policies**

In his Executive Order, President Trump went beyond simply removing requirements for federal contractors and sought to "deter DEI programs or principles," using the vague and undefined terms "illegal DEI and DEIA policies." EO 14173 also stated an intention to "encourage the private sector to end illegal discrimination and preferences, including DEI" through enforcement actions, and to require federal contractors and grantees to certify that they had no "DEI" programs that would violate anti-discrimination law, without defining what was meant by "DEI."

On March 24, 2025, DOL's news release announcing the appointment of Catherine Eschbach as the new OFCCP Director stated, "President Trump made clear in his executive order on eliminating DEI that EO 11246 had facilitated federal contractors adopting DEI practices out of step with the requirements of our Nation's civil rights laws and that, with the recission of EO 11246, the President mandates federal contractors wind those practices down within 90 days."[8]

---

[7] Pursuant to Secretary's Order 03-2025 investigations have been "held in abeyance pending further guidance." *Available at* https://www.dol.gov/sites/dolgov/files/OPA/newsreleases/2025/01/Secretarys-Order-03-2025.pdf.
[8] OFCCP News Release, *supra* note 5.

3

**Open Letter to the Federal Contractor Community from Former U.S. Department of Labor Officials**

On that same day, to implement EO 14173, as reported in the media,[9] Director Eschbach went even further in attempting to force private employers to stop voluntary equal opportunity efforts. Director Eschbach sent an email to all staff proposing to turn OFCCP's entire mission on its head. She asserted that OFCCP will, among other things, identify potential "civil compliance investigations" to "deter DEI" – not limiting this to "illegal DEI" – and examine affirmative action program documents that were submitted to the agency in the past, looking for "unlawful discrimination" that could be the subject of investigations and enforcement.[10] She also threatened to use "all enforcement options" against contractors that did not "wind down" their own internal compliance and equal opportunity work – failing to recognize that employers may voluntarily continue these lawful efforts and that EO 14173 did not mandate the "winding down" of contractors' programs.[11] President Trump and Director Eschbach may not threaten or pursue federal enforcement against private employers for engaging in lawful diversity, equity, inclusion, and accessibility programs.

**President Trump and Director Eschbach Have No Authority to Forbid Lawful Equal Opportunity Programs by Federal Contractors**

The Administration's conduct violates constitutional and statutory law for three significant reasons. First, Congress has already established standards for voluntary equal opportunity programs through statutory law, as interpreted by the Supreme Court, and no Executive Order can lawfully contradict them. Second, the government may not pursue enforcement actions against employers that complied in good faith with the laws and regulations that existed prior to January 20, 2025, by sanctioning them based on their previously submitted affirmative action programs. Third, the threats of both prospective and retrospective enforcement – including requiring certifications – raise substantial constitutional and other concerns, from violations of due process and the First Amendment, to the utter absence of any authority for OFCCP to take these actions after the revocation of EO 11246.

---

[9] Heckman, *supra* note 3.

[10] Her email stated she intended to (1) "advise the Secretary of measures to deter DEI programs or principles by identifying potential civil compliance investigations;" (2) examine "federal contractors' previously submitted affirmative action plans to determine whether they indicate the presence of longstanding unlawful discrimination and whether it is appropriate for OFCCP to undertake any investigation and enforcement actions or refer the matter," and (3) "verify all federal contractors have wound down their use of affirmative action plans and implement all enforcement options to ensure President Trump's executive order has been complied with."

[11] EO 14173 states that "[f]or 90 days from the date of this order, Federal contractors may continue to comply with the regulatory scheme in effect on January 20, 2025." 90 Fed. Reg. 8633, § 3(iv)(b)(i) (Jan. 21 2025). Nowhere in the executive order does it reference a mandate to "wind down" programs or authorize OFCCP to enforce the EO.

**Open Letter to the Federal Contractor Community from Former U.S. Department of Labor Officials**

### 1. President Trump may not change legal standards established by Congress, as interpreted by the Supreme Court, through an Executive Order

President Trump cannot override any substantive federal law concerning employment discrimination via Executive Order. Title VII continues to prohibit discrimination in employment because of race, sex, and other protected characteristics. Decades of judicial precedent affirm employer efforts to lawfully promote equal opportunity in the workplace through voluntary practices. The Administration's efforts to suggest that diversity, equity, inclusion, and accessibility practices are inherently discriminatory do not have the force of law – and there is ample existing law to the contrary.

It is well-established law that employers may express their interest in providing equal opportunity through having a general diversity policy and working to address barriers to equality.[12] The Supreme Court has recognized that employers have an "affirmative obligation to prevent violations" and that Title VII provides a catalyst for employers to self-evaluate their employment practices to eliminate discrimination.[13] In fact, where employers have a lack of diversity in their workforce, as compared to the qualified labor pool in their geographic area, proactive recruitment efforts can represent a good-faith effort to provide equal opportunity. Well-crafted diversity, equity, inclusion, and accessibility policies and practices, including utilizing tools to help identify and address barriers to equal opportunity, promote compliance and can help reduce the risk of a discrimination lawsuit.[14] Indeed, as one federal appellate judge considering a challenge to EO 14173 recently stated, the Administration's Executive Orders on DEIA "do not purport to establish the illegality of all efforts to advance diversity, equity or inclusion,

---

[12] *Peterson v. Hewlett-Packard Co.*, 358 F. 3d 599 (9th Cir. 2004) (goal of diversity policy to reduce sexual orientation discrimination is consistent with goals of civil rights laws); *Bernstein v. St. Paul Companies, Inc.*, 134 F. Supp. 2d 730, 739 (D. Md. 2001) ("A company's (or its CEO's) commitment to 'diversity,' if expressed in terms of creating opportunities for employees of different races and both genders, or fostering workplace tolerance, is not proof of discriminatory motive with respect to any specific hiring decision."); *Lutes v. Goldin*, 62 F. Supp. 2d 118, 131 (D.D.C.1999) (concern for ensuring equal opportunity and removing barriers does not support a claim of discrimination when there is no evidence of any preference for one group over the other).

[13] *See, e.g., Faragher v. City of Boca Raton,* 524 U.S. 775, 806 (1998) (recognizing employers' "affirmative obligation to prevent violations" and citing favorably to EEOC guidance advising employers to "take all steps necessary to prevent" harassment); *Albemarle Paper Co. v. Moody,* 422 U. S. 405, 417-418 (1975) (observing that backpay is the catalyst that "causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history").

[14] Recently, the state Attorneys General of Massachusetts, Illinois, Arizona, California, Connecticut, Delaware, Hawaii, Maine, Maryland, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, and Vermont issued Multi-state Guidance on the importance of continuing lawful diversity, equity, and inclusion programs to prevent discrimination. Multistate Guidance Concerning Diversity, Equity, Inclusion, and Accessibility Employment Initiatives from the Commonwealth of Massachusetts and State of Illinois Offices of Attorney General and others (Feb. 13, 2025), *available at* https://www.mass.gov/doc/multi-state-guidance-concerning-diversity-equity-inclusion-and-accessibility-employment-initiatives/download.

5

**Open Letter to the Federal Contractor Community from Former U.S. Department of Labor Officials**

and they should not be so understood."[15] Any enforcement threat in the Administration's new Executive Order may apply only to conduct that independently violates existing federal anti-discrimination law. The Administration cannot alter any existing obligations under anti-discrimination laws, or the decades of case law interpreting them.[16]

### 2. The Administration may not retroactively impose liability for complying with prior federal requirements

The Administration may not punish federal contractors for their past actions to comply in good faith with federal law and regulations as they existed at the time. The OFCCP Director proposes to embark on a fishing expedition reviewing the data and documents OFCCP has collected over the years to look for so-called "discriminatory DEI," and then threatens to have OFCCP undertake investigations or refer these matters to other enforcement agencies. This is clear overreach and a potential constitutional due process violation.

Fundamental principles of due process require that contractors be given fair notice that their conduct may violate the law.[17] Here, not only was there no notice, the government itself had previously *required* contractors to engage in the very practices to proactively assess potential barriers to equal opportunity that it now seeks to deter. The government may not find contractors in violation of the law for acting in clear reliance on the legal standards as the government had defined them at the time.[18] Longstanding OFCCP regulations already forbade discrimination, did not require balancing the workforce, and did not permit racial preferences or quotas.[19] Nor is there any basis to find contractors' prior regulatory compliance efforts are now discriminatory.

### 3. The threats of enforcement and certification requirements raise serious constitutional and other legal issues, including the absence of any underlying agency authority

Trump's EO 14173 also improperly threatens investigations and enforcement actions against employers for engaging in "illegal DEI" – even outside of contractors' prior affirmative action program documents. Director Eschbach has gone even further, announcing an unqualified effort to "deter DEI."[20] Seeking to force private entities to abandon lawful efforts to ensure compliance with Title VII is a misuse of enforcement power that exceeds the President's legitimate enforcement authority, and raises significant constitutional concerns.

---

[15] *NADOHE v. Trump,* No. 25-1189, (4th Cir., Mar. 14, 2025), Judge Harris, concurring.
[16] *See Chicago Women in Trades v. Trump*, No. 25 C 2005 (N.D. Ill., Mar. 27, 2025).
[17] *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.")
[18] *See United States v. Pennsylvania Industrial Chemical Corp.*, 411 US 655 (1973).
[19] *See* 41 CFR 60-2.16.
[20] *Supra* note 10.

6

**Open Letter to the Federal Contractor Community from Former U.S. Department of Labor Officials**

The proposed investigations and enforcement actions are based on vague and undefined standards, raising Fifth Amendment due process concerns.[21] Due process requires the government to provide fair notice and clear enforcement standards so that "regulated parties. . . know what is required of them so they may act accordingly [and] . . . so that those enforcing the law do not act in an arbitrary or discriminatory way."[22] Contractors are currently confused about what is required of them and have no way to know whether a particular policy or practice will be deemed "illegal DEI" or otherwise targeted and lead to a government investigation.

Further, under the Fourth Amendment, courts have held that OFCCP may only pursue a targeted investigation into a contractor if the government has "specific evidence of an existing violation."[23] Investigating employers for engaging in lawful efforts to promote equal opportunity through diversity, equity, and inclusion initiatives does not constitute specific evidence of an existing violation.

The enforcement threats also have the potential to chill speech in violation of the First Amendment, by improperly discouraging employers from promoting values of diversity, equity, inclusion, and accessibility.[24] Although the federal government has chosen to dismantle diversity, equity, inclusion, and accessibility programs in its own workplaces at its own peril, the government cannot prohibit private employers from engaging in fully lawful strategies to advance equal opportunity for all.

---

[21] *See NADOHE v. Trump*, Case No. 1:25-cv-00333-ABA (D.Md., Feb. 21, 2025) (issuing a preliminary injunction against the enforcement provisions of EO 14173 based on potential to violate Fifth Amendment Due Process Clause). While the Fourth Circuit has stayed enforcement of this facial challenge pending appeal, two members of the panel each wrote separately noting the potential for infringement of constitutional rights, including Due Process, depending on how the Administration sought to apply EO 14173 in practice. *NADOHE v. Trump,* 4th Cir.*, supra* note 15.
[22] *F.C.C. v. Fox Television,* 567 U.S. at 253.
[23] *See, e.g., Bank of Am. v. Solis,* No. CV 09-2009 (EGS), 2014 WL 4661287, at *8 (D.D.C. July 2, 2014) (recognizing that OFCCP must meet a probable cause standard for an onsite investigation and either show "specific evidence of an existing violation" or a neutral scheduling plan (citing *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 320 (1978)); *Beverly Enters., Inc. v. Herman,* 130 F. Supp. 2d 1, 13 (D.D.C. 2000) (stating that probable cause standard of "specific evidence of an existing violation" has been interpreted to require that the proposed search be: (1) authorized by statute; (2) properly limited in scope and (3) initiated in a proper manner).
[24] *NADOHE v. Trump,* D.Md., *supra* note 21*; Chicago Women in Trades v. Trump*, *supra* note 16 (issuing a temporary restraining order against the enforcement and certification provisions of EO 14173 based on potential chilling effect on speech). In the Fourth Circuit opinion on the government's motion for a stay in the *NADOHE* case, two judges noted in their concurrences their concerns about potential free speech implications of EO 14173. As Judge Diaz stated, "Under the most basic tenets of the First Amendment, there should be room for open discussion and principled debate about DEI programs, and whether its corresponding values should guide admissions, hiring, scholarship, funding, or workplace and educational practices." *NADOHE*, 4th Cir., *supra* note 15*,* Judge Diaz, concurring. And Judge Harris said, "Agency enforcement actions that go beyond the Orders' narrow scope may well raise serious First Amendment and Due Process concerns, for the reasons cogently explained by the district court." *NADOHE*, 4th Cir., *supra* note 15, Judge Harris, concurring.

**Open Letter to the Federal Contractor Community from Former U.S. Department of Labor Officials**

Further, after the revocation of EO 11246, OFCCP has no authority to pursue investigations or enforcement actions against contractors for "discriminatory DEI" based on race, sex, or any of the other categories that EO 11246 covered. President Trump revoked EO 11246. The DOL Secretary's Order 03-2025 states: "DOL no longer has any authority under rescinded EO 11246" and directed all employees "to cease and desist all investigative and enforcement activity under the rescinded EO 11246 and the regulations promulgated under it,"[25] which leaves OFCCP unable to enforce anti-discrimination standards, other than those related to veterans' status or disability. Without the underlying authorization, this enforcement would be entirely *ultra vires*.

In addition, EO 14173 states that, "[f]or 90 days from the date of this order, Federal contractors may continue to comply with the regulatory scheme in effect on January 20, 2025."[26] This does not mean it is or will become unlawful for contractors to continue their voluntary efforts to detect and prevent discrimination, simply because such efforts previously were required by OFCCP's regulations. Moreover, the government cannot prohibit private entities from implementing lawful policies and practices of their choosing. Accordingly, there is no authority for OFCCP to "verify all contractors have wound down" their programs and threaten enforcement.

Finally, the Administration may not require contractors to certify compliance without setting forth clear standards for what constitutes "illegal DEI" and undertaking proper federal administrative procedures. At least two courts have already identified constitutional and other problems with the certification requirement.[27] Indeed, the Supreme Court has held that requiring entities receiving federal funds to adopt the government's viewpoint as their own, by certifying they oppose a particular policy, is an unconstitutional condition that violates First Amendment rights.[28] In addition, no government agency or contracting office may issue a certification form to contractors as a condition of continuing their federal contracts, without ensuring compliance with well-established procedures under the Paperwork Reduction Act.[29]

---

[25] Secretary's Order 03-2025, *supra* note 7.
[26] 90 Fed. Reg. 8633, § 3(iv)(b)(i) (Jan. 21 2025).
[27] *NADOHE v. Trump, supra* note 21*; Chicago Women in Trades v. Trump, supra* note 16.
[28] *AID v. Alliance for Open Society Intern.*, 570 U.S. 205 (2013). The *NADOHE* District Court applied this precedent in enjoining the certification provision, noting the Supreme Court's concern that it would be improper for the government to use the threat of denying federal funding to compel speech that was unrelated to the purpose of the funding. Here, requiring a federal contractor who provides goods or services to adopt the government's view of diversity, equity, inclusion, and accessibility as harmful and discriminatory would clearly impact protected conduct that likely is not related to the underlying purpose of the contract.
[29] Contractors are not required to respond to government forms and other requests for data and information that have been sent in the same form to 10 or more people, and that have not been approved by the Office of Management and Budget according to the procedures set forth at 5 C.F.R. Part 1320 *et seq.*

**Open Letter to the Federal Contractor Community from Former U.S. Department of Labor Officials**

**Federal Contractors Should Continue to Use Lawful and Effective Tools to Ensure Equal Opportunity**

As explained above, the effort to forbid federal contractors from taking proactive measures that had previously been used to comply with EO 11246's implementing regulations is fundamentally at odds with Title VII and the Constitution. Nor should federal contractors voluntarily agree to abandon these powerful tools that help employers attract and retain qualified talent and foster innovation and business performance – as well as provide sound risk management.[30]

Leading employers, including contractors, regularly conduct voluntary self-evaluations to prevent discrimination, such as analyzing workforce data, setting aspirational benchmarks, conducting barrier analyses, and evaluating the impact of their employment practices. There are critical reasons to continue these practices to root out discrimination and promote equal opportunity. Rather than discouraging effective efforts to prevent discrimination, our federal civil rights officials should actively encourage and amplify such practices to advance our nation's shared commitment to equal opportunity and human dignity in the workplace. Below we share some reasons these programs remain essential, and some design recommendations to promote effective and lawful practices. Indeed, high-performing federal contractors are continuing to prioritize this work, recognizing that inclusive practices drive measurable outcomes – including operational excellence and competitive advantage.

1. **Proactive Barrier Analysis Remains Fully Lawful and Essential to Prevent Discrimination**

Barrier analysis is a self-assessment approach used to identify and remove obstacles that prevent equal employment opportunity. It investigates unusual patterns in an employer's employment practices to evaluate whether particular employment practices provide fair opportunities to everyone, and do not favor or unfairly disadvantage individuals because of a protected basis. It enables employers to spot potential liability risks and also ensures that decisions about hiring, pay, and promotion rely on legitimate job-related qualifications.

Examples of barrier analysis include examining a hiring process to understand high rejection rates for qualified candidates from certain backgrounds, such as ensuring that interview procedures accurately assess job related criteria and that job descriptions identify and remove unnecessary requirements. It can also include analyzing high turnover rates for particular workers to determine potential driving factors. Pay equity analysis is another form of proactive analysis to make sure that pay practices are fair and non-discriminatory. Where the analysis shows potential problems, it is critical to understand the root cause of the barrier and how to remove it. This sometimes involves

---

[30] Letter of State Attorneys General, *supra* note 14; National Institute for Workers' Rights (NIWR), *NIWR and NELA Warn Corporations Of Increased Liability Risk In Rolling Back Diversity, Equity And Inclusion Programs* (April 8, 2025), *available at* https://niwr.org/2025/04/08/release-risk-eliminating-dei-programs.

9

**Open Letter to the Federal Contractor Community from Former U.S. Department of Labor Officials**

more detailed data analysis, as well as interviews and listening sessions with employees and managers and review of policy documents or survey data.[31]

Employers that decline to track applicant flow data and analyze their hiring and recruitment practices for potential barriers, or fail to assess pay equity or other practices, face an increased risk of liability.[32] They may miss critical insights into policies or practices that are unlawfully excluding or negatively affecting qualified workers and thus, they cannot take steps to address them.

## 2. Collecting and Analyzing Workforce Data

OFCCP's regulations required federal contractors to collect and analyze applicant flow data as well as workforce demographic data. This allows contractors to ensure they are fully utilizing the available workers in their geographic area who have the skills and abilities to do the job.

Notwithstanding the revocation of EO 11246, to comply with federal law, covered employers, including federal contractors, should continue to collect and analyze applicant flow and workforce data. Title VII requires that employers "make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed."[33] Collecting applicant flow and workforce data is a critical part of determining whether an employer has unlawful employment practices. In 2008, during President George W. Bush's Administration, the legal counsel of the U.S. Equal Employment Opportunity Commission (EEOC) issued an informal discussion letter expressly stating that "the EEOC's regulations require companies to maintain, and have available for inspection, data by identifiable race, sex, and ethnic group for all job applicants."[34] The letter explained that this data was "necessary for employers and the EEOC to determine if discrimination has occurred."[35] EEOC regulations instruct employers to provide that the records are kept separate from the employee's other

---

[31] For an example of this approach, *see* RAND, Miriam Matthews, et al, *Unequal Opportunity: Barriers to Employment in the Department of Defense Civilian Workforce, available at* https://www.rand.org/pubs/research_briefs/RB10017.html.

[32] An employment practice violates Title VII where it unjustifiably screens out employees on the basis of race, gender or other protected characteristics. 42 U.S.C. §2000e-2(k); *Griggs v. Duke Power Co.*, 401 US 424, 431 (1973) ("What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.")

[33] Title VII, 42 U.S.C. § 2000e-8(c).

[34] EEOC Informal Discussion Letter dated Nov. 18, 2008, *available at* https://www.eeoc.gov/foia/eeoc-informal-discussion-letter-200 (emphasis added); *see also* Title VII, §. 2000e-8(c), *citing* 29 C.F.R. § 1607.4A.

[35] *Id.; see also* EEOC Pre-Employment Inquiries and Race, *available at* https://www.eeoc.gov/pre-employment-inquiries-and-race (explaining that an employer may request information about an applicant's race where it has a legitimate business need, such as "to track applicant flow").

**Open Letter to the Federal Contractor Community from Former U.S. Department of Labor Officials**

personnel information, and that the employer does not make the information available to those responsible for employment decisions.[36]

For decades, EEOC has collected workforce data by job category from employers with more than 100 employees for enforcement, self-assessment, and research.[37] In addition, several state laws require employers to track demographic data for purposes of pay data reporting.[38] Analyzing current workforce data is a critical strategy to assess whether promotion, assignment, pay, and other policies are compliant with federal, state, and local civil rights requirements.[39]

### 3. <u>Tracking Progress Through Well-Crafted Benchmarks</u>

Some employers use benchmarking or aspirational goal setting to monitor for potential discrimination in recruitment, hiring, promotion, and other practices. OFCCP regulations supported this practice. Even in the absence of federal mandates it remains a useful tool for employers. Well-crafted benchmarks or aspirational goals reflect the reasonable expectation that under a fair and open process, qualified individuals of all backgrounds will apply and be selected, and there will not be any significant patterns that favor one group over others. Where there are unexpected discrepancies, this provides an indicator to investigate further to determine if there may be artificial barriers that exclude qualified workers.

An appropriate benchmark helps employers to assess their full utilization of the qualified labor pool in their geographic area. Under existing law, these goals or benchmarks must not be mandatory or inflexible quotas that dictate the selection of a certain number of people from specific demographic groups.[40] Benchmarks should be based on an analysis of the qualified, available labor pool. Setting realistic goals, grounded in what it takes to be successful in the job and where the job is located, helps to make sure an employer's benchmarks advance its equal opportunity commitment.[41] Employers should also establish safeguards to make sure hiring and promotion decisions focus on job-related skills and abilities so that decisions remain merit-based, and do not exclude qualified workers because of a protected characteristic. Training and guidance for managers should emphasize that their individual decisions about particular candidates

---

[36] 29 C.F.R. § 1602.13.
[37] 29 C.F.R. 1602.7.
[38] *See, e.g.*, California Government Code § 12999; Illinois, Equal Pay Act amendments requiring employers to obtain equal pay registration certificates, 820 ILCS 112, Sec. 11; Mass. Gen. Laws ch. 141 (2024). *See also* New Jersey S. Res. 104, 2018 Leg., 218th Sess. (NJ. 2018), which applies to entities that contract with the state.
[39] *See* Lynn Clements, David Cohen and Victoria Lipnic, *Workforce Data Considerations After DEI Order, Law 360* (February 27, 2025) (detailing considerations for continuing to collect workforce data.)
[40] *Ricci v. DeStefano,* 557 U.S. 557, 583 (2009); *Richmond v. JA Croson*, 488 U.S. 469, 499 (1989).
[41] *Johnson v. Transportation Agency, Santa Clara Cty.*, 480 US 616, 632 (1986).

11

**Open Letter to the Federal Contractor Community from Former U.S. Department of Labor Officials**

should be confined to their qualifications and the requirements of the job, and that race, gender or other protected characteristics should not be considered in those decisions.[42]

Setting benchmarks in this way, and pursuing aspirations to expand opportunity, are not quotas and are not discriminatory.[43] They can help employers evaluate their practices to ensure there are no unfair limitations in how they utilize talent.

**OFCCP's History and Impact Show the Harm of These Unlawful Actions**

As former DOL OFCCP and Office of the Solicitor officials, we categorically reject Director Eschbach's claims that the work of OFCCP and EO 11246 itself "facilitated" the adoption of so-called discriminatory "DEI." This deeply misunderstands the history and impact of the agency and its work.

EO 11246 and its regulatory framework not only forbade discrimination but also went further and required contractors to take steps to open job opportunities to all, expand recruitment and outreach, ensure equal pay, and remove barriers in hiring, promotion and other employment opportunities, so that qualified workers were not disadvantaged because of favoritism, stereotypes, and other forms of bias due to their backgrounds. OFCCP conducted compliance evaluations to assess whether federal contractors were meeting their obligations under its regulations. OFCCP's regulations specifically barred quotas, preferences, and set asides.[44]

OFCCP and EO 11246 filled key gaps in federal civil rights protections, complementing the work of EEOC. As part of OFCCP's compliance evaluations of contractors, OFCCP reviewed hiring and pay data and information about EEO policies, and went onsite to talk with workers, to root out patterns of discrimination that may not otherwise come to light. Often workers do not have information about who was hired, what colleagues are paid, or how they are treated. Without this information, workers will not have the evidence of discrimination they need to support a charge of discrimination with the EEOC, which does not have authority to conduct routine compliance reviews of

---

[42] *See supra* note 12*; see also, e.g., Mlynczak v. Bodman*, 442 F. 3d 1050, 1054 (7th Cir. 2006) ("while [the goals] stress active recruitment of women and minority candidates, they do not contain quotas, nor do they authorize management to give preference to less-qualified female or minority applicants for jobs or promotions. Instead, the Chicago DOE office is bound by the rules in the DOE Merit Promotion Policy, under which selecting officials may not make a hiring or promotion decision based on race, color, sex, national origin, age, or disability.").

[43] *Christensen v. Equitable Life Assur. Soc. of US*, 767 F. 2d 340, 344 (7th Cir. 1985) (fact that employer had adopted goals for recruiting Black employees into executive positions not evidence of discrimination where there was no evidence it affected the decisions about plaintiff); *Reed v. Agilent Technologies, Inc.*, 174 F. Supp. 2d 176, 186 ( D. Del. 2001) (the mere existence of a policy promoting diversity awareness is not evidence of discrimination . . . evidence regarding the aspirational purpose of an employer's diversity policy, and its intent to ameliorate any underutilization of certain groups, is not sufficient); *Lutes*, 62 F. Supp. 2d at 132 (existence of affirmative action plan not evidence of discrimination against individual where plan not considered by decision-makers).

[44] 41 CFR 60-2.16.

**Open Letter to the Federal Contractor Community from Former U.S. Department of Labor Officials**

employers as OFCCP did. Finally, the regulatory requirement that federal contractors regularly review their practices and workforce data, and take steps to reduce bias and inequality, added another layer of protection for these workers.

As a result of this proactive enforcement program, OFCCP has improved the lives of American workers. From desegregating workplaces, to expanding opportunities for all in hiring and promotion, to ensuring equal pay, to uncovering workplace harassment, the agency has promoted equal employment opportunity for all employees: people of color and white individuals; women and men; LGBTQ individuals and those of all gender identities and sexual orientations; veterans; people with disabilities; and employees of all religious backgrounds. OFCCP has also helped federal contractors advance their equal opportunity commitments through technical assistance and engagement.

From 2014 to 2024, OFCCP recovered over $260 million in lost wages for over a quarter of a million employees and job seekers impacted by discrimination. This includes providing workers with over $107 million in back and front pay to rectify pay discrimination. In addition to financial remedies, OFCCP also helped workers of all backgrounds obtain jobs and raises. During this same period, OFCCP obtained over 22,000 job opportunities and salary adjustments for workers to remedy discrimination. Contrary to the Administration's suggestions of unequal enforcement, OFCCP had for decades pursued and obtained recoveries on behalf of all workers - including white men.

Despite OFCCP's long track record of success opening doors to opportunity, President Trump has now abandoned this critical mission. It has also been reported that OFCCP will soon lose possibly hundreds of highly talented and experienced staff who have dedicated their lives to helping workers around the country. The loss of this deep institutional knowledge about compliance assistance and equal opportunity would harm both employers and workers alike. While each past Administration has made changes to the OFCCP enforcement program to reflect Presidential policy priorities and often to expand protections, no prior President – Republican or Democrat – had ever before walked away from our nation's commitment to equal opportunity for all.

Instead, this Administration is weaponizing tools intended for civil rights enforcement against contractors that simply wish to voluntarily deploy practices that have helped them recruit, retain, and fully utilize America's talent. The Administration cannot lawfully coerce the private sector into adopting this Administration's view of diversity, equity, inclusion, and accessibility programs. Nor should it take away effective tools that foster innovation through diverse perspectives and create workplaces where all employees can fully contribute.

**Open Letter to the Federal Contractor Community from Former U.S. Department of Labor Officials**

America's enduring promise is that talent and effort – not background or origin – should determine one's path. We urge you to stand firm in your commitments to lawful diversity, equity, inclusion, and accessibility practices that promote civil rights compliance, true merit, and a strong economy.

Signed, /s/

Pamela Coukos, OFCCP Senior Advisor, 2011-2016

Donna Lenhoff, OFCCP Senior Civil Rights Advisor, 2011-2017

Seema Nanda, Solicitor of Labor, 2021-2025

Patrick O. Patterson, OFCCP Deputy Director, 2014-2017

Maya Raghu, OFCCP Deputy Director, Policy, 2021-2023

Dariely Rodriguez, OFCCP Chief of Staff, 2021-2022

Patricia A. Shiu, OFCCP Director, 2009-2016

M. Patricia Smith, Solicitor of Labor, 2010-2017

Shirley J. Wilcher, Deputy Assistant Secretary for OFCCP, 1994-2001

Jenny R. Yang, OFCCP Director, 2021-2023