1
2
3
4          UNITED STATES DISTRICT COURT
5          NORTHERN DISTRICT OF CALIFORNIA
6

| | |
|---|---|
| SAN FRANCISCO A.I.D.S. FOUNDATION, et al., | Case No. 25-cv-01824-JST |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, et al., | Re: ECF No. 47 |
| Defendants. | |

Within the first two days of taking office in January 2025, President Trump issued two Executive Orders aiming to roll back diversity, equity, and inclusion ("DEI") programs within the government and private sector as well as an Executive Order targeting initiatives promoting "gender ideology," or the idea that one can identify as a gender identity different from one's sex assigned at birth. Plaintiffs[1] are a group of nonprofit organizations that provide healthcare, social services, and advocacy for LGBTQ[2] communities—many specifically serving transgender individuals—and that rely heavily on federal funding to carry out their missions. They move for a preliminary injunction enjoining nine provisions of those Executive Orders. The Court will grant the motion in part and deny it in part.

Of the nine Challenged Provisions, Plaintiffs have demonstrated that they likely have standing to challenge: (1) a provision requiring them to certify that they do "not operate any

---

[1] Plaintiffs are Baltimore Safe Haven Corp ("BSH"); Bradbury-Sullivan LGBT Community Center ("Bradbury-Sullivan"); FORGE, Inc. ("FORGE"); Gay Lesbian Bisexual Transgender Historical Society ("GLBT Historical Society"); Los Angeles LGBT Center ("LA LGBT Center"); Lesbian and Gay Community Services Center, Inc. d/b/a The LGBT Community Center ("NY LGBT Center"); Prisma Community Care ("Prisma"); San Francisco Aids Foundation ("SFAF"); Asian and Pacific Islander Wellness Center, Inc. d/b/a San Francisco Community Health Center ("SFCHC").

[2] As used in this Order, LGBTQ stands for lesbian, gay, bisexual, transgender, and queer.

United States District Court
Northern District of California

programs promoting DEI that violate any applicable Federal anti-discrimination laws" (the "Certification Provision"); (2) a provision directing agencies to terminate funding for all "'equity-related grants or contracts" (the "Equity Termination Provision"); and (3) two provisions commanding agencies to terminate funding for any programs that "promote gender ideology" (the "Gender Termination Provision" and "Gender Promotion Provision").

These three funding provisions reflect an effort to censor constitutionally protected speech and services promoting DEI and recognizing the existence of transgender individuals.  These provisions seek to strip funding from programs that serve historically disenfranchised populations in direct contravention of several statutes under which Plaintiffs receive funding.  Plaintiffs have therefore demonstrated a likelihood of success on the merits that these provisions violate their rights under the First Amendment, Fifth Amendment, and the Separation of Powers.  Plaintiffs, however, have not demonstrated that they likely to succeed in their challenge to the Certification Provision because they have not shown at this juncture that the provision goes beyond targeting DEI programs that violate federal antidiscrimination law.

While the Executive requires some degree of freedom to implement its political agenda, it is still bound by the Constitution.  And even in the context of federal subsidies, it cannot weaponize Congressionally appropriated funds to single out protected communities for disfavored treatment or suppress ideas that it does not like or has deemed dangerous.  It further cannot do so in such a vague manner that all federal grantees and contractors are left to wonder what activities or expression they can engage in without risking the funding on which they depend.

Absent injunctive relief, Plaintiffs face the imminent loss of federal funding critical to their ability to provide lifesaving healthcare and support services to marginalized LGBTQ populations.  This loss not only threatens the survival of critical programs but also forces Plaintiffs to choose between their constitutional rights and their continued existence.

Accordingly, the Court grants Plaintiffs' motion to enjoin Defendants from enforcing the Equity Termination Provision, Gender Termination Provision, and Gender Promotion Provision against them.   The Court addresses the parties' arguments and explores the Court's reasoning for granting Plaintiffs' motion in part and denying it in part more fully below.

## I.    BACKGROUND

### A.    The Executive Orders

On January 20, 2025, President Donald J. Trump signed Executive Order No. 14168, 90 Fed. Reg. 8650 (Jan. 20, 2025), "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Order").  That same day, he also signed Executive Order 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025), "Ending Radical and Wasteful Government DEI[3] Programs and Preferencing" ("DEI-1 Order").  On January 21, President Trump signed Executive Order 14173, 90 Fed. Reg. 8633, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" ("DEI-2 Order") (collectively, "Challenged Orders").

Plaintiffs move to enjoin the enforcement of the following provisions of the Challenged Orders against them:  Section 3(e) of the Gender Order (the "Gender Termination Provision"); Section 3(g) of the Gender Order (the "Gender Promotion Provision"); Section 4(d) of the Gender Order (the "Intimate Spaces Provision"); Section 2(b)(i) of the DEI-1 Order (the "Equity Termination Provision"); Section 2(b)(ii)(C) of the DEI-1 Order (the "List Provision"); Section 3(c)(ii) of the DEI-2 Order (the "DEIA Principles Provision"); Section 3(c)(iii) of the DEI-2 Order (the "Diversity Termination Provision"); Section 3(b)(iv)(A)-(B) of the DEI-2 Order (the "Certification Provision"); and Section 4(b) of the DEI-2 Order (the "Enforcement Threat Provision") (collectively, the "Challenged Provisions").  The language of these provisions is described further below.

### B.    Defendants

Defendants are President Donald J. Trump;[4] the U.S. Department of Justice ("DOJ"); the Office of Federal Contract Compliance Programs ("OFCCP"); the Office of Management and Budget ("OMB"); the U.S. Department of Labor ("DOL"); the U.S. Department of Health and Human Services ("HHS"); the U.S. Department of Housing and Urban Development ("HUD"); the National Archives and Records Administration ("NARA"); the National Endowment for the

---

[3] As used in this order, DEI stands for "diversity, equity, and inclusion," and DEIA stands for "diversity, equity, inclusion, and accessibility."

[4] Plaintiffs seek only declaratory relief against President Trump, and the motion before the Court does not seek injunctive relief against him.  ECF No. 47 at 10 n.1.

Humanities ("NEH"); and the highest-ranking officials within those agencies allegedly responsible for implementing the Executive Orders, including Attorney General Pamela Bondi, Acting Labor Secretary Vince Micone, Acting OFCCP Director Michael Schloss, OMB Director Russell Vought, HHS Secretary Robert K. Kennedy, Jr., HUD Secretary Scott Turner, Deputy Archivist William J. Bosanko, and NEH Chair Shelly C. Lowe.  *See* ECF No. 1 ¶¶ 26–43.

### C.    Plaintiffs

Plaintiffs are a group of nonprofit organizations that receive federal funding to support their work providing services to "members of the LGBTQ communities."  ECF No. 47 at 12.  "Speech, advocacy, and services advancing the civil rights and welfare of transgender and other LGBTQ people, and addressing systemic racism, sexism, and anti-LGBTQ bias, are central to each Plaintiff's mission."  *Id.*  Plaintiffs contend that they cannot "advertise, provide services, train staff, train other agencies or providers, or accomplish their core mission and mandates under existing grants while simultaneously complying with the Executive Orders."  ECF No. 47 at 20–21 (citing ECF Nos. 47-1 ¶¶ 10–14; 47-2 ¶¶ 26–28; 47-3 ¶¶ 20–21; 47-4 ¶¶ 12–13, 24; 47-7 ¶¶ 16–34; 47-5 ¶ 21; 47-8 ¶ 25; 47-9 ¶¶ 10–13, 34–47; 47-10 ¶ 23); *see also* ECF No. 47-10 ¶ 23 ("If the Executive Orders are allowed to stand, SFCHC will face the impossible choice of abandoning our mission to provide targeted, culturally competent care to marginalized communities, or forfeit the federal funding supporting many of our lifesaving services.").

SFAF is a nonprofit organization based in San Francisco, California, that "promotes health, wellness, and social justice for communities most affected by HIV, through sexual health and substance use services, advocacy, and community partnerships."  ECF No. 1 ¶ 15.  Specifically, SFAF "confronts and combats HIV-related health disparities among gay and bisexual men, transgender women, cisgender women, Black people, Latinx people, and, in particular, people residing at the intersections of these identities."  *Id.* ¶ 45.  "For Fiscal Year 2025–2026, SFAF is contracted to receive $2,275,557.00 in direct and indirect funding.  Of this amount, $641,625.00 is directly funded through agreements with CDC, and the balance of $1,633,952.00 is indirectly funded by a variety of federal agencies through subcontracts with state and local agencies."  ECF No. 47-9 ¶ 5.  "SFAF's core HIV prevention efforts rely on federal funding to provide services

4

such as testing, treatment, PrEP, PEP, harm reduction, and telehealth to underserved communities." *Id.* ¶ 11.

GLBT Historical Society is a nonprofit organization based in San Francisco, California, that "collects, preserves, exhibits, and makes accessible to the public materials and knowledge to support and promote understanding of LGBTQ history, culture, and arts in all their diversity." ECF No. 1 ¶ 16.  "The organization was founded during the height of the HIV/AIDS epidemic; community members began collecting materials belonging to primarily gay and bisexual men who were dying of AIDS-related illnesses when families of origin had abandoned them, and healthcare systems and the government had failed them."  ECF No. 47-4 ¶ 5.  GLBT Historical Society receives federal funding primarily from the NEH and the National Archives through the National Historic Publications and Records Commission ("NHPRC"), including current funding from an open NHPRC grant of approximately $122K to support work to "process, digitize, and create online access for collections related to LGBTQ+ Asian American/Pacific Islander people" and "an open NEH grant of around $10K that supports the purchase of a new archival storage cabinet." *Id.* ¶ 14.

SFCHC is a nonprofit organization based in San Francisco, California, that "seeks to celebrate and attend to the health and wellness of the communities that define San Francisco—immigrant and communities of color, queer, transgender, unhoused people, and all who are most affected by oppression—through comprehensive medical, dental, and mental health services." ECF No. 1 ¶ 17.  SFCHC currently receives more than $5 million in federal grant funding, including several grants from the CDC and the Substance Abuse and Mental Health Services Administration to provide HIV-related health services to transgender people and young people of color.  ECF No. 47-10 ¶¶ 5–8.

LA LGBT Center is a nonprofit organization based in Los Angeles, California, that "offers programs, services, and advocacy spanning four broad categories: (i) health, (ii) social services and housing, (iii) culture and education, and (iv) leadership and advocacy" to fulfill its mission of "build[ing] a world in which LGBTQ people thrive as healthy, equal, and complete members of society."  ECF No. 1 ¶ 18.  LA LGBT Center states that "nearly every aspect of the services

provided by the LA LGBT Center directly or indirectly impacts the transgender community, and the LA LGBT Center has provided its services to more than 6,000 transgender individuals over the past ten years—the majority of such services relating to their medical care."  ECF No. 47-5 ¶ 5. "A significant portion of the LA LGBT Center's revenue comes from federal programs, including, but not limited to, direct funding from the Department of Justice (DOJ) Office of Violence Against Women and the Department of Health & Human Services (HHS) divisions: Centers for Disease Control and Prevention (CDC); Health Resources and Services Administration (HRSA) Bureau of Primary Health Care, under which the LA LGBT Center is a Federally Qualified Health Center (FQHC); and the Administration for Children Youth & Families."  *Id.* ¶ 7.  The LA LGBT Center is scheduled to receive $22 million of federal funding for use over the next several years. *Id.*

Prisma is a nonprofit organization based in Phoenix, Arizona, that "offers a wide variety of healthcare services, including services related to HIV, sexual health, gender-affirming care, and mental and social wellness" to carry out its mission of providing "affirming and inclusive services to promote well-being and advance health equity for diverse communities particularly people of color, 2SLGBTQIA+ and queer individuals, and those affected by HIV."  ECF No. 1 ¶ 19.  Prisma "receives over three million dollars in federal funding, either directly or as pass-through funding through state agencies like the Arizona Department of Health Services (ADHS)."  ECF No. 47-8 ¶ 9.

NY LGBT Center is a nonprofit organization based in New York, New York, that was "established in 1983 at the height of the AIDS crisis to provide a safe and affirming place for LGBTQ New Yorkers to respond to the urgent threats facing the community."  ECF No. 1 ¶ 20. NY LGBT Center "provides recovery and wellness programs, economic advancement initiatives, family and youth support, advocacy, arts and cultural programming, and space for community organizing, connection, and celebration."  *Id.*  "Over $2 million of the NY LGBT Center's annual budget comes from federal funding, both in direct grants from federal agencies and in pass-through federal funds received from New York State agencies.  This accounts for approximately 12% of the NY LGBT Center's annual budget."  ECF No. 47-7 ¶ 13.  These federal funds "are

1    used to support services including substance use treatment and prevention, youth programming,

2    HIV testing and prevention, mental health counseling, case management, support for survivors of

3    violence, training for clinicians and capacity building for other providers on working with the

4    LGBTQ+ community, and more." *Id.* ¶ 15.

5         Bradbury-Sullivan is a nonprofit organization based in Allentown, Pennsylvania, that

6    "provides a vibrant, inclusive space in Pennsylvania's Lehigh Valley for all the region's LGBTQ

7    residents, offering affirming programming and health programs" to fulfill its mission of

8    "provid[ing] safe and celebratory spaces for the LGBTQ community." ECF No. 1 ¶ 21. About

9    62% of Bradbury-Sullivan's budget comes from federal sources, including the CDC, through pass-

10   through contracts with state and local agencies such as the Pennsylvania Department of Health.

11   ECF No. 47-2 ¶ 7.

12        BSH is a nonprofit organization based in Baltimore, Maryland, that provides

13   "comprehensive support services for marginalized TLGBQIA+ people, especially focusing on

14   Black transgender women navigating survival mode living." ECF No. 1 ¶ 22. BSH asserts that its

15   origin as "an organization created by transgender people for transgender people [] makes it

16   imperative that [it] not only fight injustices against transgender people but provide our services to

17   our community in a culturally competent way. It is the cornerstone of [BSH's] identity." ECF

18   No. 47-1 ¶ 10. Approximately "80% of BSH's budget comes from federal grant money,"

19   including "$3 million in operating funds via federal grant money, whether directly or as a

20   subgrantee." *Id.* ¶ 9. One such grant includes "$182,000 grant of funding from the Centers for

21   Disease Control and Prevention ('CDC') via the Baltimore City Health Department

22   ('BCHD') . . . through the CDC's High lmpact HIV and Surveillance Programs for Health

23   Departments." *Id.* "When the BCHD issued its request for proposals from subgrantees, it

24   specifically invited proposals for HIV-prevention programs with a focus on transgender people in

25   the zip codes BSH most regularly serves." *Id.*

26        FORGE is a nonprofit organization based in Milwaukee, Wisconsin, that "offers programs

27   and services to reduce the impact of trauma on transgender and nonbinary survivors of violence by

28   empowering service providers, advocating for systems reform, and connecting survivors to healing

United States District Court
Northern District of California

1    possibilities." ECF No. 1 ¶ 23. About "90% of FORGE's revenue arises from federal programs

2    and grants, including but not limited to grants from the DOJ Offices for Victims of Crime (OVC),

3    Justice Programs (OJP), and Violence Against Women (OVW) and National Institute of Justice

4    (NIJ), the Substance Abuse and Mental Health Services Administration (SAMHSA), and the

5    National Institutes of Health National Institute on Alcohol Abuse and Alcoholism (NIH-

6    NIAAA)." ECF No. 47-3 ¶ 7. These federally funded grants support FORGE's initiatives,

7    "including the development of training materials and direct support services for transgender and

8    nonbinary survivors." *Id.*

9       Plaintiffs filed this lawsuit on February 20, 2025. ECF No. 1. They filed the motion for

10   preliminary injunction now before the Court on March 3, 2025. ECF No. 47.

11      **D.**    **Related Litigation**

12      Several plaintiffs have filed other cases challenging various provisions of the orders

13   challenged here. Without providing an exhaustive summary of all such cases, the Court briefly

14   recounts the cases involving issues similar to those here.

15            **1.**    **National Association of Diversity Officers in Higher Education**

16      In *National Association of Diversity Officers in Higher Education v. Trump*, the District

17   Court for the District of Maryland granted the plaintiffs' motion for a preliminary injunction

18   enjoining the enforcement of the Equity Termination Provision, the Certification Provision, and

19   the Report Provision on a nationwide basis. No. 25-cv-333 (ABA), 2025 WL 573764, at *27–30

20   (D. Md. Feb. 21, 2025). The court held that the Equity Termination Provision was likely void for

21   vagueness under the Fifth Amendment. *Id.* at *19–21. It also held that the plaintiffs' First

22   Amendment challenge to the Certification Provision was likely to succeed on the merits. *See id.* at

23   *21–23. Finally, it held that the Enforcement Threat Provision likely violated the First

24   Amendment and was also unconstitutionally vague. *See id.* at *24, 26.

25      The Fourth Circuit stayed that decision pending appeal. *See Nat'l Ass'n of Diversity

26   Officers in Higher Educ. v. Trump*, No. 25-1189, ECF No. 29 (4th Cir. Mar. 14, 2025). The panel

27   held that the government had carried its burden of "satisf[ying] the factors for a stay," including

28   likelihood of success on the merits. *Id.* at 2; *see also id.* at 7 (Harris, J., concurring). In her

United States District Court
Northern District of California

concurrence explaining the reasoning of the panel, Judge Harris noted that the DEI-1 and DEI-2 Orders "are of distinctly limited scope" and that nothing in their text "purport[s] to establish the illegality of all efforts to advance diversity, equity or inclusion." *Id.* at 7 (Harris, J., concurring). She found that the Certification Provision and Enforcement Threat Provision "appl[ied] only to conduct that violates existing federal anti-discrimination law" and that the DEI-1 and DEI-2 Orders did not "authorize the termination of grants based on a grantee's speech or activities outside the scope of the funded activities." *Id.* Lastly, Judge Harris explained that her "vote to grant the stay comes with a caveat," explaining that "[a]gency enforcement actions that go beyond the Orders' narrow scope may well raise serious First Amendment and Due Process concerns, for the reasons cogently explained by the district court." *Id.*

### 2.    Chicago Women in Trades

In the Northern District of Illinois, Chicago Women in Trades—a national nonprofit organization—sought a temporary restraining order enjoining the DOL, the OMB, the DOJ, and the heads of those agencies from enforcing parts of the DEI-1 and DEI-2 Orders. *See Chi. Women in Trades v. Trump*, No. 25-cv-2005 (MFK), 2025 WL 933871, at *1–2 (N.D. Ill. Mar. 27, 2025) ("*CWIT I*"). The court granted a temporary restraining order enjoining the DOL and its Acting Secretary from enforcing the Certification Provision on a nationwide basis and from enforcing the Equity Termination Provision against the plaintiff. *See id.* at *10–13. But the court reconsidered part of its decision upon ruling on the plaintiff's motion for a preliminary injunction. *See Chi. Women in Trades v. Trump*, No. 25-cv-2005 (MFK), 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025) ("*CWIT II*"). The court reaffirmed that the Certification Provision likely violated the First Amendment. In particular, it noted:

> The Order that contains the Certification Provision does not define the term "DEI" itself, and it does not refer to any other source indicating what the term means as used in the Order—let alone what might make any given "DEI" program violate Federal anti-discrimination laws. And although the government emphasized, both in its briefing and at oral argument, that the Certification Provision implicates only illegal DEI programs, it has studiously declined to shed any light on what this means.

2025 WL 1114466, at *11. However, the court changed its holding as to the Equity Termination

1    Provision and found that provision likely did not violate either the First or Fifth Amendments.  *See*

2    *id.* at 12–16.  In addition, the court found that the Equity Termination Provision likely violated the

3    Separation of Powers under the Spending Clause as to one specific grant.  *See id.* at 16–18.

### 3.    PFLAG, Inc.

5        In the District of Maryland, six individual transgender plaintiffs who were seeking gender

6    affirming care and two national nonprofit organizations that supported transgender individuals in

7    seeking medical treatment for gender dysphoria moved for an emergency temporary restraining

8    order.  *PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 510050, at *1–3 (D. Md. Feb. 14,

9    2025) ("*PFLAG I*").  They sought an order enjoining various government defendants from

10   enforcing the Gender Promotion Provision of the Gender Order and a provision of  Executive

11   Order 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025), "Protecting Children from Chemical and Surgical

12   Mutilation," which directed all federal agencies to "immediately take appropriate steps to ensure

13   that institutions receiving Federal research or education grants end the chemical and surgical

14   mutilation of children."  *Id.*  The court granted the temporary restraining order and found that the

15   plaintiffs were likely to succeed on the merits of their claims that the challenged provisions there

16   violated the Separation of Powers, conflicted with statutory law, and violated the Fifth

17   Amendment's guarantee to equal protection.  *See id.* at *13–21.  The court then reaffirmed those

18   findings upon issuing a preliminary injunction.  *PFLAG, Inc. v. Trump*, No. CV 25-337-BAH,

19   2025 WL 685124, at *14–28 (D. Md. Mar. 4, 2025) ("*PFLAG II*").

### 4.    National Urban League

21       In the District of Columbia, three national nonprofit organizations moved for a preliminary

22   injunction regarding enforcement of eight of the nine Challenged Provisions.[5]  *Nat'l Urb.*

23   *League v. Trump*, No. CV 25-471 (TJK), 2025 WL 1275613, at *3 (D.D.C. May 2, 2025).  The

24   court found that the plaintiffs had standing to challenge only the Gender Termination Provision,

25   Gender Promotion Provision, Equity Termination Provision, and Certification Provision.  *See id.*

26   at *10–13.  The court then held that the plaintiffs were unlikely to succeed on the merits of their

27

28   _____

[5] The plaintiffs there did not challenge the Intimate Spaces Provision.

United States District Court
Northern District of California

1  challenges under the First and Fifth Amendments as to those provisions because the "government

2  need not subsidize the exercise of constitutional rights to avoid infringing them, and the

3  Constitution does not provide a right to violate federal antidiscrimination law." *Id.* at *1, 13–26.

## II.  PRELIMINARY INJUNCTION STANDARD

5      Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear

6  showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7,

7  22 (2008).  To obtain preliminary injunctive relief, a plaintiff "must establish that he is likely to

8  succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

9  relief, that the balance of equities tips in his favor, and that an injunction is in the public

10 interest." *Id.* at 20.  A court may "balance the elements" of this test, "so long as a certain

11 threshold showing is made on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir.

12 2011) (per curiam).  Thus, for example, "serious questions going to the merits and a balance of

13 hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction,

14 so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

15 injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th

16 Cir. 2011) (quotation marks omitted).

## III.  THRESHOLD CHALLENGES

18     The Court addresses as a threshold matter Plaintiffs' standing to bring this lawsuit.

19 *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998).

### A.  Article III Standing

21     Article III standing requires that a "plaintiff must have (1) suffered an injury in fact, (2)

22 that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

23 redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

24 "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally

25 protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or

26 hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

27     Because "[t]he party invoking federal jurisdiction bears the burden of establishing these

28 elements," they are "an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561.

*United States District Court*
*Northern District of California*

11

1    Accordingly, "each element must be supported in the same way as any other matter on which the

2    plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the

3    successive stages of the litigation." *Id.* at 561.

4                    **1.    List Provision and Enforcement Threat Provision**

5           The "List Provision" directs each agency and department to provide the Director of the

6    OMB with a list of all "Federal grantees who received Federal funding to provide or advance DEI,

7    DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021."  DEI-1

8    Order § 2(b)(ii)(C).  The Enforcement Threat Provision directs the Attorney General to submit a

9    report to the Assistant to the President for Domestic Policy.  The report shall, in relevant part:

10   contain the "most egregious and discriminatory DEI practitioners in each sector of concern" and

11   include a "plan of specific steps or measures to deter DEI programs or principles . . . that

12   constitute illegal discrimination or preferences," wherein "each agency shall identify up to nine

13   potential civil compliance investigations of . . . large non-profit corporations or associations."

14   DEI-2 Order § 4(b).

15          Plaintiffs appear to argue primarily that creating lists of organizations engaged in DEI or

16   illegal DEI chills protected speech and that Plaintiffs would suffer reputational harm if they were

17   placed on those lists.  *See* ECF No. 47 at 20; ECF No. 64 at 15.  But the List Provision operates

18   intragovernmentally—directing all agencies and departments to submit a list to the OMB Director

19   of all grantees who receive federal funding for DEI programs.  It does not instruct the Director to

20   do anything with the list or even publicly disseminate the list.  It is thus unclear how the creation

21   of an internal, intragovernmental list would operate to chill speech, particularly given that

22   Plaintiffs have not stated an intent to discontinue their DEI activities if such a list is created.

23   Plaintiffs have thus failed to adequately identify any injury that is "concrete and particularized" or

24   any future injury that is imminent, rather than conjectural or hypothetical.  *See Spokeo, Inc.*, 578

25   U.S. at 339 (quoting *Lujan*, 504 U.S. at 560)).

26          Plaintiffs' challenge to the Enforcement Threat Provision, which also operates

27   intragovernmentally, suffers from a similar flaw.  Plaintiffs argue that requiring "government

28   officials to produce lists of private citizens expressing disfavored views" gives rise to

United States District Court
Northern District of California

constitutional concerns and risks causing Plaintiffs reputational harm. ECF No. 64 at 20. In doing so, Plaintiffs rely heavily on *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951). In that case, the Supreme Court found that the plaintiffs had sufficiently stated claims that they were defamed by the Attorney General's arbitrary designation of their organizations as Communist on a list of subversives given to the Loyalty Review Board of the United States Civil Service Commission. *See id.* at 124–25, 139–41. Critically, the plaintiffs there had already been labeled as Communist and contested the basis of that classification. *See id.* Here, however, Plaintiffs' theory of harm requires speculation as to the content of a report that has not yet issued—assuming that the report will identify Plaintiffs' sectors as "sectors of concern" and then identify them as some of the "most egregious and discriminatory DEI practitioners" in those sectors. Alternatively, the report would have to identify Plaintiffs as the subjects of nine or fewer potential total civil compliance investigations—if Plaintiffs even qualify as "large non-profit corporations or associations." Their theory thus rests "on a highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410; *see also Nat'l Urb. League*, 2025 WL 1275613, at *7–8 (finding that the plaintiffs there lacked standing to challenge the Enforcement Threat Provision for the same reasons); *CWIT I*, No. 25 C 2005, 2025 WL 933871, at *2 ("[I]t is difficult to see how CWIT can be in imminent danger of an injury based on a provision that simply requires a cabinet official to issue a report at a future date."). Accordingly, the Court finds that Plaintiffs have not sufficiently demonstrated any injury or imminent likelihood of injury resulting from the List Provision or the Enforcement Threat Provision.

### 2. Intimate Spaces Provision, DEIA Principles Provision, and Diversity Termination Provision

The Intimate Spaces Provision provides that "[a]gencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity." Gender Order § 4(d). While the Court is unsure what exactly the Intimate Spaces Provision calls for, Plaintiffs do not sufficiently allege any injury specifically flowing from this provision. Indeed, despite identifying it as one of

1    the provisions they challenge, they do not otherwise reference this provision specifically in their

2    briefing.  The Court thus finds that Plaintiffs do not have standing to challenge the Intimate Spaces

3    Provision.

4    　　　　Relatedly, the DEIA Principles Provision and Diversity Termination Provision fall under

5    Section 3 of the DEI-2 Order, titled "Terminating Illegal Discrimination in the Federal

6    Government."  The full subsection they fall under, Section 3(c), provides:

> The Director of the Office of Management and Budget (OMB), with
> the assistance of the Attorney General as requested, shall:
>
> (i)     Review and revise, as appropriate, all *Government-wide
>          processes, directives, and guidance*;
> (ii)    Excise references to DEI and DEIA principles, under
>          whatever name they may appear, from Federal acquisition,
>          contracting, grants, and financial assistance procedures to
>          streamline those procedures, improve speed and efficiency,
>          lower costs, and comply with civil-rights laws; and
> (iii)   Terminate all 'diversity,' 'equity,' 'equitable decision-
>          making,' 'equitable deployment of financial and technical
>          assistance,' 'advancing equity,' and like mandates,
>          requirements, programs, or activities, as appropriate."  DEI-2
>          Order § 3(c)(iii).

15    DEI-2 Order § 3(c) (emphasis added).  Both provisions appear to—consistent with Defendants'

16    representations, ECF No. 64 at 19–20—apply internally within the government and to the

17    government's *own* processes, directives, and programs.  While the Court wonders whether the

18    scope of the language in this provision could be applied to result in injury to Plaintiffs, Plaintiffs

19    have not adequately alleged what injuries they suffer from these two provisions.  Unlike the

20    Equity Termination Provision, the Diversity Termination Provision does not clearly implicate any

21    of Plaintiffs' programs or activities, as Plaintiffs have not alleged that they conduct any

22    programming for the government.  *See CWIT I*, 2025 WL 933871, at *2 (finding that the plaintiff

23    there lacked standing to challenge the Diversity Termination Provision because the provision

24    focuses on "internal government agency processes and programs").  And a reading of the

25    Diversity Termination Provision to apply externally would render it duplicative of the Equity

26    Termination Provision.

27    　　　　Accordingly, the Court finds that Plaintiffs likely lack standing to challenge the Intimate

28    Spaces Provision, DEIA Principles Provision, and Diversity Termination Provision.

United States District Court
Northern District of California

### 3. Equity Termination Provision, Gender Termination Provision, and Gender Promotion Provision

Three of the Challenged Provisions regard the ineligibility of federal funding for certain categories of grants or contracts. The Equity Termination Provision directs, in relevant part, each agency, department, or commission head to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts." DEI-1 Order § 2(b)(i). The Gender Termination Provision provides that agencies "shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." Gender Order § 3(e). And the Gender Promotion Provision states, "Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Gender Order § 3(g) (collectively, the "Funding Provisions").

The Court finds that Plaintiffs have adequately alleged standing to challenge the Funding Provisions because a "loss of funds promised under federal law[] satisfies Article III's standing requirement." *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) (quoting *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015)); s*ee also Nat'l Urb. League*, 2025 WL 1275613, at *13 (finding that the plaintiff there had standing to challenge the same Funding Provisions).

Plaintiffs challenge the Funding Provisions in part on the basis that they have lost or will likely lose federal funding for their organizational activities. For example, on February 1, 2025, SFCHC received a notice from Defendant HHS terminating, "in accordance with the [Gender Order]," SFCHC's grant award for "Comprehensive High-Impact HIV Prevention Programs for Young Men of Color Who Have Sex With Men and Young Transgender Persons of Color," effective January 31, 2025. ECF No. 47-10, Ex. C.[6] Prisma and NY LGBT Center have also each received termination notices citing to the Challenged Orders. *See* ECF No. 47-8, Ex. A (termination notice from the Centers for Disease Control and Prevention ("CDC") explaining that to implement DEI-1 Order, Prisma must "immediately terminate, to the maximum extent, all

---

[6] On February 12, 2025, SFCHC received a notice that the termination was rescinded pursuant to the temporary restraining order that was issued by a federal district court in Rhode Island. *See id.*, Ex. D.

programs, personnel, activities, or contracts promoting 'diversity, equity, and inclusion' (DEI) at every level and activity" that was supported by CDC funds); ECF No. 47-8, Ex. B (termination notice from the CDC to Prisma explaining that to implement the Gender Order, "any vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated"); ECF No. 47-7, Ex. A (termination notice from the Health Resources and Services Administration ("HRSA"), a component of HHS, stating that effectively immediately, HRSA grant funds "may not be used for activities that do not align with" the DEI-1 Order or the Gender Order and that any "vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part"). These grant terminations—both threatened and actual—constitute "a classic pocketbook injury sufficient to give [them] standing." *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023); *see also, e.g.*, *Collins v. Yellen*, 594 U.S. 220, 243 (2021) (describing "pocketbook injury" as "a prototypical form of injury in fact").

Defendants argue that Plaintiffs lack standing because their injuries are neither traceable to these provisions nor redressable. First, they argue that Plaintiffs have failed to allege that the terminations are fairly traceable to the Funding Provisions because the provisions did not directly terminate any particular fund or program and instead "merely provided policy directives to federal agencies." ECF No. 61 at 22.[7] Second, Defendants contend that Plaintiffs' injuries are not redressable because "even if this Court granted relief against the Executive Orders, that would not prevent defendant agencies from exercising their own independent authorities to determine whether, consistent with law, any termination of a fund/contract would be warranted." ECF No. 61 at 23.

As for traceability, the Court does not read the Funding Provisions to consist of only "policy directives." They command specific action. *See* DEI-1 Order § 2(b)(i) (each agency "*shall*" terminate all equity-related grants or contracts (emphasis added)); Gender Order § 3(e)

---

[7] Defendants also argue that Plaintiffs have not provided any termination letters stating that their grants were terminated pursuant to the Challenged Orders. *Id.* But as discussed above, Defendants' argument is flatly contradicted by the record.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  (each agency "*shall* take all necessary steps, as permitted by law, to end the Federal funding of

2  gender ideology" (emphasis added)); Gender Order § 3(g) (each agency "*shall* assess grant

3  conditions and grantee preferences and ensure grant funds do not promote gender ideology"

4  (emphasis added)).  Moreover, as discussed above, Plaintiffs have already received notices

5  pursuant to the Challenged Orders terminating their grant awards.  *See* ECF No. 47-10, Ex. C;

6  ECF No. 47-8, Ex. A; ECF No. 47-8, Ex. B; ECF No. 47-7, Ex. A.

7       Furthermore, an order enjoining Defendants from enforcing those provisions against

8  Plaintiffs would redress their injuries of losing grant funding by making them less likely to suffer

9  monetary harm.  And Defendants' speculation that the Defendant agencies might nevertheless still

10  terminate Plaintiffs' funding for other reasons does not defeat redressability at this stage.  For one

11  thing, the Court rejects the suggestion that a court should not enjoin unlawful activity simply

12  because a defendant might theoretically achieve the same outcome by different, lawful means.

13  Illegality is illegality.  In any event, as the requested relief need only be likely—not guaranteed in

14  fact—to alleviate Plaintiffs' injury.  *See Lujan*, 504 U.S. at 561; *see also Nat'l Urb. League*, 2025

15  WL 1275613, at *11 & n.4 (rejecting the defendants' speculative causation and redressability

16  arguments regarding the same provisions).

17       The Court thus finds that Plaintiffs have demonstrated that they have standing to challenge

18  the Equity Termination Provision, Gender Termination Provision, and Gender Promotion

19  Provision.

20               **4.**         **Certification Provision**

21       The Certification Provision requires the head of each agency to include in every contract or

22  grant award (1) a term "requiring the contractual counterparty or grant recipient to agree that its

23  compliance in all respects with all applicable Federal anti-discrimination laws is material to the

24  government's payment decisions for purposes of" the False Claims Act, and (2) a term "requiring

25  such counterparty or recipient to certify that it does not operate any programs promoting DEI that

26  violate any applicable Federal anti-discrimination laws."  DEI-2 Order § 3(b)(iv)(A)-(B).

27       The Certification Provision directly affects Plaintiffs because of their activities as federal

28  grantees.  The additional terms in each federal contract or grant award create new obligations for

Plaintiffs.  As another court explained, Plaintiffs are likely "to face the 'forced choice' that the Certification Provision presents: change their programming to enable them to make the certification; make the certification without changes and risk a false certification; or give up federal funds and contracts."  *Nat'l Urb. League*, 2025 WL 1275613, at *11 (finding that the plaintiff there had standing to challenge the Certification Provision for this reason) (quoting *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1138 (9th Cir. 2024)).  And as with above, the Court finds Defendants' traceability and redressability arguments unpersuasive because the Certification Provision expressly requires agencies to include the two terms requiring certification.  An injunction enjoining Defendants from enforcing the Certification Provision would thus redress Plaintiffs' alleged injury of having to either modify their conduct or risk making a false certification.

The Court finds that Plaintiffs have adequately shown that they have standing to challenge the Certification Provision.

### B.    Tucker Act

Defendants argue that the Court lacks jurisdiction to review Plaintiffs' claims relating to the termination or prospective termination of their grants because the Tucker Act provides that the United States Court of Federal Claims has exclusive jurisdiction over contract claims against the United States.  ECF No. 61 at 23–25 (citing 28 U.S.C. § 1491(a)).  They further argue that the Tucker Act still applies despite Plaintiffs' constitutional claims because a "suit belongs in the Claims Court when the source of plaintiffs' asserted right is a contract and what plaintiffs seek amounts to contractual remedies."  ECF No. 61 at 24 (citing *Dep't of Educ. v. California*, 604 U.S.---, 145 S.Ct. 966, 2025 WL 1008354, at *1 (U.S. Apr. 4, 2025)).

The Tucker Act provides for exclusive jurisdiction in the Court of Federal Claims over actions based upon "any express or implied contract with the United States" exceeding $10,000.  *See* 28 U.S.C. § 1491(a).  But "the mere fact that a court may rule on a contract issue does not . . . automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have."  *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).  Instead, an action triggers the Tucker Act's jurisdictional hook only when the claim is "at

its essence" a contract claim. *Id.* at 967. "[W]here there is a possible alternative basis for jurisdiction independent of the Tucker Act," a court "must be more deliberat[ive] in [its] examination" of whether the particular action is "one which is or is not 'at its essence' a contract action." *Id.* at 968. To determine the essence of an action, courts look at the source of the rights on which the plaintiff bases its claims and the type of relief sought. *See United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (citing cases which in turn cite *Megapulse*). "If rights and remedies are *statutorily* or *constitutionally* based, then districts courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief." *Id* (emphases in original).

Here, Plaintiffs' claims are not "at [their] essence" contract actions because both the source of the rights claimed and the remedies sought are not contractually based. Plaintiffs' claims are all based upon the Constitution—arising under the First and Fifth Amendments, the Spending Clause, and the Separation of Powers. These are not breach of contract claims just because they "requir[e] some reference to or incorporation of a contract." *See Megapulse, Inc.*, 672 F.2d at 967–68. Similarly, Plaintiffs seek exclusively injunctive and other equitable relief. *See* ECF No. 1 at 71–72 (seeking declaratory judgment, preliminary and permanent injunctions, and costs and reasonable attorney's fees). And while an injunction precluding Defendants from terminating grants awarded to Plaintiffs would in effect require the government to keep funding those grants, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). Indeed, the Court of Federal Claims "has no power to grant equitable relief" and thus cannot address the remainder of the relief sought by Plaintiffs. *See id.* at 905 (citation omitted).

Defendants' reliance on the two-page, per curiam opinion in *Department of Education v. California* does not change the Court's analysis. In that case, the plaintiffs asserted only a claim that the government's termination of grants was arbitrary and capricious under the Administrative Procedures Act. *Dep't of Educ.*, 145 S.Ct. at 968–69. The Supreme Court found the government was "likely to succeed in showing the District Court lacked jurisdiction" and that

jurisdiction would likely lie in the Court of Federal Claims under the Tucker Act. *Id.* at 969–70. The case involved neither claims asserting the infringement of constitutional rights, a request for declaratory judgment, nor a request for injunctive relief preventing future harm. The Court therefore finds *Department of Education v. California* distinguishable and concludes that the Tucker Act does not preclude Plaintiffs from proceeding in district court. *See CWIT II*, 2025 WL 1114466, at *9–10 (concluding the same for the plaintiff's identical set of claims challenging the DEI-1 and DEI-2 Orders).

### C.    Third-Party Standing

The parties dispute whether Plaintiffs have third-party standing to assert the equal protection rights of their transgender patients, clients, and patrons to challenge the Gender Termination Provision and Gender Promotion Provision.

The default rule is that "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). To depart from that rule and assert a third party's right: (1) "[t]he litigant must have suffered an 'injury in fact;'" (2) "the litigant must have a close relationship to the third party;" and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests." *Id.* at 410–11 (citation omitted).

First, as discussed above, the Gender Order imposes actual and threatened loss of funding *to Plaintiffs* such that Plaintiffs themselves have adequately demonstrated an injury in fact. Second, Plaintiffs provide a variety of healthcare services to transgender individuals within their communities, including HIV-testing and treatment, gender-affirming care, substance use treatment and prevention. ECF No. 47-9 ¶ 11; ECF No. 47-10 ¶¶ 5–8; ECF No. 1 ¶ 19; ECF No. 47-7 ¶ 15. As healthcare providers, Plaintiffs have a close relationship to their transgender patients and are likely "fully, or very nearly, as effective a proponent of the right" as those patients. *Washington v. Trump*, 847 F.3d 1151, 1160 (9th Cir. 2017) (quoting *Singleton v. Wulff*, 428 U.S. 106, 114–16 (1976)); *see also Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 35 (D.D.C. 2020) (finding that "'there can be no doubt' that the health-provider Plaintiffs will be 'motivated, effective advocate[s]' for their LGBTQ patients" (quoting *Powers*,

499 U.S. at 414)).  Indeed, many of the named plaintiffs were founded specifically to serve transgender people.  *See, e.g.*, ECF No. 47-1 ¶ 10; ECF No. 47-3 ¶19 ("[E]very aspect of our programming and services revolve[s] around transgender and nonbinary survivors and the providers who serve them."); ECF No. 47-5 ¶ 5 ("Respecting transgender people and advancing their civil rights is central to the LA LGBT Center's identity, advocacy, and mission, and a necessary part of every aspect of the services we provide."); ECF No. 47-7 ¶¶ 31–34 ("One of the NY LGBT Center's core purposes is recognizing and affirming the existence of transgender and gender-diverse individuals. . . .  Compliance with the Executive Order would dismantle the NY LGBT Center's identity, rendering us incapable of serving the community we were established to support.").

Finally, Plaintiffs' transgender patients and clients likely face barriers to being able to protect their own interests under these circumstances.  Defendants argue that because other individual plaintiffs have initiated lawsuits challenging the Gender Order, including by making equal protection claims, "this is not a case where individual litigants face 'daunting' barriers or have 'little incentive' to litigate their own claims."  ECF No. 61 at 45 (quoting *Powers*, 499 U.S. at 414–15).  However, Plaintiffs need only show "some hindrance" to the ability of their patients to vindicate their rights, *see Powers*, 499 U.S. at 410–11, and Plaintiffs have done so.  Many of the transgender persons they serve are some of the most vulnerable members of society, experiencing poverty, homelessness, and substance abuse.  *See, e.g.*, ECF Nos. 47-1 ¶¶ 11, 14; 47-4 ¶ 11; 47-5 ¶¶ 13, 21; 47-6 ¶¶ 8, 18, 21; 47-7 ¶¶ 9, 17; 47-9 ¶¶ 19, 21; 47-10 ¶¶ 10, 14, 21–22.  "[D]ue to the sensitive nature of the subject matter, fear of retaliation from the federal government, and lack of capacity and/or financial resources, [] Plaintiffs' patients [and clients] are hindered from protecting their own interests."  *Washington v. Trump*, No. 2:25-CV-00244-LK, 2025 WL 659057, at *8 (W.D. Wash. Feb. 28, 2025).  And transgender individuals in particular face obvious barriers to filing suit to assert their own rights, since disclosure of their transgender status exposes them to "a substantial risk of stigma, discrimination, intimidation, violence, and danger."  *Arroyo González v. Rosselló Nevares*, 305 F.Supp.3d 327, 333 (D.P.R. 2018); *see also Whitman-Walker Clinic*, 485 F. Supp. 3d at 36. ("It is enough that patients' fear of stigmatization operates as a

powerful deterrent to bringing suit.").

The Court thus rejects Defendants' argument that Plaintiffs' equal protection claim fails for lack of standing.  *See* ECF No. 61 at 45.

## IV. LIKELIHOOD OF SUCCESS ON THE MERITS

### A. Fifth Amendment Equal Protection

The Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. Amend. V.   The "Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws."  *Davis v. Passman*, 442 U.S. 228, 234 (1979) (internal quotation marks omitted).  "When considering an equal protection claim," the Court determines "what level of scrutiny applies to a classification under a law or policy, and then decide[s] whether the policy at issue survives that level of scrutiny."  *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2024).  The Ninth Circuit has held that "discrimination on the basis of transgender status is a form of sex-based discrimination" for equal protection purposes.  *Id*.  So if a law "discriminates based on transgender status, either purposefully or on its face, heightened scrutiny applies."  *Doe v. Horne*, 115 F.4th 1083, 1102 (9th Cir. 2024); *see also Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019).  "To withstand heightened scrutiny, a classification 'must serve important governmental objectives and must be substantially related to achievement of those objectives.'"  *Horne*, 115 F.4th at 1106  (quoting *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1127 (9th Cir. 1982)).  "The State bears the burden of demonstrating an 'exceedingly persuasive justification' for the classification, and '[t]he justification . . . must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.'"  *Id.* at 1106–07 (quoting *United States v. Virginia*, 518 U.S. 515, 531, 533 (1996)).

Plaintiffs argue that the Gender Order violates the Fifth Amendment's guarantee of equal protection because it "purposefully discriminates based on transgender status and it facially classifies based on transgender status and sex."  ECF No. 47 at 36.  They further contend that heightened scrutiny applies and that the funding provisions of the Gender Order fail heightened scrutiny because "directing agencies and federal grantees to" disapprove of transgender people is a

22

"plainly illegitimate purpose[]." *Id.* at 37–38.

The Court finds that Plaintiffs have shown that they are likely to succeed on the merits of their equal protection challenge to the Gender Termination Provision and the Gender Promotion Provision.

### 1.    Heightened Scrutiny

Defendants do not contest that heightened scrutiny applies to discrimination based on transgender status.  Instead, they argue that (1) the Gender Order is merely rhetoric, not discriminatory action; and that (2) the funding provisions of the Gender Order "do not purport to withhold federal funding based on any protected characteristic of the recipients; they merely realign the government's funding of particular *topics*."  ECF No. 61 at 43 (emphasis in original).  This argument is not persuasive.

First, Defendants' argument that the Gender Order is mere "rhetoric" flies in the face of the facts, given that Defendants have already terminated several of Plaintiffs' federal grants pursuant to that order.  SFCHC received a notice from the HHS specifically terminating SFCHC's grant for its Comprehensive High-Impact HIV Prevention Programs for Young Men of Color Who Have Sex With Men and Young Transgender Persons of Color *"in accordance with the [Gender Order]"* effective January 31, 2025.  ECF No. 47-10, Ex. C (emphasis added).[8]  That grant funds "the San Francisco Bay Transgender Alliance for Health Resources (STAHR), a program to reduce and prevent new cases of HIV transmission among young trans people of color (YTPC) and their partners in San Francisco and Alameda Counties in accordance with both the HIV National Strategic Plan and the CDC's High-Impact, Status-Neutral HIV Prevention approach."  ECF No. 47-10 ¶ 5.

Furthermore, Prisma, SFCHC, NY LGBT Center, and SFAF have each received a notice from a government agency informing them that any programs in conflict with the Gender Order and funded by the federal government are immediately and permanently terminated.  *See* ECF

---

[8] On February 12, 2025, SFCHC received a notice that the termination was rescinded pursuant to the temporary restraining order that was issued by a federal district court in Rhode Island.  *See id.*, Ex. D.

United States District Court
Northern District of California

Nos. 47-7, Ex. A; 47-8, Ex. B; 47-10, Ex. B; 77-3, Ex. C.  While the government has apparently added an element of confusion by leaving these grantees to deduce for themselves which particular grants have been terminated, there is no doubt that the actions are not merely rhetorical.

Second, the Gender Order withholds federal funding based on the transgender status of the individuals that grantees serve, rather than based on "topics" as Defendants argue.  To adopt Defendants' cramped reading requires ignoring the plainly intended consequences flowing from the Gender Termination and Gender Promotion Provisions.  As Plaintiffs point out, the Gender Order imposes federal funding restrictions that preclude providing health and social services that "acknowledge the existence of transgender people because doing so in the operation of such programs is considered the 'promotion of gender ideology.'"  ECF No. 64 at 26; *see* Gender Order § 2(f) (defining "gender ideology" as "replac[ing] the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa," and "includ[ing] the idea that there is a vast spectrum of genders that are disconnected from one's sex").  In other words, these orders require grantees, who provide specialized services to transgender persons, to remove references to those persons— as well as the characteristics that caused those persons to need the services in the first place.  It is as difficult to imagine how this would work as it is to imagine a pediatrician not acknowledging the existence of children or a gerontologist denying the existence of the elderly.  The Gender Termination and Gender Promotion Provisions thus collapse content-based discrimination (as Defendants appear to concede) with status-based discrimination by excluding protected communities from receiving federally-funded services.  Take, for example, SFCHC's operation of an emergency shelter designed for transgender and non-binary individuals experiencing homelessness.  *See* ECF No. 47-10 ¶ 12(e).  The Gender Termination and Gender Promotion Provisions would terminate federal grants used for that project but place no similar restrictions on shelters designed to house only cisgender men or cisgender women.  By singling out grants that *serve* transgender people, the Gender Order necessarily singles out *transgender people* and excludes them from being able to benefit from federal funds.

In addition to facially discriminating based on transgender status, the Gender Termination

and Gender Promotion Provisions purposefully discriminate based on transgender status.  "A discriminatory purpose is shown when 'the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Horne*, 115 F.4th at 1103 (quoting *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979)).  Here, the Gender Order's stated purpose is to deny the existence of transgender persons entirely.  *See* Gender Order § 2 ("It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality.").

Accordingly, because the Gender Termination and Gender Promotion Provisions discriminate based on transgender status, both purposefully and on their face, heightened scrutiny applies.  *See Horne*, 115 F.4th at 1102.

### 2.    Governmental Interest

Plaintiffs argue that the Gender Termination Provision and Gender Promotion Provision fail any level of scrutiny because the Gender Order is "transparently motivated by a 'bare desire to harm' transgender people."  ECF No. 47 at 36 (quoting *Romer v. Evans*, 517 U.S. 620, 635 (1996)).  Defendants offer no response in their opposition, nor any argument that either provision advances any legitimate government interest, and thus concede the point.[9]  *See Tyler v. Travelers Com. Ins. Co.*, 499 F. Supp. 3d 693, 701 (N.D. Cal. 2020) ("Plaintiff concedes these arguments by failing to address them in her opposition." (collecting cases)).

Indeed, the Gender Order's express purpose is to disapprove of transgender people and declare their existence as "unmoored from biological facts" and "false."  *See* Gender Order §§ 1, 2(f).  This facially discriminatory objective—achieved here by denying federal funding only to

---

[9] Defendants at hearing argued that it is actually Plaintiffs who waived their arguments here because they did not properly identify the Gender Termination Provision or Gender Promotion Provision as the provisions they were challenging in their opening motion.  The Court finds that while Plaintiffs could have been more explicit, Defendants received reasonable notice that Plaintiffs were primarily challenging those two funding provisions of the Gender Order in their motion.  *See, e.g.*, ECF No. 47 at 34–35 ("Moreover, the Gender Order facially discriminates based on sex. It directs agencies to withhold grants from entities that 'promote gender ideology . . . .'").  Further, Defendants made no attempt to respond to Plaintiffs' argument that the Gender Order advanced no legitimate governmental interest.  Defendants' argument is thus unavailing.

United States District Court
Northern District of California

grantees who recognize the existence of transgender people—is not a legitimate government interest, let alone one that justifies the overt discrimination practiced here. *See Horne*, 115 F.4th at 1108 (finding that a sweeping ban on transgender girls from playing on sports teams did not satisfy heightened scrutiny because the ban was not substantially related to achievement of a legitimate state interest). As one other court considering the Gender Order explained, the Court "cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." *PFLAG II*, 2025 WL 685124, at *23.

Accordingly, the Court finds that the Gender Termination Provision and Gender Promotion Provision do not serve important governmental objectives sufficient to survive heightened scrutiny. Plaintiffs have thus shown that they are likely to succeed on the merits of their equal protection claim.

### B.    First Amendment Claims

The First Amendment prohibits the government from "abridging the freedom of speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I). Ordinarily, "the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of U. Va.*, 515 U.S. 819, 828 (1995). But in the context of federal funding, the government may place attach certain conditions to eligibility for that funding even if those conditions "may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("*AID*"). That is because "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds," *id.*, and the "refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (plurality opinion) (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)). However, there are still limitations on the types of conditions that the government may attach to federal funds without violating the First Amendment.

First, "a funding condition can result in an unconstitutional burden on First Amendment rights" if the condition "seek[s] to leverage funding to regulate speech outside the contours of the

26

program itself." *AID*, 570 U.S. at 214–15.  As noted by the Supreme Court, "conditions that define the federal program and those that reach outside it—is not always self-evident." *Id.* at 217. But where the government "has placed a [speech] condition on the *recipient* of the subsidy rather than on a particular program or service," that condition can violate the First Amendment. *Id.* at 218–19 (quoting *Rust*, 500 U.S. at 197) (emphasis in original).  Furthermore, a funding condition that "is not relevant to the objectives of the program" can also place an unconstitutional burden on First Amendment rights. *See id.* at 214.  This includes where a funding statute has "no programmatic message . . .  to allow the Government to [regulate speech as] deemed necessary for its legitimate objectives . . . ." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001). Importantly, the government "cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *Id.* at 547.

Second, "even in the provision of subsidies, the government may not 'ai[m] at the suppression of dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 550 (1983)).  As recognized by the Ninth Circuit, the line of Supreme Court unconstitutional-conditions cases "teaches that the government can violate the First Amendment by withholding benefits for a censorious purpose . . . ." *Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019) ("The *Speiser-Perry-Regan-Finley* line of cases reflects the Supreme Court's continued cautionary admonition that the First Amendment will not tolerate the administration of subsidy programs with a censorious purpose." (citing *Regan*, 461 U.S. at 548; *Speiser v. Randall*, 357 U.S. 513, 518–19 (1958); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Finley*, 524 U.S. at 587)).

### 1.    Gender Termination, Gender Promotion, and Equity Termination Provisions

Defendants primarily argue that the Funding Provisions "do not seek to regulate a grantee's speech 'outside the contours of' any [] policy initiatives" paid for by the government. ECF No. 61 at 33 (quoting *AID*, 570 U.S. at 218).  Further, they argue that "the government is permitted to have policy priorities, and it does not violate the First Amendment by not

United States District Court
Northern District of California

affirmatively funding programs that do not align with those policies." *Id.*

The Court finds that even if the Funding Provisions apply only to activities paid for by the federal government—rather than to the recipients' private activity[10]—their blanket withholding of funding for all programs that are "equity-related" or that "promote gender ideology" is entirely untethered to any "legitimate objective[]" or "programmatic message" of the programs they burden to justify their intrusion on protected speech. *See Velazquez*, 531 U.S. at 548; *see also AID*, 570 U.S. at 214. Defendants hang their hat on the argument that the Funding Provisions limit Plaintiffs' speech only while they are on the government's dime. But "funding by the Government, even when coupled with the freedom of the fund recipients to speak outside the scope of the Government-funded project, is [not] invariably sufficient to justify Government control over the content of expression." *Rust*, 500 U.S. at 199.

An examination of two relevant unconstitutional conditions cases illustrates why the government's intrusion on speech is not permissible even in the context of federal subsidies. In *Rust*, the Supreme Court upheld regulations that prohibited "counseling, referral, and the provision of information regarding abortion as a method of family planning" because they were "designed to ensure that the limits of the federal program are observed," i.e., that the "Title X program is designed not for prenatal care, but to encourage family planning." *Rust*, 500 U.S. at 193–94. The Court thus reasoned that *Rust* was "not a case of the Government 'suppressing a dangerous idea,' but of a prohibition on a project grantee or its employees from engaging in activities outside of the project's scope." *Id.* Critically, the Court explained, "we have here not the case of a general law singling out a disfavored group on the basis of speech content, but a case of the Government refusing to fund activities, including speech, which are specifically excluded from the scope of the

---

[10] The Court does note that it is unclear whether the provisions could be interpreted to apply to regulating expression outside of the grant-funded activity—for example, an organization's name containing "equity-related" terms or terms that "promote gender ideology" as defined by the Gender Order. Furthermore, Plaintiffs point to Defendant HHS's February 10, 2025, "issuance of a Secretarial Directive to 'avoid[] the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ('DEI') initiatives.'" ECF No. 64 at 16 (quoting ECF No. 64-4 at 1). This directive suggests that the engagement of any DEI activity at all—regardless of whether it's on the government's dime—could make an organization ineligible to receive federal funds.

project funded." *Id.* at 194–95. "The condition that federal funds will be used only to further *the purposes of a grant* does not violate constitutional rights." *Rust v. Sullivan*, 500 U.S. at 198 (emphasis added).

Then, in *Velazquez*, the Supreme Court examined the Legal Services Corporation Act, which established the Legal Services Corporation ("LSC") to distribute federal funds to eligible local grantee organizations for the purpose of providing legal assistance to indigent individuals. 531 U.S. at 536. The Court found unconstitutional under the First Amendment a provision of the Act that prohibited an LSC grantee from representing clients if the grantee challenged the validity of the underlying welfare statutes and regulations. *See id.* at 549. In distinguishing *Rust*, the Court again noted that "Title X did not single out a particular idea for suppression because it was dangerous or disfavored; rather, Congress prohibited Title X doctors from counseling that was outside the scope of the project." *Id.* at 541 (citing *Rust*, 500 U.S. at 194–95). "[A]nd in the context of [the LSC] statute there is no programmatic message of the kind recognized in *Rust* and which sufficed there to allow the Government to specify the advice deemed necessary for its legitimate objectives. This serves to distinguish § 504(a)(16) from any of the Title X program restrictions upheld in *Rust,* and to place it beyond any congressional funding condition approved in the past by this Court." *Id.* at 548.

Here, the Funding Provisions more closely resemble the condition found unconstitutional in *Velasquez*. The Funding Provisions are not directed towards advancing any legitimate objectives embedded within the programs they burden—as appropriated and determined by Congress—but towards disfavored speech. They categorically bar funding for any "equity-related" or "gender ideology" activity or expression, regardless of the scope of the contract or grant in question—including, as discussed below on the Separation of Powers, for contracts and grants that explicitly call for the consideration of equity. As an example, Defendants took the position at hearing that an organization would lose its federal funding if it, in its day-to-day work on within the federally funded program, refers to clients by a pronoun other than Mr., Ms. Mrs., or Miss. They also represented that if an organization is receiving federal funds to provide Covid-19 vaccines, it would not lose that funding for promoting gender ideology on its own dime and time

29

United States District Court
Northern District of California

outside of the vaccination project.  But under Defendants' logic, an organization receiving federal funds to provide public health services—as many of Plaintiffs do—would not be able to refer to the clients they serve under that project by any pronoun that would "promote gender ideology," even when addressing them by such pronouns is pure speech that has no relation to the public health objectives for which the federal grants they receive aim to fund.  So unlike in *Rust*, where the government was merely "refusing to fund activities, including speech, which are specifically excluded from the scope of the project funded"—in that case, promoting family planning—the Funding Provisions "singl[e] out a disfavored group on the basis of speech content" with no specific relation to the program under which they are receiving funds.  *See Rust*, 500 U.S. at 194–95.  And the government "cannot recast a condition on funding as a mere definition of its program [here], lest the First Amendment be reduced to a simple semantic exercise."  *Velazquez*, 531 U.S. at 547.

Moreover, the Funding Provisions also violate the First Amendment by withholding subsidies for a censorious purpose—aiming to suppress the dangerous ideas of "equity," "DEI," and "gender ideology."  *See Koala*, 931 F.3d at 898; *see also Finley,* 524 U.S. at 587 (emphasizing that "even in the provision of subsidies, the government may not 'ai[m] at the suppression of dangerous ideas'").  Indeed, the express purpose of the Gender Order is to root out the "extrem[e]," "false claims" of gender identity that contradict the government's view that there is only one "biological reality of sex."  *See* Gender Order §§ 1, 2(f).  Similarly, the DEI-1 Order aims to eliminate DEI- and equity-related expression that it considers "radical" and "immoral."  *See* DEI-1 Order.  The government here is thus not merely selectively funding some programs but not others—it is rendering ineligible for federal funding *all* activities, speech, and conduct that is even related to the dangerous ideas it has identified.  And it has drawn that line based on viewpoint by targeting only speech that "promote[s] gender ideology" or that advances DEI and equity, while tolerating speech in opposition to those ideas.  This is precisely the kind of "invidious viewpoint discrimination" that the Supreme Court has suggested would present First Amendment concerns even in the context of federal subsidies.  *See Finley*, 524 U.S. at 587 (explaining that the result in *Finley* would likely be different "if the NEA were to leverage its

United States District Court
Northern District of California

power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints"). And the censorious purpose of the Funding Provisions together with their broad application to *all* recipients of federal funding "'prohibit[] a substantial amount of protected speech' relative to [their] 'plainly legitimate sweep,'" to justify the likelihood of success on a facial First Amendment challenge. *United States v. Hansen*, 599 U.S. 762, 770 (2023) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)).

Accordingly, the Court finds that Plaintiffs have shown a likelihood of success on the merits on their First Amendment challenge as to the Gender Termination, Gender Promotion, and Equity Termination Provisions.

### 2.    Certification Provision

Defendants do not dispute that the Certification Provision applies to conduct outside of federally funded programs. Instead, Defendants argue that Plaintiff's First Amendment challenge to the Certification Provision fails because they "have no First Amendment right to violate federal antidiscrimination laws in the first place." ECF No 61 at 34. Defendants also argue that requiring Plaintiffs to sign the Certification Provision for purposes of the False Claims Act does not violate the First Amendment because Plaintiffs would be able to rely on a good-faith defense as to their reasonable interpretation that their conduct does not violate federal antidiscrimination laws. ECF No. 61 at 35.

Plaintiffs counter that despite arguing that the Certification Provision only implicates DEI programs that "violate any applicable Federal anti-discrimination law," the government has not defined what that means and has made clear— through its actions—that it considers *all* DEI programs and initiatives to be unlawful. *See* ECF No. 64 at 17, 19. In other words, Plaintiffs argue that the Certification Provision does not mean what it says. Plaintiffs thus argue that they have no way of knowing whether their activities would be considered legal or illegal DEI. *See id.* at 17, 19, 23.

As evidence, Plaintiffs cite to the language of the DEI Orders and to the government's termination of DEI programs. Plaintiffs assert that the DEI-1 and DEI-2 Orders "categorically refer to 'illegal DEI,' without distinguishing between legal DEI and a subset that is supposedly

unlawful." ECF No. 64 at 22. Further, "in implementing the Orders, Defendants have canceled funding for programs that are even tangentially related to DEIA, without any indication that they have deemed those programs illegal." *Id.* at 23. Plaintiffs also cite to various remarks that President Trump has made, including that he committed to "end all of the Marxist diversity, equity, and inclusion policies across the entire federal government," but also to "ban these unlawful policies from . . . the private sector as well," and that he announced having "ended the tyranny of so-called Diversity, Equity, and Inclusion policies all across the entire federal government and indeed the private sector and our military." ECF No. 64 at 16 (first quoting ECF No. 64-15 and then quoting ECF No. 64-3).

Plaintiffs further cite to the U.S. Attorney General's memorandum interpreting the DEI-2 Order as "making clear that policies relating to 'diversity, equity, and inclusion' ('DEI') and 'diversity, equity, inclusion, and accessibility' ('DEIA') 'violate the text and spirit of our longstanding Federal civil-rights laws' and 'undermine our national unity,'" ECF No. 64 at 22–23 (quoting ECF No. 64-18 at 1). Plaintiffs contend that this memorandum demonstrates that the government interprets all DEI or DEIA policies as violating federal anti-discrimination law. However, the same memorandum goes on to refer specifically to "illegal DEI and DEIA preferences" and clarifies that it "is intended to encompass programs, initiatives, or policies that discriminate, exclude, or divide individuals based on race or sex" and does not prohibit "events that celebrate diversity, recognize historical contributions, and promote awareness without engaging in exclusion or discrimination." ECF No. 64-18 at 1 & n.1.

Although the Court agrees that the government has made little attempt to define the distinction between "legal" and "illegal" DEI, [11] Plaintiffs have not provided sufficient evidence that the government has enforced or plans to enforce the *Certification Provision* in a way that implicates DEI programs beyond those that "violate any applicable Federal anti-discrimination law." Indeed, Plaintiffs cite primarily to examples of the government's *termination* of federally

---

[11] Indeed, Defendants struggled at hearing to provide any examples of DEI activities they would consider legal besides the cultural celebrations referenced in the Attorney General's memorandum. Similarly, they avoided providing any concrete examples of DEI activities that would violate federal antidiscrimination law.

funded DEI programs.  But the provisions of the DEI-1 and DEI-2 Orders directing the termination of DEI and "equity-related" programs do not include the same limiting qualifier as the Certification Provision.  Instead, the termination provisions explicitly call for the termination of *all* federally funded DEI programs, regardless of whether those programs violate antidiscrimination law.  *See* DEI-1 Order § 2(b)(i) (directing each agency, department, or commission head terminate, in relevant part, *all* "'equity-related' grants or contracts"); DEI-2 Order § 3(c)(iii) (directing the Director of the OMB to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate").  The fact that the Certification Provision specifically includes the qualifier limiting the certification requirement to illegal DEI programs, when the DEI-1 and DEI-2 Orders elsewhere do not include that qualifier for termination of funding, suggests that the qualifier was intentional and should be given meaning.  The Court thus agrees with Defendants that the Certification Provision does not "penalize conduct beyond those prohibited by existing antidiscrimination laws."  *See* ECF No. 61 at 30.

Moreover, "'[a]s is true of interpretation of statutes, the interpretation of an Executive Order begins with its text,' which 'must be construed consistently with the Order's 'object and policy.'"  *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1238–39 (9th Cir. 2018) (quoting *Bassidji v. Goe*, 413 F.3d 928, 934 (9th Cir. 2005)).  And the DEI-1 Order begins by stating its purpose as enforcing "[l]ongstanding Federal civil-rights laws [that] protect individual Americans from discrimination based on race, color, religion, sex, or national origin."  DEI-1 Order § 1.  It then discusses how many institutions in recent years have adopted DEI activities "dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that *can* violate the civil-rights laws of this Nation."  *Id.*  The section ends with, "The Federal Government is charged with enforcing our civil-rights laws.  The purpose of this order is to ensure that it does so by ending illegal preferences and discrimination."  *Id.*

Plaintiffs additionally argue that even if the Certification Provision is limited to promoting

United States District Court
Northern District of California

1    "illegal DEI," "it is bedrock First Amendment canon that advocating for violation of the law

2    cannot be proscribed unless it rises to incitement." ECF No. 64 at 18 (citing *Virginia v. Black*,

3    538 U.S. 343, 359 (2003)). But Plaintiffs' argument relies on a construction not supported by a

4    plain reading of the Certification Provision. The Certification Provision directs that every federal

5    contract or grant award include a term "requiring such counterparty or recipient to certify that it

6    does not operate any *programs* promoting DEI that *violate* any applicable Federal anti-

7    discrimination laws." DEI-2 Order § 3(b)(iv)(B). The operative word, "violate," modifies

8    "programs"—rather than "promoting" or "DEI." In other words, the provision implicates the

9    *operation* of programs that both promote DEI and "violate any applicable Federal anti-

10   discrimination laws." And while the First Amendment may protect speech that advocates for

11   violation of law, it does not protect activities that directly violate antidiscrimination law. *See*

12   *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992) ("Where the government does not target

13   conduct on the basis of its expressive content, acts are not shielded from regulation merely

14   because they express a discriminatory idea or philosophy.").

15        The Court therefore finds that Plaintiffs have not demonstrated a likelihood of success on

16   the merits for their First Amendment claim as to the Certification Provision.

17        **C.    Fifth Amendment Due Process**

18        "It is a basic principle of due process that an enactment is void for vagueness if its

19   prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see*

20   *also Williams*, 553 U.S. at 304 (describing vagueness doctrine as "an outgrowth . . . of the Due

21   Process Clause of the Fifth Amendment."). "[C]larity in regulation is essential to the protections

22   provided by the Due Process Clause of the Fifth Amendment." *F.C.C. v. Fox Television Stations,*

23   *Inc.*, 567 U.S. 239, 253 (2012) (citing *United States v. Williams*, 553 U.S. 285, 304 (2008)). The

24   two primary concerns with vague laws are that "(1) they do not give a 'person of ordinary

25   intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly';

26   and (2) they encourage arbitrary and discriminatory enforcement by not providing explicit

27   standards for policemen, judges, and juries." *United States v. Jae Gab Kim*, 449 F.3d 933, 941–42

28   (9th Cir. 2006) (quoting *Grayned*, 408 U.S. at 108). And vague laws that implicate First

Amendment rights "also have the "'potential for arbitrarily suppressing First Amendment liberties.'" *Id.* n.15 (quoting *Shuttlesworth v. City of Birmingham,* 382 U.S. 87, 91 (1965)).

The applicable void-for-vagueness standard thus depends in part on whether "a vague statute abuts upon sensitive areas of basic First Amendment Freedoms." *Grayned*, 408 U.S. at 109 (cleaned up). "Under the First and Fifth Amendments, speakers are protected from arbitrary and discriminatory enforcement of vague standards." *Finley*, 524 U.S. at 588 (citing *NAACP v. Button,* 371 U.S. 415, 432–433 (1963)); *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) (explaining that when a law "interferes with the right of free speech or of association, a more stringent vagueness test should apply").

But "the degree of vagueness that the Constitution [allows] depends in part on the nature of the enactment." *Sessions v. Dimaya,* 584 U.S. 148, 156 (2018) (quoting *Hoffman Estates*, 455 U.S. at 498). For example, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 156 (quoting *Hoffman Estates*, 455 U.S. at 498–99). And when the government awards "selective subsidies," the tolerance for vagueness is even greater because "the consequences of imprecision are not constitutionally severe." *See Finley*, 524 U.S. at 589.

As a preliminary matter, Defendants argue that the void-for-vagueness doctrine does not apply because the Challenged Orders do not regulate primary conduct, and no due process concerns arise "when the President gives his subordinates an unclear directive." *See* ECF No. 61 at 26. Defendants cite no authority for that proposition. Regardless, Defendants' description of the Challenged Orders is incomplete, given that they expressly command action—and various agencies have already taken such action against Plaintiffs pursuant to the Challenged Orders. The vagueness of the remaining Challenged Provisions thus implicates the traditional concerns under the vagueness doctrine, i.e., that they do not give fair notice so that grantees can act accordingly, and they encourage arbitrary and discriminatory enforcement by the implementing agencies. *See Kim*, 449 F.3d at 941–42. And in the context of Plaintiffs' combined First Amendment arguments, the vague provisions also risk "arbitrarily suppressing First Amendment liberties." *Shuttlesworth,* 382 U.S. at 91.

Defendants further contend that Plaintiffs' facial vagueness challenges fail because "the appropriate posture for Due Process vagueness challenges is as-applied," and that facial challenges are reserved for criminal laws or civil statutes involving severe penalties that implicate liberty interests. ECF No. 61 at 26–27. That statement of the law is incomplete: "[i]n the First Amendment context, facial vagueness challenges are appropriate if the statute clearly implicates free speech rights." *California Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149 (9th Cir. 2001); *see also Kashem v. Barr*, 941 F.3d 358, 375 (9th Cir. 2019) (only "[v]agueness challenges to statutes that do not involve First Amendment violations must be examined as applied to the defendant") (quoting *United States v. Kim*, 449 F.3d 933, 942 (9th Cir. 2006)); *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) ("Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand."); *Isaacson v. Mayes*, 84 F.4th 1089, 1098–99 (9th Cir. 2023) (rejecting "district court's suggestion that . . . vagueness challenges, cannot be reviewed before enforcement" because the court must "decide whether the harm is sufficiently likely so that the litigant need not wait until the harm occurs")

Because Plaintiffs raise combined Fifth and First Amendment challenges, there is no categorical bar preventing Plaintiffs from raising a facial challenge to the vagueness of the remaining Challenged Provisions. Moreover, Plaintiffs bring both facial and as-applied challenges. *See* ECF No. 64 at 21–22.

### 1.    Equity Termination Provision

The Court finds that Plaintiffs are likely to succeed on the merits of their claim that the Equity Termination Provision is impermissibly vague under the Fifth Amendment. The Equity Termination Provision directs the head of each agency to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts." DEI-1 Order § 2(b)(i). The vagueness of the term "'equity-related' grants or contracts" invites arbitrary and discriminatory enforcement and does not provide sufficient notice to grantees as to what types of speech or activity they must avoid to prevent termination of their grants or contracts—compelling grantees and grant applicants to "steer far too clear of [the] 'forbidden area'" of anything related to the broad and undefined term of "equity." *Cf. Finley*, 524 U.S. at 588.

United States District Court
Northern District of California

The Supreme Court case *National Endowment for the Arts v. Finley* provides a useful counterpoint.  In *Finley*, the plaintiff raised a facial challenge under the First and Fifth Amendments to language in the National Foundation on the Arts and Humanities Act.  *See* 524 U.S. at 569.  The Act provided that the Chairperson of the National Endowment for the Arts, in establishing procedures to judge the artistic merit of grant applications, shall ensure that "artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public."  *Id.* at 572 (quoting 20 U.S.C. § 954(d)(1)).  The plaintiff challenged the portion of the Act directing the grantor to "tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public."  *Id.* (quoting 20 U.S.C. § 954(d)(1)).  Because the challenged statute in *Finley* dealt with the "competitive process according to which [art] grants [were] allocated," *id.* at 586, wherein grantees would be selected based on "artistic excellence and artistic merit," the Supreme Court reasoned that the challenged language "merely adds some imprecise considerations to an already subjective selection process," *id.* at 590.  The Supreme Court thus ultimately held that the statute was not unconstitutionally vague because while "[t]he terms of the provision are undeniably opaque," it was unlikely "that speakers will be compelled to steer too far clear of any 'forbidden area' in the context of grants of this nature."  *Id.* at 588–89.

Here, the Court finds that the Equity Termination Provision *is* likely to compel speakers to "steer too far clear of [a] 'forbidden area'" of protected speech and activity.  *Finley*, 524 U.S. at 588.  Indeed, it is hard to imagine an Executive Order vaguer in its command (providing that agencies *shall* terminate any grant or contract for being "equity-related") or broader in its facial scope (applying to *all* federal grants and contracts).

First, whereas the vague language in *Finley* was only another factor to be considered in an inherently subjective evaluation alongside "artistic excellence and artistic merit," the Equity Termination Provision renders categorically ineligible for funding any contract or grant based on the single determination of whether it is "equity-related" without any guidelines as to what that term may mean.  *See Finley*, 524 U.S. at 581, 583–84 (noting that the challenged text "imposes no

categorical requirement" and instead operates as "advisory language" with "the vague exhortation to 'take [decency] into consideration'"). The Equity Termination Provision is vague here not because "it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Indeed, the DEI-1 Order does not define what "equity" or "equity-related" means at all. And the government has avoided offering any concrete definition of the term—taking the position at hearing that it need not put forward *any* definition. This lack of definition is particularly problematic given the broad nature and applications of the term "equity," let alone with the additional modifier of "-related." "Equity," could mean (1) "fairness or justice in the way people are treated;" (2) "freedom from disparities in the way people of different races, genders, etc. are treated;" or (3) "something that is equitable." Equity, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/equity (last visited May 7, 2025). To give just one example, surely many federal grants expressly fund programs about fairness. But the Equity Termination Provision could reasonably cover any grantee activity or speech about fairness in the treatment of others, as well as that acknowledging the import or mere existence of gender, inequality, race, age, disability, sexuality, socioeconomic status, religion, or citizenship.

"[T]his lack of clarity may operate to inhibit the exercise of freedom of expression because individuals will not know whether the ordinance allows their conduct, and may choose not to exercise their rights for fear of being . . . punished." *Hunt v. City of Los Angeles*, 638 F.3d 703, 713 (9th Cir. 2011); *see also Baggett v. Bullitt*, 377 U.S. 360, 372–73 (1964) (finding that the challenged statute was unconstitutionally vague because it required individuals to take vague oaths that would require the oath-taker to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked") (internal quotation marks omitted). Indeed, the uncertainty created by the Equity Termination Provision has left grantees to interpret for themselves which of their awarded grants even fall under the scope of the provision. *See* ECF No. 47-7 ¶ 35; *see also id.*, Ex. A; ECF No. 47-8, Ex. A; ECF No. 47-10, Ex. A; ECF No. 77-4, Ex. D. But even after undertaking these efforts, the vagueness of the Equity Termination Provision prevents grantees from determining how they can modify their expression to avoid termination or

from even assessing which grants are implicated.  Could a Plaintiff's very organizational name, if it attempts to promote the inclusion of certain identities, (such as the Gay Lesbian Bisexual Transgender Historical Society) trigger the Equity Termination Provision as "equity-related" and cause all their federal grants or contracts to be terminated?  Plaintiffs and similar organizations are left to wonder.

Second, the Equity Termination Provision applies with maximum scope—terminating funding for *all* federal grants and contracts, including future awards and those that already have been awarded.  Whereas *Finley* dealt with a statute whose "mandate is to make esthetic judgments" and which involved an "inherently content-based 'excellence' threshold," *Finley*, 524 U.S. at 586, the Equity Termination Provision risks chilling First Amendment speech and activity across *all* federal grants and contracts regardless of the statutory mandates from which they arise. *See id.* at 569, 589–90 (noting that while the challenged language of the Act may cause artists to "conform their speech to what they believe to be the decisionmaking criteria in order to acquire funding," this was common in "the context of selective subsidies" where government programs award scholarships and grants on the basis of subjective criteria such as "excellence").  As discussed in the Court's First Amendment analysis, the Equity Termination Provision's broad sweep—applying uniformly with no regard to the objectives of any individual grant or contract— makes its intrusion upon First Amendment rights particularly pernicious and likely to chill a "substantial amount of protected speech" relative to its legitimate purposes. *See United States v. Stevens*, 559 U.S. 460, 473–481 (2010).  In other words, the vague categorically prohibition set out in the Equity Termination Provision creates an enormous "forbidden area" of speech (across all federally funded grants or contracts) that grantees must steer clear of—all without any guidance as to how they can do so.

Accordingly, the Court finds that Plaintiffs are likely to succeed on the merits of their Fifth Amendment vagueness challenge—both facial and as-applied—to the Equity Termination Provision. *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543–44 (N.D. Cal. 2020) (finding that an Executive Order provision conditioning federal funds on the "recipient's certification that it will not use federal funds to 'promote' [divisive concepts,

39

United States District Court
Northern District of California

1    including] . . . that "an individual, by virtue of his or her race or sex, is inherently racist, sexist, or

2    oppressive, whether consciously or unconsciously" because the provision was "so vague that it is

3    impossible for Plaintiffs to determine what conduct is prohibited").

4    **2.    Gender Termination Provision and Gender Promotion Provision**

5    The Gender Termination Provision provides that agencies "shall take all necessary steps,

6    as permitted by law, to end the Federal funding of gender ideology."  Gender Order § 3(e).

7    Similarly, the Gender Promotion Provision states, "Federal funds shall not be used to promote

8    gender ideology.  Each agency shall assess grant conditions and grantee preferences and ensure

9    grant funds do not promote gender ideology."  Gender Order § 3(g).  Critically, unlike the Equity

10   Termination Provision, the Gender Order provides a definition of the key phrase "gender

11   ideology."  "Gender ideology" is defined in the order as "replac[ing] the biological category of sex

12   with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males

13   can identify as and thus become women and vice versa," and "includ[ing] the idea that there is a

14   vast spectrum of genders that are disconnected from one's sex."  Gender Order § 2(f).

15   A plain reading of these provisions thus suggests that they are aimed at prohibiting federal

16   funding used to "promote" ideas of "self-assessed gender identity," i.e., that "there is a vast

17   spectrum of genders that are disconnected from one's sex."  At hearing, Plaintiffs contended that

18   the term "promote" makes the provisions unconstitutionally vague because it does not sufficiently

19   explain which activities would constitute "promoting gender ideology"—for example, referring to

20   their transgender patients by their pronouns, asking patients for their gender identities, or even

21   generally providing services to transgender people at all.  But the Gender Order as a whole offers

22   greater determinacy to what the plain term "promote" means in the context of the two challenged

23   provisions.  To be specific, the Gender Order stands in opposition to the principle that persons can

24   identify as other than strictly male or female, or that persons may have a gender identity different

25   from their biological sex as classified at birth.  Plaintiffs appear to attach this same meaning to the

26   Gender Termination Provision and the Gender Promotion Provision.  In their reply brief, they

27   write:

28   The Gender Order requires agencies to "ensure grant funds do not

40

1

2

3

4

> *promote gender ideology*" and "*to end the Federal funding of*
> *gender ideology*," which it defines as the recognition that a person
> may have a gender identity that differs from their birth sex. Gender
> Order §§ 2(f), 3(e), (g) (emphasis added). At their core, the Gender
> Order and its implementing agency actions seek to prohibit
> transgender people from accessing federally funded healthcare and
> social services if such services are provided in a way that
> acknowledges and respects their identities.

5    ECF No. 64 at 25.[12]  Plaintiffs thus appear to be able to construe the general application of the

6    term "promote gender ideology."  And "the mere fact that close cases can be envisioned [does not]

7    render[] a statute vague."  *United States v. Williams*, 553 U.S. 285, 305 (2008).  The Court thus

8    finds that the Gender Termination Provision and Gender Promotion Provision are not so vague

9    that their "prohibitions are not clearly defined."  *See Grayned*, 408 U.S. at 108.  Accordingly,

10   Plaintiffs have not shown that they are likely to succeed on the merits on their Fifth Amendment

11   challenge as to the Gender Termination Provision and Gender Promotion Provision.

### 3.    Certification Provision

12

13           Defendants argue that Plaintiffs' vagueness challenge to the Certification Provision fails

14   because the provision applies only to conduct that violates existing federal antidiscrimination law

15   and does not penalize any new conduct, so Plaintiffs "have no legitimate concern that they will not

16   be given a '"reasonable opportunity to know what is prohibited.""  ECF No. 61 at 30 (quoting

17   *Grayned*, 408 U.S. at 108).  Plaintiffs primarily make the same arguments as in their First

18   Amendment challenge to the Certification Provision—arguing that an "ordinary person has no

19   way of knowing whether their expression relating to DEI satisfies Defendants' conception of

20   'legal' DEI where Defendants refuse to explain the distinction between 'legal' and 'illegal' DEI."

21   ECF No. 64 at 23.

22           For the reasons discussed above, the Court does not now find that the Certification

23   Provision implicates DEI activities beyond those described in its express text, i.e., DEI programs

24   that "violate any applicable Federal anti-discrimination law."  While the term "DEI" is undefined

25   and vague, the limiting qualifier implicating only DEI programs that "violate any applicable

26   Federal anti-discrimination law" is sufficiently defined because it incorporates by reference the

27

28   _____

     [12] Defendants do not attempt to define these terms in their opposition brief.

United States District Court
Northern District of California

body of existing federal law.  As another court examining the Certification Provision has noted, "[i]f Plaintiffs worry that this administration takes a broader view of what counts as illegal discrimination, that is a concern with the interpretation of the underlying federal antidiscrimination law—which Plaintiffs do not challenge—rather than the Certification Provision. . . . Plaintiffs may contest whether their DEI programs fall within the scope of that law if they ever face an enforcement action connected to the Certification Provision."  *Nat'l Urb. League v. Trump*, 2025 WL 1275613, at *24; *see also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189, ECF No. 29 at 7 (4th Cir. Mar. 14, 2025) (Harris, J., concurring) (finding that the Certification Provision does not "purport to establish the illegality of all efforts to advance [DEI]," and instead applies "only to conduct that violates existing federal anti-discrimination law"); *but see CWIT II*, 2025 WL 1114466, at *11 (finding that the Certification Provision's limitation to only "*illegal* DEI programs" was "left entirely to the grantee's imagination" because the government did not provide any meaningful definition as to what it meant for a DEI program to violate federal anti-discrimination law).  Without clearer evidence that the Executive intends to enforce the Certification Provision to target all legal DEI activity, Plaintiffs' challenge is more appropriately considered in a post-enforcement posture.

Because the Court concludes that Plaintiffs are unlikely to succeed in their claim that the Gender Termination Provision, Gender Promotion Provision, and Certification Provision are unconstitutionally vague, the Court need not address arguments regarding whether Plaintiffs hold an underlying property right to their grants or liberty interest in their reputations.  *See CWIT II*, 2025 WL 1114466, at *16.

### D.    Separation of Powers

Plaintiffs assert both facial and as-applied challenges under the Separation of Powers against the remaining Challenged Provisions.  Plaintiffs argue that the Challenged Provisions "improperly usurp Congress's spending power by directing that grants or contracts authorized by Congress be cancelled based on conditions not set by Congress."  ECF No. 64 at 29.  Defendants respond that Plaintiffs cannot satisfy the requirement under a facial challenge that the Challenged Provisions are unconstitutional in all of their applications. ECF No. 61 at 39–40.

"The President's authority to act 'must stem either from an act of Congress or from the Constitution itself.'" *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). "[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233–34 (9th Cir. 2018) (quoting *id.* at 637 (Jackson, J., concurring)). Instead, the President has an affirmative obligation to enforce the law relating to appropriations. *Id.* at 1234. "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *Id.* at 1235. "To bring a successful facial challenge outside the context of the First Amendment, 'the challenger must establish that no set of circumstances exists under which the [challenged law] would be valid.'" *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 971 (9th Cir. 2003) (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987).

### 1.    Facial Challenge

The Court finds that Plaintiffs have not carried their burden of showing that the remaining Challenged Provisions violate Separation-of-Powers principles in all of their applications. Defendants correctly identify at least two circumstances implicated by the Challenged Provisions where the Executive has discretion to act without seeking Congressional approval. First, the Challenged Provisions apply to both federal grants and contracts. And the Executive has "broad" discretion to "terminate a contract for convenience." *Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622, 626 (2000) (citation omitted). Second, at least some of the federal grants implicated here may, under the terms of the applicable regulations, be terminated by the Executive if the grant "award no longer effectuates the program goals or agency priorities." *See, e.g.*, ECF No. 58-3 (quoting 2 C.F.R. § 200.340(a)(2)). Each of the remaining Challenged Provisions thus involve at least some contracts and grants that can properly be terminated without violating the Spending Clause. *See Chicago Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 1114466, at *16–17 (N.D. Ill. Apr. 14, 2025) (finding that because the Equity Termination Provision impacts grant statutes "that do not require the government to fund equity-related projects, . . . there are situations in which the Executive Branch could lawfully terminate such grants without running afoul of the separation of powers").

Plaintiffs' reliance on *City and County of San Francisco v. Trump*, does not warrant a different result.  There, the Ninth Circuit found that an executive order directing the Attorney General and Secretary of the Department of Homeland Security to make "sanctuary jurisdictions" ineligible to receive federal grants violated the Spending Clause and Separation of Powers.  *Id.*, 897 F.3d at 1235.  But that case involved grants that were specifically appropriated for the plaintiff jurisdictions.  And "to condition the States' receipt of federal funds, [Congress] 'must do so unambiguously . . . , enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation," due to federalism principles.  *S. Dakota v. Dole*, 483 U.S. 203, 207 (1987).  Whereas here, the grants received by Plaintiffs were appropriated by Congress for more general purposes and to be allocated by the implementing agencies, including with terms (as discussed above) that give the Executive discretion to terminate at least in some instances.  Accordingly, Plaintiffs have not sufficiently demonstrated that they are likely to succeed in their facial Separation of Powers challenge.

## 2.    As-Applied Challenge/Conflict with Statutory Requirements

Plaintiffs' as-applied Separation of Powers challenge essentially collapses with their claim that the Equity Termination Provision, Gender Termination Provision, and Gender Promotion Provision are *ultra vires* because they are contrary to the statutes identified by Plaintiffs.  Plaintiffs argue that the Equity Termination Provision conflicts with the following funding statutes under which Plaintiffs receive funding: (1) Ryan White Program; (2) the Housing Opportunities for People with AIDS ("HOPWA") program; and (3) the statutory framework governing Federally Qualified Health Centers ("FQHCs").  The Court agrees.

First, the Ryan White Program provides that for the purpose of "address[ing] the disproportionate impact of HIV/AIDS on, and the disparities in access, treatment, care, and outcomes for, racial and ethnic minorities," there are specifically appropriated funds for which the Secretary "*shall* develop a formula for the awarding of grants . . . that ensures that *funding is provided based on the distribution of populations disproportionately impacted* by HIV/AIDS."  42 U.S. Code § 300ff-121(a) (emphases added).  By directing the termination of all "'equity-related' grants or contracts," the Equity Termination Provision runs headlong into the Ryan White

Program's statutory mandate—as a distribution of funds to populations based on how they were disproportionately impacted is a classic example of "equitable" distribution. *See CWIT II*, 2025 WL 1114466, at *17–18 (finding that the Equity Termination Provision likely violated the separation of powers when applied to plaintiff's grant under the Women in Apprenticeship and Nontraditional Occupations Act, in which Congress explicitly stated that the Executive "'*shall*' award grants for projects impacting women (quoting 29 U.S.C. § 2503(a) (emphasis in original))).

Second, under the subsection entitled "[a]ffirmative outreach," HOPWA regulations provide that a "grantee or project sponsor must adopt procedures to ensure that all persons who qualify for the assistance, regardless of their race, color, religion, sex, age, national origin, familial status, or handicap, know of the availability of the HOPWA program." 24 C.F.R. § 574.603(b). While HOPWA's requirement here *could* lead to a grantee adopting procedures in such a way that prioritizes outreach based on equitable principles, it is not clear to the Court that a grantee *must* adopt procedures in exactly that fashion to satisfy HOPWA's regulations. However, because Defendants do not respond to this specific argument, they have waived it and conceded the point. *See Tyler*, 499 F. Supp. 3d at 701.

Third, the statutory framework for FQHCs, which applies to Plaintiffs SFCHC and LA LGBT Center, mandates them as receivers of federal funding to provide medical care to "medically underserved populations" and specific minority groups facing systemic barriers to healthcare access. *See* 42 U.S.C. § 254b(a)(1). Furthermore, Congress has directly appropriated funds for providing healthcare services to specific minority populations under the FQHC program—a core "equity-related" purpose. *See* 42 U.S.C. § 254c-1 (providing that the HHS Secretary "shall provide grants to, or enter into contracts with, public or private nonprofit agencies that have demonstrated experience in serving the health needs of Pacific Islanders living in the Territory of American Samoa, the Commonwealth of Northern Mariana Islands, the Territory of Guam, the Republic of the Marshall Islands, the Republic of Palau, and the Federated States of Micronesia" and that such grants "shall be used, among other items . . . to continue, as a priority, the medical officer training program in Pohnpei, Federated States of Micronesia"); *see also* 42 U.S.C. § 254c-3 (providing that the HHS Secretary "shall make grants for providing services for

United States District Court
Northern District of California

the prevention and treatment of diabetes" through the Indian Health Service, an Indian health program operated by an Indian tribe or tribal organization, or an urban Indian health program operated by an urban Indian organization). The Equity Termination Provision thus also conflicts with the statutory framework providing federal funding to FQHCs.

Plaintiffs further argue that because the Gender Order's termination provisions facially discriminate based on transgender status—and thus sex—they violate the antidiscrimination requirements contained within the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, and the Public Health Service Act ("PHSA"), 42 U.S.C. § 300w-7. Section 1557 of the ACA provides that an individual shall not, among other things, "be excluded [on the basis of sex under Title IX, 20 U.S.C. 1681 et seq.] from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). Section 1908 of the PHSA similarly prohibits discrimination on the basis of sex in programs, services, and activities "receiving Federal financial assistance" through Preventive Health and Health Services Block Grants, which are allotted by the HHS Secretary. *See* 42 U.S.C. § 300w-7.

For the reasons explained in the Court's discussion on Plaintiffs' equal protection claim, the Gender Termination Provision and Gender Promotion Provision contravene the antidiscrimination requirements within the ACA and PHSA. *See Bostock v. Clayton County*, 590 U.S. 644, 660 (2020) (holding in the context of Title VII that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex"); *see also Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) ("We construe Title IX's protections consistently with those of Title VII."); *PFLAG II*, 2025 WL 510050, at *18 (finding that the plaintiff was likely to succeed on its claim that the Gender Promotion Provision was *ultra vires* as contrary to statutes because it was "facially discriminatory on the basis of transgender identity" and therefore on the basis of sex and thus violated Section 1557 of the ACA and Section 1908 of the PHSA); *C.P. v. Blue Cross Blue Shield of Ill.*, No. 3:20-CV-06145-RJB, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022) ("Section 1557 [of the ACA] forbids sex discrimination based on transgender status.").

46

Defendants do not explicitly argue that the Funding Provisions do not conflict with the statutory frameworks identified above but rather that they "do not unequivocally compel agencies to improperly withhold congressionally appropriated funds" and instead only "provide general directives to agencies to align government funding with policy priorities while explicitly directing them to yield to any and all applicable laws before terminating any grant/contact." ECF No. 61 at 40–41. So, Defendants argue, the qualifiers "to the maximum extent allowed by law" in the Equity Termination Provision and "as permitted by law" in the Gender Termination Provision operate as applicable savings clauses. Essentially, Defendants argue that if Plaintiffs are correct that an applicable statute bars the termination of their grants, then the Equity Termination Provision "would instruct agencies to yield to the statutory and regulatory mandates and refrain from terminating those grants." ECF No. 61 at 42. In making this argument, Defendants rely heavily on the D.C. Circuit's decision in *Building and Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002).

In *Allbaugh*, the D.C. Circuit considered an executive order which barred any federal agency, "to the extent permitted by law," from requiring or prohibiting contractors or bidders from entering into a labor agreement. *Id.* at 29. The D.C. Circuit found that because the executive order limited agencies' power "to the extent permitted by law," the order did not infringe on Congress's spending power, as it only "instruct[ed] . . . agenc[ies] to follow the law." *Id.* at 33. The court concluded that "[t]he mere possibility that some agency might make a legally suspect decision . . . does not justify an injunction against enforcement of a policy." *Id.*

However, the Ninth Circuit has distinguished the application of *Allbaugh* in a case more similar to the one at hand. In *City and County of San Francisco v. Trump*, the Ninth Circuit found that the executive order directing the Attorney General and Secretary of the Department of Homeland Security to make "sanctuary jurisdictions" ineligible to receive federal grants "to the extent consistent with law" "unambiguously command[ed] action" and hence created more than a "mere possibility that some agency might make a legally suspect decision." 897 F.3d at 1240 (quoting *Allbaugh*, 295 F.3d at 33). The court thus distinguished *Allbaugh* and found that the order's savings clause "does not and cannot override [the executive order's] meaning." *Id.* "If

47

United States District Court
Northern District of California

1   'consistent with law' precludes a court from examining whether the Executive Order is consistent

2   with law," the court explained, "judicial review [would be] a meaningless exercise, precluding

3   resolution of the critical legal issues" and leading the court into "an intellectual cul-de-sac."  *Id.*

4           Here, as in *City and County of San Francisco*, the Equity Termination Provision, Gender

5   Termination Provision, and Gender Promotion Provision all "unambiguously command[] action,"

6   *see id.* at 1240, by expressly requiring agencies and departments to terminate all "'equity-related'

7   grants or contracts," "end the Federal funding of gender ideology," and "ensure grant funds do not

8   promote gender ideology."  *See* DEI-1 Order § 2(b)(i); Gender Order § 3(e); Gender Order § 3(g).

9   Indeed, agencies have already begun terminating grants or contracts pursuant to these

10  provisions—even though such terminations conflict with the statutory requirements cited above.

11  *See, e.g.*, ECF No. 47-10, Ex. C; ECF No. 57 ¶¶ 5–16; ECF No. 77 ¶¶ 3–11.  The Court thus

12  rejects Defendants' argument that the provisions here merely provide general directives to

13  agencies and direct them to yield to all applicable laws before terminating any grant or contract.

14  *See PFLAG II*, 2025 WL 685124, at *18 (finding that the Gender Promotion Provision's savings

15  clause did not override its plain meaning and stated purpose of "unlawfully restrict[ing] federal

16  funding without congressional authorization") (citing *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th

17  Cir. 2021) and *City & Cnty. of San Francisco*, 897 F.3d at 1240); *see also CWIT II*, 2025 WL

18  1114466, at *17–18 (finding that the Equity Termination Provision's savings clause did not

19  immunize the provision from contravening the WANTO Act's prescriptions).

20          Accordingly, the Court finds that Plaintiffs have demonstrated a likelihood of success on

21  their claim that the Equity Termination Provision violates the Separation of Powers as applied to

22  the grants Plaintiffs receive under the Ryan White Program, under the HOPWA program, and as

23  FQHCs.  And Plaintiffs have demonstrated a likelihood of success on their claim that the Gender

24  Termination Provision and Gender Promotion Provision violate the Separation of Powers by

25  contravening the antidiscrimination provisions of the ACA and PHSA.

26  **V.    IRREPARABLE HARM**

27          As the Court found in its analysis on the merits, Plaintiffs have demonstrated that the

28  Gender Promotion, Gender Termination, and Equity Termination Provisions likely violate the

48

1    equal protection rights of Plaintiffs and their clients as well as Plaintiffs' constitutional rights

2    under the First and Fifth Amendments.

3           That means that Plaintiffs have also made a sufficient showing of irreparable harm that

4    would result from enforcement of those provisions, as it is "well established that the deprivation of

5    constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872

6    F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

7    This is particularly true when the First Amendment is implicated, because the "loss of First

8    Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

9    injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *New York Times Co. v. United States*,

10   403 U.S. 713 (1971)).

11          Furthermore, enforcement of the Gender Termination Provision and Gender Promotion

12   Provision prevents Plaintiffs from being able to effectively serve their transgender patients and

13   clients.  Without an injunction against those provisions, Plaintiffs' patients and clients will suffer

14   irreparable harm in being deprived vital healthcare services.  *See Washington*, 2025 WL 659057,

15   at *26

16   **VI.    BALANCE OF THE HARMS AND PUBLIC INTEREST**

17          "Where the government is a party to a case in which a preliminary injunction is sought, the

18   balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41

19   (9th Cir. 2020).  To begin, the Ninth Circuit has consistently recognized that "it is always in the

20   public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at

21   1002 (internal quotations omitted).  Furthermore, as discussed above, Plaintiffs have established

22   specific operational harms that they have suffered and will continue to suffer absent an injunction.

23   Defendants mainly argue that granting an injunction here would disable the Executive from being

24   able to implement the President's priorities and chill agency action because agencies "may feel

25   obligated to forgo pursuing legally permissible actions in furtherance of the President's policy

26   priorities—independent of the Executive Orders—for fear of risking contempt."  ECF No. 61 at

27   46.

28          The Court finds that the balance of harms and public interest weigh in favor of issuing an

United States District Court
Northern District of California

49

injunction.  The injunction requested here would not prevent the Executive from taking any number of lawful actions to implement the President's priorities, including promulgating regulations, proposing legislation, or taking litigation positions.  The problem here is that three of the Challenged Provisions attempt to implement those priorities in ways that are inconsistent with the Constitution and existing statutes.  Defendants thus do not suffer harm from being unable to enforce those unlawful provisions.  And any potential "chill" on agency action is speculative at this stage and does not outweigh the strong public interest in upholding the rule of law and Plaintiffs' constitutional rights.  *See Washington*, 2025 WL 509617, at *14; *see also PFLAG II*, 2025 WL 510050, at *23.

## VII.    SCOPE OF INJUNCTION

Plaintiffs request a preliminary injunction enjoining the Agency Defendants[13] from enforcing the Challenged Provisions against them.  The Court thus grants a preliminary injunction barring Agency Defendants from enforcing the Gender Termination Provision, Gender Promotion Provision, and Equity Termination Provision against Plaintiffs.

Separately, the Court rejects Defendants' request that the Court "clarify that it does not prohibit the President from reissuing a different directive or Executive Order and does not limit the defendant agencies from taking actions pursuant to their legal authority to regulate in furtherance of the substantive policy priorities in the Executive Orders," ECF No. 61 at 48, because those questions are not properly before the Court.

## VIII.   BOND

Rule 65(c) provides that the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P 65(c).  But "[d]espite the seemingly mandatory language, 'Rule 65(c)

---

[13] Defendants DOJ; Attorney General Pamela Bondi; DOL; Acting Labor Secretary Vince Micone; OFCCP; Acting OFCCP Director Michael Schloss; OMB; OMB Director Russell Vought; HHS; HHS Secretary Robert K. Kennedy, Jr.; HUD; HUD Secretary Scott Turner; NARA; Deputy Archivist William J. Bosanko; NEH; and NEH Chair Shelly C. Lowe.

United States District Court
Northern District of California

United States District Court
Northern District of California

invests the district court 'with discretion as to the amount of security required, *if any.*'"

*Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday,* 320 F.3d 906, 919 (9th Cir. 2003)) (emphasis in original).  The District Court thus "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* (quoting *Jorgensen,* 320 F.3d at 919).  Here, because the Court finds Plaintiffs likely to succeed on the merits of their claims as to the three enjoined provisions, the Court does not find that a preliminary injunction is likely to pose any harm to Defendants by preventing them from enforcing those unlawful provisions.  Furthermore, waiving bond is particularly appropriate here where Plaintiffs are nonprofit organizations suing in large part because they are suffering monetary harm from the unlawful provisions of the Challenged Orders that have withheld federal funding critical to their everyday operations.  *See Miller v. Carlson*, 768 F. Supp. 1331, 1340 (N.D. Cal. 1991) (explaining that courts have waived bond to avoid denying access to judicial review).

The Court therefore orders Plaintiffs to post a nominal bond in the amount of $1,000.00. *See Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999), *supplemented,* 236 F.3d 1115 (9th Cir. 2001).

## IX.    REQUEST FOR STAY

Defendants request that the Court stay its preliminary injunction pending the disposition of any appeal filed, or in the alternative, administratively stay the injunction "for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized."  *See* ECF No. 61 at 48–49.

As a threshold matter, Defendants' request is procedurally improper. *See* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion.").  But regardless, as the Court has found that *Plaintiffs* are likely to succeed on the merits relating to the three enjoined provisions, the Court denies Defendants' request for a stay.  *See Manrique v. Kolc*, 65 F.4th 1037, 1040 (9th Cir. 2023) (providing that one of the primary factors considered for whether a stay should be issued is whether the applicant for the stay has "made a strong showing that he is likely to succeed on the merits" (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009))); *see also Washington v.*

*Trump*, No. 25-807, 2025 WL 553485, at *3 (9th Cir. Feb. 19, 2025).  Moreover, Defendants have not carried their burden of showing that they are likely to face "irreparable injury . . . during the period before the appeal is decided."  *See Doe #1 v. Trump*, 957 F.3d 1050, 1058–59 (9th Cir. 2020).

Similarly, the Court denies Defendants' request for an administrative stay.  The purpose of an administrative stay is to "preserve the status quo until the substantive motion for a stay pending appeal can be considered on the merits."  *See Nat'l Urban League v. Ross*, 977 F.3d 698, 700–01 (9th Cir. 2020).  Because the Court has found that a preliminary injunction is necessary precisely to alter the status quo and address the irreparable harm that Plaintiffs face absent an injunction, an administrative stay is not appropriate here.

## CONCLUSION

The Court grants, in part, Plaintiffs' motion for a  preliminary injunction consistent with the discussion in this Order.  The Court will enter a separate preliminary injunction order. Plaintiffs are directed to file a proposed preliminary injunction order, and submit a Word version of the same to the to the Court's proposed order email address, by June 13, 2025.

**IT IS SO ORDERED.**

Dated:  June 9, 2025



_____
JON S. TIGAR
United States District Judge